Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC WHITE, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BROOGE ENERGY LIMITED F/K/A BROOGE HOLDINGS LIMITED F/K/A TWELVE SEAS INVESTMENT COMPANY, NICOLAAS L. PAARDENKOOPER, SALEH YAMMOUT, SYED MASOOD ALI, BURGESE VIRAF PAREKH, LINA SAHEB, DIMITRI ELKIN, NEIL RICHARDSON, STEPHEN N. CANNON, and PAUL DITCHBURN,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Plaintiff Eric White ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Brooge Energy Limited ("Brooge" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Brooge securities between November 25, 2019 and December 21, 2023 inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b), and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged

misstatements entered and the subsequent damages took place in this judicial district.

5.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.    Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Brooge securities during the Class Period and was economically damaged thereby.

7.    Brooge is incorporated in the Cayman Islands, and its principal executive offices are located at Opus Tower A, 1002, Business Bay, Dubai, United Arab Emirates. Brooge operates through its subsidiary, Brooge Petroleum and Gas Investment Company FZE ("BPGIC Subsidiary"), which was formed under the laws of the Fujairah Free Zone, United Arab Emirates, and conducts its business out of an oil storage facility in Fujairah, United Arab Emirates. After the SPAC Merger (defined below), Brooge went by the name "Brooge Holdings Limited", until April 2020.

8.    On December 20, 2019, Brooge went public through a SPAC merger (the "SPAC Merger" or the "Transaction") which entailed the following set of mergers between Twelve Seas Investment Company, which then changed its name to BPGIC International ("Twelve Seas"), Brooge Holdings Limited (the Company changed its name to "Brooge Energy Limited" in April 2020), BPGIC Subsidiary, and a merger sub created for the purpose of facilitating the SPAC Merger:

The board of directors of Twelve Seas Investment Company, a Cayman Islands exempted company ("Twelve Seas") has unanimously approved the Business Combination Agreement, dated as of April 15, 2019 (the "Business

2

Combination Agreement"), by and among Twelve Seas, Brooge Holdings Limited, a Cayman Islands exempted company ("Pubco"), Brooge Merger Sub Limited, a Cayman Islands exempted company and a wholly owned subsidiary of Pubco ("Merger Sub"), Brooge Petroleum And Gas Investment Company FZE, a company formed under the laws of the Fujairah Free Zone, UAE ("BPGIC") and the shareholder of BPGIC who has become a party thereto (the "Seller"), *which, among other things, provides for (i) the Merger of Merger Sub with Twelve Seas*, with Twelve Seas surviving the Merger and the security holders of Twelve Seas becoming security holders of Pubco, (ii) upon the effectiveness of such Merger, the exchange of 100% of the outstanding ordinary shares of BPGIC by the Seller for Ordinary Shares of Pubco (collectively, the "Business Combination") and (iii) the adoption of Pubco's amended and restated memorandum and articles of association. As a result of and upon consummation of the Business Combination, *each of Twelve Seas and BPGIC will become a wholly owned subsidiary of Pubco, as described in this proxy statement/prospectus and Pubco will become a new public company owned by the prior shareholders of Twelve Seas and the prior shareholder of BPGIC*.

Pursuant to the Business Combination Agreement, upon the consummation of the Business Combination (i) each outstanding ordinary share of Twelve Seas will be converted into one Ordinary Share of Pubco, (ii) each outstanding Warrant of Twelve Seas will be converted into one warrant of Pubco that entitles the holder thereof to purchase one Ordinary Share of Pubco in lieu of one ordinary share of Twelve Seas and otherwise upon substantially the same terms and conditions, and (iii) each outstanding Right of Twelve Seas will be exchanged for one-tenth of an Ordinary Share of Pubco.

(Emphasis added).

9.      The above-detailed SPAC Merger was executed on or about December 23, 2019.

10.     Brooge common shares trade on the NASDAQ exchange under the ticker symbol "BROG".

11.     Defendant Nicolaas L. Paardenkooper ("Paardenkooper") served as Brooge's Chief Executive Officer ("CEO") and Chairman of the Board of Directors, from once the SPAC Merger was consummated until December 8, 2022.

3

Prior to the SPAC Merger, he was the CEO of BPGIC Subsidiary and Legacy Brooge.

12.     Defendant Lina Saheb served as the Company's interim CEO from December 8, 2022 until August 8, 2023.

13.     Defendant Paul Ditchburn ("Ditchburn") has served as the Company's Chief Financial Officer ("CFO") since December 2022.

14.     Additionally, after Defendant Saheb resigned from the Company on August 8, 2023, an "Office of the Chief Executive Officer" was formed to temporarily provide for Company leadership while the Company searches for a new CEO. Defendant Ditchburn serves in this group role along with Defendant Yammout.

15.     Defendant Saleh Yammout ("Yammout") was the CFO of BPGIC Subsidiary at the time of the SPAC Merger and held the role until April 27, 2020. He joined Brooge in October 2018. He currently serves as a non-executive Director and in the Office of the Chief Executive Office.

16.     Defendant Syed Masood Ali (also referred to as "Syed Masood" in certain of the Company's filings) ("Syed") served as Brooge's CFO from April 27, 2020 until April 28, 2022.

17.     Defendant Burgese Viraf Parekh ("Parekh") has served as the Company's CFO since April 28, 2022. Parekh previously worked from 2018 to 2022 as Brooge's finance manager.

18.     Defendant Neil Richardson ("Richardson") was Twelve Seas' Chairman at the time of the SPAC Merger.

19.     Defendant Dimitri Elkin ("Elkin") was Twelve Seas' CEO at the time of the SPAC Merger.

20.     Defendant Stephen N. Cannon ("Cannon") was Twelve Seas' CFO at the time of the SPAC Merger.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

21.     Defendants Paardenkooper, Yammout, Syed Masood Ali, Parekh, Saheb, Elkin, Richardson, Cannon, and Ditchburn are collectively referred to herein as the "Individual Defendants."

22.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

23.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

24.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Brooge under *respondeat superior* and agency principles.

25.     Defendant Brooge and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

5

**Materially False and Misleading Statements Issued During the Class Period**

26.    On November 25, 2019, Twelve Seas filed with the SEC its definitive proxy on SEC Form Schedule 14A (the "Proxy") to solicit votes for its December 19, 2019 Special Meeting to approve the planned merger with the then-private Brooge Holdings Limited ("Legacy Brooge").

