# EXHIBIT D

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
**Release No. 11260 / December 22, 2023**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 99228 / December 22, 2023**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 4480 / December 22, 2023**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-21816**

|  |  |
|---|---|
| **In the Matter of**<br><br>**BROOGE ENERGY LIMITED, NICOLAAS LAMMERT PAARDENKOOPER and LINA SAHEB,**<br><br>   **Respondents.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Brooge Energy Limited ("Brooge" or "company"), Nicolaas Lammert Paardenkooper ("Paardenkooper"), and Lina Saheb ("Saheb") (collectively, "Respondents").

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, and except as provided in Section VI, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings pursuant to Section 8A of the

Securities Act and Section 21C of the Exchange Act, Making Findings, and Imposing Remedial Sanctions and a Cease-And-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

### Summary

1.      These proceedings arise out of an accounting and offering fraud by Brooge, which is a publicly-traded company that owns and operates an oil storage facility in Fujairah, United Arab Emirates ("UAE").

2.      Brooge went public through a special purpose acquisition company ("SPAC") transaction in December 2019.  Before and after going public between thirty (30) and eighty (80) percent of Brooge's revenues were unsupported and materially misstated from 2018 through early 2021 ("Relevant Period").  Subsequent to the SPAC transaction, Brooge registered the offer and sale of up to $500 million in different types of securities with the Commission and an affiliate of the company issued $200 million of 5-year senior secured bonds in the Nordic bond market.

3.      The crux of the fraud was the creation of two sets of invoices.  The first set consisted of actual invoices to customers who stored oil at Brooge's facilities in Fujairah.  Customers paid these invoices in the ordinary course.  A second set of invoices which reflected significantly higher rates and volumes were ostensibly sent to customers who never used Brooge's facilities.  These invoices were "paid" through a complicated series of unsupported transactions involving an affiliated or related party.  Brooge's former Chief Executive Officer ("CEO") Paardenkooper and former Chief Strategy Officer ("CSO") and Interim CEO, Saheb (together "Senior Management") knew, or were reckless in not knowing, of the accounting fraud.

4.      Certain personnel reporting to Senior Management provided Brooge's outside auditors with only the second set of invoices along with falsified ledger entries and other documents designed to support the inflated rates and volumes on the false second set of invoices.  As a result, Senior Management misled the auditors regarding Brooge's revenues.  Further, in order to avoid an event of default on the Nordic bonds, an affiliate of the company created a third set of unsupported invoices, and certain persons at the company directed the creation of additional false documents during the pendency of our investigation.

### Respondents

5.      **Brooge Energy Limited** (f/k/a Brooge Holdings Limited) ("Brooge"), was incorporated on April 12, 2019, in the Cayman Islands with its principal office in Fujairah, UAE. Brooge conducted its business through a wholly-owned subsidiary, Brooge Petroleum and Gas

---

[1]      The findings herein are made pursuant to Respondents' Offers and are not binding on any other person or entity in this or any other proceeding.

Investment FZE ("BPGIC").  During the Relevant Period, BPGIC owned and operated an oil storage facility in Fujairah, UAE, with fourteen (14) tanks and a capacity of 399,324 cubic meters.  The company's common stock and warrants were registered with the Commission pursuant to Section 12(b) of the Exchange Act and trade on NASDAQ as "BROG" and "BROGW."

6.    Brooge filed reports with the Commission as a foreign private issuer and prepared its financial statements in accordance with International Financial Reporting Standards ("IFRS") during the Relevant Period.  Brooge's fiscal year ended December 31.  Ernst & Young – Middle East (Abu Dhabi Branch) ("E&Y") audited the company's financial statements for 2018 and 2019.  PricewaterhouseCoopers (Dubai Branch) ("PwC") audited its financial statements for 2020.  On January 5, 2023, Brooge announced PwC's resignation.  Brooge retained Affiniax AAS Auditors to audit its financial statements for 2021 and 2022.  On April 26, 2023, the company announced a restatement of its audited financial statements from 2018 through 2020.

7.    **Nicolaas Lammert Paardenkooper** ("Paardenkooper"), age 61, is a citizen of the Netherlands.  Paardenkooper served as CEO of the company during the Relevant Period until his resignation on December 8, 2022.

8.    **Lina Saheb** ("Saheb"), age 40, is a citizen of the Republic of Iraq.  Saheb served as the CSO of the company during the Relevant Period.  Upon Paardenkooper's resignation, Saheb served as Interim CEO until her resignation on August 8, 2023.

### Facts

#### A.  Relevant Background

9.    On April 15, 2019, Brooge and BPGIC entered into a Business Combination Agreement with a SPAC that had raised $180 million in an initial public offering.  On November 25, 2019, the SPAC filed a proxy statement that included historical financial information for BPGIC.  According to those proxy materials, BPGIC's revenues were $35.839 million for 2018 and $22.042 million for the six months ended June 30, 2019 – figures that were overstated.  After receiving BPGIC's historical and projected financial performance, the SPAC placed a value on the proposed transaction of approximately one billion dollars.

10.    Those revenue figures were used during roadshows in the United States to market the SPAC merger to investors.  On December 19, 2019, the business combination closed with a share price of $10.32.  The vast majority of SPAC shareholders redeemed their shares for cash and, as a result, the new entity Brooge received only $16.7 million from the transaction.  As a result of the inflated financials, BPGIC was able to support a higher share price for the business combination.

11.    On September 24, 2020, BPGIC issued $200 million of 5-year senior secured bonds in the Nordic bond market.  The bonds were unregistered, purportedly offered only to qualified institutional buyers ("QIBs") in reliance on Rule 144A under the Securities Act, and outside the United States only to non-U.S. investors pursuant to Regulation S under the Securities Act.  The bonds mature in September 2025 and have a fixed semi-annual coupon of 8.50% per annum.

12. On April 15, 2021, Brooge filed a post-effective amendment on Form F-3 to a Form F-1 registration statement that was previously declared effective ("Warrant Shares Registration Statement"). The Warrant Shares Registration Statement related to the issuance of common stock underlying 21,228,900 outstanding warrants issued after the SPAC business combination. On April 19, 2021, Brooge filed a Form F-3 shelf registration statement, which registered the offer and sale by Brooge of up to $500 million in different types of securities and also registers the offer and sale by an affiliated selling shareholder – namely, the majority shareholder of Brooge – of up to 6 million Brooge shares. Brooge agreed not to issue securities pursuant to those two registration statements during the Commission's investigation.

13. On August 17, 2022, Brooge issued a press release announcing that Brooge's "majority shareholder, BPGIC Holding Limited, has expressed an interest to acquire all the shares of [Brooge] that it does not currently own and to take [Brooge] private . . . ." More recently, in October 2023, Brooge disclosed that it had received a formal proposal from a maritime and shipping company listed in the Dubai Financial Market to acquire the company. The contemplated acquisition, which is being evaluated by the parties, is anticipated to close in the fourth quarter of 2023.

## B. Brooge's Revenue Overstatement

14. During the Relevant Period, Brooge represented to investors, bankers and auditors that it had a single customer contractually obligated to rent 100% of its storage capacity and certain other services at specific rates, thereby producing revenue of approximately $44 million per year. In reality, actual customers used a smaller portion of the storage capacity and almost no ancillary services, at rates lower than those specified in the single-customer contract. The difference was addressed through an accounting scheme that relied upon a false second set of invoices. From December 2017 until at least December 2020, Brooge improperly recognized revenues by issuing invoices to two customers, Customer A and Al Brooge International Advisory LLC ("BIA").

### 1. Customer A Invoices

15. Customer A is a private company with an address in Singapore that purports to be in the business of buying and selling crude oil. On December 12, 2017, BPGIC entered into an agreement pursuant to which Customer A leased the full 399,324 cubic meter storage capacity of all fourteen (14) tanks for five years at a monthly rate of $5.00 per cubic meter for storage and $1.70 for certain ancillary services. This agreement formed the basis of the company's cash flow projections. BPGIC's cash flow projections assumed that under the terms of their agreement Customer A paid approximately $1.997 million in storage revenue per month (399,324 * $5.00) and $679,000 in certain ancillary services (399,324 * $1.70). Customer A never stored any oil and never paid anything to BPGIC.

16. BPGIC provided services to oil and gas companies that used its storage facility but at significantly lower rates and volumes than those reflected in the contract with Customer A. These customers were invoiced and paid in the ordinary course. For example, in December 2018, one customer rented a tank with a storage capacity of 41,563 cubic meters at a rate of $2.30, for a total

of $95,594.90. An invoice in that amount was issued to and paid by that customer. A second set of invoices addressed to Customer A was created. These invoices reflected the same total amounts as the real invoices but at the contractual storage rate of $5.00 per cubic meter. For example, the total amount of $95,594.90 in the invoice to the customer referenced above matched the total amount in the duplicate invoice to Customer A, but the storage rate was adjusted upward to $5.00 per cubic meter. To make the math consistent, the storage quantity was adjusted downward on the Customer A invoice to 19,118.98 cubic meters. In this manner, between December 2017 and July 2019, BPGIC created over one hundred unsupported invoices addressed to Customer A.

17.    BPGIC also created large month-end invoices addressed to Customer A to fill the gap in projected revenues. BPGIC issued end-of-the-month invoices to Customer A on a monthly basis from January 2018 through July 2019. The majority were in amounts ranging from $2.5-to-$3.4 million. Again, Customer A never stored any oil with and never paid anything to BPGIC. Thus, the end-of-the-month invoices to Customer A were false and the revenues associated with them unsupported. To make it appear as if these invoices had been paid, BPGIC engaged in a series of complicated transactions with BIA, an affiliated or related party, pursuant to which BIA wrote checks to BPGIC and then BPGIC wrote checks for corresponding amounts to BIA. These were recorded in the company's general ledger as payments by Customer A.

18.    BIA was a private company located in Abu Dhabi and an affiliated or related party of BPGIC. One of the owners of BIA was a shareholder in BPGIC. Representatives of BPGIC opened bank accounts on behalf of BIA. BIA had no meaningful business operations aside from participating in the misstatements of revenues associated with BPGIC.

2.    BIA Invoices

19.    From August 2019 through at least December 2020, these improper accounting practices continued in largely in the same manner, but with BIA in the place of Customer A. In August 2019, BPGIC's contract with Customer A was novated to BIA under similar terms, *e.g.*, BIA was obligated to lease the full 399,324 cubic meter storage capacity of all fourteen (14) tanks at a monthly rate of $5.00 per cubic meter for storage and $1.70 for certain ancillary services. BIA never stored any oil with BPGIC.

20.    BPGIC continued to provide services to oil and gas companies that used its storage facility but at significantly lower rates and volumes than those reflected in the contract novated to BIA. A second set of invoices addressed to BIA was created. These invoices reflected the same total amounts as the invoices sent to oil and gas companies that used the storage facility but at the contractual storage rate of $5.00 per cubic meter with storage quantities adjusted downward to make the math consistent. Certain of these invoices also re-characterized ancillary services as storage fees. In this manner, between August 2019 and December 2020, BPGIC created over two hundred unsupported invoices addressed to BIA.

21.    As it had done previously with respect to Customer A, BPGIC created invoices addressed to BIA to fill the gap in projected revenues. BPGIC issued these invoices on a monthly basis from August 2019 through at least December 2020. The majority were in amounts ranging

from $1.5-to-$2.5 million.  BIA did not store any oil with BPGIC.  In order to make it appear as if these invoices were paid, BPGIC engaged in a complicated series of transactions pursuant to which BIA wrote checks to BPGIC and then BPGIC wrote checks in similar amounts to BIA.

### 3.    Third Set of Unsupported Invoices

22.    Towards the end of 2020, market demand for BPGIC's oil storage services increased during the coronavirus pandemic.  With tanks at or near capacity and market rates for storage close to or above contractual amounts with Customer A and BIA, Brooge ceased the dual invoicing system However, in May and June 2021, Brooge created another set of unsupported invoices to avoid a potential event of default on the Nordic bonds.  These invoices were addressed – but never sent – to real customers and reflected charges for ancillary services far in excess of actual usage rates.  The result was that Brooge's revenues and EBITDA were artificially inflated for the six months ended June 30, 2021.

### C.  Misstatements to Auditors

23.    Senior Management and persons acting at their direction concealed the inflated revenues from the company's outside auditors, E&Y and PwC.  Outside auditors were provided with contracts and false invoices to Customer A and BIA, but the company did not provide them contracts and invoices with actual customers.  Additionally, numerous false entries to the company's general ledger were made and then provided to the outside auditors.

24.    BPGIC provided false audit evidence requested by E&Y and PwC as part of their invoice testing.  This included the fabrication of emails and "customer order forms."  These efforts were intended to make it appear as if the company had business communications with Customer A or BIA when it had not.  This was done when E&Y selected a handful of Customer A and BIA invoices for testing during the 2018 and 2019 audits and when PwC requested backup support for ancillary service revenue from BIA during the 2020 audit.  The false materials provided to PwC include charts purporting to show which vessels were delivering oil in Fujairah, UAE, on specific dates.  In reality, those vessels were scattered throughout the world, including off the coasts of India, Indonesia, Egypt, West Africa, and in the Gulf of Mexico.

25.    Paardenkooper signed management representation letters misrepresenting that the company had "made available to [the outside auditors] all significant contracts, communications (either written or oral), and other related information pertaining to arrangements with customers" and confirmation letters attesting falsely to account receivable balances from Customer A and BIA.

### D.  Fictitious Documents Provided to the SEC Staff

26.    Brooge personnel took additional steps to conceal the accounting fraud from Commission staff.  At the direction of Senior Management, Brooge employees created  three categories of false documents which were provided to Commission staff during the investigation.

27.    The first category consisted of false invoices to BIA, backdated to February 2018 – July 2019, which purported to explain why BIA made payments for invoices to Customer A.

BPGIC's general ledger falsely recorded that Customer A made the payments on the invoices rather than BIA. Paardenkooper signed the falsified, backdated invoices. In reality, the invoices were not for any services rendered and did not exist until they were created in 2022. The second was a Commercial Storage Agreement between BPGIC and BIA, backdated to January 22, 2018, to provide support for the false invoices addressed to BIA that were created in 2022. The falsified, backdated Commercial Storage Agreement was created at the direction of Senior Management. The third was a "loan agreement," backdated to July 17, 2017, purporting to explain other false general ledger entries relating to the transactions.

## E. Material Overstatement of Revenue

28.    Brooge's Audit Committee hired an outside law firm and an expert accounting consultancy firm to conduct an internal investigation, and the company eventually restated its historical financial statements, as reflected in the chart below:

|  | **2018** | **2019** | **2020** |
|---|---|---|---|
| **Revenue as Restated** | $6,387,348 | $15,885,219 | $27,191,176 |
| **Revenue as Originally Reported** | $35,839,268 | $44,085,374 | $41,831,537 |

29.    Internal spreadsheets contemporaneously tracked actual revenue data, as compared against the revenues that were publicly disclosed. Those internal spreadsheets reflect actual revenues consistent with restated figures. In addition, the third set of unsupported invoices artificially inflated revenues by approximately $3.4 million in May and June 2021.

30.    As a result of these improper accounting practices, the financial statements included in numerous of Brooge's Commission filings were materially overstated including Form 20-F Annual Reports, Form 6-K Half-Year Reports, Form 6-K Press Releases, Form F-4 and Form 424B Proxy Materials, Form F-1 and Form F-3 Registration Statements and Form 425 Investor Presentations. Paardenkooper signed the majority of these Commission filings as the company's CEO.

31.    In determining to accept the Offer, the Commission considered remedial acts undertaken by Brooge and cooperation afforded the Commission staff. These included providing to Commission staff information from an internal investigation conducted on behalf of the Audit Committee.

## Violations

32.    As a result of the conduct described above, Brooge violated (i) Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of

securities; (ii) Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, which prohibit material misstatement and omissions in proxy statements; (iii) Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-16 thereunder, which require registrants to file materially accurate and complete periodic reports; and (iv) Section 13(b)(2)(A) of the Exchange Act, which requires registrants to make and keep accurate books, records and accounts, and Section 13(b)(2)(B) of the Exchange Act, which requires registrants to devise and maintain adequate internal accounting controls.

34.     As a result of the conduct described above, Paardenkooper violated (i) Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities; (ii) Section 13(b)(5) of the Exchange Act and Rules 13b2-1 and 13b2-2 thereunder, which prohibit the falsification of books and records and lying to auditors; (iii) caused Brooge's violations of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, which prohibit material misstatement and omissions in proxy statements; (iv) caused Brooge's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-16 thereunder, which require registrants to file materially accurate and complete periodic reports; and (v) caused Brooge's violations of Section 13(b)(2)(A) of the Exchange Act, which requires registrants to make and keep accurate books, records and accounts.

35.     As a result of the conduct described above, Saheb violated (i) Sections 17(a)(1) and (3) of the Securities Act, Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities; (ii) Section 13(b)(5) of the Exchange Act and Rules 13b2-1 and 13b2-2 thereunder, which prohibit the falsification of books and records and lying to auditors; and (iii) caused Brooge's violations of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, which prohibit material misstatement and omissions in proxy statements; (iv) caused Brooge's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-16 thereunder, which require registrants to file materially accurate and complete periodic reports; and (v) caused Brooge's violations of Section 13(b)(2)(A) of the Exchange Act, which requires registrants to make and keep accurate books, records and accounts.

## IV.

## <u>Undertakings</u>

Respondent Brooge has undertaken to:

A.     Retain, at Brooge's expense within 150 days of issuance of this Order, a qualified independent ethics and compliance consultant (the "Consultant") with extensive experience in developing, implementing and overseeing organizational compliance and ethics programs, not unacceptable to the Commission staff, to conduct an ethics and compliance program assessment focused on the components of the program delineated in paragraphs (1)-(3) below. The Consultant shall also have expertise in, or retain someone with expertise in, internal accounting controls and public company financial reporting, including accounting for revenues and related party

transactions. Brooge shall cause the Consultant to analyze Brooge's ethics and compliance program as it relates to the areas described in paragraphs (1)-(3) below. In discharging this undertaking, the Consultant shall:

1.  Evaluate and assess the effectiveness of Brooge's internal accounting controls and financial reporting policies and procedures, including but not limited to:

a.  Whether Brooge's internal accounting controls are sufficient to provide reasonable assurances that the company is maintaining fair and accurate books, records and accounts, with particular emphasis on whether they are designed to address the integrity of its revenue accounting, and ensure consistent accuracy; and

b.  Whether Brooge has specific accounting and financial reporting controls and procedures sufficient to identify any related or affiliated parties, with any direct or indirect affiliation with Brooge and/or its controlling shareholders, and ensure that all accounting with respect to such parties, including but not limited to BIA, complies with applicable accounting rules and policies;

2.  Evaluate and assess whether Brooge's corporate culture has an adverse impact upon or impedes the company's ability to comply fully with its disclosure obligations;

3.  Evaluate, for purposes of analyzing the areas addressed above in paragraphs (1) and (2), whether there are proper resources, oversight and independence of the compliance and ethics function, including seniority of corporate executives responsible for implementation and oversight, reporting lines, autonomy and independence, compensation and rewards, consistent discipline, resources, and access to information and personnel.  The review shall include sufficiency of training and guidance, including regarding anti-retaliation and whistleblowing;

B.  Provide the Consultant with complete access and resources to review key documents (*e.g.*, material agreements, counterparty due diligence, bank records, business principles, codes of conduct, policies and procedures, risk assessments, performance evaluation forms, relevant internal training materials and internal communications).  In reviewing the creation, administration and implementation of the compliance and ethics program as it relates to the areas addressed in ¶ A above, the Consultant shall conduct an assessment survey and interview relevant personnel;

C.  Provide a copy of the engagement letter detailing the Consultant's responsibilities to Reid A. Muoio, Assistant Director, Division of Enforcement, U.S. Securities and Exchange Commission, 100 F Street, N.E., Washington, D.C. 20549;

D.  Cooperate fully with the Consultant, including providing the Consultant with access to Brooge's files, books, records and personnel as reasonably requested for the above-described review except to the extent such files, books, or records are protected from disclosure by any applicable protection or privilege such as the attorney-client privilege or the attorney work product doctrine.  To the extent the Consultant believes that documents are being withheld unreasonably, Brooge shall work cooperatively with the Consultant to resolve the matter, and if

9

they are unable to reach agreement after exhausting reasonable efforts to do so, the Consultant shall promptly notify the Commission staff.  To ensure the independence of the Consultant, Brooge shall not have the authority to terminate the Consultant without prior written approval of the Commission's staff and shall compensate the Consultant and persons engaged to assist the Consultant for services rendered pursuant to this Order at their reasonable and customary rates;

E.      Require the Consultant to report to the Commission staff (at the address set forth above) on his/her activities as the staff shall request;

F.      Permit the Consultant to engage such assistance, clerical, legal or expert, as necessary and at reasonable cost, to carry out his/her activities, and the cost, if any, of such assistance shall be borne exclusively by Brooge;

G.      Require, within 210 days of the issuance of this Order, unless otherwise extended by the Commission staff for good cause, the Consultant to complete the review and report to the Commission staff (at the address set forth above) and Brooge's Chief Executive Officer and Board of Directors concerning:

1.      The scope and methodologies used by the Consultant in order to complete the review;

2.      Brooge's compliance with the review;

3.      The adequacy of Brooge's existing policies, practices and procedures regarding the matters assessed; and

4.      The Consultant's recommendations, if any, regarding modification or supplementation of Brooge's policies, practices and procedures related to the matters assessed (the "Recommendations");

H.      Adopt and implement, within 120 days of Brooge's receipt of the Recommendations, all of the Recommendations; provided, however, that as to any Recommendation that Brooge considers to be, in whole or in part, unduly burdensome, unnecessary or impractical, Brooge may submit in writing to the Consultant and the Commission staff (at the address set forth above), within 60 days of receiving the Recommendations, an alternative policy, practice or procedure designed to achieve or provide appropriate comfort regarding the same objective or purpose.  Brooge and the Consultant shall then attempt in good faith to reach an agreement relating to each Recommendation that Brooge considers to be unduly burdensome, impractical or unnecessary, and the Consultant shall reasonably evaluate any alternative policy, practice or procedure proposed by Brooge.  Such discussion and evaluation shall conclude within 90 days after Brooge's receipt of the Recommendations. If Brooge and the Consultant do not reach a solution, the Consultant shall inform the Commission staff of such disagreement within 14 days. Brooge and the Consultant shall discuss the disagreement with the Commission staff.  The Commission staff shall make the final determination concerning any such Recommendation.  Brooge shall abide by the determinations of the Commission staff and, within 60 days after final agreement between Brooge and the Consultant or final determination by the

10

Commission staff, whichever occurs first, Brooge shall adopt and implement all disputed Recommendations of the Consultant that the Commission staff deems appropriate; and

I.        Certify, in writing, compliance with the undertaking(s) set forth above. The certification shall identify the undertaking(s), provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Brooge agrees to provide such evidence. The certification and supporting material shall be submitted to the Commission staff (at the address set forth above), with a copy to the Office of Chief Counsel of the Enforcement Division, no later than sixty (60) days from the date of the completion of the undertakings.

Brooge may apply to the Commission staff (at the address set forth above) for an extension of the deadlines described above before their expiration, and upon a showing of good cause by Brooge, the Commission staff may, in its sole discretion, grant such extensions for whatever time period it deems appropriate.

For the period of engagement and for a period of two years from completion of the engagement, Brooge shall not (i) retain the independent Consultant for any other professional services outside of the services described in this Order; (ii) enter into any other professional relationship with the independent Consultant, including any employment, consultant, attorney-client, auditing or other professional relationship; or (iii) enter, without prior written consent of the Commission staff, into any such professional relationship with any of the independent Consultant's present or former affiliates, employers, directors, officers, employees, or agents acting in their capacity as such.

The reports by the independent Consultant will likely include confidential financial, proprietary, competitive business or commercial information. Public disclosure of the reports could discourage cooperation, impede pending or potential government investigations or undermine the objectives of the reporting requirement. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except (1) pursuant to court order, (2) as agreed to by the parties in writing, (3) to the extent that the Commission determines in its sole discretion that disclosure would be in furtherance of the Commission's discharge of its duties and responsibilities, or (4) as otherwise required by law.

*Provided that*, none of the undertakings required in this Section IV shall be required in the event that (1) subject to review and written approval by Commission staff (at the address set forth above), Brooge closes, within 150 days of this Order (or such longer period of time as may be approved for good cause by the Commission staff), on either (a) the transaction announced in its Form 6-K, dated October 3, 2023, or (b) a similar transaction on substantially the same terms; and (2) Brooge and its securities are no longer registered, or required to be registered, with the Commission, in any capacity.

11

**V.**

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, it is hereby ORDERED that:

A.      Brooge cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 14(a) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-16 and 14a-9 thereunder.

B.      Paardenkooper cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(5) and 14(a) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-16, 13b2-1, 13b2-2 and 14a-9 thereunder.

C.      Saheb cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(5) and 14(a) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-16, 13b2-1, 13b2-2 and 14a-9 thereunder.

D.      Paardenkooper is prohibited, pursuant to Section 21C(f) of the Exchange Act, from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

E.      Saheb is prohibited, pursuant to Section 21C(f) of the Exchange Act, from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

F.      Brooge shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $5,000,000 to the Securities and Exchange Commission.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

G.      Paardenkooper shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $100,000 to the Securities and Exchange Commission.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

H.      Saheb shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $100,000 to the Securities and Exchange Commission.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

12

Payment must be made in one of the following ways:

(1)     Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)     Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)     Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Respondents in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Reid A. Muoio, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549.

I.     Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, a Fair Fund is created for the civil money penalties referenced in paragraphs F through H above.  Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of their payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

J.     Brooge shall comply with the undertakings enumerated in Section IV.

## VI.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. § 523, the findings in this Order are true and admitted by Respondents Paardenkooper and Saheb, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondents Paardenkooper or Saheb under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Vanessa A. Countryman
Secretary

14