Amanda F. Lawrence (admitted *pro hac vice*)
alawrence@scott-scott.com
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 S. Main St.
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 404-7770
Facsimile:  (860) 537-4432

*Attorneys for Lead Plaintiff*
*Bluefin Capital Management, LLC*

[Additional Counsel on Signature Page.]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ERIC WHITE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BROOGE ENERGY LIMITED, et al.,<br>Defendants. | Case No.: 2:24-cv-00959-AH-DFM<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT ERNST & YOUNG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BRIEF STATEMENT OF RELEVANT FACTS........................................................2

    I.    E&Y's Audit of the Financial Statements for the Proxy .....................2

          A.    Brooge's Operations at the Time of the Proxy .........................3

          B.    Brooge's Revenue Scheme .....................................................3

          C.    Related Party BIA ..................................................................4

    II.    E&Y's Audit of the FY2019 Financial Statements .............................5

    III.    E&Y's Resignation as Brooge's Auditor..............................................6

LEGAL STANDARD.................................................................................................7

ARGUMENT .............................................................................................................7

    I.    Plaintiff's Claims Against E&Y Are Not Time Barred ........................7

    II.    E&Y Made False and Misleading Statements .....................................8

          A.    E&Y Did Not Genuinely Believe Its Opinions .........................9

          B.    E&Y's "Opinions" Were False by Omission ...........................10

          C.    E&Y's "Opinions" Contained Embedded Statements of Fact .10

    III.    Defendants Acted with Scienter.........................................................12

          A.    The Numerous Red Flags Clearly Demonstrate Scienter.........13

              1.    BIA/Related Parties .........................................................13

              2.    Internal Controls .............................................................14

              3.    Usage and Contract Terms ..............................................15

              4.    Prior Restatements...........................................................16

              5.    Size of Issues ..................................................................17

              6.    Going Concerns ...............................................................18

          B.    The Inference of Scienter Is Strong .........................................19

    IV.    Plaintiff Adequately Pleads Loss Causation Against E&Y ................20

          A.    August 17, 2022 Was Not a Corrective Disclosure..................22

i

B.    Plaintiff Has Incurred Significant Economic Loss ...................23

C.    Plaintiff's Trading Record Does Not Foreclose Loss Causation ...........................................................................................25

CONCLUSION .............................................................................................25

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
529 F. Supp. 3d 111 (S.D.N.Y. 2021) ...................................................................13

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
824 F. Supp. 2d 1164 (C.D. Cal. 2011) ...............................................................23

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*,
568 U.S. 455 (2013)...............................................................................................22

*Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*,
315 F. Supp. 2d 666 (E.D. Pa. 2004) ...................................................................18

*In re Bare Escentuals, Inc. Sec. Litig.*,
745 F. Supp. 2d 1052 ...............................................................................................7

*Baron v. HyreCar Inc.*,
2022 WL 17413562 (C.D. Cal. Dec. 5, 2022).......................................................10

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012) ....................................................................7

*In re Bofl Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ...........................................................................21, 22

*Bond v. Clover Health Invs., Corp.*,
2023 WL 1999859 (M.D. Tenn. Feb. 14, 2023)....................................................24

*Buttonwood Tree Value Partners, LP v. Sweeney*,
910 F. Supp. 2d 1199 (C.D. Cal. 2012) ..........................................................11, 14

*In re Cal. Bail Bond Antitrust Litig.*,
2020 WL 3041316 ....................................................................................................7

*In re Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*,
582 U.S. 497 (2017).................................................................................................8

*In re Cendant Corp. Litig.*,
60 F. Supp. 2d 354 (D. N.J. 1999).................................................................16, 17

*Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.*,
793 F. Supp. 2d 1138 (C.D. Cal. 2011) ...............................................................23

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ..................................................................................9

OPPOSITION TO DEFENDANT ERNST & YOUNG'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..................................................................19

*Danis v. USN Commc'ns, Inc.*,
    73 F. Supp. 2d 923 (N.D. Ill. 1999) .......................................................................18

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ..................................................................................7

*In re DNTW Chartered Accountants Sec. Litig.*,
    96 F. Supp. 3d 155 (S.D.N.Y. 2015) ......................................................................16

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012) ....................................................................10

*DSAM Global Value Fund v. Altris Software, Inc.*,
    288 F.3d 385 (9th Cir. 2002) ..................................................................................17

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................21

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2nd Cir. 2009) .................................................................................20

*In re Fastly, Inc. Sec. Litig.*,
    2025 WL 2721693 (N.D. Cal. Sept. 24, 2025).......................................................21

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) .....................................................................................25

*Grigsby v. BofI Holding, Inc.*,
    979 F.3d 1198 .........................................................................................................21

*Hildes v. Andersen*,
    2010 WL 4811975 (S.D. Cal. Nov. 8, 2010)..........................................................22

*In re Juniper Networks, Inc. Sec. Litig.*,
    264 F.R.D. 584 (N.D. Cal. 2009)............................................................................25

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008)....................................................................7

*In re Lernout & Hauspie Sec. Litig.*,
    230 F. Supp. 2d 152 (D. Mass. 2002).....................................................................17

*In re Leslie Fay Cos., Inc. Sec. Litig.*,
    835 F. Supp. 167 (S.D.N.Y. 1993) .........................................................................17

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ................................................................................22

iv

*Masel v. Villarreal*,
924 F.3d 734 (5th Cir. 2019) ...............................................................................10

*McIntire v. China MediaExpress Holdings, Inc.*,
927 F. Supp. 2d 105 (S.D.N.Y. 2013) ..................................................................11

*Mehedi v. View, Inc.*,
2023 WL 3592098 (N.D. Cal. May 22, 2023).......................................................11

*Munoz v. China Expert Technology, Inc.*,
2011 WL 5346323 (S.D.N.Y. Nov. 7, 2011)..........................................................15

*N.M. State Inv. Council v. Ernst & Young, LLP*,
641 F.3d 1089 (9th Cir. 2011) ....................................................12, 14, 16, 20

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ........................................................16, 20

*Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*,
2024 WL 4353049 (N.D. Cal. Sept. 30, 2024)................................................22, 23

*In re OSG Sec. Litig.*,
971 F. Supp. 2d 387 (S.D.N.Y. 2013) ....................................................................9

*In re Oxford Health Plans, Inc. Sec. Litig.*,
51 F. Supp. 2d 290 (S.D.N.Y. 1999) ....................................................................20

*Painters and Allied Trades Dist. Council 82 Health Care Fund v.
Takeda Pharm. Co. Ltd.*,
674 F. Supp. 3d 799 (C.D. Cal. 2023), *aff'd*, 2025 WL 1683472
(9th Cir. June 16, 2025) ........................................................................................24

*In re Peregrine Sys., Inc. Sec. Litig.*,
2005 WL 8158825 (S.D. Cal. Mar. 30, 2005) ......................................................12

*In re Petrobras Sec. Litig.*,
2016 WL 1533553 (S.D.N.Y. Feb. 19, 2016) .........................................................9

*In re Phillip Servs. Corp. Sec. Litig.*,
383 F. Supp. 2d 463 (S.D.N.Y. 2004) ............................................................12, 15

*Reiger v. Price Waterhouse Coopers LLP*,
117 F. Supp. 2d 1003 (S.D. Cal. 2000)................................................................17

*In re Rent-Way Sec. Litig.*,
209 F. Supp. 2d 493 (W.D. Pa. 2002)...................................................................17

*Ret. Sys. v. ANZ Sec., Inc.*,
582 U.S. 497 (2017).................................................................................................8

*Rieckborn v. Jefferies LLC*,
81 F. Supp. 3d 902 (N.D. Cal. 2015)......................................................................7

v

*In re Salix Pharms., Ltd.*,
　2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ........................................................10

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
　2022 WL 3572474 (M.D. Pa. Aug. 18, 2022).......................................................10

*In re Silver Wheaton Corp. Sec. Litig.*,
　2019 WL 1512269 (C.D. Cal. Mar. 25, 2019)......................................................11

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
　243 F. Supp. 3d 1109 (E.D. Cal. 2017) ...........................................................9, 10

*In re Suprema Specialties, Inc. Sec. Litig.*,
　438 F.3d 256 (3rd Cir. 2006) .............................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　551 U.S. 308 (2007)...........................................................................7, 12, 19

*TransUnion LLC v. Ramirez*,
　594 U.S. 413 (2021) (E&Y Br. ) .........................................................................24

*United States v. Arthur Young & Co.*,
　465 U.S. 805 (1984)...............................................................................................1

*In re Upstart Holdings, Inc. Sec. Litig.*,
　348 F.R.D. 612 (S.D. Ohio 2025)........................................................................24

*In re Verisign, Inc., Derivative Litig.*,
　531 F. Supp. 2d 1173 (N.D. Cal. 2007) ..............................................................23

*Volk v. D.A. Davidson & Co.*,
　816 F.2d 1406 (9th Cir. 1987) ............................................................................24

*In re WageWorks, Inc., Sec. Lit.*,
　2020 WL 2896547 (N.D. Cal. June 1, 2020)......................................................21

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
　694 F. Supp. 2d 1192 (W.D. Wash. 2009) ..........................................................11

*Whalen v. Hibernia Foods PLC*,
　2005 WL 1799370 ...............................................................................................12

*Wietschner v. Monterey Pasta Co.*,
　294 F. Supp. 2d 1102 (N.D. Cal. 2003).............................................................25

*Winstar Commc'ns v. Rouhana*,
　2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) .......................................................22

*Wochos v. Tesla, Inc.*,
　985 F.3d 1180 (9th Cir. 2021) ............................................................................23

OPPOSITION TO DEFENDANT ERNST & YOUNG'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

**Statutes**

Private Securities Litigation Reform Act of 1995 ........................................7, 19, 20

**Other Authorities**

Gideon Mark, *Accounting Fraud: Pleading Scienter of Auditors Under the PSLRA,* 39 CONN. L. REV. 1097, (2007).....................................................................19, 20

Robert A. Prentice, *The Case of the Irrational Auditor: A Behavioral Insight into Securities Fraud Litigation,* 95 NW. U. L. REV. 133, 142 (2000)...........................................................................................................20

Federal Rule of Civil Procedure 12(b)(6) ............................................................2, 7

Plaintiff Bluefin Capital Management, LLC ("Plaintiff" or "Bluefin") respectfully submits this opposition to Defendant Ernst & Young's ("E&Y") Motion to Dismiss the Second Amended Complaint (ECF No. 134, the "Motion" and "E&Y Br."). As discussed below, the Motion should be denied in its entirety.

**INTRODUCTION**

For the better part of three years, E&Y served as the auditor first for BPGIC FZE and then Brooge Energy Limited ("Brooge," or the "Company"), a role that the Supreme Court has characterized as a "public watchdog." *United States v. Arthur Young & Co.,* 465 U.S. 805, 818 (1984). E&Y gave Brooge a clean bill of financial health in each of the years it served as the auditor, repeatedly stating that it believed its audits were conducted pursuant to the Public Company Accounting Oversight Board ("PCAOB") standards and fairly represented the state of affairs at Brooge. The Complaint alleges with great particularity why each of these statements by E&Y were false and misleading when made.

As discussed in the multiple briefs filed herewith, for E&Y's entire tenure, Brooge was engaged in a massive fraud whereby it masked that it was receiving zero income from its primary "customer." The Complaint discusses a litany of red flags that existed right in front of E&Y, including 100% revenue from a related party, an utter and complete lack of internal controls, glaring mismatches in invoices, restatements, and massive going concern issues (to name a few). And, setting this case aside from the vast majority of auditor cases, the Complaint contains more than just the red flags, but actual evidence demonstrating E&Y's knowledge of enough elements of the fraud that it was duty-bound to look closer, such as emails with bank statements and Audit Committee meeting minutes. Far from investigating further (as E&Y boasted it did for all clients), E&Y never contacted Brooge customers or made any site visits which would have readily revealed the shenanigans.

1

E&Y confronts these cascading allegations the only way it can—one by one—because especially when they are taken together, there can be zero doubt that Brooge's SEC filings were riddled with fraud; a fact which E&Y knew or willfully disregarded. This attempt to pick apart the Complaint and minimize the allegations one by one is contrary to basic principles under Rule 12(b)(6).

## BRIEF STATEMENT OF RELEVANT FACTS

Brooge[1] was incorporated in 2013 in the United Arab Emirates, with the support and backing of an Emirati sheikh. ¶¶48, 187.[2] By 2018, Brooge's Phase I operation, which involved providing oil storage and ancillary services like heating and blending, was operational, with a planned Phase II in the works. ¶¶48-50. Around this time, Brooge began looking to the U.S. markets, which required audited financials. For that it turned to E&Y, who signed on as its auditor no later than July 2018. Allegedly, E&Y had a "rigorous" client acceptance process that required it to carefully consider the "risk characteristics of a prospective client" and "assess[] . . . the need for internal investigation," make timely confidential inquiries of third parties and/or use private investigators "where appropriate" to assess the "reputation or integrity" of key members of management. ¶182.

## I.    E&Y's Audit of the Financial Statements for the Proxy

As Brooge's independent auditor, E&Y was responsible for auditing the financial statements that appeared in the Proxy that investors would review when determining whether to approve the business combination.[3] Though E&Y became aware soon after taking on its auditor role that Brooge's finances were incompatible

---

[1] "Brooge" refers to Brooge Petroleum and Gas Investment Company FZE ("BPGIC FZE") before the business combination, and Brooge Energy Limited after the business combination.

[2] ¶ or ¶¶ refers to paragraphs in the Second Amended Complaint (ECF No. 114) (the "Complaint").

[3] The business combination between the Twelve Seas Special Purpose Acquisition Company and BPGIC FZE resulting in Brooge going public is discussed in further detail in the Opposition to Defendant Dimitri Elkin's Motion to Dismiss.

with its public statements, it never warned investors and instead issued clean audit opinions for the Proxy. ¶171. Investors voted to approve the business combination.

## A. Brooge's Operations at the Time of the Proxy

E&Y audited Brooge's financial statements for all the periods included in the Proxy: fiscal year ("FY") 2017, FY2018, and the first half ("1H") of FY2019. ¶¶59. From the beginning, E&Y knew that Brooge was a high-risk enterprise requiring heightened due diligence as it was completely reliant on a single Phase I customer, Coral Energy Pte Ltd ("Coral") for 100% of its revenue. ¶¶54-55. Coral was purportedly paying to lease all of Brooge's Phase I oil storage, regardless of whether or not it used that storage. *Id.* Though Brooge pitched this take-or-pay contract as a way to put the risk on Coral, the reality was that if Coral defaulted, Brooge's entire revenue stream would dry up. *See* ¶107.

At the time of the Proxy, E&Y was also aware of multiple other factors making Brooge a high-risk client. There were material weaknesses in Brooge's internal controls, and Brooge had needed to restate its FY2017 financials to change key liabilities from "non-current" to "current" based on its non-compliance with its debt covenants. ¶¶227, 237. E&Y also knew there was a material uncertainty as to whether Brooge could continue as a going concern, given that its liabilities exceeded its assets by more than $100 million for both FY2018 and 1H FY2019. ¶240.

## B. Brooge's Revenue Scheme

No later than July 2018, E&Y knew Brooge's contract with Coral—the source of 100% of its revenue—was a sham. ¶¶211-16. On July 11, 2018, Brooge's finance manager emailed a member of the E&Y audit team a 1H 2018 Company bank statement confirming that Brooge was receiving no revenue from Coral, the counterparty to the Phase I contract. *See* ¶¶212-15. It also showed that Brooge *was* receiving income from BIA—a related party due to its partial ownership by Hind Mohammed Muktar Ahmed, who also held an ownership stake in Brooge. ¶¶91,

3

212-15. None of these payments aligned with the terms of the Phase I contract. Had E&Y looked into them, it would have discovered a fraud.

Indeed, contrary to Defendants' public representations, Coral never stored any oil or paid any money to Brooge. ¶72. Instead, Brooge was leasing storage directly to end users at lower rates and volumes than in the Coral contract. ¶¶71-75. Brooge falsified invoices to cover up the difference in two distinct ways.[4] First, it created invoices to Coral (which Coral never paid) that matched the dollar amounts paid by the end users, but which had storage volumes adjusted so that the numbers matched the higher rates in the take-or-pay contract. *See, e.g.*, ¶76.[5] Second, to make up the difference in revenue between the contractual rates and its actual revenue from end users, Brooge created large, month-end invoices to Coral (which Coral also never paid) to cover the gaps. ¶85. In reality, it was related-party BIA that sent Brooge funds to cover the invoices. ¶86. Brooge then reimbursed BIA for these payments, meaning BIA, like Coral, never made any net payments to Brooge. ¶¶93-94.

### C.    Related Party BIA

In August 2019, Brooge novated the Phase I contract to replace Coral with BIA, with the terms otherwise remaining unchanged. ¶¶56-57 In September 2019, Brooge novated its Phase II contract to insert BIA, also on the same terms. *Id.* The replacement of two independent customers—one of which was the sole source of Brooge's revenue at the time—with BIA, a related party, in Brooge's two flagship contracts was troubling on its own. ¶¶189-92. Replacing the original counterparties nearly two years later and against a different economic backdrop would, in any arm's-length transaction, be expected to prompt renegotiation of key terms such as

---

[4]    The details of the Brooge fraud are discussed at greater length in the Opposition to the Brooge Defendants' Motion to Dismiss.

[5]    Any site visitation would have made clear that the invoices were false and did not match the actual usage of Brooge's oil storage. ¶¶217-19.

4

pricing.  The complete absence of any such changes indicates that the novations were not the product of genuine economic negotiations.  ¶190.

Even prior to the August 2019 novation, BIA was involved in Brooge's business dealings.  The bank statements sent to E&Y in July 2018 included transfers from BIA to Brooge made more than a year before the contracts were novated to insert BIA.  ¶¶215-16.  Even if BIA had been a counterparty at the time (it was not), the flow of funds from BIA, a presumptive customer, to Brooge would have made little sense.  That BIA remained a related party at the time of the Proxy's filing, with just a vague mention of a "planned sale," only exacerbated the situation.  ¶191.

## II.    E&Y's Audit of the FY2019 Financial Statements

E&Y audited the FY2019 financial statements that were filed with its Form 20-F on June 30, 2020, giving Brooge a clean audit opinion for FY2019.  ¶107 n.30.[6] Prior to the filing of the Form 20-F, the Audit Committee held a meeting on April 9, attended by E&Y.  At that meeting, an E&Y senior manager raised the issue of Brooge's ability to continue as a going concern, as Brooge was in "continual non-compliance" with a loan agreement.  ¶242.  Rather than pay the loan, Brooge was funneling money to other priorities, including IPO and investor fundraising expenses.  ¶244.  Even though the loan non-compliance was established, at the same meeting, the Audit Committee chair discussed that Brooge's management had asked the Board to sign disclosures stating that the Company was, in fact, in full compliance with the loan agreement.  ¶245.  E&Y thus knew no later than April 2020 that Brooge's management had tried to get the Board to lie.  *Id.*

---

[6]    E&Y's audit opinions were repeated in other filings through February 4, 2021. *See* Compl. App'x B (ECF No. 114-2) (Misstatements Chart).

5

## III.    E&Y's Resignation as Brooge's Auditor

In a July 7, 2020 Audit Committee meeting that was convened at E&Y's request to "debrief" after the 20-F's filing, an E&Y audit partner flagged "multiple transactions [involving BIA] subsequent to the yearend." ¶194.  E&Y also noted multiple problems with Brooge's financial reporting, such as: Brooge's finance team was unable to meet the basic requirements of the job; its audit was delayed by management's unavailability; and E&Y was not even formally appointed as Brooge's auditor for FY2019 until just ten days before the original reporting deadline. *See* ¶230.  E&Y admitted that it had not identified these issues to the Audit Committee prior to the filing of the Form 20-F, with its only excuse being that "material weaknesses were already highlighted . . . during the 2018 audits." ¶231.

E&Y was replaced by PwC as Brooge's auditor in October 2020. ¶60.  There were no disagreements between Brooge and E&Y "on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure," and there were no "reportable events." *Id.*  E&Y provided a letter generally agreeing with Brooge's assessment. *Id.*

Furthermore, E&Y never withdrew any of its audit opinions. ¶170 & n.44. Nor did it comment on Brooge's statements in August 2022 when the Company claimed that its prior financials—which E&Y itself had audited—could no longer be relied upon. *See* ¶62.[7]  By not withdrawing its audit opinions, E&Y allowed the market to continue to believe the problems at Brooge were limited in scope and thus addressable.  The truth, which was that Brooge was operating a fraudulent enterprise with falsified financials—all while E&Y was its independent auditor—only emerged in full in December 2023 with the announcement of the C&D Order (the "SEC

---

[7]    Brooge attributed the non-reliance decision "primarily [due to] revenue recognition and other financial reporting and disclosure issues." *Id.*  E&Y apparently blessed the Company's version of events, as Brooge stated the matter was "discussed" with E&Y before Brooge made its announcement. *Id.*

OPPOSITION TO DEFENDANT ERNST & YOUNG'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

Order").  ¶¶132-33.  In the interim, investors lost millions in reliance on E&Y's material misstatements and omissions.  ¶¶127-36.  This lawsuit followed.

## LEGAL STANDARD

In assessing a Fed. R. Civ. P. 12(b)(6) motion in a case arising under the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), courts must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The allegations in the Complaint must be construed in the light most favorable to the plaintiff.  *In re Daou Sys., Inc.,* 411 F.3d 1006, 1013 (9th Cir. 2005).  The PSLRA does not turn a 12(b)(6) motion into a "trial-type, papers-only proceeding, much less one in which defendants get the benefit of every conceivable doubt, including credibility calls. That is reserved for the jury." *In re LDK Solar Sec. Litig.*,584 F. Supp. 2d 1230, 1260 (N.D. Cal. 2008).

## ARGUMENT

### I.    Plaintiff's Claims Against E&Y Are Not Time Barred

E&Y first argues that Plaintiff's claims are barred by the two-year statute of limitations.  E&Y Br. at 8-9.  But its argument is flawed for several cogent reasons.  To begin with, whether Plaintiff should have been on notice of claims is "a fact-intensive inquiry and, thus, generally ill-suited for resolution at the motion to dismiss stage." *In re Bear Stearns Mortg. Pass-Through Certificates Litig.,* 851 F. Supp. 2d 746, 763 (S.D.N.Y. 2012); *In re Bare Escentuals, Inc. Sec. Litig.,* 745 F. Supp. 2d 1052, at *1080 (determination of statute of limitations is fact intensive).  In fact, statute of limitations defenses "'may not be raised by motion to dismiss' unless they include 'no disputed issues of fact.'" *In re Cal. Bail Bond Antitrust Litig.*, 2020 WL 3041316, at *17 (citing *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984)).  Defendants have the burden of proving that the limitations period has run and it is an "especially high hurdle." *Rieckborn v. Jefferies LLC,* 81 F. Supp. 3d 902, 916 (N.D. Cal. 2015).  E&Y fails to meet this heavy burden.

E&Y suggests that all allegations against it could have been brought in August 2022 when Brooge announced that its 2018-2020 financial statements could no longer be relied upon.  However, in disclosing this, Brooge did not explain *why* they were unreliable, nor give any further details that would have put Plaintiff on notice of the scheme and of E&Y's involvement therein.  In fact, E&Y itself makes this point throughout its brief by citing to the July 2018 email and to Audit Committee meeting minutes.  Plaintiff was not in possession of these documents until shortly before filing the Complaint, and certainly not in August 2022.  The two-year limitation simply does not apply here.

In an afterthought, E&Y then suggests that any claims based on E&Y's opinion in the Proxy statement are barred by the five-year statute of repose.  E&Y Br. at 9.  First, even if E&Y is correct, this would only apply to the statements in the Proxy and not to E&Y's later statements.  And the Supreme Court in *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.,* 582 U.S. 497, 497-98 (2017) made clear that the statute of repose is satisfied so long as the original action is timely filed.  Thus, there is no statute of repose problem here because this action was initiated well within the statute of repose and has been pending uninterrupted since then.

## II.   E&Y Made False and Misleading Statements

In each of its audit opinions, E&Y made the following statements:

- In its opinion, "the financial statements present fairly, in all material respects, the financial position of the Company…."
- "We conducted our audits in accordance with the standards of the PCAOB"
- "We believe that our audits provide a reasonable basis for our opinion." ¶171

E&Y's sole argument concerning their falsity is that they are opinions and somehow protected under the Supreme Court's *Omnicare* decision.  But audit opinions are not

8

by definition opinions as E&Y states, and E&Y's self-serving labels do not automatically make them so. *See, e.g.*, *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 399 (S.D.N.Y. 2013) ("Auditors may not shield themselves from liability . . . merely by using the word 'opinion."). As stated in *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.,* 243 F. Supp. 3d 1109, 1116 (E.D. Cal. 2017):

> Audit opinions are not of the same substance as those discussed in *Omnicare.* The Supreme Court in that case keeps a running hypothetical of a CEO who opines, "I believe… the TVs we manufacture have the highest resolution available on the market." These sorts of opinions are qualitatively different from an auditor's professional opinion about the soundness of a company's financial statements. Thus, no amount of couching an audit report as an opinion obviates the certification effect of those reports when made part of a registration statement.

*See also In re Petrobras Sec. Litig.,* 2016 WL 1533553, at *3 (S.D.N.Y. Feb. 19, 2016) (an auditor's "opinion" is a "term of art," which is not "entirely synonymous with the more everyday use of the word "opinion" discussed in *Omnicare*). Furthermore, under *Omnicare* and the Ninth Circuit's application in *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,* 856 F.3d 605 (9th Cir. 2017), an opinion can be actionable in three ways: (1) if the speaker did not genuinely hold the stated belief; (2) if the opinion includes an embedded factual assertion that is false; and (3) if the opinion omits material facts about the basis for the view that would mislead a reasonable investor reading the statement in context. *Id.* at 615-16. E&Y's statements fit into each of these three buckets.

## A. E&Y Did Not Genuinely Believe Its Opinions

Far more than the "mere speculation" E&Y suggests, the Complaint alleges that because E&Y ignored numerous red flags and played a key role in the revenue scheme, it did not subjectively believe that its audits complied with PCAOB standards and provided a reasonable basis for its opinions, and that Brooge's financial statements were presented fairly. Indeed, had E&Y complied with PCAOB standards—as its opinions represented—it would have recognized its opinions

9

lacked a reasonable basis.  And while E&Y attempts to downplay this as "fraud by hindsight," the majority of the red flags described below existed at the time E&Y made each alleged misstatement, and a fraud by hindsight argument only makes sense if the red flags appeared after the truth was revealed.[8]

## B.    E&Y's "Opinions" Were False by Omission

Then E&Y glosses over the omissions that render any "opinions" "actionable."  E&Y Br. at 9-11.  Its statements are actionable because they did not match what E&Y knew or should have considered.  The Complaint alleges E&Y had extensive information about pervasive issues at Brooge—including its reliance on one customer, its related party transactions, and its lack of internal controls.  Courts regularly sustain omission-based opinion claims on similar facts.  *See, e.g.*, *Baron v. HyreCar Inc.*, 2022 WL 17413562, at *11 (C.D. Cal. Dec. 5, 2022) (facts known but omitted render opinion misleading); *Special Situations Fund III QP,* 243 F. Supp. 3d at 1122 (auditor liability where opinion misdescribed financial condition); *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2022 WL 3572474 at *57 (M.D. Pa. Aug. 18, 2022) (similar statements to those here omitted material information including company's failure to disclose impaired loans).

## C.    E&Y's "Opinions" Contained Embedded Statements of Fact

Finally, E&Y claims there are no untrue "embedded statements of fact" in its audit opinions. E&Y Br. at 11.  But there are clearly at least two: that the audits complied with PCAOB standards, and that Brooge's financial statements presented

---

[8]    *See, e.g. In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *17 (S.D.N.Y. Apr. 22, 2016)("Courts often reject an incantation of fraud-by-hindsight when plaintiffs allege that 'the company failed to take into account information that was available to it' at the time the company issued the incorrect statements or omissions."); Furthermore, "evidence of later events can provide useful circumstantial evidence that a given representation was false when made." *Masel v. Villarreal,* 924 F.3d 734, 750 (5th Cir. 2019); *see also Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 644 (S.D.N.Y. 2012) (rejecting fraud by hindsight arguments when there was a "vast gap" between the picture that Defendants presented to investors and the actions that Goldman took).

OPPOSITION TO DEFENDANT ERNST & YOUNG'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

fairly the financial condition of the Company.   In truth, E&Y in no way complied with the PCAOB standards because, as examples, those standards required E&Y to (i) identify "the existence of unusual transactions and events, and amounts, ratios and trends that warrant investigation"; (ii) understand the company's "relationships and transactions with its related parties"; (iii) apply the appropriate "professional skepticism" by maintaining "a questioning mind;" (iv) understand the business rationale for "significant unusual transactions"; and (v) identify related party transactions required to be disclosed.  ¶169.  E&Y did none of these things.  The opinions are therefore actionable even if framed as opinions.

Indeed, courts have long held that these precise statements are statements of fact.  *See, e.g.*, *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1224 (W.D. Wash. 2009) (an "affirmation that the [issuer's] financial statements were presented in conformity with" GAAP "is an actionable statement of fact . . ." and PCAOB compliance statements "a verifiable factual statement."); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 134 (S.D.N.Y. 2013) (same); *In re Silver Wheaton Corp. Sec. Litig.*, 2019 WL 1512269, at *12 (C.D. Cal. Mar. 25, 2019) (holding that auditor's "PCAOB Standards Statement was false").  E&Y's two cases do not dictate otherwise.  *Mehedi v. View, Inc.*, 2023 WL 3592098, at *10 (N.D. Cal. May 22, 2023) was a Section 11 case where the court found a tension between the complaint disclaiming any allegations of fraud and plaintiff arguing that auditors did not sincerely believe their audit opinions. Meanwhile, in *Buttonwood Tree Value Partners, LP v. Sweeney*, 910 F. Supp. 2d 1199, 1208 (C.D. Cal. 2012), the auditor recognized and discussed issues with the company but did not consider them "significant enough" for an adverse opinion. Here, E&Y either performed no audit at all, or it was aware of the glaring issues at the Company and failed to disclose them.  In conclusion, E&Y made actionable materially misleading statements.  Those statements are not protected by *Omnicare*.

11

## III.   Defendants Acted with Scienter

To establish scienter at the pleading stage against an auditor, a complaint must allege that "[T]he accounting practices were so deficient that the audit amounted to no audit al all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *N.M. State Inv. Council v. Ernst & Young, LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011) ("*NMSIC*").  A complaint may meet this standard by alleging that an auditor disregarded "red flags" that would place a reasonable auditor on notice that the company was engaged in wrongdoing to the detriment of its investors.  Red flags "illustrate at the very least behavior that could not conceivably escape a rational auditor's critical eye, if his eyes were open." *Whalen v. Hibernia Foods PLC*, 2005 WL 1799370, at *3.  As the Supreme Court stated in *Tellabs,* the "inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." 551 U.S. at 322-23.  Auditors "cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder."  *In re Phillip Servs. Corp. Sec. Litig.,* 383 F. Supp. 2d 463, 476 (S.D.N.Y. 2004).

The Complaint here pleads a myriad of facts and red flags that, taken together, raise a strong inference that E&Y knew or was deliberately reckless in not knowing that its audits and certifications were materially false or misleading.[9]

---

[9]   Actual knowledge is not required, despite E&Y's insinuations.  In fact, in *NMSIC*, 641 F.3d at 1095, the Ninth Circuit expressly declined to impose a heightened scienter burden on claims against auditors, rejecting a "district court's comment that scienter allegations against accountants or auditors carry 'a little bit of a heavier burden.'"  E&Y's cited case for this heightened standard, *In re Peregrine Sys., Inc. Sec. Litig.*, 2005 WL 8158825, at *65 (S.D. Cal. Mar. 30, 2005), predates *NMSIC*.

12

### A.      The Numerous Red Flags Clearly Demonstrate Scienter

Plaintiff describes a litany of red flags and how even the most cursory audit would have revealed them.  E&Y attempts to pick them apart one by one, but the law forbids exactly that.  "[B]ecause it is elementary that, on a motion to dismiss, the Complaint must be read as a whole, the red flags must be viewed in the aggregate; defendants cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder."  *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 149 (S.D.N.Y. 2021).  Thus, it is the totality of the red flags that demonstrates scienter.  However, even taking them one by one (as E&Y does), each one should have raised the suspicion of E&Y and merited further inquiry.

### 1.      BIA/Related Parties.

The fact that in 2018, Brooge was supposed to get 100% of its revenue from the Phase I customer should alone have been a red flag for E&Y and caused it at an absolute minimum *to contact the Phase I customer*.  It never did this.  Then, once BIA was more involved, the red flag elevated at numerous junctures:

- When BIA took over for the Phase I and the Phase II customers.  ¶190. At that time, BIA was already a related party, as one of BIA's partial owners also held an ownership stake in Brooge.  ¶191.

- When, in February, 2020, Brooge replaced another partner with BIA. ¶193.

- In April 2020, when BIA leased back to Brooge a portion of its contract without providing valid reasons.  ¶195.

13

At no point did E&Y investigate this relationship, even though transfers from BIA were listed as "inter group transfers," flagging them as a related party. ¶215.[10]

E&Y's only defense is to state that it was somehow "diligen[t]" because it was always skeptical of the BIA relationship and ultimately terminated its relationship with Brooge over it. E&Y Br. at 15. But it did so only over two years and multiple clean audit opinions. In fact, the Form 6-K announcing E&Y's departure stated that "there were no disagreements with E&Y…" ¶60. E&Y even provided Brooge with a letter stating it was in "general agreement" with the 6-K statements. *Id.* This alone defeats E&Y's "skeptical" argument. *See, e.g.*, *NMSIC*, 641 F.3d at 1098 (finding scienter where plaintiffs alleged that the auditor was "suspicious" about the timing of a large option grant but nonetheless did "not take steps to verify the accuracy of the grant").[11] Far from a "badge of good faith," this lapse shows that E&Y willfully failed to further investigate issues it was duty bound to address.

### 2.    Internal Controls

In the Proxy, E&Y disclosed that it had identified material weaknesses in internal controls over financial reporting and that these included a lack of sufficiently skilled personnel with SEC reporting knowledge. ¶227. E&Y also noted that Brooge was not required to perform an evaluation of internal controls but that had such a review been done: "additional control deficiencies may have been identified . . ." *Id.* These issues were never rectified. Indeed, at the July 7, 2020 Audit

---

[10]    This is particularly incriminating combined with the actual documents sent to E&Y and cited in the Complaint. The July 11, 2018 email to E&Y attached a copy of a Brooge bank statement with multiple questionable transfers, including at least two substantial unexplained transfers from BIA into Brooge's accounts. ¶212.

[11]    Once again, E&Y relies on *Buttonwood Tree Value Partners*, 910 F. Supp. 2d at 1207-08. But that case contained allegations that the auditor *did* recognize weaknesses and provided recommendations to the company, including that it tested the valuation of loans, spoke to the audit committee, and identified areas of concern. Thus, the auditor there, unlike E&Y, actually acted on its suspicions.

Committee meeting with E&Y, the topic of Brooge's finance team being unable to meet basic requirements was highlighted. ¶230. The lack of competent accounting staff should have been a red flag to look closer. E&Y claims that because it cautioned investors that there was a lack of internal controls involving "shaky" accounting systems (E&Y Br. at 16), there can be no inference of scienter. But E&Y misses the point. The lack of internal controls may not in and of itself establish fraud, but it certainly would have alerted E&Y to the need to monitor or investigate.

### 3. Usage and Contract Terms

The glaring mismatches between the actual usage, fees, and contract terms should have alerted E&Y to look further. There were made up ancillary services, mischaracterized payments, and rates charged that differed from the fake invoices.[12] E&Y thus failed to check basic information, such as the "shortfall" invoices with significantly higher amounts due, that it was duty bound to collect and examine. While E&Y claims that Brooge gave it fake invoices as well, the Complaint shows how between December 2017 and July 2019 alone, there were more than one hundred invoices to Coral that contained false information. ¶82. Had E&Y bothered to check a single one of these or to contact Coral, it would have discovered the mismatches. These are not complicated accounting manipulations, but basic math, further contributing to the inference of scienter. *See, e.g.*, *In re Phillip Servs.*, 383 F. Supp. 2d at 475 ("highly suspicious" and "massive" increases in inventory, and "obvious simplicity" of fraud "would be clearly evident to any auditor performing its duties"); *Munoz v. China Expert Technology, Inc.*, 2011 WL 5346323 (S.D.N.Y. Nov. 7, 2011) (upholding claims against auditor where it did not check whether customer contracts were fraudulent and had in fact generated the revenue claimed).

---

[12] The Complaint gives an example of a customer paying $2.30 per cubic meter for storage when the contract/invoice rate was $5.00 per cubic meter. ¶219.

15

Furthermore, E&Y's reliance solely on management rather than customers or site visits "evidences recklessness" in conducting its audit. *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 373 (D. N.J. 1999). *See also NMSIC*, 641 F.3d at 1100 (accepting management at its word and failing to investigate even after being alerted to potential problems supporting an inference of scienter); *In re New Century,* 588 F. Supp. 2d 1206, 1235 (C.D. Cal. 2008) (auditor's acceptance of incomplete documentation concerning a company's valuation method may support a strong inference of scienter).[13] E&Y's recklessness is even more evident given the lack of skilled personnel it noted, its own comment that management was "unavailable," and its express awareness of at least one instance of blatant dishonesty by Brooge executives.

### 4.    Prior Restatements

Additionally, that Brooge previously restated its financials was a further red flag for E&Y. E&Y's lone argument for the 2017 restatement is that it is somehow to be expected from a foreign issuer. E&Y Br. at 17. But this misses the point. The presence of warning signs does not establish fraud, but required E&Y to look more closely and to structure an audit focusing on problem areas. Furthermore, the errors in the 2017 financials, as noted by E&Y itself, included the erroneous classification of debt as "non current liability," which when reclassified, increased the Company's liabilities by more than 650% and impacted the Company's ability to continue as a going concern. ¶237. This is a far cry from the small "foreign" issues E&Y attempts to assign to the restatement and should have been a red flag.

---

[13]    In *In re DNTW Chartered Accountants Sec. Litig.*, 96 F. Supp. 3d 155, 167 (S.D.N.Y. 2015), cited by E&Y, the auditor, far from relying on the statements of management, sought independent corroboration. As a result of the auditor's questioning, assets were converted to expenses.

16

### 5. Size of Issues

The sheer magnitude of the fraud here was also a red flag. Allegations demonstrating the magnitude and importance of the fraud here include that:

- Brooge fabricated its revenue for 2018-2020 *by at times over 80%.* ¶3.

- The Phase I customer accounted for *100 percent* of Brooge's revenue for the year ended December 31, 2018, (¶55) but Brooge actually received *nothing* from it. ¶67.

- Between August 2019 and December 2020, more than *two hundred* fake invoices to BIA were created. ¶83

- The "shortfall" invoices to either the Phase I customer or BIA were extremely large—ranging from **$2.5 million to $3.4 million**. ¶86.

These alone give rise to an inference that E&Y acted recklessly. *See, e.g.*, *In re Leslie Fay Cos., Inc. Sec. Litig.,* 835 F. Supp. 167, 175 (S.D.N.Y. 1993) ("when tidal waves of accounting fraud are alleged, it may be determined that the accountant's failure to discover his client's fraud raises an inference of scienter on the face of the pleading"); *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 160 (D. Mass. 2002) (overstatement of earnings by 103% is probative of KPMG's scienter); *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 507 (W.D. Pa. 2002) (restatement of earnings resulting in reduction of earnings per share from $0.66 to $0.04 is probative of scienter); *Cendant*, 60 F. Supp. 2d at 372-73 (denying E&Y's motion to dismiss where earnings per share were overstated by 130%). It also distinguishes this case from many of those cited by E&Y and involving far smaller issues, including *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002), concerning twelve transactions, and *Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1008 (S.D. Cal. 2000), involving transactions amounting to 3 to 10% of the reported revenues.

17

### 6.   Going Concern

In the Proxy, E&Y stated that Brooge's liabilities exceeded its assets by over $100 million and it was in default on at least one loan.  ¶240.  E&Y was thus well aware of these issues, and they were a glaring red flag.  To get around this, E&Y parses apart the 2020 Audit Committee meeting and offers a different explanation and interpretation of them.  E&Y Br. at 18.  This is completely inappropriate at the motion to dismiss stage and is reserved, at best, for summary judgment.

Plus, the allegations in the Complaint suggest numerous further red flags that courts routinely consider when finding a sufficient showing of scienter against an auditor.  Those include the speed with which others uncovered the revenue scheme.  By August 17, 2022, "a respected global law firm and an expert accounting consultancy firm" had concluded that the financial statements could not be relied upon.  Such a quick uncovering of the fraud by another party supports the inference of E&Y's scienter.  *See, e.g.*, *Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 942 (N.D. Ill. 1999) ("conditions readily discoverable by a third party suggests that an auditor and consultant was likely aware of those conditions").  In fact, it is unfathomable that E&Y did not obtain this information when outsiders did.  *See, e.g.*, *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 280 (3rd Cir. 2006) (fraud "hiding in plain sight" and "even a cursory inquiry" would have uncovered it); *Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 686 (E.D. Pa. 2004) (claim upheld when "the flaws were so obvious" that an outside consultant identified them).

Additionally, the Complaint discusses the E&Y client acceptance process involving supposedly careful due diligence that allegedly included assessing "the need for internal investigation," and "investigation by a private investigative agency."  ¶182.  E&Y also boasted that it reviewed whether to keep clients on an annual basis, allegedly employing "additional oversight procedures."  ¶183.  Such

18

diligence would have at least uncovered that it needed to do further investigation or monitoring at Brooge.   E&Y was duty bound as Brooge's auditor to inspect competent audit evidence.  Had E&Y done this basic task, it would have immediately been alerted to the fraud.  Taken collectively—as they must be—the cumulative red flags clearly establish scienter here.

### B.  The Inference of Scienter Is Strong

The inference of scienter need not be irrefutable, a "smoking gun," or even the "most plausible of competing inferences."  *Tellabs,* 551 U.S. at 324.  A strong inference exists "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.*  The most compelling inferences here are either: (1) that E&Y actually knew of the fraud, in which case its certifications were knowingly false; or (2) that E&Y did not know of the fraud, which could only happen as a result of audit procedures that were so sub-standard that E&Y refused to investigate the doubtful.

E&Y attempts to claim the more compelling inference is that it was somehow also a "victim" of Brooge, but this argument is severely flawed.  To begin with, E&Y relies heavily on motive.  E&Y Br. at 19-20.  But while motive is not required, "auditors have powerful economic incentives to deliver aggressive and even fraudulent audit reports, stemming from their desire to obtain lucrative non-audit work."  Giden Mark, *Accounting Fraud: Pleading Scienter of Auditors Under the PSLRA,* 39 CONN. L. REV. 1097, 1103 (2007); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1197 n.79 (C.D. Cal. 2008) ("outside auditors' economic incentives weigh, if at all, somewhat against auditors" for purposes of scienter).[14]  And, on top of this, the Complaint alleges a separate motive allegation

---

[14]    *See also* Robert A. Prentice, *The Case of the Irrational Auditor: A Behavioral Insight into Securities Fraud Litigation,* 95 NW. U. L. REV. 133, 142 (2000)

which E&Y completely downplays:  one of the most powerful individuals in the UAE, Sheik MBK, was a substantial Brooge shareholder, and E&Y would not have wanted to run afoul of him but rather to curry his favor.  ¶187.  At the pleading stage, despite E&Y's attempts, these allegations must be taken as true and add to the already compelling inference of scienter.

The only other support for E&Y's preferred inference is the SEC order.  But this proves nothing.  *See, e.g.*, *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 200, n.5 (2nd Cir. 2009) ("SEC charges simply are not a prerequisite to pleading recklessness with regard to accounting and financial reporting violations."); *In re New Century*, 588 F. Supp. 2d at 1234 ("The Court is not persuaded that the [bankruptcy] Examiner's finding that there was no evidence of intentional misrepresentation to be dispositive at the pleading stage."). The SEC was not tasked with evaluating the work of E&Y.

In conclusion, here, as in analogous cases, "Plaintiff alleges in your face facts that cry out how could [the auditor] not have known that the financial statements were false."  *In re Oxford Health Plans, Inc. Sec. Litig.,* 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999) (citation modified).  Taking all the facts alleged collectively and in the light most favorable to Plaintiff, as is required under Supreme Court and Ninth Circuit authority, scienter is demonstrated by E&Y's "egregious refusal to see the obvious, or to investigate the doubtful."  *NMSIC*, 641 F.3d at 1098.

## IV.    Plaintiff Adequately Pleads Loss Causation Against E&Y

Pleading loss causation requires allegations of "a causal connection between the material [misstatements or omissions] and the loss."  *Dura Pharms., Inc. v.*

---

("[a]uditors' rationality, like that of the rest of the population, is highly suspect . . . ."); Gideon Mark, *Accounting Fraud: Pleading Scienter of Auditors Under the PSLRA,* 39 CONN. L. REV. AT 1204 ("Any damage to auditor reputation that does occur is mitigated by positive cash flow.  Mitigation often occurs in the form of revenue from nonaudit services, such as consulting and tax.").

*Broudo*, 544 U.S. 336, 342 (2005). Plaintiffs need only allege that "revelation of fraudulent activity, rather than changing market conditions or other unrelated factors, proximately caused the decline in defendant's stock price"—which is typically done by "plausibly" alleging corrective disclosures by which "defendant's fraud was revealed to the market and caused the resulting losses." *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1204 n.5, 1205 n.7 (9th Cir. 2020). Plaintiff may also plead "materialization of the risk," alleging that corrective discloses revealed the true extent of relevant risk. *See In re WageWorks, Inc., Sec. Lit.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020). Loss causation allegations suffice "so long as they give defendant notice of plaintiff's . . . theory and provide . . . some assurance that the theory has a basis in fact." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 793 n.16 (9th Cir. 2020).

Here, Plaintiff alleges both corrective disclosures and a materialization of the risk. ¶¶127-36. The truth about Defendants' misconduct leaked into the market through a series of partial disclosures on December 8, 2022 (announcement of the CEO's abrupt resignation), January 20, 2023 (Form 6-K exposing likely illegal acts), and December 22, 2023 (disclosure that Brooge had settled SEC charges.[15] Each of these disclosures was a successive stage in the materialization of the risks Defendants concealed—that Brooge's financial results were fabricated through a fake invoicing scheme. *See In re Fastly, Inc. Sec. Litig.*, 2025 WL 2721693, at *23 (N.D. Cal. Sept. 24, 2025) ("[U]nder the materialization-of-the-risk approach, loss causation 'may be shown even where the alleged fraud is not necessarily revealed

---

[15]    Between the time of the first corrective disclosure on December 8, 2022, and the final corrective disclosure in December 2023, Brooge's stock price declined from $5.74 per share to $2.75 per share—a drop of 52.1%. ¶134.

21

prior to the economic loss.'").[16]  In fact, the final disclosure and the accompanying SEC Order is a textbook corrective disclosure sufficient to plead loss causation. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1203 (9th Cir. 2016) ("[T]he announcement of an SEC investigation related to an alleged misrepresentation, coupled with a subsequent revelation of the inaccuracy of that misrepresentation, can serve as a corrective disclosure for the purpose of loss causation."). E&Y's arguments on loss causation all fail.

## A.     August 17, 2022 Was Not a Corrective Disclosure

E&Y first argues that the August 17, 2022 filing stating that Brooge's financial statements should not be relied upon is the corrective disclosure that fully revealed the "truth" about the reliability of its audits. E&Y Br. at 21. It then argues that because Brooge's stock price rose following this, Plaintiff cannot allege loss causation. *Id.* at 22. E&Y is wrong on both the facts and the law.

To begin with, E&Y's argument that the truth entered the market in August 2022 is a factual inquiry that cannot be resolved at the pleading stage. *See Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 482 (2013) (proof that "news of the truth credibly entered the market and dissipated the effects of prior misstatements" is an issue for trial or summary judgment.); *Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*, 2024 WL 4353049, at *19 (N.D. Cal. Sept. 30, 2024) (same); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1185 n.25

---

[16]     *See also In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d at 790 (To be corrective, it "is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading"); *Hildes v. Andersen*, 2010 WL 4811975, at *4 (S.D. Cal. Nov. 8, 2010) (loss causation adequately alleged where an audit report approved improper revenue recognition and the company's stock price declined "after the truth became known" regarding the improper revenue recognition.); *Winstar Commc'ns v. Rouhana*, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) (loss causation against an auditor adequately alleged where plaintiffs alleged that financial statements had been materially inflated and that the audit conducted by the defendant accounting firm was flawed and concealed the accounting fraud, which when revealed led to the investors' losses).

22

(C.D. Cal. 2011) (The "truth on the market" defense "requires a fact-intensive inquiry that is better reserved for summary judgment").

Second, the August 17 filing was not a corrective disclosure at all. It was itself misleading and conveyed no corrective information to the market. *See Ohio Pub. Emps. Ret. Sys.*, 2024 WL 4353049, at *19 (earlier statement did not disclose the truth where the plaintiff alleged the statement was false and misleading, and thus "did not disseminate knowledge to the market"). The August 17 announcement simply disclosed that revenue recognition and other financial reporting issues existed that could supposedly be addressed by a proposed remediation plan. ¶63. EY did not even withdraw its audit opinions. ¶170 n.44. It came nowhere near disclosing that Brooge's entire operation was a scam. E&Y's clean audit opinions were not misleading because certain line items in the financial statements were wrong (as the August 17 disclosure suggested), but because they certified the legitimacy of a business that effectively *did not exist*. [17]

**B.    Plaintiff Has Incurred Significant Economic Loss**

E&Y's next argument is that Plaintiff somehow cannot state a claim because its common stock transactions reflect a net gain of $281,380. E&Y Br. at 23-24. First, this is again a question of fact that cannot be resolved at this stage. *Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.*, 793 F. Supp. 2d 1138, 1144 (C.D. Cal. 2011) ("[T]he netting of each Plaintiff's gains and losses is a detailed inquiry which the Court is unable to undertake at [the motion to dismiss]

---

[17]    The cases cited by E&Y relating to the August 17 announcement are distinguishable even assuming *arguendo* it did constitute a corrective disclosure. In *In re Verisign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1208 (N.D. Cal. 2007), plaintiff failed to allege *any* connection between the fraud and the *single* alleged corrective disclosure that led to a stock drop, where there were other prior announcements that constituted "disclosure to the market" after which the stock went up. Not so here. Likewise distinguishable, in *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021), there was a "quick and *sustained* price recovery" *after* a drop. Here there is no issue of sustained price recovery.

23

stage of the litigation."). This argument is also legally baseless. E&Y reaches this conclusion by carving out Plaintiff's common stock trades—without citing a single case permitting such cherry-picking—and ignoring that Plaintiff incurred $592,236.53 in losses on warrants, resulting in an overall net loss of $310,856.68. ECF No. 19-3 at 104.[18] This improper carving is routinely rejected by courts. *In re Upstart Holdings, Inc. Sec. Litig.*, 348 F.R.D. 612, 625 (S.D. Ohio 2025) (where plaintiff's losses on options dwarfed gains on common stock sales, plaintiff "did not make a net profit on the covered securities").[19] And even if Plaintiff had earned a net profit (it did not), it would be of no significance to the loss causation inquiry.[20] *Painters and Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 674 F. Supp. 3d 799, 826 (C.D. Cal. 2023), *aff'd*, 2025 WL 1683472 (9th Cir. June 16, 2025) ("To the extent that class members were relieved of their money by [defendant's] deceptive conduct—as Plaintiffs allege—they have suffered an 'injury in fact.' . . . whether the net economic loss is zero (or negative) is a question of *damages*, not injury.") (emphasis in original); *Bond v. Clover Health Invs., Corp.*, 2023 WL 1999859, at *7 (M.D. Tenn. Feb. 14, 2023) ("There is no contradiction between [plaintiff] having been a victim of fraud related to [defendant's] securities and the fact that he ultimately made a net profit off of those securities. Fraud requires only that the plaintiff was injured, not that he never enjoyed a benefit.").

---

[18] Plaintiff includes Brooge Warrants (which were publicly traded securities) in the class definition. ¶251.

[19] E&Y's reference to *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021) (E&Y Br. at 24) in support of this argument is inapposite, as it is a consumer (not securities) action that does not address net economic loss.

[20] Nor would it impact standing. *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1412 (9th Cir. 1987) (emphasis added). ("In a securities fraud case, the "cognizable injury occurs *at the time an investor enters . . . into a transaction* as a result of material misrepresentations. This constitutes the injury giving rise to a cause of action, even if an actual monetary loss is not sustained until later.").

## C.    Plaintiff's Trading Record Does Not Foreclose Loss Causation

Finally, E&Y argues that there is no loss causation because Plaintiff sold all Brooge common shares relevant to its claim against E&Y before the first alleged corrective disclosure.  E&Y Br. at 24.  This characterization is plainly inaccurate. Plaintiff traded common stock shares in late 2023 (ECF No. 19-3 at 102-103) and thus cannot be reasonably categorized as an "in-out-trader" who sold prior to corrective disclosures.  E&Y's unsound argument to the contrary appears to rely on a string of speculative assumptions about which trades are "relevant," which shares Plaintiff purchased "as a result of [E&Y's] misstatements," how certain corrective disclosures affected the market, and which disclosures are relevant to E&Y's misstatements.  E&Y Br. at 24.  These assumptions are both convoluted and fact-intensive—precisely the type of issues that cannot be resolved at the pleading stage.[21]

## CONCLUSION

For the foregoing reasons, the Motion should be denied.[22]

DATED:  December 17, 2025    Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

s/ Amanda F. Lawrence
Amanda F. Lawrence (admitted *pro hac vice*)
156 S. Main St.
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 404-7770
Facsimile:  (860) 537-4432
alawrence@scott-scott.com

---

[21]    Tellingly, the cases E&Y cites—*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009) and *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 594 (N.D. Cal. 2009)—were decided at the *class certification* stage.

[22]    If the Complaint is dismissed, Plaintiff respectfully requests leave to amend. *See Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1118 (N.D. Cal. 2003) (leave to amend should be liberally granted).

Anna Hunanyan (CA 330609)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Ave., 24th Fl.
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
ahunanyan@scott-scott.com

John T. Jasnoch (CA 281605)
Cornelia J. B. Gordon (CA 320207)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508
jjasnoch@scott-scott.com
cgordon@scott-scott.com

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile:  310-388-0192
brian@schallfirm.com

*Attorneys for Lead Plaintiff Bluefin Capital Management, LLC and Co-Lead Counsel*

26

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Lead Plaintiff Bluefin Capital Management, LLC, certifies that this Opposition to Defendant Ernst & Young's Motion to Dismiss the Second Amended Complaint is twenty-five pages in length and complies with the 25-page limit of this Court's Standing Order, ¶ F(3), Dated December 17, 2024, docketed in this action as ECF No. 48.

DATED: December 17, 2025

s/ Amanda F. Lawrence

Amanda F. Lawrence (admitted *pro hac vice*)

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of this filing via electronic means to all counsel of record.


DATED: December 17, 2025

s/ Amanda F. Lawrence
Amanda F. Lawrence (admitted *pro hac vice*)

28

OPPOSITION TO DEFENDANT ERNST & YOUNG'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM
