Amanda F. Lawrence (admitted *pro hac vice*)
alawrence@scott-scott.com
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 S. Main St.
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 404-7770
Facsimile:  (860) 537-4432

*Attorneys for Lead Plaintiff*
*Bluefin Capital Management, LLC*

[Additional Counsel on Signature Page.]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ERIC WHITE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BROOGE ENERGY LIMITED, et al.,<br><br>Defendants. | Case No.: 2:24-cv-00959-AH-DFM<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT PRICEWATERHOUSECOOPERS LIMITED PARTNERSHIP, DUBAI BRANCH'S MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BRIEF STATEMENT OF RELEVANT FACTS.......................................................2

    I.    PwC's FY2020 Audit ................................................................3

        A.    The State of Play at the Time of PwC's Appointment ..............3

        B.    Events Occurring After PwC's Appointment ...........................4

        C.    Post FY2020 Audit Meetings and Documents .........................6

LEGAL STANDARD................................................................................................7

ARGUMENT .........................................................................................................7

    II.    PwC Made False and Misleading Statements .........................................8

        A.    PwC's "Opinions" Contained Embedded Statements of Fact....9

        B.    PwC Did Not Genuinely Believe Its Opinions .........................10

        C.    PwC's "Opinions" Were False Due to Omissions....................10

    III.    Plaintiff Has Alleged a Strong Inference of Scienter.........................12

        A.    Fraudulent Intent .........................................................13

        B.    Red Flags Analysis.........................................................13

            1.    Related Party Transactions .............................................15

            2.    Inconsistencies in Invoices .............................................16

            3.    E&Y Resignation, Material Weakness and

                     Restatements .................................................................17

            4.    Contradictions in Documents Sent to PwC ....................18

            5.    Other Red Flags .............................................................18

        C.    Inference.........................................................................20

        D.    Motive .............................................................................21

    IV.    Plaintiff Adequately Pleads Loss Causation Against PwC.................21

        A.    PwC's Truth on the Market Defense Fails Because the
Disclosures Were Misleading .................................................23

OPPOSITION TO DEFENDANT PRICEWATERHOUSECOOPER'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

B.    PwC's Truth on the Market Defense Presents a Question of Fact Inappropriate for Resolution at This Stage ........................25

CONCLUSION ..................................................................................................25

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Battery Techs., Inc. v. Bagell*,
781 F.3d 638 (2d Cir. 2015) ................................................................................20

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
824 F. Supp. 2d 1164 (C.D. Cal. 2011) ...............................................................24

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) .............................................................................................24

*Argent Classic Convertible Arbitrage Fund, L.P. v. Rite Aid Corp., et al,*
315 F. Supp. 2d 666 (E.D. Pa. 2004) ..................................................................19

*Baron v. HyreCar, Inc.*,
2022 WL 17413562 (C.D. Cal. Dec. 5, 2022) .....................................................11

*Borenstein v. Animal Found.*,
2022 WL 17968059 (D. Nev. July 18, 2022) ......................................................25

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ......................................................11

*Brown v. Ambow Educ. Holding Ltd.*,
2014 WL 523166 (C.D. Cal. Feb. 6, 2014) .........................................................22

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech, Inc.*,
856 F.3d 605 (9th Cir. 2017) ............................................................................8, 9

*Danis v. USN Commc'ns, Inc.*,
73 F. Supp. 2d 923 (N.D. Ill. 1999) ....................................................................19

*DuraPharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ..........................................................................................7, 21

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JPMorgan Chase Co.*,
553 F.3d 187 (2nd Cir. 2009) ..............................................................................20

*Grigsby v. BofI Holding, Inc.*,
979 F.3d 1198 (9th Cir. 2020) .............................................................................21

*Hildes v. Andersen*,
2010 WL 4811975 (S.D. Cal. Nov. 8, 2010) .......................................................22

*In re Aegean Marine Petroleum Network, Inc.*,
529 F. Supp. 3d 111 (S.D.N.Y. 2021) ............................................................14, 17

iii

*In re Am. Bus. Fin. Servs., Inc. Noteholders Litig.*,
 2008 WL 3405580 (E.D. Pa. Aug. 11, 2008) .......................................................14

*In re BofI Holding, Inc. Sec. Litig.*,
 977 F.3d 781 (9th Cir. 2020) ............................................................................22

*In re Cendant Corp. Litig.*,
 60 F. Supp. 2d 354 (D.N.J. 1999) .................................................................16, 19

*In re Countrywide Fin. Corp. Sec. Litig.*,
 588 F. Supp. 2d 1132 (C.D. Cal. 2008) .......................................................18, 20

*In re Daou Sys., Inc.*,
 411 F.3d 1006 (9th Cir. 2005) .............................................................................7

*In re DNTW Chartered Accountants Sec. Litig.*,
 172 F. Supp. 3d 675 (S.D.N.Y. 2016) ................................................................14

*In re Fastly, Inc. Sec. Litig.*,
 2025 WL 2721693 (N.D. Cal. Sept. 24, 2025) ...................................................22

*In re Gilead Scis. Sec. Litig.*,
 536 F.3d 1049 (9th Cir. 2008) ...........................................................................24

*In re Homestore.com, Inc. Sec. Litig.*,
 252 F. Supp. 2d 1018 (C.D. Cal. 2003) .............................................................15

*In re Lernout & Hauspie Sec. Litig.*,
 230 F. Supp. 2d 152 (D. Mass. 2002) ................................................................18

*In re Leslie Fay Cos. Sec. Litig.*,
 835 F. Supp. 167 (S.D.N.Y. 1993) .....................................................................14

*In re MicroStrategy, Inc. Sec. Litig.*,
 115 F. Supp. 2d 620 (E.D. Va. 2000) .................................................................19

*In re New Century*,
 588 F. Supp. 2d 1206 (C.D. Cal. 2008) .......................................................16, 20

*In re Nuvelo, Inc. Sec. Litig.*,
 668 F. Supp. 2d 1217 (N.D. Cal. 2009) .............................................................11

*In re OSG Sec. Litig.*,
 971 F. Supp. 2d 387 (S.D.N.Y. Sept. 10, 2013) ..................................................8

*In re Oxford Health Plans, Inc. Sec. Litig.*,
 51 F. Supp. 2d 290 (S.D.N.Y. 1999) ..................................................................21

*In re Parmalat Sec. Litig.*,
 375 F. Supp. 2d 278 (S.D.N.Y. 2005) ..................................................................1

*In re Petrobras Sec. Litig.*,
 2016 WL 1533553 (S.D.N.Y. Feb. 19, 2016) ......................................................8

iv

*In re Phillip Servs. Corp., Sec., Litig.*,
  383 F. Supp. 2d 463 (S.D.N.Y. 2004) ..............................................................16

*In re Rent-a-Way Sec. Litig.*,
  209 F. Supp. 2d 493 (W.D. Pa. 2002).............................................................18

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
  380 F. Supp. 2d 509 (D.N.J. 2005).................................................................15

*In re Silver Wheaton Corp. Sec. Litig.*,
  2019 WL 1512269 (C.D. Cal. Mar. 25, 2019)...................................................9

*In re Sunterra Corp. Sec. Litig.*,
  199 F. Supp. 2d 1308 (M.D. Fla. 2002)...........................................................13

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006) ......................................................................13, 19

*In re Verisign, Inc., Derivative Litig.*,
  531 F. Supp. 2d 1173 (N.D. Cal. 2007)............................................................24

*In re WageWorks, Inc. Sec. Lit.*,
  2020 WL 2896547 (N.D. Cal. June 1, 2020).....................................................21

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*,
  694 F. Supp. 2d 1192 (W.D. Wash. 2009) .....................................................9, 23

*In re Wilmington Tr. Sec. Litig.*,
  29 F. Supp. 3d 432 (D. Del. 2014)...................................................................13

*Kove IO, Inc. v. Amazon Web Servs., Inc.*,
  745 F. Supp. 3d 685 (N.D. Ill. 2024)...............................................................25

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) .........................................................................23

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ...........................................................................24

*McCracken v. Thor Motor Coach Inc.*,
  2015 WL 13566918 (D. Ariz. Dec. 3, 2015).....................................................25

*McIntire v. China MediaExpress Holdings, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013) ................................................................9

*Munoz, et al v. China Expert Technology, Inc.*,
  2011 WL 5346323 (S.D.N.Y. Nov. 4, 2011).....................................................16

*New Mexico State Inv. Council v. Ernst & Young LLP*,
  641 F.3d 1089 (9th Cir. 2011) ........................................................12, 14, 15, 16

*Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*,
  2024 WL 4353049 (N.D. Cal. Sept. 30, 2024)............................................23, 24

v

*Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
  2022 WL 3572474 (M.D. Pa. Aug. 18, 2022) ......................................................11

*Reiger v. PriceWaterHouseCoopers, LLP*,
  117 F. Supp. 2d 1003 (S.D. Cal. 2000) ..........................................................14, 18

*Southeastern Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
  2015 WL 3833849 (M.D. Pa. June 22, 2015) ......................................................11

*Southeastern Pennsylvania Transportation Authority v. Orrstown Fin. Servs., Inc.*,
  2016 WL 7117455 (M.D.Pa. Dec. 7, 2016) ..........................................................10

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
  243 F. Supp. 3d 1109 (E.D. Cal. 2017) ...........................................................8, 11

*Starr Int'l U.S.A. Invs. v. Ernst & Young, LLP*,
  131 F. Supp. 3d 241 (S.D.N.Y. 2015) ..................................................................10

*Swanson v. U.S. Forest Serv.*,
  87 F.3d 339 (9th Cir. 1996) ..................................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...............................................................................7, 13, 19

*United States v. Arthur Young & Co.*,
  465 U.S. 805 (1984).................................................................................................1

*Whalen v. Hibernia Foods PLC*,
  2005 WL 1799370 (S.D.N.Y. Aug. 1, 2005).......................................................14

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) .............................................................................24

*Zucco Partners LLC v. Digimare Corp.*,
  552 F.3d 981 (9th Cir. 2009) ...............................................................................21

**Statutes**

Private Securities Litigation Reform Act of 1995 ...............................................7, 20

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)...............................................................................................7

Plaintiff Bluefin Capital Management, LLC ("Plaintiff" or "Bluefin") respectfully submits this opposition to Defendant PricewaterhouseCoopers, Dubai Branch's ("PwC") Motion to Dismiss the Second Amended Class Action Complaint (ECF No. 133-1, the "Motion" and "PWC Br."). As discussed below, the Motion should be denied in its entirety.

## INTRODUCTION

*Independent auditors serve a very crucial role in the functioning of world capital markets because they are reputational intermediaries. In certifying a company's financial statements, their reputations for independence and probity signal the accuracy of the information disclosed by the company.*

*In re Parmalat Sec. Litig.,* 375 F. Supp. 2d 278, 289 (S.D.N.Y. 2005). As Brooge's independent auditor, PwC played a critical role as a "public watchdog."[1] Investors, creditors, and others relied on PwC's audit opinions to assess Brooge's finances. *Id.* The Public Company Accounting Oversight Board ("PCAOB") standards required PwC to perform its financial audit to obtain "reasonable assurance" that Brooge's financial statements were free of material misstatements. ¶¶164-68. PwC, in auditing Brooge's fiscal year ("FY") 2020 financial statements, simply did not do this. Instead, PwC attested to Brooge's false financial statements for FY2020 and, in doing so, itself made glaring misrepresentations. Faced with well-pled allegations, PwC has little choice but to downplay its failures and point to the conclusory findings of the C&D Order (the "SEC Order"). Its only other tactic is to cherry-pick from that order and from the Complaint's allegations. In doing so, PwC ignores the mountain of facts alleged in the Complaint showing its alarming failures in the face of a blatant fraud.

PwC seeks dismissal on the basis of falsity, scienter and loss causation. It concedes all other elements of a §10(b) claim. As to falsity, PwC's efforts to avoid

---

[1]   *United States v. Arthur Young & Co.*, 465 U.S. 805, 818 (1984).

liability by casting its statements as "opinions" are in vain as they fall into all three possible exceptions. For scienter, Plaintiff pleads an abundance of red flags that PwC necessarily would have encountered had it performed its duties an auditor. When considered in the aggregate, these red flags support an inference of scienter more than sufficient to move forward at this stage. Far from "fraud by hindsight," the red flags existed and were ignored at the time PwC made its false and misleading statements. Finally, as to loss causation, PwC simply ignores the three true corrective disclosure dates, proffering its own fact-intensive counter narrative. For these reasons and those discussed herein, PwC's Motion should be denied.

## BRIEF STATEMENT OF RELEVANT FACTS

Brooge[2] was incorporated in 2013 in the United Arab Emirates with the support and backing of an Emirati sheikh. ¶¶48, 187.[3] In 2019, the Company went public with Ernst & Young ("E&Y") as its auditor.[4] ¶¶33, 46, 48-50, 59. After providing a clean audit opinion for the 2019 Proxy and for FY2019, E&Y withdrew as Brooge's auditor in October of 2020 and PwC stepped in. ¶¶60, 171-73. Allegedly, it did so only after conducting a "powerful" client acceptance and retention process. ¶185. That process required PwC to assess whether risks related to the client were manageable, and to evaluate "[t]he reputation of the company and its management," incentives for management "to manipulate reported results," and transactions with related parties. ¶¶184-85. As discussed below, PwC failed to live up to both its own and the PCAOB standards.

---

[2]    For ease of reference, "Brooge" or the "Company" as used herein refers to Brooge Petroleum and Gas Investment Company FZE ("BPGIC FZE," f/k/a Brooge Petroleum and Gas Investment Company FZC) before the business combination, and Brooge Energy Limited after the business combination.
[3]    Unless otherwise noted, defined terms have the same meanings ascribed to them in the Second Amended Complaint (ECF No. 114) (the "Complaint"). All ¶ or ¶¶ refer to allegations in the Complaint.
[4]    The business combination between Twelve Seas and BPGIC FZE is discussed in further detail in the Opposition to Defendant Dimitri Elkin's Motion to Dismiss.

OPPOSITION TO DEFENDANT PRICEWATERHOUSECOOPER'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

## I. PwC's FY2020 Audit

### A. The State of Play at the Time of PwC's Appointment

In 2020, Brooge was 100% reliant on a single customer—BIA, formerly a related party at the time of the Proxy due to Hind Mohammed Muktar Ahmed, its then-partial owner, also holding an ownership stake in Brooge—for its revenue. ¶¶54-55, 57, 91, 116; *see also* ¶221. BIA was purportedly paying to lease all of Brooge's "Phase I" oil storage, regardless of whether or not it used that storage, with the same arrangement planned for the Phase II operations. ¶¶49, 54-57, 192. BIA, in turn, was permitted to sublease that storage to other end users. *See* ¶¶57, 72, 107, 189. Though Brooge pitched this as a way to put the risk on BIA, the real risk was obvious: if BIA defaulted or refused to pay, Brooge's entire revenue stream would dry up. *See* ¶107.

But BIA was never a customer—let alone a paying one. Rather, it was Brooge's partner in effecting a revenue fraud and fake invoicing scheme.[5] Contrary to Brooge's public representations, BIA never stored any oil or paid any money to Brooge. ¶¶77, 117. Instead, Brooge leased storage directly to end users—not BIA— at lower rates and volumes than stated in contract with BIA. ¶¶71-77. Brooge falsified invoices to cover up the difference in two distinct ways, both of which involved having BIA transmit funds to Brooge and Brooge then reimbursing BIA. ¶¶93-94.[6] As a result, BIA never made any net payments to Brooge. ¶117. Not only was BIA the counterparty for both the Phase I and Phase II contracts and the

---

[5]    The fraud and fake invoicing scheme are discussed at greater length in the Statement of Facts in the Opposition to the Brooge Defendants' Motion to Dismiss.

[6]    Critically, the volumes in the falsified invoices dd not match the actual storage of oil, meaning a simple site visit would have exposed the fraud. ¶¶217-19.

OPPOSITION TO DEFENDANT PRICEWATERHOUSECOOPER'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

source of the vast majority of Brooge's "income," but in February 2020, Brooge novated a third contract to replace an independent counterparty with BIA. ¶193.[7]

In April 2020, with the onset of the pandemic, demand for oil storage increased and rates for oil storage went up. *See* ¶195. Instead of doing what an independent party would have done—subleasing storage to end users and pocketing the difference between the rates it was obligated to pay Brooge and the higher rates it could now charge—BIA agreed to lease back storage to Brooge. *See id.* Brooge then leased that storage back to end users at rates that were 60% higher than what BIA had agreed to pay it. *Id.* No truly independent party would have agreed to these terms, and this raised serious concerns about the BIA relationship. *See id.*

**B.    Events Occurring After PwC's Appointment**

PwC was appointed in October 2020, and at a November 8, 2020 Audit Committee meeting, a PwC partner noted the need to "reassess the status of BIA, currently disclosed as an unrelated party." ¶196. That same month, PwC determined that Brooge's FY2019 financials should no longer be relied upon because the Company's warrants were misclassified, leading to another restatement. ¶238.

Then, on the eve of the FY2020 audit, a curious turn of events happened:

- On March 23, 2021, a PwC director sent a draft of PwC's Audit Committee report for FY2020 to Defendant Masood (then CFO). ¶198.

- That report flagged a transfer of more than 6 million United Arab Emirates Dirham from a subsidiary's bank account to BIA that "d[id] not have a valid business purpose." ¶¶198-99.

- In response, Masood wrote a frantic email to CEO Paardenkooper stating that PwC had identified the transfer of funds to BIA, Brooge's

---

[7]    Unlike the Phases I and II take-or-pay contracts, this contract was completely different in kind (it involved building out a refinery), making BIA's replacement of the counterparty especially striking. ¶197.

- "BIGGEST CUSTOMER" as "NOT MAKING ANY SENSE" and evidencing "A CLEAR LACK OF CONTROL." *Id.*

- Masood further told Paardenkooper that he had "MANAGED SOMEHOW" for PwC "NOT TO HIGHLIGHT IT AS AN UNRESOLVED ITEM TO [THE] AUDIT COMMITTEE," but only if Paardenkooper sent PwC an email explaining the transaction. *Id.*

- Paardenkooper then sent PwC an email admitting that the transfer to BIA was an "Intercompany Transfer." ¶203. He claimed, however, that it was intended as an intercompany transfer *not* to BIA but to another Brooge account, and that it was inadvertently sent to BIA during an "extra busy period" for the finance team. *Id.*[8]

- The PwC audit partner then sent a brief reply thanking Paardenkooper. ¶204. The final version of the report sent to the Audit Committee described the transaction but framed it as resolved. ¶¶201, 205-06.

Then, days before the FY2020 audit was due, Brooge sent PwC a suspicious spreadsheet showing, for example, that all of Brooge's oil storage rental income came from *BIA* from January 2019 onward. ¶223. In January 2019 (and, in fact, until August 2019), BIA had not yet replaced the Phase I customer, and BIA was a related party because Hind Mohammed Muktar Ahmed was both a partial owner of BIA and held a stake in Brooge. ¶¶91, 223-24. Furthermore, the charts that Brooge sent PwC in connection with the audit purported to show which vessels were delivering oil in Fujairah when in reality, those vessels were located across the globe. ¶225. Despite these events, PwC gave Brooge a clean audit opinion for FY2020.

---

[8] This response made clear that the most minimal remedial steps (mostly involving the addition of further signatory and approval requirements) were being taken to prevent the problem from reoccurring. *See* ¶203.

OPPOSITION TO DEFENDANT PRICEWATERHOUSECOOPER'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

### C.    Post FY2020 Audit Meetings and Documents

After PwC's clean audit opinion dated April 5, 2021, PwC continued as Brooge's auditor and further troubling events occurred. *See* ¶107 n.30. To begin with, in the first half of 2021, PwC audited (and signed off on) the financials of Brooge's operating subsidiary, BPGIC FZE, who attributed all pre-April 2020 revenue to BIA—even though it was Coral, not BIA, which was purportedly the counterparty until August 2019. ¶¶221-222. Then, PwC attended a June 9, 2021 Audit Committee meeting where it was discussed that the "erroneous" BIA transfer was authorized by Brooge's majority shareholders and not the Company's management or Board members. This was extremely troubling because BIA was also a shareholder. ¶¶91, 207-08.

Next, on August 17, 2022, Brooge announced that its financials for FY2018-20 should no longer be relied upon, attributing the decision to "the on-going examination undertaken by the Audit Committee" and issues focused "primarily on revenue recognition and other financial reporting and disclosure issues." *Id.* The release stated that the Audit Committee had discussed the matter with PwC. *Id.* On January 5, 2023, before the FY2021 financials were filed, Brooge filed a Form 6-K announcing PwC's resignation. ¶64.

Then, on January 20, 2023, Brooge filed a letter from PwC providing additional context for its resignation. The letter clarified that there "were disagreements between the Company and PwC on matters of accounting principles or practices and auditing scope or procedure." ¶129. It also stated that PwC was unwilling to accept representations from either Defendants Paardenkooper or Saheb absent certain safeguards. PwC also stated that "likely illegal acts" had come to its attention "which were the subject of the Audit Committee Examination." *Id.*

Despite all that it knew and learned, PwC never withdrew its audit opinion. ¶170 n.44. By not withdrawing its FY2020 audit opinion and waiting until January

6

2023 to resign, PwC allowed the market to continue to believe the problems at Brooge were limited in scope and thus addressable. The truth, which was that Brooge was operating a fraudulent enterprise with falsified financials while PwC was its independent auditor, only emerged in full in December 2023 with the filing of the SEC Order. ¶¶132-33. In the interim, investors lost millions in reliance on PwC's material misstatements and omissions. ¶¶127-36. This lawsuit followed.

## LEGAL STANDARD

In assessing a Fed. R. Civ. P. 12(b)(6) motion in a case arising under the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), courts must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). Allegations must be construed in the light most favorable to the plaintiff. *In re Daou Sys., Inc.,* 411 F.3d 1006, 1013 (9th Cir. 2005). To state a Section 10(b) claim, plaintiffs must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *DuraPharms., Inc. v.* Broudo, 544 U.S. 336, 341-42 (2005). The PSLRA does not require plaintiffs to plead evidence. Tellabs, 551 U.S. at 322. Here, PwC focusses solely on falsity, scienter, and loss causation, but the Complaint readily establishes all three at the pleading stage.

## ARGUMENT

The Complaint sets forth how, by the time PwC took over as Brooge's auditor for FY2020, the Company was firmly entrenched in a rampant fraud. Not only did PwC have the benefit of its supposedly intense pre-signing due diligence, but it also had the historical information surrounding E&Y, including its resignation and restatements. Plus, the Complaint cites specific documents and meetings where PwC was exposed—at least in part—to the revenue fraud. On top of this, the Complaint pleads a myriad of red flags. In response to this mountain of allegations,

7

PwC picks them apart, cries "victim," and ceaselessly claims the SEC Order somehow exonerates it. None of these tactics work.

## II. PwC Made False and Misleading Statements

In its 2020 audit report, PWC stated:

- That in its opinion, "the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020…."

- "We conducted our audit of these consolidated financial statements in accordance with the standards of the PCAOB."

- "We believe that our audit provides a reasonable basis for our opinion." ¶177

PwC's sole argument on falsity is that the statements above are opinions and protected under *Omnicare*. PwC Br. at 8-12. But audit opinions are not by definition opinions, and PwC's self-serving labels do not automatically make them so. *See, e.g., In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 399 (S.D.N.Y. Sept. 10, 2013)(""Auditors may not shield themselves from liability… merely by using the word 'opinion' as a disclaimer."); *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1116 (E.D. Cal. 2017) ("Audit opinions are not of the same substance as those discussed in *Omnicare*…Thus, no amount of couching an audit report as an opinion obviates the certification effect of those reports when made part of a registration statement.); *In re Petrobras Sec. Litig.*, 2016 WL 1533553, at *3 (S.D.N.Y. Feb. 19, 2016) (an auditor's "opinion" is a "term of art," which is not "entirely synonymous with the more everyday use of the word 'opinion' discussed in *Omnicare*). Furthermore, under *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech, Inc.,* 856 F.3d 605 (9th Cir. 2017), an opinion can be actionable in three ways: (1) if the speaker did not genuinely hold the stated belief; (2) if the opinion includes a false embedded factual assertion; and (3)

8

if the opinion omits material facts about the basis for the view that would mislead a reasonable investor reading the statement in context. *Id.* at 615-16. PwC's statements fit into each of these three buckets.

### A.    PwC's "Opinions" Contained Embedded Statements of Fact

PwC relegates the third *Omnicare* exception to a footnote, even though it is clear that there are demonstrably false embedded statements of fact in PwC's opinions: that the audits complied with PCAOB standards and that Brooge's financial statements presented fairly the financial condition of the Company. Courts have long held that these precise statements are statements of fact. *See, e.g.*, *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1224 (W.D. Wash. 2009) (an "affirmation that the [issuer's] financial statements were presented in conformity with" GAAP "is an actionable statement of fact…." and PCAOB compliance statements "a verifiable factual statement that is material to those relying on its certification."); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 134 (S.D.N.Y. 2013) (same); *In re Silver Wheaton Corp. Sec. Litig.*, 2019 WL 1512269, at *12 (C.D. Cal. Mar. 25, 2019) (same).

Thus, PwC's statements carried factual assurances that, as alleged, were untrue. In reality, PwC in no way complied with the PCAOB standards. It did not, for example, understand the Company's "relationships and transactions with its related parties" or apply the appropriate "professional skepticism" by maintaining "a questioning mind" or understand the business rationale for "significant unusual transactions." ¶168. PCAOB standards further forbade PwC from issuing its clean audit opinion without gathering sufficient supporting audit evidence and required it to perform additional procedures when in doubt. *Id*. PwC did none of these things. The opinions are therefore actionable.

OPPOSITION TO DEFENDANT PRICEWATERHOUSECOOPER'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

## B.   PwC Did Not Genuinely Believe Its Opinions

As to the first prong of the *Omincare* exceptions, PwC was aware of Brooge's practices, ignored numerous red flags, and played a key role in the revenue scheme. This shows that PwC did not subjectively believe that its audit complied with PCAOB standards or provided a reasonable basis for its opinion, and did not believe Brooge's financial statements presented fairly in all material respects the financial conditions of the Company.   Indeed, had PwC complied with PCAOB standards— as its opinion represented—it would have recognized its opinion lacked a reasonable basis.   PwC's arguments concerning this prong lack merit.   It first manipulates the law to suggest that red flags cannot be used in a falsity analysis.   PwC is wrong. *See, e.g., Starr Int'l U.S.A. Invs. v. Ernst & Young, LLP,* 131 F. Supp. 3d 241, 259 (S.D.N.Y. 2015) (discussing *Omnicare* as to auditor statements and that "a sufficient accumulation of 'red flags' perhaps could permit the inference that the auditor did not actually believe that it had conducted a GAAS-compliant audit").[9]   Then, PwC points to the SEC Order to claim it must have believed its statements because the SEC said it was misled by management.   PwC Br. at 8-9.   However, as discussed further below, the SEC Order proves nothing.   Under a different standard and with different resources, the SEC was investigating Brooge and not the work of the auditors.

## C.   PwC's "Opinions" Were False Due to Omissions

PwC makes several convoluted arguments to get around the fact that its statements are actionable by omission.   The Complaint alleges PwC had extensive information about pervasive issues at Brooge—including reliance on one customer, related party transactions, and a lack of internal controls.   Courts regularly sustain

---

[9]   *Southeastern Pennsylvania Transportation Authority v. Orrstown Fin. Servs., Inc.,* 2016 WL 7117455, at * 15 (M.D.Pa. Dec. 7, 2016), involved a plaintiff who failed to identify steps taken or not taken by the auditor, or to identify knowledge the auditor did or not have in forming its opinions.  Plaintiff has done both here.

OPPOSITION TO DEFENDANT PRICEWATERHOUSECOOPER'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

omission-based opinion claims on similar facts. *See, e.g.*, *Baron v. HyreCar, Inc.*, 2022 WL 17413562, at *11 (C.D. Cal. Dec. 5, 2022) (facts known but omitted render opinion misleading and supports inference of no meaningful inquiry); *Special Situations Fund II QP,* 243 F. Supp. 3d at 1122 (E.D. Cal. 2017) (auditor liable where opinion misdescribed financial condition); *Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.,* 2022 WL 3572474 at *57 (M.D. Pa. Aug. 18, 2022) (similar statements omitted material information including failure to disclose impaired loans). None of PwC's varied arguments to the contrary are persuasive.

To begin with, the allegations against PwC are far from "conclusory." Instead, they contain details of prior issues with E&Y that were known to PwC, specific documents, and specific meetings. This is a far cry from *Southeastern Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2015 WL 3833849, at *34 (M.D. Pa. June 22, 2015), where the plaintiff did not "identify actual and material steps taken or not taken by [the auditor] in its audit or knowledge it did or did not have in the formation of its opinion…"

Then, this is not "fraud by hindsight" despite PwC's label. The majority of the red flags existed at the time PwC made each alleged misstatement, and a fraud by hindsight argument only makes sense if the red flags appeared after the truth was revealed. *See, e.g.*, *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *8 (N.D. Cal. Aug. 7, 2020) ("The complaint does not engage in impermissible hindsight pleading" where the complaint relies on "contemporaneous" events.); *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1230 (N.D. Cal. 2009) (failure to disclose then-existing risk does not constitute fraud-by-hindsight).

Next, to suggest that PwC did not actually have the correct information is to misstate the law and the facts. The Complaint cites specific documents PwC received. In response, PwC attempts a counter-interpretation of the documents that is completely inappropriate at the motion to dismiss stage. Taking the allegations in

11

the Complaint as true (as one must), the March, 2021 email chains show that: (i) prior to its clean audit, PwC was aware of a (purportedly) erroneous transfer to BIA (a former related party and the counterparty to multiple significant contracts); (ii) that PwC viewed this as a "clear lack of control" at the Company; (iii) that nonetheless PwC did not flag this as unresolved but instead took the word of management that it was a "mistake" and issued a clean audit opinion. ¶¶188-189. This is telling, especially when added to the spreadsheet reviewed by PwC days before its clean audit opinion that showed extremely suspicious payments and incorrect boat locations.[10]

In conclusion, PwC's statements are not opinions, and even if they are, they fall under all three *Omincare* exceptions and are actionable.

## III.    Plaintiff Has Alleged a Strong Inference of Scienter

In the Ninth Circuit, to establish scienter at the pleading stage against an auditor, a complaint must allege that "[t]he accounting practices were so deficient that the audit amounted to no audit al all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011). Therefore, to plead facts giving rise to a strong inference of scienter against an auditor, it is sufficient to show "either [a] lack [of] a genuine belief that its representations were supported by adequate information or [that the audit] engaged in auditing practices so shoddy that they amounted at best

---

[10] In this section and again in scienter, PwC demands more particularity from the documents cited such as why the location of vessels mattered (PwC Br. at 19) and the significance of the signatories. *Id.* at 17. First of all, such details and interpretive questions are best reserved for summary judgment, if not trial. Then, PwC misses the point. It is not the intricate details of each document that made its statements false and misleading, but the aggregate picture which clearly showed foul play. Finally, even without these specific documents, the allegations in the Complaint would suffice because of the numerous red flags discussed below.

12

to a 'pretended audit'…even in the face of assertions of good faith." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279 (3d Cir. 2006).  A complaint may meet this standard by alleging that an auditor disregarded specific "red flags" that "would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1333 (M.D. Fla. 2002).  The "inquiry… is whether all the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standards." *Tellabs*, 551 U.S. at 322-23.  The Complaint here pleads a myriad of facts and red flags that, taken together, raise a strong inference that PwC knew or was deliberately reckless in not knowing that its audit was materially false or misleading.

### A.    Fraudulent Intent

The Complaint does not offer conclusory allegations but alleges in detail how PwC actually knew (or was reckless in not knowing) during the course of its audit that Brooge, at the absolute least, had suspicious related party transactions, displayed a complete lack of internal controls, had previously had massive going concern issues, and had a history of unreliable financial statements.  It also alleges that PwC deliberately turned a blind eye to many of Brooge's practices.  The allegations here are precisely the kind that courts have held will support a strong inference of scienter against an auditor.  *See, e.g.*, *In re Wilmington Tr. Sec. Litig.,* 29 F. Supp. 3d 432, 449-50 (D. Del. 2014) (scienter adequately alleged where auditor did not request appraisals despite having a duty to evaluate loan reserves); *In re Suprema,* 438 F.3d at 281 (could not rule out a strong and reasonable inference of the auditor's scienter given the numerous accounting violations).

### B.    Red Flags Analysis

Even if PwC did not act with fraudulent intent, it was undoubtedly reckless given the copious red flags which even the most cursory audit would have revealed.

PwC suggests that each red flag itself must be a fraud. PwC Br. at 14-18. But this is not what courts actually say. As the Ninth Circuit made clear in *New Mexico State Investment Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011), an auditor's failure to obtain verifying documents before issuing an unqualified opinion was "sufficient to support an inference that [the auditor] knew or should have known" that transactions were suspect and the financials accordingly inaccurate. Courts routinely find an auditor's failure to exercise due diligence in the face of red flags leads to an inference of scienter. *See, e.g.*, *In re Leslie Fay Cos. Sec. Litig.*, 835 F. Supp. 167, 175 (S.D.N.Y. 1993) ("when tidal waves of accounting fraud are alleged, it may be determined that the accountant's failure to discover her client's fraud raises an inference of scienter on the face of the pleading"); *Whalen v. Hibernia Foods PLC*, 2005 WL 1799370, at *3 (S.D.N.Y. Aug. 1, 2005) (scienter where "PwC knew about and ignored a wide variety of 'red flag' incidents" that should have put it on notice that "fraud was afoot"); *In re Am. Bus. Fin. Servs., Inc. Noteholders Litig.*, 2008 WL 3405580, at *9 (E.D. Pa. Aug. 11, 2008) (scienter alleged on decisions not to investigate red flags).[11]

PwC also attempts to pick the red flags apart one by one, but the law forbids exactly that. *See, e.g.*, *In re Aegean Marine Petroleum Network, Inc.*, 529 F. Supp. 3d 111, 149 (S.D.N.Y. 2021) ("the red flags must be viewed in the aggregate; defendants cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder."). Thus, the totality of the

---

[11]    PwC's two outlier cases for this point are distinguishable. For example, *In re DNTW Chartered Accountants Sec. Litig.,* 172 F. Supp. 3d 675, 687 (S.D.N.Y. 2016) involved a limited number of individual accounts and not a wholesale fraud. And, similarly, *Reiger v. PriceWaterHouseCoopers, LLP*, 117 F. Supp. 2d 1003, 1008 (S.D. Cal. 2000) concerned two transactions involving 3-10% of the company's revenue. It is not surprising that courts in these circumstances found such individual transactions "[n]ot so overtly suspicious as to suggest fraud." *Id.* at 1009. Here, by contrast, the entire business was predicated on a fraud.

14

red flags demonstrates scienter.  However, even taking them one by one, each should have raised the suspicion of PwC and merited further inquiry.

### 1.    Related Party Transactions

The fact that Brooge was supposed to get 100% of its revenue from BIA should have alone been a red flag for PwC.  The same holds true for the fact that Brooge replaced its Phase I and Phase II customers with BIA prior to PwC signing on, which PwC was aware of particularly given the pre-signing due diligence steps it boasted of.  Then, in April 2020, when BIA leased back to Brooge a portion of its contract without providing valid reasons, the red flag was elevated.  ¶192.  At no point did PwC appear to contact BIA or look further into the relationship.  Furthermore, the Complaint points to documents showing that PwC was well aware that before BIA became a counterparty to the Phase I contract, and while it was a known related party, it made substantial payments to Brooge.  *See* ¶¶221-24.

In response, PwC first argues that related party transactions are not necessarily "improper."  PwC Br. at 14-15.  While that may be true in some instances, here, where BIA was not only a former related party but the source of the majority of Brooge's alleged revenue, PwC was duty-bound to look closer at it.  It did not.  While PwC claims that the March 2021 email chain somehow shows its diligence because it identified the erroneous bank transfer, this is only part of the story.  PwC noted the transfer but ultimately did nothing about it based upon the word of management.  Cases routinely hold similar fact patterns to be indicative of scienter.[12]  As one court stated, "[f]or the auditor to have recognized potential problems yet continue to sign

---

[12]    *See, e.g.*, *N.M. State Inv. Council,* 641 F.3d at 1098 (finding scienter where plaintiffs alleged that the auditor was "suspicious" about the timing of a large option grant, but nonetheless did "not take steps to verify the accuracy of the grant"); *In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018 (C.D. Cal. 2003) (auditor objected to some barter transactions but allowed others to go uncorrected and the court found that disregard of "red flags" supported strong inference of recklessness).

15

off on financial statements only supports Plaintiff's claim of reckless behavior." *In re Royal Dutch/Shell Transp. Sec. Litig.*, 380 F. Supp. 2d 509, 570 (D.N.J. 2005).

### 2. Inconsistencies in Invoices

The glaring mismatches between the actual usage, fees, and contract terms should have also alerted PwC to look further. Indeed, the Complaint alleges that PwC failed to check basic information, such as made-up ancillary services. While PwC claims that Brooge gave it fake invoices as well, the Complaint shows how between August 2019 and December 2020, more than two hundred fake invoices to BIA were created. ¶83. Had PwC bothered to check a single one of these, or to contact customers or make site visits, it would have discovered these mismatches. These are not complicated accounting manipulations but basic math, further contributing to the inference of scienter. *See, e.g.*, *In re Phillip Servs. Corp., Sec., Litig.*, 383 F. Supp. 2d 463, 475 (S.D.N.Y. 2004) ("highly suspicious" and "massive" increases in inventory, and "obvious simplicity" of fraud "would be clear evidence to any auditor performing its duties"); *Munoz, et al v. China Expert Technology, Inc.*, 2011 WL 5346323 (S.D.N.Y. Nov. 4, 2011) (upholding claims against auditor that issued unqualified audit opinions and did not check whether customer contracts had in fact generated the revenue claimed in contravention of PCAOB).

Furthermore, PwC's reliance solely on management rather than customers or site visits "evidences recklessness." *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 373 (D.N.J. 1999); *see also N.M. State Inv. Council*, 641 F.3d at 1100 (accepting management at its word and failing to investigate deficient documentation even after being alerted to potential problems supports an inference of scienter); *In re New Century*, 588 F. Supp. 2d 1206, 1235 (C.D. Cal. 2008) (auditor's acceptance of incomplete documentation may support a strong inference of scienter).

### 3.    E&Y Resignation, Material Weakness and Restatements

Additionally, that Brooge previously restated its financials should have been a further red flag for PwC.  PwC's sole argument appears to be that a restatement alone cannot be a red flag.  PwC Br. at 20.  But here, the two restatements fall on a laundry list of red flags.  The 2017 restatement involved increasing the Company's liabilities by more than 650% and impacted the Company's ability to continue as a going concern.  ¶204.  This should have alerted PwC to take extra care.  Then, as to the second restatement, it happened under PwC's watch and reduced equity by $15.7 million while increasing liabilities by that same amount.  ¶205.

The internal control issues were also a glaring red flag.  In 2019, E&Y identified material weaknesses in internal controls including both a lack of sufficiently skilled personnel with SEC reporting knowledge and of sufficient financial reporting policies and procedures.  ¶200[13].  E&Y later resigned over these issues and PwC later cited them in its audit, so they were never rectified.  The lack of sufficiently skilled persons for SEC reporting that lasted multiple years should have been a red flag to look closer.  *See, e.g.*, *Aegean*, 529 F. Supp. 3d at 153 (information about a CEO's "reputation and history" was a red flag that called for "heightened scrutiny" on part of the auditors).

On top of all this, PwC knew that E&Y had resigned and the Audit Committee meeting minutes leading up to that resignation would have alerted PwC to serious issues.[14]  For example, at the April 9, 2020 meeting, E&Y flagged that Brooge was in continual non-compliance with its loan agreement, while management asked the Board to lie about its compliance with its contractual loan repayments in an attempt

---

[13]    In the Proxy, E&Y noted that Brooge was not required to perform an evaluation of internal controls but that had such a review been done, "additional control deficiencies may have been identified…" ¶200.

[14]    The April and July 2020 Audit Committee meetings are discussed in greater detail in the Opposition to Ernst & Young's Motion to Dismiss.

OPPOSITION TO DEFENDANT PRICEWATERHOUSECOOPER'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

to get a dividend proposal approved. ¶245. Then, at a July 7, 2020 meeting, E&Y flagged suspicious transactions with BIA as deserving of further analysis for the FY2020 audit. ¶¶194, 230. PwC was aware of these issues when performing its FY2020 audit because it had access to the minutes for both meetings. ¶232.

### 4. Contradictions in Documents Sent to PwC

PwC skims over the concrete documents it received showing clear inconsistencies that raised yet another red flag. Those include, *inter alia*: documents stating Brooge's operating subsidiary, BPGIC FZE, had only one customer from 2017-2020; the spreadsheet showing that Brooge's only storage rental revenue came from BIA; and charts allegedly showing the location of oil vessels in UAE when they were as far away as the Gulf of Mexico. ¶¶220-224. These are just more examples of inconsistencies that were red flags for PwC in conducting its audit. When combined with the others discussed herein in particular, they are telling. *See, e.g.*, *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1197 (C.D. Cal. 2008) ("the more facts alleged that should have caused a reasonable auditor to investigate further before making a representation, the more cogent and compelling a scienter inference becomes.").[15]

### 5. Other Red Flags

The sheer magnitude of the fraud here was also a red flag. Brooge fabricated its revenue for 2018-2020 *by at times over 80%* (¶78), while BIA often accounted for *100%* of revenue. Over 14 months, there were more than *two hundred* fake invoices to BIA. ¶83. Then, the "shortfall" invoices were extremely large—ranging

---

[15]   PwC tries to get around these documents by citing to *DSAM*, 288 F.3d at 389-90. PwC Br. at 19. But *DSAM* is at odds with this case as it involved twelve isolated transactions amounting to 3-10% of revenue and, crucially, plaintiffs there argued solely that PwC had access to documents, not actual documents sent to it. *See Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1009 (S.D. Cal. 2000), *aff'd sub nom. DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002).

from *$2.5 million to $3.4 million*. ¶86. These alone give rise to an inference that PwC acted recklessly.[16] Further, the fact that there had been issues with Brooge's ability to continue as a going concern was a red flag. Indeed, this had long existed as the Proxy stated that Brooge's liabilities exceeded its assets by over $100 million and that it was in technical default on at least one of its loans. ¶207.

Finally, the speed with which others uncovered the scheme is highly probative of scienter. *See Bear Sterns*, 763 F. Supp. 2d at 517. Brooge announced the SEC investigation in May 2022, and by August 17, 2022, a law firm and an accounting consultancy firm had concluded Brooge's financial statements could not be relied upon. ECF No. 133-4 at 1; ¶62. Such a quick uncovering of the fraud by others supports the inference of PwC's scienter. *See, e.g.*, *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 652 (E.D. Va. 2000); *Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 942 (N.D. Ill. 1999) ("conditions readily discoverable by a third party suggests that an auditor and consultant was likely aware of those conditions"). In fact, it is unfathomable that PwC did not obtain this information when it was obtainable by outsiders. *See, e.g.*, *Suprema Specialties,* 438 F.3d at 279-80 (fraud "hiding in plain sight" and "even a cursory inquiry" would have uncovered it); *Argent Classic Convertible Arbitrage Fund, L.P. v. Rite Aid Corp., et al*, 315 F. Supp. 2d 666, 686 (E.D. Pa. 2004) (claim upheld when "the flaws were so obvious that an outside consultant identified some of them in a matter of days).

---

[16] *See, e.g.*, *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 160 (D. Mass. 2002) (overstatement of reported earnings by 103% probative of KPMG's scienter); *In re Rent-a-Way Sec. Litig.,* 209 F. Supp. 2d 493, 507 (W.D. Pa. 2002) (restatement of earnings resulting in reduction of earnings per share from $0.66 to $.04 probative of PwC's scienter); *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 372-73 (D.N.J. 1999) (denying E&Y's motion to dismiss where earnings per share were overstated by 130% over a period of three years).

OPPOSITION TO DEFENDANT PRICEWATERHOUSECOOPER'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

## C.   Inference

The inference of scienter need not be irrefutable or a "smoking gun," or even the "most plausible of competing inferences." *Tellabs*, 551 U.S. at 234.  A strong inference exists "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*  The most compelling and cogent inferences here are either that PwC actually knew of the fraud and made knowingly false statements, or that PwC conducted a pretend audit allowing it to willingly refuse to investigate the doubtful.[17]

PwC attempts to claim the more compelling inference is that it was somehow a "victim" of Brooge, but this argument is severely flawed as PwC again relies on the SEC Order.  PwC Br. at 20-21.  The SEC's conclusions do not exonerate PwC as the SEC was not tasked with evaluating the work of PwC.  Courts have agreed with this conclusion.  *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JPMorgan Chase Co.*, 553 F.3d 187, 200, n.5 (2nd Cir. 2009) ("SEC charges simply are not a prerequisite to pleading recklessness with regard to accounting and financial reporting violations."); *In re New Century,* 588 F. Supp. 2d at 1234 ("The Court is not persuaded that the [bankruptcy] Examiner's finding that there was no evidence of intentional misrepresentation to be dispositive at the pleading stage.").

---

[17]   PwC cites to *Advanced Battery Techs., Inc. v. Bagell,* 781 F.3d 638, 644 (2d Cir. 2015) as support for its non-culpable inference, and indeed throughout its brief. This case is distinguishable on numerous grounds.  There, the red flags were generic in nature ("high CFO turnover") and the plaintiffs complained that the auditors were required to look to the filings of a related foreign company—something the PCAOB does not require.  Furthermore, the Second Circuit there explicitly stated that plaintiffs adequately allege scienter "when a defendant conducts an audit so deficient as to amount to no audit at all, or disregards signs of fraud so obvious that the defendant must have been aware of them."  That is what occurred here.

20

### D.    Motive

PwC also suggests that it had no motive to undertake a shoddy audit and enable the fraud.  But motive is not required.   And, despite PwC suggesting otherwise, "auditors have powerful economic incentives to deliver aggressive and even fraudulent audit reports, stemming from their desire to obtain lucrative non-audit work."  Giden Mark, *Accounting Fraud: Pleading Scienter of Auditors Under the PSLRA*, 39 Conn. L. Rev. 1097, 1103 (2007); *see also Countrywide*, 588 F. Supp. 2d at 1197 n.79 ("outside auditors' economic incentives weigh, if at all, somewhat against auditors" for purposes of scienter).  On top of this, the Complaint alleges a separate motive allegation:  that one of the most powerful individuals in the UAE, Sheik MBK, was a substantial Brooge shareholder, and PwC would not have wanted to run afoul of him but rather to curry his favor.  ¶187.[18]

While PwC is keen to state its "loud" resignation defeats any motive, it glosses over that this resignation occurred years after it signed on and garnered fees not just for audits of Brooge, but of its subsidiaries.  PwC Br. at 23.  Plus, this resignation occurred relatively soon after a clean audit opinion.  For PwC, this is simply too little too late.  In conclusion, Plaintiff alleges "in your face facts that cry out" how could PwC not have known that the financial statements were false."  *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999).

### IV.    Plaintiff Adequately Pleads Loss Causation Against PwC

Pleading loss causation requires "a causal connection between the material [misstatements or omissions] and the loss."  *Dura Pharms., Inc., v. Broudo*, 544 U.S. 336, 342 (2005).  Plaintiffs need only allege that "revelation of fraudulent activity, rather than changing market conditions or other unrelated factors, proximately

---

[18]    PwC's case of *Zucco Partners LLC v. Digimare Corp.,* 552 F.3d 981, 1005 (9th Cir. 2009) is at odds with the motive allegations here.  There, the sole motive allegations for executives (not auditors) were bonuses without anything more.

OPPOSITION TO DEFENDANT PRICEWATERHOUSECOOPER'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

caused the decline in defendant's stock price"—which is typically done by "plausibly" alleging corrective disclosures by which "defendant's fraud was revealed to the market and caused the resulting losses." *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020). Plaintiff may also plead "materialization of the risk," alleging that corrective discloses revealed the true extent of relevant risk. *See In re WageWorks, Inc. Sec. Lit.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020). Loss causation allegations suffice "so long as they give defendant notice of plaintiffs' … theory and provide … some assurance that the theory has a basis in fact." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020).

Here, Plaintiff alleges both corrective disclosures and a materialization of the risk. ¶¶127-36. The truth about Defendants' misconduct leaked into the market through a series of partial disclosures on December 8, 2022 (CEO's abrupt resignation), January 20, 2023 (Form 6-K exposing likely illegal acts) and December 22, 2023 (disclosure that Brooge had settled SEC charges).[19] Each of these disclosures was a successive stage in the materialization of the risks Defendants concealed—that Brooge's financial results were fabricated through a fake invoicing scheme.[20] *In re Fastly, Inc. Sec. Litig.*, 2025 WL 2721693, at *23 (N.D. Cal. Sept. 24, 2025) ("[U]nder the materialization-of-the-risk approach, loss causation "may

---

[19] Between the time of the first corrective disclosure on December 8, 2022, and the final corrective disclosure in December 2023, Brooge's stock price declined from $5.74 per share to $2.75 per share; a drop of 52.1%. ¶134.

[20] Citing to *Brown v. Ambow Educ. Holding Ltd.,* 2014 WL 523166, at *11–12 (C.D. Cal. Feb. 6, 2014), PwC argues that its resignation letter is not a corrective disclosure because it did not disclose any misrepresentation or omission in a prior audit opinion. PwC Br. at 25. First, for the reasons cited above, a corrective disclosure need not explicitly correct the prior representation. Second, *Brown* is inapposite. There, the court found that the auditor's statement was too "speculative" to establish loss causation where the auditor said that "it remained *possible* that [defendant's] previously issued financial statements were misleading." 2014 WL 523166, at *12 (C.D. Cal. Feb. 6, 2014) (emphasis added). Here, PwC's letter regarding its resignation stated that Brooge "had not taken timely and appropriate remedial actions" and "that those remedial actions were with respect to *likely illegal acts*" and that "those likely illegal acts *will* have a material effect on the financial statements of the Company". *See* ¶129-131; ECF 133-5 at 2 (emphasis added).

be shown even where the alleged fraud is not necessarily revealed prior to the economic loss."); *In re BofI Holding, Inc. Sec. Litig*., 977 F.3d 781, 790 (9th Cir. 2020) (To be corrective, it "is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading"); *Hildes v. Andersen*, 2010 WL 4811975, at *4 (S.D. Cal. Nov. 8, 2010) (loss causation adequately alleged against auditor where an audit report approved improper revenue recognition and the company's stock price declined "after the truth became known" regarding the improper revenue recognition.).[21]    And the final disclosure and the accompanying SEC Order is a textbook corrective disclosure sufficient to plead loss causation. *Lloyd v. CVB Fin. Corp*., 811 F.3d 1200, 1203 (9th Cir. 2016) ("[T]he announcement of an SEC investigation related to an alleged misrepresentation, coupled with a subsequent revelation of the inaccuracy of that misrepresentation, can serve as a corrective disclosure for the purpose of loss causation."). PwC's arguments on loss causation all fail.

## A.    PwC's Truth on the Market Defense Fails Because the Disclosures Were Misleading

PwC contends that two events constitute corrective disclosures: (i) the August 17, 2022 filing stating that Brooge's financial statements "should no longer be relied upon" and (ii) the May 1, 2023 restatement of Brooge's revenues. PwC Br. at 24-25. It then argues that because Brooge's stock price rose following these, Plaintiff cannot allege loss causation. *Id*. PwC is wrong on both the facts and the law. First,

---

[21]    The cases cited by PwC to the contrary (PwC Br. at 23-25) are readily distinguishable. In *In re Ramp Corp. Sec. Litig*., the court found that there was "no allegation that [auditor] knew or was reckless in not knowing of the [misconduct]." 2006 WL 2037913, at *10 (S.D.N.Y. July 21, 2006). Here, Plaintiff clearly alleges that PwC either knew or was reckless in not knowing about Brooge's fraud. Likewise, in *In re AOL Time Warner, Inc. Sec. Litig*., plaintiffs' losses were predicated on varying factors that went beyond the auditor's realm. 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007). Here, the loss is based on a singular underlying fraud that is squarely within the scope of PwC's misleading opinion.

23

neither the August 17, 2022, nor the May 1, 2023 filing was a corrective disclosure at all. Each was itself misleading and therefore conveyed no corrective information to the market. *Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*, 2024 WL 4353049, at *19 (N.D. Cal. Sept. 30, 2024) (rejecting the theory that an earlier statement disclosed the truth where the plaintiff alleged the statement was false and misleading, and thus "did not disseminate knowledge to the market"). As to the August 17, 2022 announcement, it spoke of financial reporting and disclosure issues that could supposedly be addressed by a proposed remediation plan—not of the wholesale fraud that would later be revealed. ¶63. Plus, neither PwC nor E&Y withdrew their audit opinions. ¶170 n.44. Then, as to the May 1, 2023 restatement, this was attributed to a technical revenue recognition issue that was being "rectified" by "a conservative approach." ¶124. In reality, for years the bulk of Brooge's revenues were fabricated, and its main customers fake. PwC's clean audit opinion was not misleading because of a technical revenue recognition issue (as the August 17 and May 1 disclosures suggested); it was misleading because PwC certified the legitimacy of a business that *did not exist*.[22]

---

[22] Even assuming that the August 17 and/or May 1 disclosures were corrective (they were not), the mere fact that the stock price increased after these disclosures is not fatal as PwC suggests. *See, e.g.*, *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008) (approving an inference that a company's stock price decline was caused by a partial corrective disclosure from three months prior); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 n.33 (5th Cir. 2009) (where a "disclosure was followed immediately by a stock price increase rather than a decrease," loss causation could still be adequately pled because "[t]he market could plausibly have had a delayed reaction" and "[t]he actual timing [of a loss] is a factual question"). The cases cited by PwC suggesting otherwise are inapposite. PwC Br. at 24. In *In re Verisign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1207 (N.D. Cal. 2007), plaintiff failed to allege *any* connection between the fraud and the *single* alleged corrective disclosure that led to a stock drop, where there were other prior announcements that constituted "disclosure to the market" after which the stock went up. Not so here. Likewise distinguishable, in *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021), there was a "quick and *sustained* price recovery" *after* a drop. There is no sustained price recovery issue here.

**B.       PwC's Truth on the Market Defense Presents a Question of Fact Inappropriate for Resolution at This Stage**

Second, and dispositively, PwC's argument that the truth had entered the market in August 17, 2022, and/or May 1, 2023, is a factual inquiry that cannot be resolved at the pleading stage. *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 (2013) (proof that "news of the truth credibly entered the market and dissipated the effects of prior misstatements" is an issue for trial or summary judgment.); *Ohio Pub. Emps. Ret. Sys.*, 2024 WL 4353049, at *19 (same); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1185 n.25 (C.D. Cal. 2011) (The "truth on the market" defense "requires a fact-intensive inquiry that is better reserved for summary judgment").   In summary, the December 8, 2022, January 20, 2023, and December 22, 2023, disclosures indisputably added new information previously unknown to the market.  These alleged disclosures constitute corrective disclosures and/or materialization of the risk that caused the decline in Brooge's stock sufficient to adequately plead loss causation.[23]

**CONCLUSION**

For the foregoing reasons, the Motion should be denied.[24]

---

[23]     PwC also incorporates by reference "certain arguments set forth in E&Y's Motion to Dismiss."  PwC Br. at 25.  This is an improper circumvention of the page limit, and thus PwC waived those arguments. *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 345 (9th Cir. 1996) ("[T]he incorporation of substantive material by reference is not sanctioned by the federal rules"); *Borenstein v. Animal Found.*, 2022 WL 17968059, at *1 (D. Nev. July 18, 2022) (Attempts to "incorporate by reference" arguments presented elsewhere are unhelpful and confusing, as well as a potential violation of the page limitations in the local rules.); *McCracken v. Thor Motor Coach Inc.*, 2015 WL 13566918, at *2 (D. Ariz. Dec. 3, 2015) ("Incorporating prior arguments by reference in motion papers is generally ignored by the Court."); *Kove IO, Inc. v. Amazon Web Servs., Inc.*, 745 F. Supp. 3d 685, 701 (N.D. Ill. 2024) ("This Court deems any arguments incorporated by reference waived").  To the extent the Court considers those arguments, Plaintiff in turn incorporates by reference its responses to those arguments in its Opposition to E&Y's Motion to Dismiss.

[24]     If the Complaint is dismissed, Plaintiff respectfully requests leave to amend. *See Wietschner v. Monterey Pasta* Co., 294 F. Supp. 2d 1102, 1118 (N.D. Cal. 2003) (leave to amend should be liberally granted).

DATED:  December 17, 2025

Respectfully submitted,
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Amanda F. Lawrence

Amanda F. Lawrence (*pro hac vice*)
156 S. Main St.
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 404-7770
Facsimile:  (860) 537-4432
alawrence@scott-scott.com

Anna Hunanyan (CA 330609)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Ave., 24th Fl.
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
ahunanyan@scott-scott.com

Cornelia J. B. Gordon (CA 320207)
John T. Jasnoch (CA 281605)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508
cgordon@scott-scott.com
jjasnoch@scott-scott.com

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile:  310-388-0192
brian@schallfirm.com

*Attorneys for Lead Plaintiff Bluefin Capital Management, LLC, and Co-Lead Counsel*

26

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Lead Plaintiff Bluefin Capital Management, LLC certifies that this Opposition to Defendant PricewaterhouseCoopers' Motion to Dismiss the Second Amended Complaint is twenty-five pages in length and complies with the 25-page limit of this Court's Standing Order, ¶ F(3), Dated December 17, 2024, docketed in this action as ECF No. 48.

DATED: December 17, 2025

/s/ Amanda F. Lawrence
Amanda F. Lawrence (*pro hac vice*)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 17, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of this filing via electronic means to all counsel of record.

DATED: December 17, 2025

/s/ Amanda F. Lawrence

Amanda F. Lawrence (*pro hac vice*)

28