Amanda F. Lawrence (admitted *pro hac vice*)
alawrence@scott-scott.com
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 S. Main St.
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 404-7770
Facsimile: (860) 537-4432

*Attorneys for Lead Plaintiff*
*Bluefin Capital Management, LLC*

[Additional Counsel on Signature Page.]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC WHITE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BROOGE ENERGY LIMITED, et al.,<br><br>Defendants. | Case No.: 2:24-cv-00959-AH-DFM<br><br>**PLAINTIFF'S OPPOSITION TO THE BROOGE DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

STATEMENT OF FACTS ...................................................................................2

    I.     Brooge Gave the Markets a False Picture of Its Profits.......................3

    II.    The Reality: Brooge Was a Fraud.........................................................3

    III.   Brooge's Management Effectuated the Fraud.......................................5

         A.    Defendants Paardenkooper and Saheb......................................6

         B.    Defendant Yammout...................................................................6

         C.    Defendant Masood.....................................................................7

         D.    Defendant Ditchburn..................................................................8

LEGAL STANDARD...........................................................................................8

ARGUMENT ........................................................................................................9

    I.     Plaintiff Has Standing to Sue Based on Pre-SPAC Statements............9

    II.    Plaintiff Properly States a Claim Based on Warrants .........................11

         A.    Plaintiff Adequately Alleges Loss Causation for the Warrants 11

         B.    Plaintiff Properly Pleads Actionable Losses on Its Warrants...13

         C.    Plaintiff Does Not Need to Demonstrate Losses or Standing for Both Warrants and Common Stock .........................................15

    III.   Plaintiff Has Alleged Economic Loss and Article III Standing in Connection with Its Common Stock Transactions.............................17

    IV.   Plaintiff Has Sufficiently Alleged Loss Causation .............................18

         A.    Defendants' "Price Recovery" Arguments Fail.......................22

         B.    Defendants' Truth on the Market Argument Fails ...................23

    V.    A Speculative, Potential Recovery from a Fair Fund Does Not Moot This Case and There Is No "Double Recovery" ...............................25

    VI.   Plaintiff Has Pled a Strong Inference of Scienter Against Brooge.....27

    VII.  Plaintiff Has Properly Alleged Scienter and Falsity Against Yammout, Masood, and Ditchburn ...................................................................30

         A.    Plaintiff Has Alleged Falsity.....................................................30

i

B.     Plaintiff Has Alleged Scienter Against These Individuals .......31

CONCLUSION ..................................................................................................34

ii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abadilla v. Precigen, Inc.*,
2022 WL 1750033 (N.D. Cal. May 31, 2022)....................................................24

*Acticon AG v. China N.E. Petroleum Holdings, Ltd.*,
692 F.3d 34 (2d Cir. 2012) ...............................................................................23

*Alghazwi v. Beauty Health Co.*,
2025 WL 2751076 (C.D. Cal. Sept. 23, 2025) ...................................................33

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
824 F. Supp. 2d 1164 (C.D. Cal. 2011) .............................................................23

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*,
568 U.S. 455 (2013)...........................................................................................23

*Audet v. Fraser*,
332 F.R.D. 53 (D. Conn. 2019) .........................................................................17

*Baker v. Twitter, Inc.*,
2023 WL 6932568 (C.D. Cal. Aug. 25, 2023) .............................................13, 14

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..............................................................................................9

*Blake v. Canoo Inc.*,
2025 WL 2992263 (C.D. Cal. Oct. 22, 2025) ....................................................28

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975)........................................................................................9, 10

*Bond v. Clover Health Invs., Corp.*,
2023 WL 1999859 (M.D. Tenn. Feb. 14, 2023)..................................................18

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019).................................................................21

iii

*Carrieri v. Jobs.com Inc.*,
  393 F.3d 508 (5th Cir. 2004) ......................................................................11

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
  964 F. Supp. 2d 1128 (N.D. Cal. 2013).......................................................20, 21

*Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.*,
  793 F. Supp. 2d 1138 (C.D. Cal. 2011) ........................................................17

*Children's Hosp. & Med. Ctr. Found. of Omaha v. Countrywide Fin. Corp.*,
  2011 WL 13220509 (C.D. Cal. Aug. 22, 2011) .................................................14

*Clinton v. Jones*,
  520 U.S. 681 (1997).................................................................................27

*Crossen v. CV Therapeutics*,
  2005 WL 1910928 (N.D. Cal. Aug. 10, 2005) ...............................................11, 15

*de la Fuente v. DCI Telecommunications, Inc.*,
  259 F. Supp. 2d 250 (S.D.N.Y. 2003) ...........................................................28

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005).................................................................................18

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
  81 F.4th 918 (9th Cir. 2023) .......................................................................27

*Evanston Police Pension Fund v. McKesson Corp.*,
  411 F. Supp. 3d 580 (N.D. Cal. 2019)...........................................................34

*Forest Guardians v. Johanns*,
  450 F.3d 455 (9th Cir. 2006) ......................................................................26

*Griggs v. Pace Am. Grp., Inc.*,
  170 F.3d 877 (9th Cir. 1999) ......................................................................10

*Grigsby v. BofI Holding, Inc.*,
  979 F.3d 1198 ........................................................................................19

iv

*In re Adobe Sys., Inc. Sec. Litig.*,
    139 F.R.D. 150 (N.D. Cal. 1991)........................................................................11

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) .........................................................19, 20, 21, 22

*In re Charles Schwab Corp. Sec. Litig.*,
    257 F.R.D. 534 (N.D. Cal. 2009).......................................................................20

*In re ChinaCast Educ. Corp. Sec. Litig.*,
    809 F.3d 471 (9th Cir. 2015) ............................................................................29

*In re Cigna Corp. Sec. Litig.*,
    459 F. Supp. 2d 338 (E.D. Pa. 2006)................................................................18

*In re Connetics Corp. Sec. Litig.*,
    257 F.R.D. 572 (N.D. Cal. 2009).......................................................................24

*In re Credit Suisse Sec. Fraud Class Actions*,
    2025 WL 1866293 (S.D.N.Y. July 7, 2025).......................................................15

*In re CV Scis., Inc. Sec. Litig.*,
    2019 WL 6718086 (D. Nev. Dec. 10, 2019) .................................................12, 23

*In re Enron Corp. Sec.*,
    529 F. Supp. 2d 644 (S.D. Tex. 2006)...............................................................11

*In re Fastly, Inc. Sec. Litig.*,
    2025 WL 2721693 (N.D. Cal. Sept. 24, 2025)............................................13, 19

*In re Initial Pub. Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) ...............................................................25

*In re MannKind Sec. Actions*,
    835 F. Supp. 2d 797 (C.D. Cal. 2011) ..............................................................21

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
    2013 WL 396117 (D.N.J. Jan. 30, 2013).......................................................12, 16

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ..........................................................................29

v

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ..............................................................24

*In re PG&E Corp. Sec. Litig.*,
    2025 WL 2781745 (N.D. Cal. Sept. 30, 2025) ....................................................16

*In re Priceline.com Inc.*,
    236 F.R.D. 89 (D. Conn. 2006) ...........................................................................12

*In re Upstart Holdings, Inc. Sec. Litig.*,
    348 F.R.D. 612 (S.D. Ohio 2025) ........................................................................18

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and
    Products Liability Litig.*,
    2017 WL 3058563 (N.D. Cal. July 19, 2017) ......................................................16

*In re WageWorks, Inc., Sec. Lit.*,
    2020 WL 2896547 (N.D. Cal. June 1, 2020) ........................................................19

*Iron Workers Local 580 Joint Funds v. Nvidia Corp.*,
    2020 WL 1244936 (N.D. Cal. Mar. 16, 2020) .....................................................21

*Lacey v. Maricopa Cnty.*,
    693 F.3d 896 (9th Cir. 2012) ...............................................................................18

*Lako v. Loandepot, Inc.*,
    2023 WL 444151 (C.D. Cal. Jan. 24, 2023) .........................................................28

*Lehmann v. S/V THALIA*,
    520 F. Supp. 3d 146 (D.R.I. 2021) .......................................................................26

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005) ..........................................................................13, 14

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) .............................................................................22

*Lockyer v. Mirant Corp.*,
    398 F.3d 1098 (9th Cir. 2005) .............................................................................27

*Lucid Motors Sec. Litig.*,
    110 F.4th 1181 (9th Cir. 2024) .........................................................................9, 10

vi

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)................................................................................................9

*Melendres v. Arpaio*,
  784 F.3d 1254 (9th Cir. 2015) ....................................................................16, 17

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ..........................................................................23

*MFS Secs. Corp. v. New York Stock Exchange, Inc.*,
  277 F.3d 613 (2d Cir 2002) ...............................................................................27

*Miller v. Sonus Networks, Inc.*,
  2019 WL 2567283 (D. Mass. June 21, 2019).....................................................11

*Nathanson v. Polycom, Inc.*,
  87 F. Supp. 3d 966 (N.D. Cal. 2015)..................................................................23

*New York City Employees' Ret. Sys. v. Jobs*,
  593 F.3d 1018 (9th Cir. 2010) ...........................................................................18

*Nuveen Mun. High Income Opp. Fund v. City of Alameda, Cal.*,
  730 F.3d 1111 (9th Cir. 2013) ...........................................................................19

*Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*,
  2024 WL 4353049 (N.D. Cal. Sept. 30, 2024)..............................................23, 24

*Painters and Allied Trades Dist. Council 82 Health Care Fund v.
  Takeda Pharm. Co. Ltd.*,
  674 F. Supp. 3d 799 (C.D. Cal. 2023), *aff'd*, 2025 WL 1683472
  (9th Cir. June 16, 2025) .....................................................................................18

*Pampena v. Musk*,
  705 F. Supp. 3d 1018 (N.D. Cal. 2023)..............................................................29

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ...........................................................................30

*Ramos v. Comerica Inc.*,
  2024 WL 2104398 (C.D. Cal. Apr. 12, 2024).....................................................23

*Rosemere Neighborhood Ass'n v. U.S. Env't Prot. Agency*,
  581 F.3d 1169 (9th Cir. 2009) ...........................................................................26

vii

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
119 F. Supp. 3d 1213 (C.D. Cal. 2015) .............................................................28

*Simpson v. Specialty Retail Concepts*,
823 F. Supp. 353 (M.D.N.C. 1993) ..................................................................25

*Smilovits v. First Solar, Inc.*,
295 F.R.D. 423 (D. Ariz. 2013) ...............................................................15, 19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) .........................................................................................27

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
581 U.S. 433 (2017) .........................................................................................17

*Volk v. D.A. Davidson & Co.*,
816 F.2d 1406 (9th Cir. 1987) .........................................................................17

*Weston v. DocuSign, Inc.*,
348 F.R.D. 354 (N.D. Cal. 2024)................................................................14, 24

*Wietschner v. Monterey Pasta Co.*,
294 F. Supp. 2d 1102 (N.D. Cal. 2003)............................................................34

*York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*,
738 F. Supp. 3d 1182 (N.D. Cal. 2024)............................................................16

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ...........................................................................34

**Statutes**

15 U.S.C. §78j(b) .....................................................................................................9

15 U.S.C. §78u–4

(e)(1) .................................................................................................................18

(b)(1) ...................................................................................................................9

15 U.S.C. §7241(a) .................................................................................................31

PSLRA ........................................................................................................... *passim*

OPPOSITION TO BROOGE DEFENDANTS' MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

**Other Authorities**

17 C.F.R. §240.13a-14 ...........................................................................................31

Urska Velikonja, *Public Compensation for Private Harm: Evidence
   from the SEC's Fair Fund Distributions*, 67 STAN. L. REV. 331,
   345, 363 (2015) ................................................................................................25

ix

Plaintiff Bluefin Capital Management, LLC ("Plaintiff" or "Bluefin") respectfully submits this opposition to the Motion to Dismiss the Second Amended Complaint (ECF No. 135, the "Motion" and "Brooge Brief," or "Brooge Br.") filed by Defendants Brooge Energy Limited ("Brooge"), Saleh Yammout ("Yammout"), Syed Masood Ali ("Masood"), and Paul Ditchburn ("Ditchburn") (collectively herein, "Defendants," and, for Defendants Yammout, Masood, and Ditchburn, with Defendants Nicolaas L. Paardenkooper and Lina Saheb, the "Executive Defendants"). As discussed below, the Motion should be denied in its entirety.

## INTRODUCTION

This securities class action involves false and misleading statements made by Brooge, a number of individual defendants, and its auditors. The Complaint sets forth how all defendants made materially false and misleading statements about nearly every aspect of Brooge's business while they were engaged in a scheme to grossly overstate Brooge's revenue using sham contracts and falsified invoices. Once the SEC and outsiders got wind of this, the fraud was exposed and investors were left with almost nothing. This scheme and all defendants' knowledge thereof is supported by not only the SEC's findings, but by actual documents, meetings, and other fruits of Plaintiff's investigation that unquestionably demonstrates all elements of a §10(b) claim are well-pled in this case.

Faced with such thorough allegations, the Company and three prior Chief Financial Officers ("CFOs") cobble together various arguments, all while barely acknowledging the foregoing facts. Instead, their Motion primarily attacks Plaintiff's standing and loss causation, with secondary sections on falsity and scienter, thereby waiving any argument on the remaining requirements for a §10(b) claim. But each of Defendants' attacks are unsound. As for standing and loss causation, Defendants make almost exclusively fact-intensive arguments reserved for class certification, summary judgment, or even trial, while cherry-picking from

OPPOSITION TO BROOGE DEFENDANTS' MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

trade data and ignoring the tie between stock and warrants. For falsity, they concede it for three of the four Defendants before attempting to twist facts for the fourth. And as for scienter, the Complaint's detailed allegations directly link the Defendants to the fraud—including, among other compelling facts, emails demonstrating the effectuation of the fraud. Such facts readily establish scienter. As such, Defendants' Motion should be denied in its entirety.

## BRIEF STATEMENT OF RELEVANT FACTS

Brooge[1] was incorporated in 2013 in the United Arab Emirates, with the support and backing of an Emirati sheikh. ¶¶48, 187.[2] By 2018, Brooge's Phase I operation, which involved providing oil storage and ancillary services like heating and blending, was operational, with a planned Phase II in the works. ¶¶48-50. Around this time, Brooge began looking to the U.S. markets for its public debut, particularly because the Company needed the funds to survive. In 2018, Brooge's ability to continue as a going concern was in serious question; the Company had a working capital deficiency and had repeatedly failed to comply with the terms of its Phase I loan agreement. ¶¶171, 242. Unfortunately, Brooge's modest FY2018 revenue—$6,387,348—was unlikely to attract investors. *See* ¶79. But investors were not shown that number. Instead, with the help of a related party, BIA, Brooge was able to effect a long-running fraud to boost its revenues by as much as 80%. *See id.* Investors, relying on the inflated numbers and the Company's assurances, lost millions when the fraud was revealed as discussed below.

---

[1]    For ease of reference, "Brooge" or the "Company" as used herein refers to Brooge Petroleum and Gas Investment Company FZE ("BPGIC FZE," f/k/a Brooge Petroleum and Gas Investment Company FZC) before the business combination, and Brooge Energy Limited after the business combination.

[2]    ¶ or ¶¶ refers to paragraphs in the Second Amended Complaint ("Complaint") (ECF No. 114).

2

## I.    Brooge Gave the Markets a False Picture of Its Profits

In December 2017, Brooge arranged to lease 100% of its Phase I oil storage to a "Phase I Customer," later revealed to be Coral Energy Pte Ltd ("Coral"), with Coral paying for the storage regardless of whether or not Coral ever used it.  ¶¶54-55, 190.[3]  Brooge pitched this take-or-pay contract as a way to "de-risk" its early operations.  ¶107.  In the months before the Proxy Statement ("Proxy") was filed, Brooge novated the Phase I take-or-pay contract—and a separate take-or-pay contract for Phase II, which was still in development—to replace the original take-or-pay customers with BIA, a related party.  ¶57.  Other than the replacement of the independent counterparties with BIA, the terms remained the same.  *Id.*  When the Proxy was filed, Brooge reported revenue numbers in line with the take-or-pay contract's terms for fiscal year ("FY") 2018 ($35,839,268) and the first half ("1H") of FY2019 ($22,042,687).  ¶58.  Investors saw an allegedly profiting business, whose contractual novations had not interrupted its revenue stream.

## II.    The Reality: Brooge Was a Fraud

In reality, however, the numbers in the Proxy were gross exaggerations. Neither Coral nor BIA ever used, nor paid Brooge for storage.  ¶¶72, 117.  Instead, what revenue Brooge generated came from leasing its storage directly to end users at rates and volumes substantially lower than those in the take-or-pay contract.  ¶71.

Brooge then engaged in a fake invoicing scheme to cover up the discrepancies. It created invoices to Coral (which Coral never paid) that matched the dollar amounts paid by the end users, but which had storage volumes adjusted so that the numbers matched the higher rates in the take-or-pay contract.  *See, e.g.*, ¶76.  To make up the difference in revenue between the contractual rates and its actual revenue from end users, Brooge created large, month-end invoices to Coral (which Coral also never

---

[3]    It was then allegedly Coral's responsibility to find end users to lease the storage to (or not, as it saw fit).  *See* ¶72.

OPPOSITION TO BROOGE DEFENDANTS' MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

paid) to cover the gap. ¶85. In reality, it was BIA—a related party due to its partial ownership by Hind Mohammed Muktar Ahmed, who also held an ownership stake in Brooge—that sent Brooge the funds to cover the invoices. ¶¶86, 91. Brooge then reimbursed BIA for these payments, meaning BIA also never made any net payments to Brooge. ¶¶93-94. When BIA replaced Coral, the scheme continued—only now the invoices were made out to BIA instead of Coral. ¶¶83, 90.

A March 18, 2018 email sent by Defendant Paardenkooper himself (with Defendant Saheb copied) outlined just how the scheme worked in practice. Under the Phase I contract, Coral (which had yet to be replaced by BIA at that point) was supposed to pay Brooge $5.00 USD per cubic meter per month for all of its storage. ¶72. Instead, per Paardenkooper's email, Brooge had leased a subset of the Phase I storage directly to an end user, "Sahara" (Sahara Energy Resource Limited), "at a price of [$]3[.00] USD per month"—or $2.00 USD less per cubic meter than the contractual rate—for "a total of [$]312[,]216 USD." ¶73. Paardenkooper asked for two invoices to be prepared: one to Sahara and a separate one to Coral. *Id.* Both invoices listed the same amount due ($312,216 USD) but with different rates and volumes. ¶75. The storage volume was adjusted downward for the fake invoice to Coral to make the numbers work with the higher contractual rate, while the real invoice to Sahara included the actual rates charged for the volumes used. *Id.* Between December 2017 and July 2019, more than 100 invoices to Coral were created in this manner. ¶82. Between August 2019 and December 2020, after BIA replaced Coral, more than 200 invoices to BIA were created in the same way. ¶83.

The revenue generated from customers like Sahara was not enough to match the rates the take-or-pay contract was supposed to be generating. ¶85. To address this issue, Brooge created large, month-end invoices to Coral (later, BIA) to cover the shortfall, most of which were in amounts ranging from $2.5 million to $3.4 million. ¶¶86, 90. Brooge's management was well aware of the practice. Both

4

Defendants Paardenkooper and Saheb were copied on emails addressing the need to receive these "gap-filler" payments from Coral (ultimately made by BIA). ¶¶87-88. In each case, BIA was then reimbursed for the funds it paid to Brooge. ¶94.

In the end, Brooge dramatically overstated its revenue (¶79):

| Year Ended | Revenue as Reported | Revenue as Restated | % Change |
|---|---|---|---|
| 2018 | $35,839,268 | $6,387,348 | -82.18% |
| 2019 | $44,085,374 | $15,885,219 | -63.97% |
| 2020 | $41,831,537 | $27,191,176 | -35.00% |

The truth, which was that Brooge was operating a fraudulent enterprise with falsified financials, only emerged in full in December 2023 with the filing of the C&D Order (the "SEC Order"). ¶¶132-33. In the interim, investors lost millions in reliance on Brooge and the Executive Defendants' material misstatements and omissions. ¶¶127-36. This lawsuit followed.

## III.    Brooge's Management Effectuated the Fraud

The Executive Defendants all played key roles in the Brooge fraud. In particular, the three who are parties to the instant motion—Defendants Yammout, Masood, and Ditchburn—were all Brooge's CFO at different times, and thus responsible for Brooge's finances. No one was better positioned to recognize the underlying fraud, which could not have been perpetrated without the CFOs' support. And the fraud itself had features that would have made its existence apparent to the Executive Defendants, including: (i) its sheer size; (ii) the importance of the take-or-pay contract to Brooge's business; and (iii) the clear mismatch between the terms of the take-or-pay contract and Brooge's actual revenues, given that neither Coral nor BIA ever made any net payments to Brooge. ¶¶148-49; *see also* ¶¶137-38, 156-57. All of these features, along with the allegations discussed below, discredit any innocent explanation for the Executive Defendants' complicity.

5

### A.   Defendants Paardenkooper and Saheb

The involvement of Defendants Paardenkooper—Brooge's Chief Executive Officer ("CEO") until December 2022—and Saheb—Brooge's Chief Strategy Officer ("CSO") until October 2021, Deputy CEO until December 2022, and Interim CEO until August 2023—in the fraud is beyond doubt. ¶¶18-19.  Paardenkooper himself wrote an email, copying Saheb, that directed the perpetration of the fake invoicing scheme as discussed above.   ¶147; *see* §SoF.II, *supra*.   Both Paardenkooper and Saheb were parties to the SEC Order and named at length therein. *See, e.g.*, ¶152 (referencing multiple portions of the SEC Order naming both).  Paardenkooper was the one who emailed PricewaterhouseCoopers ("PwC") with a supposed explanation for an "intercompany" transfer from Brooge to BIA flagged by the auditor right before the FY2020 Form 20-F was filed. *See* ¶¶198-203; *see also* §SoF.III.C, *infra* (further discussing the incident).  Finally, both Paardenkooper and Saheb were named by PwC as key sources of control issues in PwC's resignation letter, further supporting their complicity in the fraud. ¶129.[4] There can be no question that both knew and perpetuated the fraud.

### B.   Defendant Yammout

Defendant Yammout was Brooge's CFO from October 2018 until April 2020, and a director between December 2019 and December 2023. ¶¶20-21. As such, he was in charge of Brooge's finances while Brooge was: (i) receiving piecemeal payments from end users (not its contractual counterparties) that were incompatible with the terms of its take-or-pay contract; (ii) falsifying invoices to make it seem like the payments matched the terms of the contract; and (iii) sending out extremely

---

[4]   Though neither Paardenkooper nor Saheb are parties to the Brooge Defendants' Motion to Dismiss, their knowledge is relevant to the Company's knowledge and, as such, is discussed herein. *See* ¶¶161-62.

OPPOSITION TO BROOGE DEFENDANTS' MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

large, month-end invoices to cover the shortfall between Brooge's actual revenue and the contractual revenue it was supposed to receive. *See* §SoF.II, *supra*.

Yammout was also still CFO in April 2020, when he attended an Audit Committee meeting and was confronted with two key facts. The first was that Brooge was in "continual non-compliance" with its Phase I term loan—not because it lacked the funds to make the payments, but because (as Yammout himself admitted) it was funneling money to other priorities, including IPO and investor fundraising expenses. ¶¶242, 244. The second was that Brooge's management, including Yammout, had requested that the Board sign off on disclosures stating that the Company was current with its payment obligations (even though it had defaulted) in order to get a dividend proposal approved. ¶245. In other words, management, including Yammout, had asked the Board to lie.

### C. Defendant Masood

Defendant Masood was Brooge's CFO from April 2020 to April 2022. ¶21. As with Yammout, he was in charge of Brooge's finances while the fraud was ongoing. In keeping with his role, it was Masood who touted Brooge's "record revenue for 2019" in SEC filings and repeated the overstated revenue figures on earnings calls. ¶¶100, 102, 151. Masood was also CFO when Brooge employees sent PwC spreadsheets that identified all of Brooge's revenue from January 2019 through March 2020 as coming from BIA—even though BIA did not replace Coral as the counterparty to the take-or-pay contract until August 2019. ¶223. There was no reason for BIA to make payments to Brooge before August 2019, except in connection with the long-running fraud.

Furthermore, it was Masood who emailed PwC in late March 2021, right before the FY2020 audit was due, to ask them to hold off on flagging a large transfer from Brooge to BIA in June 2020 as an unresolved issue for the Audit Committee. *See* ¶200. He sent a frantic email to Paardenkooper informing him that PwC had

7

identified the transfer of funds to BIA, Brooge's "BIGGEST CUSTOMER," as "NOT MAKING ANY SENSE" and evidencing "A CLEAR LACK OF CONTROL." ¶201. He further told Paardenkooper that he had "MANAGED SOMEHOW" for PwC "NOT TO HIGHLIGHT IT AS AN UNRESOLVED ITEM TO [THE] AUDIT COMMITTEE," but only so long as Paardenkooper sent them an email explaining the transaction. *Id.* Masood clearly understood the significance of Brooge's auditor identifying as problematic a transfer from Brooge to BIA. *See* ¶¶94, 117 (explaining how BIA made payments to Brooge that it was subsequently reimbursed for, such that BIA never made any net payments to Brooge). Like Paardenkooper, Saheb, and Yammout, Masood was part and parcel of the fraud.

### D.    Defendant Ditchburn

Defendant Ditchburn was Brooge's CFO from December 2022 until November 2024. ¶22. He oversaw the cover-up of the fraud, as the Company began slowly revising its representations and financials. It was announced in August 2022 that Brooge's financials could no longer be relied upon due to "revenue recognition and other financial reporting and disclosure issues," but Brooge did not restate its revenue until April 2023, when Ditchburn was its CFO. ¶¶62, 65, 124. That restatement, however, was not attributed to the fraud. ¶124. As Ditchburn himself explained on a May 4, 2023 earnings call, the restatement was allegedly based on a determination that "funds received from a related party," BIA, "d[id] not qualify as revenue due to insufficient documentation and certain criteria under the accounting standards." *Id.* $74.3 million USD was therefore reclassified as a liability, which Ditchburn described as "a conservative approach." *Id.*; *see also* ¶¶154-55. Ditchburn thus played a critical role in the fraud by enabling its cover-up.

### LEGAL STANDARD

Congress enacted the Securities Exchange Act of 1934 (the "Exchange Act" or the "1934 Act") in response to widespread abuses in the securities industry. To

8

advance the objective of "honest markets," *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988), §10(b) of the Exchange Act forbids the use of "any manipulative or deceptive device or contrivance" "in connection with the purchase or sale of any security." 15 U.S.C. §78j(b). A private plaintiff seeking relief for a §10(b) violation must show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") further requires that the complaint in a securities-fraud action alleging a material misstatement or omission "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," and provide a particularized basis for any allegations made on information and belief. 15 U.S.C. §78u-4(b)(1). Where applicable, the complaint also must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"—i.e., scienter. *Id.* §78u-4(b)(2)(A).

**ARGUMENT**

**I.      Plaintiff Has Standing to Sue Based on Pre-SPAC Statements**

Defendants first argue that the "purchaser-seller" rule set forth in *In re: CCIV / Lucid Motors Sec. Litig.*, 110 F.4th 1181 (9th Cir. 2024) ("*CCIV*"), negates Plaintiff's standing for any aspects of its claims arising from purchases of the pre-SPAC merger company (Twelve Seas), as well as any claims for misrepresentations that occurred before the December 2019 merger. They are incorrect. Relying on the Supreme Court's decision in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 742 (1975), the Ninth Circuit in *CCIV* found that pre-merger holders of stock in CCIV, a SPAC, were not "purchasers or sellers of the stock in question"—in that

9

case, the target company, Lucid. *CCIV*, 110 F.4th at 1185. The critical distinction is that here, unlike in *CCIV*, Plaintiff did more than purchase shares in Twelve Seas—it *also* purchased shares post-merger in the target company, Brooge. ¶13; *see also, e.g.*, ECF No. 19-3. In contrast, the plaintiff in *CCIV* lacked standing because it only purchased pre-merger shares in the SPAC and "did not purchase or sell Lucid stock." *CCIV*, 110 F.4th at 1187. Furthermore, Defendants' argument regarding whether purchasers of Twelve Seas shares can be included in the class is a disputable factual issue about the constitution of the class best addressed at class certification or otherwise, not on a motion to dismiss.[5]

Contrary to Defendants' assertions, Plaintiff's claims are not limited to misrepresentations made after the SPAC merger. Plaintiff is suing *Brooge* based on statements *Brooge* made in connection with Plaintiff's subsequent purchases of *Brooge* securities, regardless of whether those statements are pre- or post-merger. The court in *CCIV* did not bar these claims; it merely held that a plaintiff who purchased shares in the SPAC could not sue the target company (Lucid) based on its pre-merger SPAC purchases. Here, Plaintiff was a pre- *and* post-merger purchaser. In fact, in *Blue Chip Stamps*, upon which Defendants rely, the Supreme Court defined the "stock in question" for standing considerations as "the security to which the prospectus, representation, or omission relates." *Blue Chip Stamps*, 421 U.S. at 747. Since the misrepresentations that occurred pre-merger related to Brooge

---

[5]     Defendants' argument that Plaintiff cannot sue on shares of the SPAC purchased before the merger also fails because, here, Plaintiff acquired those after the merger had been announced and agreed to in a binding agreement in April 2019. ¶46. A party that has a contractual right to receive a stock, even if contingent on a later event, is nonetheless a purchaser of the security in question under the securities fraud laws. *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 879-80 (9th Cir. 1999). Plaintiff thus had a right to sue based on the Twelve Seas shares it bought that would soon become Brooge shares (weeks later). In contrast, the plaintiff in *CCIV* purchased SPAC shares before there was any merger agreement, and even before Lucid was announced as the target company. *CCIV*, 110 F.4th at 1183.

OPPOSITION TO BROOGE DEFENDANTS' MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

(shares of which Plaintiff subsequently purchased), the misrepresentations in the Proxy are properly at issue.

## II.    Plaintiff Properly States a Claim Based on Warrants

### A.    Plaintiff Adequately Alleges Loss Causation for the Warrants

Defendants argue that the Complaint does not allege Defendants' fraud caused the price of its warrants to decline. Brooge Br. at 20. Relying on inapplicable, out-of-context quotes, Defendants argue that a plaintiff must allege that the price of the warrants declined in response to a corrective disclosure. Not so.

First, the Complaint *does* specifically allege that as a result of Defendants' fraud, "the fair value of Brooge's warrants had dropped 98.75%." ¶8. Second, because the Complaint adequately alleges declines in Brooge's stock (¶¶128-36), Plaintiff need not allege corresponding declines in warrant prices as the price of a warrant is directly related to the price of Brooge's stock. This is because a warrant (like an option) is a type of security that "is simply an 'option to purchase shares of corporate stock at a fixed price' . . . [and] a stock warrant differs from a stock option only in the sense that options are granted to employees while warrants are sold to the public."[6] *Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 513 n.4 (5th Cir. 2004) (citing BLACK'S LAW DICTIONARY (5th ed. 1979) ("warrant")). And it is well established that "the value of options is directly related to the value of common stock." *In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 155 (N.D. Cal. 1991).[7] As such, the

---

[6]    Indeed, Plaintiff alleges the direct relationship between the value of Brooge stock and warrants. ¶16 ("The warrants entitled their holders to purchase one ordinary share at an exercise price of $11.50.").

[7]    *See also Crossen v. CV Therapeutics*, 2005 WL 1910928, at *4 (N.D. Cal. Aug. 10, 2005) ("Generally, investors who trade options are entitled to the fraud-on-the-market presumption because the value of options is directly related to the value of common stock."); *Miller v. Sonus Networks, Inc.*, 2019 WL 2567283, at *1 (D. Mass. June 21, 2019) ("[T]he value of options is directly related to the value of common stock."); *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 754 (S.D. Tex. 2006) ("The value of these derivative securities depended upon the value of Enron common

value of a warrant or option "decreases if the underlying stock price falls." *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2013 WL 396117, at *6 (D.N.J. Jan. 30, 2013) ("The market price for options is directly responsive, therefore, to changes in the market price of the underlying stock . . . "). Accordingly, Plaintiff's allegations of common stock price declines directly and adequately plead corresponding losses in the warrants, contrary to Defendants' meritless contention.

Finally, Defendants are wrong that the price of the warrants did not decline immediately after the corrective disclosures, a conclusion which they only reach by cherry-picking single dates of brief, unsustained rebounds. Brooge Br. at 21-22. In fact, the price chart Defendants submitted with their request for judicial notice demonstrates that the price of warrants did decline in response to the corrective disclosures.[8] *In re CV Scis., Inc. Sec. Litig.*, 2019 WL 6718086, at *6 (D. Nev. Dec.

---

stock, and all the information about the stock was readily available to investors and factors affecting the price of the stock were incorporated into the determination of the value of the call and put options."); *In re Priceline.com Inc.*, 236 F.R.D. 89, 100 (D. Conn. 2006) (finding put options trader presumptively relied on integrity of market price in underlying stock and thus was adequate and typical class representative).

[8]    These price charts are of questionable value given the complete lack of explanation or authentication of its source (financialcontent.com). Regardless, the chart regarding warrants demonstrates that the price declined in response to the corrective disclosures. For the final disclosure on December 22, 2023, Defendants' chart shows that the warrants declined by 28.57% on that day, and then by another 60% on December 26, 2023, the next trading day, each on relatively high volume. *See* ECF No. 135-5 (Defendants' RJN Ex. B) at 3. Defendants cherry-pick a brief rebound on December 29, 2023, comparing it to the price on December 26 and ignoring the fact that the price crashed back down to far below pre-disclosure levels in January. *Id.* at 2-3. And Defendants use the wrong starting date of the 26th, instead of the 22nd. While a 6-K announcing the SEC Order was released after hours on the 22nd, the Complaint alleges the actual SEC Order was also released that day and may have been known to traders during trading hours. ¶132. The increased volume for stock sales on December 22, 2023 plausibly suggests the news may have been known that day. The chart shows four days of trading after the disclosure of significantly lower prices until a brief rebound, followed thereafter by declines. For the January 20, 2023 disclosure, Defendants' chart shows that the warrants were trading at $0.1600 on January 18, 2023 and then declined in value the next date shown to $0.1440, steadily declining to close at $0.1 by the end of February 2023. ECF No. 135-5 at 7. For the December 8, 2022 disclosure, it shows that as of

12

10, 2019) (finding alleged price drop in hours after disclosure adequate to allege loss causation despite price rebound in "subsequent days"). And again, Defendants' unsupported arguments about the scope and reasons for the decline, and overall value of the warrants, are not appropriate for determination on a motion to dismiss.

## B.   Plaintiff Properly Pleads Actionable Losses on Its Warrants

Without any citation to authority, Defendants argue that "[t]o establish loss causation on sales, a plaintiff must allege that it sold its securities at a loss *after* the truth was revealed to the market." Brooge Br. at 22:10-11 (emphasis in original). That is not the law. Loss causation can be shown via a variety of methods demonstrating that the price a party paid for the security was inflated due to the defendant's fraud. A plaintiff can claim damages from retained shares, or shares that were sold before a corrective disclosure if damages are proven by another applicable theory. *See In re Fastly, Inc. Sec. Litig.*, 2025 WL 2721693, at *22 (N.D. Cal. Sept. 24, 2025) ("[L]oss causation is a 'context-dependent' inquiry as there are an 'infinite variety' of ways for a tort to cause a loss."). "A plaintiff need not suffer a tangible economic loss to bring suit under the PSLRA. Specifically, a plaintiff is not required to 'sell their securities after revelation of wrongdoing in order to adequately plead economic loss or loss causation.'" *Baker v. Twitter, Inc.*, 2023 WL 6932568, at *11 (C.D. Cal. Aug. 25, 2023) (citing *In re Royal Dutch/Shell Transp. Sec. Litig.*, 2005 WL 8251690, at *2 (D.N.J. Dec. 20, 2005)). Thus, holders of securities who do not sell their securities nonetheless may have suffered damages with respect to securities they have retained and did not sell. *Id.*; *see also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 949 (9th Cir. 2005)

previous trading day reflected, the warrants closed at $0.2600 and then on December 8, 2022, closed at $0.1761—a significant drop. *Id.* at 8-9. Although there was a brief bounce back to $0.2200 the following day, that was short-lived and the warrants continued to decline in value consistently to close at $0.1500 by the end of the following month. *Id.*

13

(finding a party could claim damages under the PSLRA even where it held the securities). Defendants admit that although Plaintiff stopped selling its warrants just before the first corrective disclosure, Plaintiff retained 918,029 warrants throughout the entire class period and beyond. Brooge Br. at 22:22-24; ECF No. 19-2. Plaintiff has thus properly alleged damages with respect to at least those securities.

Defendants' factual argument that the warrants eventually held almost no value does not negate the fact that Plaintiff suffered losses. *See, e.g.*, *Livid Holdings Ltd.*, 416 F.3d at 949 (plaintiff properly alleged damages where it held the securities until the company went bankrupt, which caused to lose the entire value of its investment). Regardless of whether the warrants would have hit the strike price—and they might have but for the persistent fraud undercutting the entire Company—the price at which Plaintiff purchased the warrants was inflated. Plaintiff's damages are losses compared to the inflated value of the shares. *Baker*, 2023 WL 6932568, at *11; *Weston v. DocuSign, Inc.*, 348 F.R.D. 354, 368 (N.D. Cal. 2024) (noting that plaintiff who retained their shares could still assert damages). The fact that the warrants may eventually be worthless does not negate the fact that Plaintiff would have paid less for the warrants—and therefore have suffered fewer losses—had Defendants not egregiously lied about Brooge's business and revenues.[9]

Finally, Defendants' argument about the efficiency of the market fails. Defendants vaguely address only a single factor of many regarding market efficiency, asserting that daily trading volume was too low. Brooge Br. 24-25. First, this factual argument cannot be resolved on a motion to dismiss. Second, in any

---

[9] Likewise, Defendants' supposition that the warrants were deeply "out-of-the-money" is irrelevant. So long as Plaintiff has alleged that it paid an inflated price for the warrants, it has stated a claim. Plaintiff is not required to plead its exact damages. *Children's Hosp. & Med. Ctr. Found. of Omaha v. Countrywide Fin. Corp.*, 2011 WL 13220509, at *7 (C.D. Cal. Aug. 22, 2011). The price at which Plaintiff could sell the warrants declined—meaning the value was reduced further, regardless of whether their value was low to begin with.

14

case, Defendants fail to analyze or quantify the overall volume (in any detail) of warrants; examine the particular market for Brooge securities; assess the efficiency of warrant markets; or engage with any of the other numerous factors that courts assess to determine efficient markets. *See, e.g.*, *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 437 (D. Ariz. 2013). As a matter of law, this cannot defeat Plaintiff's well-pled and detailed allegations of reliance and market efficiency. ¶¶257-62. At the pleading stage, plaintiffs need not prove market efficiency; they need only allege facts that plausibly suggest that the market for the company's securities was efficient. Indeed, securities traded on national exchanges such as NASDAQ (like those at issue here, ¶¶13, 259) are entitled to a prima facie presumption of an efficient market, which alone supports Plaintiff's allegations as "plausible." *Smilovits*, 295 F.R.D. at 437. And, even if the market for warrants itself was not independently efficient, courts have held that the market and price for derivative instruments like warrants is directly related to the common stock market and price— meaning the price was affected by that market. *See, e.g.*, *Crossen*, 2005 WL 1910928, at *4 ("Generally, investors who trade options are entitled to the fraud-on-the-market presumption because the value of options is directly related to the value of common stock."); *In re Credit Suisse Sec. Fraud Class Actions*, 2025 WL 1866293, at *11 (S.D.N.Y. July 7, 2025) ("Option traders and other traders of securities aside from the shares of stock themselves may use the fraud-on-the-market presumption of reliance absent special circumstances compelling a different result.") (citations omitted).

### C. Plaintiff Does Not Need to Demonstrate Losses or Standing for Both Warrants and Common Stock

Plaintiff's claims arise from losses it, and the class, suffered with respect to both Brooge warrants and common stock that were trading at artificially inflated prices. ¶13. The Complaint defines the class as purchasers of "securities," which

15

encompasses both warrants and common stock. ¶1.  Because all claims arise out of the same course of conduct and misrepresentations, Plaintiff only needs to have standing with respect to either the warrants or common shares and, if it does, it can still pursue the Complaint on behalf of purchasers of the other type of securities. *Melendres v. Arpaio*, 784 F.3d 1254, 1261-63 (9th Cir. 2015); *see In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2013 WL 396117, at *6 (allowing claims to proceed regardless of whether the lead plaintiff had acquired common stocks or options because the "class claims, whether based on common stock purchases or options trading, arise out of the same conduct . . ."); *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litig.*, 2017 WL 3058563, at *4 (N.D. Cal. July 19, 2017) (lead plaintiff had standing to represent "putative class members who purchased . . . bonds in different tranches or offerings" in which the lead plaintiff did not participate).

Indeed, so long as the named plaintiff has a standing to assert a claim, it has standing to challenge the defendants' common conduct relating to "the same type of relief or the same kind of injury" as unnamed class members.  *Melendres*, 784 F.3d at 1263.  Then, the question regarding the scope of the class is left for the class certification stage. *Id.* at 1261-62. "[A] plaintiff who establishes Article III standing for her own claim has class standing to assert the claims of absent class members raising a sufficiently similar set of concerns, even if the named plaintiff cannot herself meet the elements to assert the absent class members' claims." *In re PG&E Corp. Sec. Litig.*, 2025 WL 2781745, at *29 (N.D. Cal. Sept. 30, 2025); *see also York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1197-98 (N.D. Cal. 2024) (finding plaintiff could assert claims on behalf of shareholders with claims during different time periods pre-dating the plaintiff's

OPPOSITION TO BROOGE DEFENDANTS' MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

claims, so long as they related to common conduct).[10]  Therefore, Plaintiff here has standing to pursue claims on  behalf of warrant and common stock purchasers.

## III.    Plaintiff Has Alleged Economic Loss and Article III Standing in Connection with Its Common Stock Transactions

Defendants also argue that Plaintiff does not have standing for common stock related claims because the loss charts submitted with its lead plaintiff application showed an overall net gain.  First, Plaintiff does not need to demonstrate losses, let alone net losses, to demonstrate an injury for Article III standing.  In a securities fraud case, the "cognizable injury occurs *at the time an investor enters.... [into] a transaction* as a result of material misrepresentations.  This constitutes the injury giving rise to a cause of action, even if an actual monetary loss is not sustained until later." *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1412 (9th Cir. 1987) (emphasis added).  Accordingly, a plaintiff who "broke even or profited" from their investment still has Article III standing in a securities class action because "a plaintiff suffers an injury in a securities fraud case when she changes her position—such as by buying or selling—as a result of a material misrepresentation," regardless of whether it suffered overall losses and even if it profited. *Audet v. Fraser*, 332 F.R.D. 53, 63-64 (D. Conn. 2019).

Second, netting gains and losses is a question of fact that cannot be decided at the motion to dismiss stage. *Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.*, 793 F. Supp. 2d 1138, 1144 (C.D. Cal. 2011) ("[T]he netting of each Plaintiff's gains and losses is a detailed inquiry which the Court is unable to undertake at [the motion to dismiss] stage of the litigation.").  Nonetheless,

---

[10]    Defendants' citation to *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) for the vague general principal that "standing is not dispensed in gross" is inapposite.  That case merely concerns when an intervenor has standing to pursue relief not requested by a plaintiff.  It does not limit the specific holding in *Melendres* and has nothing to do with class action claims under the PSLRA.

OPPOSITION TO BROOGE DEFENDANTS' MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

Plaintiff was clearly not a net gainer.[11]  Defendants only reach this conclusion by carving out Plaintiff's common stock trades and ignoring that Plaintiff incurred $592,236.53 in losses on warrants, resulting in an overall net loss of $310,856.68. ECF No. 19-3 at 104.  For purposes of standing, particularly in a class action, there is no basis to separate a plaintiff's losses between two types of securities.  *In re Upstart Holdings, Inc. Sec. Litig.*, 348 F.R.D. 612, 625 (S.D. Ohio 2025) (where plaintiff's losses on options dwarfed gains on common stock sales, plaintiff "did not make a net profit on the covered securities.").[12]

## IV.    Plaintiff Has Sufficiently Alleged Loss Causation

Pleading loss causation requires allegations of "a causal connection between the material [misstatements or omissions] and the loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Plaintiffs need only allege that "revelation of fraudulent activity, rather than changing market conditions or other unrelated factors, proximately caused the decline in defendant's stock price"—which is

---

[11]    And even if Plaintiff had earned a net profit (it did not), it would be of no significance to the loss causation inquiry. *Painters and Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 674 F. Supp. 3d 799, 826 (C.D. Cal. 2023), *aff'd*, 2025 WL 1683472 (9th Cir. June 16, 2025) ("To the extent that class members were relieved of their money by [defendant's] deceptive conduct— as Plaintiffs allege—they have suffered an 'injury in fact.' . . . whether the net economic loss is zero (or negative) is a question of *damages*, not injury.") (emphasis in original); *Bond v. Clover Health Invs., Corp.*, 2023 WL 1999859, at *7 (M.D. Tenn. Feb. 14, 2023) ("There is no contradiction between [plaintiff] having been a victim of fraud related to [defendant's] securities and the fact that he ultimately made a net profit off of those securities.  Fraud requires only that the plaintiff was injured, not that he never enjoyed a benefit."). Further, in a securities class action, a plaintiff that is a "net gainer" on a series of transactions can demonstrate economic losses using a "transaction-based" or other methodology notwithstanding its overall gains. *In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 349, 356 (E.D. Pa. 2006); *see also New York City Employees' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1024 (9th Cir. 2010) (citing *Cigna* for this proposition), overruled on other grounds by *Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012).

[12]    Defendants' citation to 15 U.S.C. §78u–4(e)(1) for the proposition that the net loss must be for the same security is misplaced.  Brooge Br. at 25-26.  That code section is the 90-day lookback provision which simply states how to calculate a cap on damages for a particular security.  It does not relate to overall losses for purposes of standing.

typically done by "plausibly" alleging corrective disclosures by which "defendant's fraud was revealed to the market and caused the resulting losses." *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1204 n.5, 1205 n.7 (9th Cir. 2020). Plaintiff may also plead "materialization of the risk," alleging that corrective discloses revealed the true extent of the relevant risk. *See In re WageWorks, Inc., Sec. Lit.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020). Loss causation allegations suffice "so long as they give defendant notice of plaintiff's . . . theory and provide . . . some assurance that the theory has a basis in fact." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 793 n.16 (9th Cir. 2020).

Here, Plaintiff alleges both corrective disclosures and a materialization of the risk. ¶¶127-36. As a threshold matter, Defendants' argument regarding loss causation fails because it ignores allegations of losses based on a materialization of the risk theory, under which Plaintiff does not need to show losses stemmed directly from a corrective disclosure revealing the fraud. *Nuveen Mun. High Income Opp. Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013). Plaintiff properly pleads that each of the alleged disclosures whereas a successive stage in the materialization of the risks Defendants concealed—that Brooge's financial results were fabricated through a fake invoicing scheme and the Company was premised on fraud. ¶¶127-36; *In re Fastly, Inc. Sec. Litig.*, 2025 WL 2721693, at *23 (where, as here, the plaintiff alleges loss causation under the materialization-of-the-risk approach, loss causation "may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.").

Further, Plaintiff also properly alleges loss causation based on the corrective disclosures. *First*, Defendants argue that the corrective disclosure on December 8, 2022, announcing Paardenkooper's resignation, is insufficient because resignation of an executive defendant alone is not enough to establish loss causation. However, an executive resignation that resulted in a stock price drop is sufficient to show loss

OPPOSITION TO BROOGE DEFENDANTS' MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

causation where the resignation was a result of the fraud or materialization of the concealed risks such as executive misconduct that caused the resignation. *See Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1145-46 (N.D. Cal. 2013).[13]  Here, the Complaint alleges an entirely plausible series of events suggesting that Paardenkooper's departure was a result of his misconduct.  Specifically, it alleges that on December 29, 2022, just weeks after Paardenkooper abruptly resigned, PwC resigned as Brooge's auditor as a result of disagreements it had with Brooge regarding critical accounting practices and senior management's reliability and conduct.  ¶129.  Shortly thereafter, Brooge filed a Form 6-K which included a letter from PwC recounting events surrounding its resignation.  *Id.*  In the letter, PwC stated that it would not accept representations from Brooge's CEO (Saheb, who replaced Paardenkooper) absent an independent review by counsel.  It also demanded that Paardenkooper not assume any role in the Company following his resignation.  *Id.*  Given the timing and specific statements regarding PwC's resignation connected to Paardenkooper's misconduct, this plausibly suggests that Pardenkooper's resignation was due to his complicity in the falsification of the financial statements later revealed in 2023.

A plaintiff will survive a motion to dismiss if it alleges that the defendant's misstatements and omissions concealed the risk that materialized and played some part in diminishing the market value of the security.  *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009).  That occurred here.  In response

---

[13]  Furthermore, a "corrective disclosure need not consist of an admission of fraud by the defendant or a formal finding of fraud by a government agency." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d at 790.  Nor must the disclosure "reveal the full scope of the defendant's fraud in one fell swoop; the true facts concealed by the defendant's misstatements may be revealed over time through a series of partial disclosures." *Id.*  Likewise, "to be corrective, a disclosure need not precisely mirror the earlier misrepresentation.  It is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading," *Id.*

to the announcement of Pardenkooper's resignation, Brooge's stock dropped 7.32%. ¶128. This drop reflected a materialization of the undisclosed risks that led to Paardenkooper's resignation. *Cement & Concrete Workers Dist. Council Pension Fund*, 964 F. Supp. 2d at 1145-46 (finding that loss causation was properly alleged based on an executive departure where the risks of unethical misconduct by an executive were concealed and then resulted in a subsequent stock drop when he resigned); *see also In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 815 (C.D. Cal. 2011).

*Second*, Plaintiff alleges a corrective disclosure on January 20, 2023 with the letter from PwC discussed above. Defendants argue that it did not reveal or definitively adjudicate any misconduct or expressly outline the fake revenues or invoicing scheme. Brooge Br. at 26. This may be true, but the letter references potential material accounting issues, "likely illegal" conduct, failures to take remedial action, and the unreliability of both Paardenkooper and Saheb, who replaced him. It was an actionable "partial disclosure" revealing negative information stemming from the fraud that had materialized from the concealed facts. *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d at 790 (a partial disclosure constitutes loss causation even if the entire fraud is not revealed). It was part of a gradual release of negative information stemming from the fraud over the course of time. "A series of corrective disclosures, when viewed in tandem, may be sufficient if the combined force of these statements . . . suggest that the market was alerted to the relevant misrepresentations." *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1263-64 (D. Nev. 2019) (internal citations omitted); *Iron Workers Local 580 Joint Funds v. Nvidia Corp.*, 2020 WL 1244936 at *13 (N.D. Cal. Mar. 16, 2020) (finding sufficient loss causation where partial disclosure resulted in a 4.9% stock drop and later 28%). *Third*, the December 22, 2023 disclosure that Brooge had settled SEC charges and the accompanying SEC Order is a textbook corrective

21

disclosure sufficient to plead loss causation. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1203 (9th Cir. 2016) ("[T]he announcement of an SEC investigation related to an alleged misrepresentation, coupled with a subsequent revelation of the inaccuracy of that misrepresentation, can serve as a corrective disclosure for the purpose of loss causation."). Especially taken together, the Complaint adequately describes how the disclosures resulted in significant cumulative losses stemming from the same undisclosed risks and fraud.

### A. Defendants' "Price Recovery" Arguments Fail

Defendants' reliance on cherry-picked price rebounds is misleading. Defendants challenge the last corrective disclosure on December 22, 2023 (of the SEC Order) by parsing trade data from their stock price chart to argue that there was no decline. Brooge Br. at 26-27. However, the Complaint—and Plaintiff's own price chart—demonstrates meaningful price drops occurring after this disclosure. There was a significant 17.66% stock decline on the two trading days following the December 22, 2023 disclosure. ¶133. That alone is enough. In fact, the price chart reflects an additional 15.66% decline on December 22, 2023 (from $3.96 the previous day to $3.34), the day of the announcement. *See* ECF No. 135-4 at 20.[14] Volume increased significantly on the date of the disclosure and for a period thereafter subsequent to this announcement, indicating that the market considered the disclosure as significant. *See* ¶133; *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d at 792 (noting higher trading volume upon the disclosure supported loss causation). Defendants point to an anomalous two-day bounce back on December 28 and 29, 2023, but ignore that after that brief and unsustained uptick, the stock resumed a steady downward trajectory, closing at $2.42 by January 5, 2024 (well below the $3.34 price on December 22, 2023), and at $1.84 by the end of January. *See* ECF

---

[14] While the Form 6-K announcing the SEC Order was released after hours that day, the SEC's press release and order itself could have affected the market.

OPPOSITION TO BROOGE DEFENDANTS' MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

No. 135-4 at 19-20.[15] This does not negate loss causation; it reinforces it. In fact, courts have repeatedly rejected dismissal on the basis of temporary or partial rebounds, recognizing that short-term price movements may reflect unrelated external forces rather than a correction of fraud-related inflation. *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 985 (N.D. Cal. 2015) ("'[B]asic economic principles preclude dismissing a complaint' on grounds that the stock price recovered after falling significantly because the rebound can often be explained by external events."); *In re CV Scis., Inc. Sec. Litig.*, 2019 WL 6718086, at *6 (same); *see also Acticon AG v. China N.E. Petroleum Holdings, Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012) (concluding that price recovery after the class period "does not negate the inference that [plaintiff] has suffered an economic loss" because the price rebound could be explained by external events).

## B. Defendants' Truth on the Market Argument Fails

Defendants' argument that the market somehow knew about the fraud prior to the December 22, 2023 disclosure is likewise unavailing. Brooge Br. at 27-28. First, the argument that the truth entered the market prior to this announcement is a factual inquiry that cannot be resolved at the pleading stage. *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 482 (2013) (proof that "news of the truth credibly entered the market and dissipated the effects of prior misstatements" is an issue for trial or summary judgment.); *Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*, 2024 WL 4353049, at *19 (N.D. Cal. Sept. 30, 2024) (same); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1184 n.25 (C.D. Cal. 2011) (the "truth on the market" defense "requires a fact-intensive inquiry that is better reserved for summary judgment").

---

[15] Unilke in *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064-65 (9th Cir. 2008) and *Ramos v. Comerica Inc.*, 2024 WL 2104398, at *3 (C.D. Cal. Apr. 12, 2024), relied upon by Defendants, the price recovery here was fleeting and not a full, sustained recovery.

Further, the August 17, 2022, April 26, 2023, and May 1, 2023 announcements Defendants rely on (Brooge Br. at 27-28) were each misleading and conveyed no corrective information to the market at all because, as alleged, Defendants made misleading statements in conjunction with these statements to further conceal the fraud. *See, e.g.*, ¶¶63, 155; *see also Ohio Pub. Emps. Ret. Sys.*, 2024 WL 4353049, at *19 (earlier statement did not disclose the truth where the plaintiff alleged the statement was false and misleading, and thus "did not disseminate knowledge to the market"). In any case, the December 2023 announcement indisputably revealed significant new information about the fake invoicing scheme and disclosed an SEC Order containing specifics revealing that Brooge was premised on a fraud. ¶132 (*see also* Complaint throughout explaining the SEC Order and its findings); *Abadilla v. Precigen, Inc.*, 2022 WL 1750033, at *9 (N.D. Cal. May 31, 2022) (finding that an SEC Order making findings of fraud plausibly supported allegations of loss causation).

Defendants' argument that Plaintiff purchased stock after two of the corrective disclosures also does not negate the plausibility of Plaintiff's reliance allegations, or the presumptions thereon. *See* ¶¶257-62; *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 577 (N.D. Cal. 2009) (noting that post-disclosure purchases by a plaintiff do not defeat allegations of reliance); *Weston*, 348 F.R.D. at 366 (a plaintiff's purchases after a corrective disclosure do not destroy typicality or the ability of the plaintiff to pursue claims on behalf of the class). *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1044 (N.D. Cal. 2008), relied upon by Defendants for this point, is inapposite as it concerned a motion to approve a settlement and the standing of an individual objector to the same. It did not explain the issue or cite any law to support its finding. In any case, Plaintiff did not purchase any stock after the final corrective disclosure, thereby negating this argument with respect to that disclosure. ECF No. 19-3 at 73. Prior to that, the truth had not yet been fully

24

revealed and Plaintiff was still acting in reliance on concealments and continued misrepresentations.

Finally, Defendant's one-line conclusory assertion that there was overall low trading volume is far from sufficient to rebut the allegations in the Complaint and presumption of an efficient market for the same reasons discussed in §Arg.II.B, *supra*. *See In re Initial Pub. Offering Sec. Litig*., 241 F. Supp. 2d 281, 377 (S.D.N.Y. 2003) ("[T]he question of whether securities were traded in an efficient market should not be decided on a motion to dismiss"); *Simpson v. Specialty Retail Concepts*, 823 F. Supp. 353, 355 (M.D.N.C. 1993) (holding plaintiffs may have traded in efficient market despite low trading volume). In conclusion, Defendants' myriad of varying standing and loss causation arguments all fail.

## V.    A Speculative, Potential Recovery from a Fair Fund Does Not Moot This Case and There Is No "Double Recovery"

Defendants are wrong that the "Fair Fund" moots this case or might result in double recovery.  First, nothing in the Complaint or judicially noticeable documents suggests, let alone proves, that Plaintiff or the proposed class have received, or will receive, anything at all from the Fair Fund.  Even if they do receive compensation from it, Defendants' conclusory and argumentative speculation that the $5.2 million in the fund might fully compensate Plaintiff and the class is entirely unfounded.[16] The damages the class suffered far exceed that amount.  Nothing in Defendants' Motion explains how a 74.58% share price decline over a four-year period (¶134) for a company that at the start of the class period had a market cap of over $1 *billion*

---

[16]    Defendants cite three journal articles purportedly supporting their assertion that Plaintiff and the putative class will have "actually received" all their losses. These articles cast further doubt on Defendants' claim as they demonstrate that Fair Funds in fact do not compensate all investors.  *See* Urska Velikonja, *Public Compensation for Private Harm: Evidence from the SEC's Fair Fund Distributions,* 67 STAN. L. REV. 331, 345, 363 (2015) ("class action damages 'dwarf' the SEC's monetary sanctions" and "fair fund distributions in accounting fraud cases undercompensate investors").

OPPOSITION TO BROOGE DEFENDANTS' MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

could result in a mere $5.2 million in damages. The total potential losses are many multiples of that. The speculative potential of some unquantified future recovery clearly cannot be used to negate allegations of damages in the Complaint.[17] *Lehmann v. S/V THALIA*, 520 F. Supp. 3d 146, 149 (D.R.I. 2021) ("a matter is not rendered moot simply because a defendant has paid—or offered to pay—some of the total amount of damages alleged").

Further, to the extent there is concern about double recovery, the Fair Fund already contemplates offsetting. In fact, the plan of distribution provides:

> To avoid payment of a windfall, an Eligible Claimant's distribution amount will be no larger than his, her, or its Recognized Loss *minus the amount of any compensation for the loss that resulted from the conduct described in the Order that was received from another source (e.g., class action settlement)*, to the extent known by the Fund Administrator ("Prior Recovery").[18]

In other words, the Fair Fund is not an adequate alternative to this class action and does not present any risk of double recovery. Indeed, Brooge agreed to waive any argument that the Fair Fund offsets damages in this case. In the SEC Order, it expressly agreed with the SEC that "[t]o preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of their payment of a civil penalty in this action." ECF No. 135-11 (Defs' RJN, Ex. H) at 13. By urging this Court to rely on the Fair Fund, Brooge is violating the consent Order's agreed mandate.

---

[17] As the party seeking to demonstrate mootness, Defendants bear a "heavy burden" in seeking dismissal. *Rosemere Neighborhood Ass'n v. U.S. Env't Prot. Agency*, 581 F.3d 1169, 1173 (9th Cir. 2009); *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006) (a party asserting mootness bears a heavy burden of "establishing that there is no effective relief that the court can provide"). Defendants have not met this burden, and Defendants' assertion that Plaintiff must affirmatively prove that its claims are not moot reverses the well-established legal burden.

[18] *In the Matter of Brooge Energy Limited, et al.*, Admin. Proceeding, File No. 3-21816, Plan of Distribution, at 3 https://www.sec.gov/files/litigation/admin/2025/34-102298-dp.pdf.

26

Finally, Defendants suggest a stay of the action to "explore" these issues.  To support this suggestion, they cobble together an out-of-context quote from the Second Circuit's decision in *MFS Secs. Corp. v. New York Stock Exchange, Inc.*, 277 F.3d 613, 620 (2d Cir 2002).  There, the potential to moot the claims arose from the fact that a pending SEC administrative action might "result in . . . reinstatement as a member of the Exchange," not that it would speculatively moot damages.  Here, Defendants have not made a motion to stay or any showing regarding their hardship, burden, or equity to meet their burden to obtain a stay.  *Clinton v. Jones*, 520 U.S. 681, 706-07 (1997) (party seeking stay has the burden).  "[B]eing required to defend a suit, without more, does not constitute a clear case of hardship or inequity [justifying a stay]."  *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005) (internal citation omitted).  Besides, it would not be reasonably possible to resolve mootness during a stay because Plaintiff would need to proceed with discovery and the case to fully assess its losses for any such mootness analysis.

**VI.    Plaintiff Has Pled a Strong Inference of Scienter Against Brooge**

To allege scienter plaintiffs must "state with particularity facts giving rise to a strong inference that defendant[s] acted with the required state of mind," "intent to deceive, manipulate, or defraud," or "deliberate recklessness."  *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937 (9th Cir. 2023).  "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007).  The inference of scienter "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Id.* at 324.

Defendants first argue that Plaintiff cannot rely on the SEC Order to plead scienter, but this argument misses the mark.[19] Plaintiff's independent investigation has confirmed all the key points made in the SEC Order. It includes an email in which Brooge's CEO, Defendant Paardenkooper, instructed Brooge employees to create fake invoices in the *exact* manner the SEC Order alleged. ¶¶70-90; *see also* §SoF.II, *supra*. The Complaint also references additional emails, Audit Committee meeting minutes, draft Audit Committee reports, bank statements, Company releases and SEC filings, and other facts, including a restatement corroborating the import of the fraud. ¶¶69, 73-76, 87-88, 100-103, 146-47, 151-52, 194-96, 198-208, 212, 244-45. Even if the SEC Order were just preliminary allegations—and Plaintiff's investigation confirms it is much more—"[s]o long as the facts contained in a different complaint are investigated independently by plaintiffs' counsel, it is not improper to rely on such complaints for evidentiary support." *Lako v. Loandepot, Inc.*, 2023 WL 444151, at *5 (C.D. Cal. Jan. 24, 2023).[20] While the findings may not constitute a binding admission that can be used as evidence at trial,

_____

[19] Defendants rely on *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1263 (C.D. Cal. 2015), in which the court noted that there is "no authority suggesting that the allegations in an SEC order, which are unproved and contested, can properly be considered evidence of scienter," before going on to state that "[m]ore fundamentally, the SEC order does not allege manipulative or fraudulent conduct," which it concluded "is not evidence that it engaged in market manipulation with scienter." Setting aside the fact that the SEC Order in this case includes references to fraudulent conduct, *ScripsAmerica* is neither binding precedent nor the last word on the matter. In *Blake v. Canoo Inc.*, 2025 WL 2992263, at *8 n.5 (C.D. Cal. Oct. 22, 2025), the court held that there was no bar to relying on an SEC order and that "to the extent defendants contend that factual allegations in an SEC order or complaint cannot be relied upon at all . . . the court is unpersuaded."

[20] The court in *Lako* cited *de la Fuente v. DCI Telecommunications, Inc.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003), which held that "[T]here is nothing improper about utilizing information from the SEC as evidence to support private claims . . . The striking similarity between the SEC's allegations and plaintiff's allegations does not demonstrate that plaintiff lacked evidentiary support. Rather, the SEC allegations provided plaintiff with evidentiary support. The PSLRA does not require that a plaintiff re-invent the wheel before filing a complaint; and one could argue that a complaint predicated on the results of an SEC investigation has far more 'evidentiary support' than one based on rumor and innuendo . . . ."

there is no reason that Plaintiff cannot use them to formulate and frame allegations in the Complaint regarding scienter, particularly where they are supported by corroborating investigations, evidence, and allegations.

Beyond their attempts to discount the SEC Order, Defendants have almost no argument to counter the well-pled allegations establishing Brooge's scienter. Defendants acknowledge that "'[i]n most cases, the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant.'" *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (quoting *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008)) (cited in Brooge Br. at 37). Plaintiff has done just that. Specifically, the detailed allegations in the Complaint that Paardenkooper and Saheb, who were both CEOs and directors during the Class Period, knew about, covered up, and intentionally engaged in the fraud are not challenged. *See, e.g.*, §SoF.III.A, *supra* (expanding on allegations against Paardenkooper and Saheb). The Complaint includes concrete, factual support for Plaintiff's allegations that both CEOs knowingly misrepresented and omitted material facts. As top executives, Paardenkooper and Sahab's scienter is imputed to Brooge. *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476-479 (9th Cir. 2015); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d at 1063. Given the well-pled allegations against Paardenkooper and Saheb, neither "corporate scienter" nor the core operations doctrine is required to demonstrate Brooge's liability. *See Pampena v. Musk*, 705 F. Supp. 3d 1018, 1048 (N.D. Cal. 2023) (scienter is demonstrated by "allegations regarding a management's role in the company . . . [that] suggest that the defendant had actual access to the disputed information, and where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter"). In conclusion, the Complaint adequately alleges scienter as to Brooge, Paardenkooper, and Saheb.

OPPOSITION TO BROOGE DEFENDANTS' MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

## VII. Plaintiff Has Properly Alleged Scienter and Falsity Against Yammout, Masood, and Ditchburn

### A. Plaintiff Has Alleged Falsity

Though Defendants try to conceal it by lumping Yammout, Masood, and Ditchburn together, they do not contest—nor could they—that Yammout and Masood, at a minimum, made false statements. Both Yammout and Masood signed off on filings that contained the falsified revenue numbers, making them uncontested makers of false statements. *See* Compl. App'x B (ECF No. 114-2 at 1-8.

As for Ditchburn, who joined in late 2022, he certified numerous false and misleading statements in connection with Form 20-Fs in April and May 2023. ¶123. The certified documents falsely attributed Brooge's financial restatements to a mere failure to classify BIA as a related party and improper recognition of related revenue, and thus served to cover up Brooge's false invoicing and revenue scheme. ¶¶123-24. Ditchburn doubled down on the deception when speaking to investors on a May 2023 earnings call where he blamed the massive restatements on "insufficient documentation" and a "conservative approach." ¶¶124, 155.

Defendants downplay these false statements and certifications, asserting that they were technically true. They were not. Brooge's restatements were not just a result of related party transactions or a "conservative approach" to revenue recognition as Ditchburn represented. ¶124. The Complaint alleges that the inflated revenues necessitating the restatement were the result of a brazen scheme at the core of Defendants' business that involved the majority of Brooge's revenues, deceptive interparty transactions, and fake invoices—not merely Brooge's accounting approach. Even if carefully worded disclosures to the public reflect a technical truth about what occurred as Defendants contend, Ditchburn engaged in actionable fraud by failing to disclose the truth and "affirmatively creat[ing] an impression of a state of affairs that differs in a material way from the one that actually exists." *Police Ret.*

*Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014). Ditchburn, like Yammout and Masood, was a maker of false statements.

### B.   Plaintiff Has Alleged Scienter Against These Individuals

Plaintiff has alleged a wealth of allegations pertaining to the scienter of Yammout, Masood, and Ditchburn.  To begin with, the Complaint alleges that all three were Brooge's CFOs during various periods, and thus all responsible for the financial statements that Brooge falsified.  They further perpetuated the fraud in various ways.  *See* §SoF.III.A-B, *supra*.  Yammout was part of the management team that asked the Board to lie; Masood helped Paardenkooper cover up a fraudulent transfer from Brooge to BIA; and Ditchburn covered up the fraud for nearly a year, until the SEC Order was published.  *See id.*  Plaintiff has alleged a strong inference of scienter with respect to each of the three.

***Defendant Yammout.***  Yammout was Brooge's CFO from October 2018, when the scheme was in its early stages, through April 2020.  ¶¶20-21.  He was also a director from the time of the SPAC merger in December 2019 until December 2023, and a member of the office of the CEO beginning in August 2023.  *Id.*  He certified Brooge's Form F-1 registration statement in August 2020—meaning he confirmed he had knowledge of, reviewed, and understood the facts therein—which misrepresented, among other things, Brooge's revenues in 2019 to be $44 million when in reality they were just $15 million.  ECF No. 114-2 at 1-5; ¶¶100-01; *see also* 15 U.S.C. §7241(a); 17 C.F.R. §240.13a-14 (certifying officers are required to review and have knowledge of the statements contained in a company's public reports).  As CFO and a longtime director of a company with only 17 employees at the end of 2019, Yammout plainly would have known that Brooge was not receiving bona fide revenues in the manner it purported to.  ¶151.  He would be well aware of the Company's true revenues, customers and activities with respect to its primary asset and agreements.  *See* §SoF.III.B, *supra* (detailing allegations against

Yammout).  It is not plausible to suggest that someone in his position, responsible for such information at a small company, would be unaware that as of 2018 and 2019, its *entire* purported revenue stream and operations were not as it represented, especially considering the magnitude and importance of the issue to Brooge. Moreover, Audit Committee meeting minutes confirm Yammout, as a member of management, had asked the Board to lie—and was certainly more than capable of letting the fraud proceed under his watch.  *See* ¶245 & §SoF.III.A, *supra*.  The inference of his scienter is more compelling than any innocent alternative.

***Defendant Masood.***  Masood served as Brooge's CFO from April 2020 to 2022.  He made material misrepresentations to the public by certifying numerous Forms F-1 and 20-F which were false because, among other reasons, they grossly inflated revenues that were the result of Defendants' deceptive scheme.  *See* ECF No. 114-2 at 1-8.  He also touted Brooge's purportedly "record revenue[s]" on earnings calls and in a Form 6-K announcement.  ¶151.  The allegations in the Complaint confirm he made these misrepresentations with scienter, describing his knowledge of the related party transactions and efforts to conceal them from the public and to draw the attention of Brooge's auditors away from the matter.  ¶¶198-208; *see* §SoF.III.B, *supra*.  The email correspondence cited in the Complaint reflects his intricate knowledge of the intercompany parties and transactions, as well as his direct involvement managing Brooge's accounting operations and Audit Committee interactions.  *Id.*  The inference that someone in this position would be aware of the true facts regarding Brooge's operations, assets, and revenues is far more compelling than Defendants' suggested inference of naivety.  As with Yammout, the inference that Masood acted knowingly, or at least with deliberate recklessness, is more compelling than the alternative.

***Defendant Ditchburn.***  Ditchburn was a key executive at Brooge during the class period.  He became Brooge's CFO in December 2022 and the chair of its office

32

of CEO in August 2023. ¶¶22, 19. He held both these positions through April 2024. ¶22. As the CFO (and later chair of the office of CEO) of a small company with relatively few employees (just 24 people during Ditchburn's tenure, *see* ¶52), Ditchburn unquestionably had access to all of the Company's financial information. And unlike Yammout and Masood, he had the benefit of PwC's resignation letter in January 2023, which expressed extreme distrust in Paardenkooper and Saheb and referenced "likely *illegal acts* that had come to the attention of PwC" and which PwC believed would "have a material effect on the financial statements of the Company." ¶129. The more compelling inference is that Ditchburn—serving alongside Saheb, and with Yammout still on the Board—assisted management in downplaying and covering up the fraud. The contrary inference, that he was deceived or naïve about such a pervasive fraud spanning years despite his roles, is hardly plausible and certainly not more plausible than a culpable intent, whether through knowledge or deliberate recklessness. *See Alghazwi v. Beauty Health Co.*, 2025 WL 2751076, at \*11 (C.D. Cal. Sept. 23, 2025) ([d]eliberate recklessness is "an extreme departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it" and warrants a finding of scienter) (citations omitted).

*Core Operations.* With respect to all three CFO defendants, the allegations standing alone are more than enough. When viewed in the context of the core operations doctrine, however, they more than establish the requisite strong inference of scienter for all three individuals. The "core operations" theory of scienter holds:

> [F]alsity may itself be indicative of scienter where it is combined with allegations regarding a management's role in the company that are particular and suggest that the defendant had actual access to the disputed information, and where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.

*Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 601 (N.D. Cal. 2019) (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009)).  The core operations theory permits general allegations about a defendant's involvement in a transaction when the allegations are "buttressed with 'detailed and specific allegations about management's exposure to factual information within the company.'"  *Zucco Partners*, 552 F.3d at 1000 (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008)).  That is just the case here—Defendants made misstatements concerning the very essence of the Company and it is simply absurd to suggest that they were without knowledge of the fraud.

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.[21]

DATED:  December 17, 2025    Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/*s*/ Amanda F. Lawrence

Amanda F. Lawrence (admitted *pro hac vice*)
156 S. Main St.
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 404-7770
Facsimile: (860) 537-4432
alawrence@scott-scott.com

Anna Hunanyan (CA 330609)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Ave., 24th Fl.

---

[21]    If the Complaint is dismissed, Plaintiff respectfully requests leave to amend. *See Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1118 (N.D. Cal. 2003) (leave to amend should be liberally granted).

34

New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
ahunanyan@scott-scott.com

John T. Jasnoch (CA 281605)
Cornelia J. B. Gordon (CA 320207)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com
cgordon@scott-scott.com

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile:  310-388-0192
brian@schallfirm.com

*Attorneys for Lead Plaintiff Bluefin Capital Management, LLC and Co-Lead Counsel*

OPPOSITION TO BROOGE DEFENDANTS' MOTION TO DISMISS
CASE NO. 2:24-cv-00959-AH-DFM

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Lead Plaintiff Bluefin Capital Management, LLC, certifies that this Opposition to the Brooge Defendants' Motion to Dismiss the Second Amended Complaint is thirty-four pages in length and complies with the 35-page limit of this Court's November 3, 2025 Order, docketed in this action as ECF No. 130.

DATED: December 17, 2025

/s/ Amanda F. Lawrence
Amanda F. Lawrence (admitted *pro hac vice*)

36

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of this filing via electronic means to all counsel of record.


 DATED: December 17, 2025

/s/ Amanda F. Lawrence

Amanda F. Lawrence (admitted *pro hac vice*)

37