27.    The Proxy contained the following table purporting to show Legacy Brooge's 2018 Revenues:

**STATEMENT OF COMPREHENSIVE INCOME**

|  | Year ended December 31 | | 6-month period ended June 30 | |
| --- | --- | --- | --- | --- |
|  | 2017 (Restated) | 2018 | 2018 | 2019 |
|  | *(USD)* | *(USD)* | *(USD)* | *(USD)* |
| Revenue | 89,593 | 35,839,268 | 13,796,112 | 22,042,687 |
| Direct costs | (2,295,809) | (9,607,360) | (4,765,900) | (4,955,436) |
| **Gross (loss) profit** | **(2,206,216)** | **26,231,908** | **9,030,212** | **17,087,251** |
| General and administrative expenses | (574,266) | (2,029,260) | (1,048,846) | (1,236,507) |
| Finance costs | (966,926) | (6,951,923) | (3,318,895) | (3,412,843) |
| Change in fair value of derivative financial instruments | — | (1,190,073) | — | (484,603) |
| **(Loss) profit and total comprehensive (loss) income for the year/period** | **(3,747,408)** | **16,060,652** | **4,662,471** | **11,953,298** |

28.    This statement was materially false and misleading at the time it was made because, as Defendants knew, Legacy Brooge's revenue for 2018 was materially lower than $35,289,268.

29.    The Proxy contained the following risk disclosure:

> ***Following the consummation of the Business Combination, Pubco's only significant asset will be its ownership of BPGIC and affiliates and such ownership may not be sufficient to pay dividends or make distributions or obtain loans to enable Pubco to pay any dividends on its Ordinary Shares or satisfy other financial obligations.***

6

Following the consummation of the Business Combination, Pubco will be a holding company and will not directly own any operating assets other than its ownership of interests in BPGIC. Pubco will depend on BPGIC for distributions, loans and other payments to generate the funds necessary to meet its financial obligations, including its expenses as a publicly traded company and to pay any dividends. The earnings from, or other available assets of, BPGIC may not be sufficient to make distributions or pay dividends, pay expenses or satisfy Pubco's other financial obligations.

30.    This statement was materially false and misleading because it understated the risks the post-SPAC entity faced considering that Legacy Brooge (through BPGIC Subsidiary) was engaging in an accounting fraud designed to inflate the Company's revenues.

31.    The Proxy contained the following risk disclosure:

*Fluctuations in operating results, quarter to quarter earnings and other factors, including incidents involving BPGIC's customers and negative media coverage, may result in significant decreases in the price of Pubco securities post-Business Combination.*

The stock markets experience volatility that is often unrelated to operating performance. These broad market fluctuations may adversely affect the trading price of Pubco securities post-Business Combination and, as a result, there may be significant volatility in the market price of Pubco securities post-Business Combination. *If BPGIC is unable to operate profitably as investors expect, the market price of Pubco securities post-Business Combination will likely decline when it becomes apparent that the market expectations may not be realized*. In addition to operating results, many economic and seasonal factors outside of Pubco's or BPGIC's control could have an adverse effect on the price of Pubco securities post-Business Combination and increase fluctuations in its quarterly earnings. These factors include certain of the risks discussed herein, operating results of other companies in the same industry, changes in financial estimates or recommendations of securities analysts post-Business Combination, speculation in the press or investment community, negative media coverage or risk of proceedings or government investigation, the possible effects of war, terrorist and other hostilities, adverse weather conditions, changes in general conditions in the economy or the financial markets or other developments affecting the oil and gas storage industry.

7

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

(Emphasis added).

32.    This statement was materially false and misleading because it understated the risk of Brooge's risk of being unable to operate profitably, given that Legacy Brooge was engaging in accounting fraud at the time the Proxy was filed with the SEC.

33.    The "BPGIC Related Party Transactions and Policies" section of the Proxy stated the following about Al Brooge International Advisory LLC ("BIA"):

> The Phase I & II Customer, Al Brooge International Advisory LLC is partially owned by Mrs. Hind Muktar. Mrs. Hind Muktar will also be a limited partner of H Capital International LP and the sole shareholder of Gyan Investments Limited, the general partner of H Capital International LP. The Phase I Customer Agreement provides for Al Brooge International Advisory LLC to lease all 14 Phase I storage tanks for a fixed fee per cubic meter per month payable in advance on a monthly basis. The Phase I Customer Agreement also provides that Al Brooge International Advisory LLC shall pay BPGIC a fixed fee per cubic meter per month for product throughput with a supplementary fee per metric ton of throughput in excess of agreed volume, a fixed blending fee per cubic meter per month, a fixed inter tank transfer fee per cubic meter per month, and a fixed heating fee of per cubic meter per month. Further, BPGIC is entitled to pass through any tariffs, additional charges or fees imposed by the Port of Fujairah. BPGIC is entitled to review and seek to amend the fees every two years. This adjustment can result only in the fees remaining constant or increasing. BPGIC believes that the terms of this agreement are no less favorable to BPGIC than would result from a similar transaction with an unaffiliated third party. Al Brooge International Advisory LLC is only allowed to sublease the Phase I storage tanks with BPGIC's prior approval. H Capital International LP is a minority stakeholder in BPGIC and following a planned sale of Mrs. Muktar's shares in Al Brooge International Advisory LLC, Al Brooge International Advisory LLC will no longer be a related party.

34.    This statement was materially false and misleading because it understated Brooge's relationship with BIA, and did not disclose that BIA had no

8

1  meaningful business operations aside from helping Brooge engage in accounting

2  fraud.

3      35.    On November 27, 2020, the Company filed with the SEC its amended

4  annual report on Form 20-F/A for the year ended December 31, 2019 (the "2019

5  Annual Report"). Attached to the 2019 Annual Report were certifications pursuant

6  to the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Paardenkooper

7  and Syed attesting to the accuracy of financial reporting, the disclosure of any

8  material changes to the Company's internal control over financial reporting, and

9  the disclosure of all fraud.

10     36.    The 2019 Annual Report contained the following chart:

| | 2019 (Restated) $ | 2018 $ | 2017 $ |
|---|---|---|---|
| Revenue | 44,085,374 | 35,839,268 | 89,593 |
| Direct costs | (10,202,465) | (9,607,360) | (2,295,809) |
| **GROSS PROFIT** | **33,882,909** | **26,231,908** | **(2,206,216)** |
| | | | |
| Listing expenses | (101,773,877) | - | - |
| General and administrative expenses | (2,608,984) | (2,029,260) | (574,266) |
| Finance costs | (5,730,535) | (6,951,923) | (966,926) |
| Change in estimated fair value of derivative warrant liabilities | 1,273,740 | - | - |
| Changes in fair value of derivative financial instruments | (328,176) | (1,190,073) | - |

22     37.    This statement was materially false and misleading at the time it was

23  made because, as Defendants knew, Brooge's revenue for 2019 was materially

24  lower than $44,085,374.

25     38.    The 2019 Annual Report contained the following statement about

26  BIA:

27      ***BPGIC is currently reliant on Al Brooge International Advisory LLC for***

28      ***the majority of its revenues and any material non-payment or non-***

*performance by Al Brooge International Advisory LLC would have a material adverse effect on BPGIC's business, financial condition and results of operations.*

Phase I of the BPGIC Terminal consists of 14 oil storage tanks with an aggregate geometric oil storage capacity of approximately 0.399 million $m^3$ and related infrastructure ("**Phase I**"). On December 12, 2017, BPGIC entered into a five-year lease and service agreement (the "**Phase I End User Agreement**") with an international energy trading company (the "**Initial Phase I End User**"). BPGIC's revenues historically depended solely on the fees it received pursuant to the Phase I End User Agreement which were comprised of (i) a monthly fixed fee to lease BPGIC's Phase I storage capacity (regardless of whether the Initial Phase I End User used any storage capacity) and (ii) monthly variable fees based on the Initial Phase I End User's usage of the following ancillary services: throughput, blending, heating and inter-tank transfers.

In August 2019, with the approval of the Initial Phase I End User, BPGIC restructured its relationship with the Initial Phase I End User by entering into a four-year lease and offtake agreement (the "**Phase I Customer Agreement**") with Al Brooge International Advisory LLC ("**BIA**"), for the Phase I facility. After entering the Phase I Customer Agreement, BIA assumed BPGIC's rights and obligations under the Phase I End User Agreement. Subsequently, in May 2020, BIA agreed to release 129,000 $m^3$ of the Phase I capacity, amounting to approximately one third of the total Phase I capacity, back to BPGIC. BPGIC leased this capacity to, Totsa Total Oil Trading SA (the "**Super Major**"), for a 6 month period (the "**Super Major Agreement**") subject to renewal for an additional 6 month period with the mutual agreement of the parties.

Accordingly, a majority of BPGIC's revenues for the immediate future are expected to consist of the fees it receives pursuant to the Phase I Customer Agreement which are comprised of (i) a monthly fixed fee to lease approximately two thirds of BPGIC's Phase I storage capacity (regardless of whether BIA uses any storage capacity) and (ii) monthly variable fees based on BIA's, or its sublessees', usage of the following ancillary services: throughput, blending, heating and inter-tank transfers.

The terms of the Phase I Customer Agreement allow BIA to sublease, subject to BPGIC's prior approval, the use of Phase I's facilities. In 2020,

10

BIA subleased the use of the Phase I facility to multiple international and regional end users. Under the Phase I Customer Agreement, BIA still retains the obligation to pay any outstanding amounts due, including if a sublessee were to fail to make any payments owed to it. There can be no assurance that in the event of a non-payment by one or more of the Phase I end users, of amounts owed to BIA, that BIA would honor its obligation to pay any outstanding amounts due to BPGIC.

39.     This statement was materially false and misleading because BIA did not ever actually store any oil with Brooge, and engaged in a complicated set of back and forth transactions with Brooge to make it appear that BIA was paying Brooge, when it was not.

40.     The 2019 Annual Report contained the following in its section on related party transactions:

BIA was partially owned by Mrs. Hind Muktar. Mrs. Hind Muktar is also a limited partner of H Capital International LP and the sole shareholder of Gyan Investments Limited, the general partner of H Capital International LP.

The Phase I Customer Agreement provides for BIA to lease approximately two thirds of the total storage capacity of the Phase I facility for a fixed fee per cubic meter per month payable in advance on a monthly basis. The Phase I Customer Agreement also provides that BIA shall pay BPGIC a fixed fee per cubic meter per month for product throughput with a supplementary fee per metric ton of throughput in excess of agreed volume, a fixed blending fee per cubic meter per month, a fixed inter tank transfer fee per cubic meter per month, and a fixed heating fee per cubic meter per month. Further, BPGIC is entitled to pass through any tariffs, additional charges or fees imposed by the Port of Fujairah. BPGIC is entitled to review and seek to amend the fees every two years. This adjustment can result only in the fees remaining constant or increasing. The Company and BPGIC believe that the terms of this agreement are no less favorable to BPGIC than would result from a similar transaction with an unaffiliated third party. BIA is only allowed to sublease the Phase I storage tanks with BPGIC's prior approval. H Capital International LP is a minority stakeholder in BPGIC *and after sale of Mrs. Muktar's shares in BIA, BIA is no longer a related party*.

The Phase II Customer Agreement provides for BIA to lease all eight Phase II storage tanks for a fixed fee per cubic meter per month payable in advance on a monthly basis. The Phase II Customer Agreement also provides that BIA shall pay BPGIC a fixed fee per cubic meter per month for product throughput with a supplementary fee per metric ton of throughput in excess of agreed volume, a fixed blending fee per cubic meter per month, a fixed inter tank transfer fee per cubic meter per month, and a fixed heating fee per cubic meter per month. Further, BPGIC is entitled to pass through any tariffs, additional charges or fees imposed by the Port of Fujairah. BPGIC is entitled to review and seek to amend the fees every two years. This adjustment can result only in the fees remaining constant or increasing. The Company and BPGIC believe that the terms of this agreement are no less favorable to BPGIC than would result from a similar transaction with an unaffiliated third party. ***BIA is only allowed to sublease the Phase II storage tanks with BPGIC's prior approval. H Capital International LP is a minority stakeholder in BPGIC and after sale of Mrs. Muktar's shares in BIA, BIA is no longer a related party***.

The Refinery Agreement provides that BIA and BPGIC will use their best efforts to finalize the technical and design feasibility studies for the BIA Refinery, a refinery with a capacity of 25,000 bpd. The parties further agreed to negotiate, within 30 days, the Refinery Operations Agreement, a sublease agreement and a joint venture agreement to govern the terms on which BPGIC will sublease land to BIA to locate, BIA will construct, and BPGIC will operate the refinery. Due to the COVID-19 pandemic, the parties agreed to extend the period for their negotiations until August 4, 2020. BPGIC and BIA are still negotiating the Refinery Operations Agreement, however BPGIC expects that BIA will finance and arrange the development, construction and commissioning of a modular refinery on a parcel of BPGIC's remaining unutilized land and will pay an ancillary service fee in connection with any ancillary services it uses. BPGIC believes that the terms of this agreement will be no less favorable to BPGIC than would result from a similar transaction with an unaffiliated third party. ***H Capital International LP is a minority stakeholder in BPGIC and following a planned sale of Mrs. Muktar's shares in BIA, BIA is no longer be a related party.***

(Emphasis added).

12

41.     The statements in paragraph 40 were materially false and misleading because they understated the extent to which BIA was a related party to Brooge. Specifically, Brooge representatives opened bank accounts on behalf of BIA, and BIA conducted no meaningful business operations other than a series of fraudulent transactions designed to create the illusion that Brooge was incurring significant revenues when in fact, BIA never used Brooge's services or actually paid it.

42.     The 2019 Annual Report contained the following statement on the Company's internal controls:

***In connection with the preparation of the Company's consolidated financial statements as of and for the years ended December 31, 2017, 2018 and 2019, the Company and its independent registered public accounting firm identified two material weaknesses in the Company's internal control over financial reporting, one related to lack of sufficient skilled personnel and one related to lack of sufficient entity level and financial reporting policies and procedures.***
Prior to the consummation of the Business Combination, the Company was neither a publicly listed company, nor an affiliate or a consolidated subsidiary of, a publicly listed company, and it has had limited accounting personnel and other resources with which to address its internal controls and procedures. Effective internal control over financial reporting is necessary for it to provide reliable financial reports and, together with adequate disclosure controls and procedures, are designed to prevent fraud.

In connection with the preparation and external audit of the Company's financial statements as of and for the years ended December 31, 2017 and December 31, 2018, the Company and our auditors, noted material weaknesses in the Company's internal control over financial reporting. The Public Company Accounting Oversight Board has defined a material weakness as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's financial statements will not be prevented or detected on a timely basis.

The material weaknesses identified were (1) a lack of sufficient skilled personnel with requisite IFRS and SEC reporting knowledge and experience

13

and (2) a lack of sufficient entity level and financial reporting policies and procedures that are commensurate with IFRS and SEC reporting requirements. These material weaknesses remain as of December 31, 2019.

The Company was not required to perform an evaluation of internal control over financial reporting as of December 31, 2019, December 31, 2018 or December 31, 2017 in accordance with the provisions of the Sarbanes-Oxley Act. Had such an evaluation been performed, additional control deficiencies may have been identified by the Company's management, and those control deficiencies could have also represented one or more material weaknesses.

The Company's auditors did not undertake an audit of the effectiveness of its internal controls over financial reporting. The Company's independent registered public accounting firm will not be required to report on the effectiveness of their respective internal controls over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act of 2002 until the Company's first annual report on Form 20-F following the date on which it ceases to qualify as an "emerging growth company," which may be up to five full fiscal years following the date of the Closing. The process of assessing the effectiveness of the Company's internal control over financial reporting may require the investment of substantial time and resources, including by members of the Company's senior management. As a result, this process may divert internal resources and take a significant amount of time and effort to complete. In addition, the Company cannot predict the outcome of this determination and whether the Company will need to implement remedial actions in order to implement effective control over financial reporting. If in subsequent years the Company is unable to assert that the Company's internal control over financial reporting is effective, or if the Company's auditors express an opinion that the Company's internal control over financial reporting is ineffective, the Company could lose investor confidence in the accuracy and completeness of their financial reports, which could have a material adverse effect on the price of the Company's securities. Since the date of the Original Form 20-F, the Company has implemented measures to address the material weaknesses, including (i) hiring personnel with relevant public reporting experience, (ii) conducting training for Company personnel with respect to IFRS and SEC financial reporting requirements and (iii) engaging a third party to prepare standard operating procedures for the Company. In this regard, the Company has, and will need to continue to, dedicate internal resources, recruit

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

personnel with public reporting experience, potentially engage additional outside consultants and adopt a detailed work plan to assess and document the adequacy of their internal control over financial reporting. This has, and may continue to, include taking steps to improve control processes as appropriate, validating that controls are functioning as documented and implementing a continuous reporting and improvement process for internal control over financial reporting.

43.     This statement was materially false and misleading because it materially understated the extent of the Company's internal controls issues.

44.     On April 6, 2021, the Company filed with the SEC its amended annual report on Form 20-F/A for the year ended December 31, 2020 (the "2020 Annual Report"). Attached to the 2020 Annual Report were certifications pursuant to SOX signed by defendants Paardenkooper and Syed attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

45.     The 2020 Annual Report contained the following chart:

### Selected Financial Information

| | 2020 $ | 2019 (Restated) $ | 2018 $ | 2017 $ |
|---|---|---|---|---|
| Revenue | 41,831,537 | 44,085,374 | 35,839,268 | 89,593 |
| Direct costs | (12,944,760) | (10,202,465) | (9,607,360) | (2,295,809) |
| GROSS PROFIT (LOSS) | 28,886,777 | 33,882,909 | 26,231,908 | (2,206,216) |
| Listing expenses | - | (101,773,877) | - | - |
| General and administrative expenses | (6,456,884) | (2,608,984) | (2,029,260) | (574,266) |
| Finance costs | (8,306,150) | (5,730,535) | (6,951,923) | (966,926) |
| Change in estimated fair value of derivative warrant liabilities | 2,547,542 | 1,273,740 | - | - |
| Changes in fair value of derivative financial instruments | (340,504) | (328,176) | (1,190,073) | - |
| Other Income | 828,332 | - | - | - |

46.     This statement was materially false and misleading at the time it was made because, as Defendants knew, Brooge's revenue for 2020 was materially lower than $41,831,537.

15

47.    The 2020 Annual Report contained the following in its section on related party transactions:

BIA was partially owned by Mrs. Hind Muktar who is also a limited partner of H Capital International LP and the sole shareholder of Gyan Investments Limited, the general partner of H Capital International LP.

The Phase I Customer Agreement provides for BIA to lease approximately two thirds of the total storage capacity of the Phase I facility for a fixed fee per cubic meter per month payable in advance on a monthly basis. The Phase I Customer Agreement also provides that BIA shall pay BPGIC a fixed fee per cubic meter per month for product throughput with a supplementary fee per metric ton of throughput in excess of agreed volume per year, a fixed blending fee per cubic meter per month, a fixed inter tank transfer fee per cubic meter per month, and a fixed heating fee per cubic meter per month. Further, BPGIC is entitled to pass through any tariffs, additional charges or fees imposed by the Port of Fujairah. BPGIC is entitled to review and seek to amend the fees every two years. This adjustment can result only in the fees remaining constant or increasing. The Company believes that the terms of this agreement are no less favorable to BPGIC than would result from a similar transaction with an unaffiliated third party. BIA is only allowed to sublease the Phase I storage tanks with BPGIC's prior approval. *H Capital International LP is a minority shareholder in the Company, and following the sale of Mrs. Muktar's shares in BIA, BIA is no longer a related party*.

The Phase II Customer Agreement provides for BIA to lease all eight Phase II storage tanks for a fixed fee per cubic meter per month payable in advance on a monthly basis. The Phase II Customer Agreement also provides that BIA shall pay BPGIC a fixed fee per cubic meter per month for product throughput in excess of agreed volume, a fixed blending fee per cubic meter per month, a fixed inter tank transfer fee per cubic meter per month, and a fixed heating fee per cubic meter per month. Further, BPGIC is entitled to pass through any tariffs, additional charges or fees imposed by the Port of Fujairah. BPGIC is entitled to review and seek to amend the fees every two years. This adjustment can result only in the fees remaining constant or increasing. The Company believes that the terms of this agreement are no less favorable to BPGIC than would result from a similar transaction with an unaffiliated third party. BIA is only allowed to sublease the Phase II storage tanks with BPGIC's prior approval. *H Capital International LP is*

16

*a minority shareholder in the Company, and following the sale of Mrs. Muktar's shares in BIA, BIA is no longer a related party*.

The Refinery Agreement provides that BIA and BPGIC will use their best efforts to finalize the technical and design feasibility studies for the BIA Refinery, a refinery with a capacity of 25,000 b/d. The parties further agreed to negotiate, within 30 days, the Refinery Operations Agreement, a sublease agreement and a joint venture agreement to govern the terms on which BPGIC will sublease land to BIA to locate, BIA will construct, and BPGIC will operate the refinery. The parties have agreed to extend the period for their negotiations until the Second Quarter of 2021. BPGIC and BIA are still negotiating the Refinery Operations Agreement, however BPGIC expects that BIA will finance and arrange the development, construction and commissioning of a modular refinery on a parcel of BPGIC's remaining unutilized land and will pay an ancillary service fee in connection with any ancillary services it uses. The Company and BPGIC believe that the terms of this agreement will be no less favorable to BPGIC than would result from a similar transaction with an unaffiliated third party. *H Capital International LP is a minority shareholder in BPGIC, and following the sale of Mrs. Muktar's shares in BIA, BIA is no longer a related party*.

(Emphasis added).

48.     The statements in paragraph 47 were materially false and misleading because they understated the extent to which BIA was a related party to Brooge. Specifically, Brooge representatives opened bank accounts on behalf of BIA, and BIA conducted no meaningful business operations other than a series of fraudulent transactions designed to create the illusion that Brooge was incurring significant revenues when in fact, BIA never used Brooge's services or actually paid it.

49.     The 2020 Annual Report contained the following statement on the Company's internal controls:

*In connection with the preparation of the Company's consolidated financial statements as of and for the years ended December 31, 2017, 2018, 2019 and 2020, the Company and its independent registered public accounting firm identified two material weaknesses in the Company's internal control over financial reporting, one related to lack of sufficient*

17

*skilled personnel and one related to lack of sufficient entity level and financial reporting policies and procedures.*

Prior to the consummation of the Business Combination, the Company was neither a publicly listed company, nor an affiliate or a consolidated subsidiary of, a publicly listed company, and it has had limited accounting personnel and other resources with which to address its internal controls and procedures. Effective internal control over financial reporting is necessary for the Company to provide reliable financial reports and, together with adequate disclosure controls and procedures, are designed to prevent fraud. In connection with the preparation and external audit of the Company's financial statements as of and for the years ended December 31, 2017, 2018, 2019 and 2020, the Company and our auditors, noted material weaknesses in the Company's internal control over financial reporting. The SEC defines a material weakness as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's financial statements will not be prevented or detected on a timely basis.

The material weaknesses identified were (i) a lack of sufficient skilled personnel with requisite IFRS and SEC reporting knowledge and experience and (ii) a lack of sufficient entity level and financial reporting policies and procedures that are commensurate with IFRS and SEC reporting requirements. During the year 2020, the Company took the steps below to minimize the effects of both these material weaknesses:

- The Company appointed a new chief financial officer and other finance personnel with relevant public reporting experience and also conducted trainings for new employees with respect to IFRS and SEC reporting requirements; and
- The Company appointed a third party consultant to prepare the processes of financial reporting and help the Company to implement them, and the consultant is in the final stages of finalizing the processes.

In this regard, the Company has, and will need to continue to, dedicate internal resources, recruit more personnel with public reporting experience,

18

potentially engage additional outside consultants and adopt a detailed work plan to assess and document the adequacy of its internal control over financial reporting. This has, and may continue to, include taking steps to improve control processes as appropriate, validating that controls are functioning as documented and implementing a continuous reporting and improvement process for internal control over financial reporting.

The Company's auditors did not undertake an audit of the effectiveness of its internal control over financial reporting. The Company's independent registered public accounting firm will not be required to report on the effectiveness of the Company's internal control over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act until the Company's first Annual Report on Form 20-F following the date on which it ceases to qualify as an "emerging growth company," which may be up to five full fiscal years following the date of the Company's initial sale of common equity pursuant to a registration statement declared effective under the Securities Act. The process of assessing the effectiveness of the Company's internal control over financial reporting may require the investment of substantial time and resources, including by members of the Company's senior management. As a result, this process may divert internal resources and take a significant amount of time and effort to complete. In addition, the Company cannot predict the outcome of this determination and whether the Company will need to implement remedial actions in order to implement effective control over financial reporting. If in subsequent years the Company is unable to assert that the Company's internal control over financial reporting is effective, or if the Company's auditors express an opinion that the Company's internal control over financial reporting is ineffective, the Company could lose investor confidence in the accuracy and completeness of its financial reports, which could have a material adverse effect on the price of the Company's securities.

50.     This statement was materially false and misleading because it materially understated the extent of the Company's internal controls issues, as well as overstated the effectiveness of the Company's remediation efforts.

51.     Due to the extent of the Company's issues, it never actually filed a 2021 Annual Report on Form 20-F with the SEC. On April 27, 2022, the Company filed a late filing notice on Form NT 20-F, and then an amended late filing notice on Form NT 20-F/A on May 3, 2022.

19

52.    On April 26, 2023, the Company filed with the SEC its amended annual report on Form 20-F for the year ended December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual Report were certifications pursuant to SOX signed by defendants Saheb and Ditchburn attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

53.    Three amendments were filed to the 2022 Annual Report on May 1, 2023, May 2, 2023, and May 2, 2023, respectively, in order to add exhibits to the 2022 Annual Report.

54.    The 2022 Annual Report contained the following statement regarding an SEC Investigation:

*The Company is currently the subject of an investigation by the staff of the SEC.*

***The Company is currently the subject of an investigation by the staff of the SEC concerning issues related to the Company's prior revenue recognition and financial reporting practices and disclosures, its prior systems of internal controls, and certain of its past dealings with or communications to previous independent auditors*.** Among other things, the SEC investigation concerns matters identified during an internal examination performed at the instance of the Company's Audit Committee, ***which produced certain preliminary findings that caused the Company to withdraw reliance on its previously-issued financial statements for certain earlier periods*.**

As noted, the SEC investigation is ongoing. ***The Company is currently unable to predict with any reasonable degree of certainty whether the investigation will lead to claims by the SEC against the Company or any of its present or former personnel.*** The Company is also unable to predict with any reasonable degree of certainty the likelihood of a favorable or unfavorable outcome if any claims are asserted by the SEC related to these matters.  Further, the Company is unable to predict with any reasonable degree of certainty the likelihood of a favorable or unfavorable outcome if the SEC does assert such claims, or the precise character of any potential

findings against or sanctions imposed on the Company to the extent the investigation produces an enforcement proceeding that results in an unfavorable outcome.

(Emphasis added).

55.     This statement was materially misleading because it understated the degree of the Company's culpability, considering that the Company had fabricated revenues, lied to its auditors, and lied to the SEC during its investigation.

56.     The 2022 Annual Report contained the following statement on the Company's internal controls:

*In connection with the preparation of the Company's consolidated financial statements as of and for the years ended December 31, 2019, 2020, 2021 and 2022, the Company and its independent registered public accounting firm identified two material weaknesses in the Company's internal control over financial reporting, one related to lack of sufficient skilled personnel and one related to lack of sufficient entity level and financial reporting policies and procedures.*

Prior to the consummation of the Business Combination, the Company was neither a publicly listed company, nor an affiliate or a consolidated subsidiary of, a publicly listed company, and it has had limited accounting personnel and other resources with which to address its internal controls and procedures. Effective internal control over financial reporting is necessary for the Company to provide reliable financial reports and, together with adequate disclosure controls and procedures, are designed to prevent fraud.

In connection with the preparation and external audit of the Company's financial statements as of and for the years ended December 31, 2019, 2020, 2021 and 2022, the Company and our auditors, noted material weaknesses in the Company's internal control over financial reporting. The SEC defines a material weakness as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's financial statements will not be prevented or detected on a timely basis.

The material weaknesses identified were (i) a lack of sufficient skilled personnel with requisite IFRS and SEC reporting knowledge and experience and (ii) a lack of sufficient entity level and financial reporting policies and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

procedures that are commensurate with IFRS and SEC reporting requirements. During the years 2020, 2021, and 2022, the Company took the steps below to minimize the effects of both these material weaknesses:

- The Company appointed a new chief financial officer and other finance personnel with relevant public reporting experience and also conducted trainings for new employees with respect to IFRS and SEC reporting requirements; and
- The Company appointed a third party consultant to prepare the processes of financial reporting and help the Company to implement them.

In this regard, the Company has, and is continuing to, dedicate internal resources, training their personnel with public reporting experience, and ensure that outside consultants adopted a detailed work plan to assess and document the adequacy of its internal control over financial reporting. This has, and may continue to, include taking steps to improve control processes as appropriate, validating that controls are functioning as documented and implementing a continuous reporting and improvement process for internal control over financial reporting.

The Company's auditors did not undertake an audit of the effectiveness of its internal control over financial reporting. The Company's independent registered public accounting firm will not be required to report on the effectiveness of the Company's internal control over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act until the Company's first Annual Report on Form 20-F following the date on which it ceases to qualify as an "emerging growth company," which may be up to five full fiscal years following the date of the Company's initial sale of common equity pursuant to a registration statement declared effective under the Securities Act. The process of assessing the effectiveness of the Company's internal control over financial reporting may require the investment of substantial time and resources, including by members of the Company's senior management. As a result, this process may divert internal resources and take a significant amount of time and effort to complete. In addition, the Company cannot predict the outcome of this determination and whether the Company will need to implement remedial actions in order to implement effective control over financial reporting. If in subsequent years the Company is unable to assert that the Company's internal control over financial reporting is effective, or if the Company's auditors express an opinion that the Company's internal control over financial reporting is

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ineffective, the Company could lose investor confidence in the accuracy and completeness of its financial reports, which could have a material adverse effect on the price of the Company's securities.

57.     This statement was materially false and misleading because it materially understated the extent of the Company's internal controls issues, as well as overstated the effectiveness of the Company's remediation efforts.

58.     The statements contained in ¶¶ 26, 27, 29, 31, 33, 35, 36, 38, 40, 42, 44, 45, 47, 49, 52, 54, and 56 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Brooge materially overstated its revenues because it never received any revenues from BIA, as well as another fictitious customer; (2) Brooge engaged in a complex pattern of payments with BIA to create the illusion of revenues from BIA and another customer that had no knowledge of the fraud; (3) Brooge intentionally lied to its auditors and the Securities and Exchange Commission about its fraudulent activities; (4) Brooge lacked internal controls; and (5) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**THE TRUTH BEGINS TO EMERGE**

59.     On December 22, 2023, the SEC posted a release on its website entitled "SEC Charges UAE-Based Brooge Energy and Former Executives with Fraud." Attached to this release was an order instituting cease-and-desist proceedings, pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-And-Desist Order (the "SEC Order" or the "Order").

23

60.    The SEC Order provided more context and detail on the restated revenue figures that the Company first announced in its 2022 Annual Report. The restated figures, as stated in the Order, were as follows:

|  | 2018 | 2019 | 2020 |
|---|---|---|---|
| Revenue as Restated | $6,387,348 | $15,885,219 | $27,191,176 |
| Revenue as Originally Reported | $35,839,268 | $44,085,374 | $41,831,537 |

61.    The SEC Order stated that "Brooge went public through a [SPAC] transaction in December 2019. Further, ***"[b]efore and after going public between thirty (30) and eighty (80) percent of Brooge's revenues were unsupported and materially misstated from 2018 through early 2021***[.]" (Emphasis added).

62.    The SEC Order defined the "Relevant Period" as "from 2018 through early 2021."

63.    The SEC Order further noted that, subsequent to the SPAC transaction, Brooge "registered the offer and sale of up to $500 million in different types of securities with the Commission and an affiliate of the company issued $200 million of 5-year senior secured bonds in the Nordic bond market."

64.    The SEC contained the following about the mechanics of Brooge's fraud:

> The crux of the fraud was the creation of two sets of invoices. The first consisted of actual invoices to customers who stored oil at Brooge's facilities in Fujairah. Customers paid these invoices in the ordinary course. ***A second set of invoices which reflected significantly higher rates and volumes were ostensibly sent to customers who never used Brooge's facilities. These invoices were "paid" through a complicated series of unsupported transactions involving an affiliated or related party***. Brooge's former [CEO] Paardenkooper and former [CSO and Interim CEO], Saheb (together "Senior Management") knew, or were reckless in not knowing, of the accounting fraud."

24

(Emphasis added).

65.     The SEC Order detailed how Brooge misled its auditors regarding its true revenues. Specifically, it stated that "[c]ertain personnel reporting to Senior Management provided Brooge's outside auditors with *only the second set of invoices along with falsified ledger entries and other documents designed to support the inflated rates and volumes on the false second set of invoices*." (Emphasis added).

66.     In addition to the false second set of invoices that were already mentioned, the SEC order stated that "*in order to avoid an event of default on the Nordic bonds, an affiliate of the company created a third set of unsupported invoices, and certain persons at the company directed the creation of additional false documents during the pendency of our investigation*." (Emphasis added).

67.     As detailed in the SEC Order, investors have been misled since before the SPAC Merger was closed:

> *On April 15, 2019, Brooge and [BPGIC Subsidiary] entered into a Business Combination Agreement with a SPAC that had raised $180 million in an initial public offering*. On November 25, 2019, the SPAC filed a proxy statement *that included historical financial information for [BPGIC Subsidiary]. According to those proxy materials, [BPGIC Subsidiary's] revenues were $35.839 million for 2018 and $22.042 for the six months ended June 30, 2019 - figures that were overstated*. After receiving BPGIC's historical and projected financial performance, the SPAC placed a value on the proposed transaction of approximately one billion dollars.

(Emphasis added).

68.     The SEC Order further stated that those false revenue figures "were used during roadshows in the United States to market the SPAC merger to investors." The SEC noted that "[o]n December 19, 2019, the business combination closed with a share price of $10.32. The vast majority of SPAC shareholders

25

redeemed their shares for cash and, as a result, the new entity Brooge received only $16.7 from the transaction." Further, the SEC Order stated that "[a]s a result of the inflated financials, BPGIC [Subsidiary] was able to support a higher share price for the business combination."

69.     The Order further noted the following:

During the Relevant Period, Brooge represented to investors, bankers and auditors that it had a single customer contractually obligated to rent 100% of its storage capacity and certain other services at specific rates, thereby producing revenue of approximately $44 million per year. ***In reality, actual customers used a smaller portion of the storage capacity and almost no ancillary services, at rates lower than those specified in the single-customer contract***. The difference was addressed through an accounting scheme that relied upon a false second set of invoices. From December 2017 until at least December 2020, ***Brooge improperly recognized revenues by issuing invoices to two customers, Customer A and Al Brooge International Advisory LLC*** ("BIA").

(Emphasis added).

70.     The Order noted that Customer A was a "private company [. . .] that purports to be in the business of buying and selling crude oil." On December 12, 2017, "[BPGIC Subsidiary] entered into an agreement pursuant to which customer A leased [the entirety of] [BPGIC Subsidiary's] storage capacity" in a deal that was to be for "five years at a monthly rate of $5.00 per cubic meter for storage and $1.70 for certain ancillary services." The Order noted that this agreement "formed the basis of the company's cash flow projections", but that "***Customer A never stored any oil and never paid anything to [BPGIC Subsidiary]***." (Emphasis added).

71.     Rather than lease its entire storage capacity to Company A, the Order noted that "[BPGIC Subsidiary] provided services to oil and gas companies that

used its storage facility *but at significantly lower rates and volumes than those reflected in the contract with Customer A*." (Emphasis added).

72.     The SEC Order than detailed how, in order to make it appear that Customer A was paying Brooge, a second set of over one hundred fake invoices were created and addressed to Customer A, and then the financial figures were manipulated.

73.     Subsequently to creating the false invoices, Brooge did the following:

To make it appear as if these invoices had been paid, [BPGIC Subsidiary] engaged in a series of complicated transactions with BIA, an affiliated or related party, pursuant to which BIA wrote checks to [BPGIC Subsidiary] and then [BPGIC Subsidiary] wrote checks for corresponding amounts to BIA. *These were recorded in the company's general ledger as payments by Customer A*.

(Emphasis added).

74.     The SEC Order stated that BIA, the company which participated in the scheme to create the illusion of payments from Customer A, "was a private company located in Abu Dhabi *and an affiliated or related party of [BPGIC Subsidiary]. One of the owners of BIA was a shareholder in [BPGIC Subsidiary]*." (Emphasis added). Furthermore, "[r]epresentatives of [BPGIC Subsidiary] *opened bank accounts on behalf of BIA. BIA had no meaningful business operations aside form participating in the misstatements of revenues associated with [BPGIC Subsidiary]*." (Emphasis added).

75.     In addition to helping Brooge, through its subsidiary, create the false impression of revenue from Customer A, BIA also assisted Brooge in its scheme of using fake invoices to create the impression of revenue. The SEC Order stated the following:

From August 2019 through at least December 2020, *these improper accounting practices continued in largely the same manner, but with BIA*

27

*in the place of Customer A*. In August 2019, [BPGIC Subsidiary]'s contract with Customer A was novated to BIA under similar terms, *e.g.*, BIA was obligated to lease the full 399,324 cubic meter storage capacity of all fourteen (14) tanks at a monthly rate of $5.00 per cubic meter for storage and $1.70 for certain ancillary services. ***BIA never stored any oil with [BPGIC Subsidiary].***

(Emphasis added).

76.     The SEC Order provided the following detail regarding the fraudulent invoices that were sent to BIA:

[BPGIC Subsidiary] continued to provide services to oil and gas companies that used its storage facility ***but at significantly lower rates and volumes than those reflected in the contract novated to BIA***. A second set of invoices addressed to BIA was created. These invoices reflected the same total amounts as the invoices sent to oil and gas companies that used the storage facility but at the contractual storage rate of $5.00 per cubic meter with storage quantities adjusted downward to make the math consistent. Certain of these invoices also re-characterized ancillary services as storage fees. ***In this manner, between August 2019 and December 2020, [BPGIC Subsidiary] created over two hundred unsupported invoices addressed to BIA***.

(Emphasis added).

77.     Further, the Company engaged in a series of fraudulent transactions to make it appear that BIA was engaging in business with BPGIC Subsidiary. The Order stated the following:

As it had done previously with respect to Customer A, [BPGIC Subsidiary] created invoices addressed to BIA to fill the gap in projected revenues. [BPGIC Subsidiary] issued these invoices on a monthly basis from August 2019 through at least December 2020. The majority were in amounts ranging from $1.5-to-$2.5 million. ***BIA did not store any oil with [BPGIC Subsidiary]. In order to make it appear as if these invoices were paid, BPGIC engaged in a complicated series of transactions pursuant to which BIA wrote checks to [BPGIC Subsidiary] and then [BPGIC Subsidiary] wrote checks in similar amounts to BIA***.

28

(Emphasis added).

78.    The fraud didn't stop there. The SEC Order detailed how there was a third set of unsupported invoices, in addition to those involving Customer A and BIA:

> [. . .] [I]n May and June 2021, Brooge created another set of unsupported invoices to avoid a potential event of default on the Nordic bonds. These invoices were addressed-but never sent- to real customers and reflected charges for ancillary services far in excess of actual usage rates. ***The result was that Brooge's revenues and EBITDA were artificially inflated for the six months ended June 30, 2021***.

(Emphasis added).

79.    Further, the Company lied to its auditors. The SEC Order stated the following:

> Senior Management and persons acting at their direction concealed the inflated revenues from the company's outside auditors, E&Y and PwC. Outside auditors were provided with contracts and false invoices to Customer A and BIA, but the company did not provide them contracts and invoices with actual customers. ***Additionally, numerous false entries to the company's general ledger were made and then provided to the outside auditors***.
>
> ***[BPGIC Subsidiary] provided false audit evidence requested by E&Y and PwC as part of their invoice testing. This included the fabrication of emails and "customer order forms." These efforts were intended to make it appear as if the company had business communications with Customer A or BIA when it had not***. This was done when E&Y selected a handful of Customer A and BIA invoices for testing during the 2018 and 2019 audits and when PwC requested backup support for ancillary services revenue from BIA during the 2020 audit. ***The false materials provided to PwC include charts purporting to show which vessels were delivering oil in Fujairah, UAE, on specific dates. In reality, those vessels were scattered throughout the world, including off the coasts of India, Indonesia, Egypt, West Africa, and in the Gulf of Mexico***.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

(Emphasis added).

80.     The SEC Order stated the following about Defendant Paardenkooper:

Paardenkooper signed management representation letters representing that the company had "made available to [the outside auditors] all significant contracts, communications (either written or oral), and other related information pertaining to arrangements with customers" and confirmation letters attesting falsely to account receivable balances from Customer A and BIA.

81.     The SEC Order revealed that Brooge employees took additional steps to cover up the accounting fraud from SEC staff, once the SEC began to investigate. Specifically, "[a]t the direction of Senior Management, ***Brooge employees created three categories of false documents which were provided to Commission staff during the investigation.***" (Emphasis added).

82.     On this news, the price of Brooge stock declined by $0.62, or 15.66%, to close at $3.34 on December 22, 2023. The next trading day, it fell by a further $0.37, or 11.08%, to close at $2.97 on December 26, 2023.

83.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

84.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired the Company's securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal

30

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

85.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

86.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

87.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

88.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

• whether the Exchange Act was violated by Defendants' acts as alleged herein;

• whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

• whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

89. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

90. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- as a public issuer, the Company filed periodic public reports;

- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

91. Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

92. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

93. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

94. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

95. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

33

96.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

97.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

98.     Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiff and the Class.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

99.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

100.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

101.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

102.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act

### Against the Individual Defendants

103.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

104.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because

of their senior positions, they knew the adverse non-public information about the Company's false financial statements.

105.   As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

106.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

107.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: 2/5/2024                    **THE ROSEN LAW FIRM, P.A.**

*/s/ Laurence M. Rosen*
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS