Amanda F. Lawrence (*pro hac vice*)
alawrence@scott-scott.com
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 S. Main St.
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 404-7770
Facsimile: (860) 537-4432

*Attorneys for Lead Plaintiff*
*Bluefin Capital Management, LLC*

[Additional Counsel on Signature Page.]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ERIC WHITE, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　Plaintiff,<br><br>　　　v.<br>BROOGE ENERGY LIMITED, et al.,<br><br>　　　　　　　Defendants. | Case No.: 2:24-cv-00959-AH-DFM<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT DIMITRI ELKIN'S MOTION TO DISMISS SECOND AMENDED COMPLAINT** |

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

BRIEF STATEMENT OF RELEVANT FACTS ...................................................2

LEGAL STANDARD .........................................................................................7

ARGUMENT......................................................................................................8

    I.    Elkin Does Not Contest His Control over Twelve Seas .................... 8

    II.    The SAC Alleges a Primary Violation by Twelve Seas ................... .9

        A.    Plaintiff Has Alleged Twelve Seas' Scienter...........................10

        B.    Plaintiff's Motive Allegations Support a Strong Inference of Scienter ...............................................................................14

        C.    The Inference of Twelve Seas' Scienter Is At Least As Compelling As Any Alternative Inference ..............................15

    III.    Dismissal Under Rule 12(b)(7) Is Inappropriate ............................. 18

        A.    None of the Absent Defendants Are "Necessary Parties"........18

        B.    Even If the Court Were to Reach the Rule 19(b) Inquiry, Elkin Has Not Met His Burden.................................................21

CONCLUSION...................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988).................................................................................................7

*Confederated Tribes of Chehalis Indian Rsrv. v. Lujan*,
   928 F.2d 1496 (1991).............................................................................................19

*Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*,
   276 F.3d 1150 (9th Cir. 2002) ...............................................................................21

*DCD Programs v. Leighton*,
   90 F.3d 1442 (9th Cir. 1996) .................................................................................19

*E. Ohman J v. NVIDIA Corp.*,
   81 F.4th 918 (9th Cir. 2023) ............................................................................12, 13

*Garrison v. Ringgold*,
   2019 WL 2089509 (S.D. Cal. May 13, 2019) .......................................................19

*Glazer Cap. Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) .................................................................................16

*Heller v. Goldin Restructuring Fund, L.P.*,
   590 F. Supp. 2d 603 (S.D.N.Y. 2008) ...................................................................14

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000) .................................................................................8

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021).....................................................................................10

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
   763 F. Supp. 3d 1027 (C.D. Cal. 2025) .................................................................12

*In re Ibis Tech. Sec. Litig.*,
   422 F. Supp. 2d 294 (D. Mass. 2006).....................................................................17

*In re Mullen Auto Sec. Litig.*,
   2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) ......................................................12

*In re Nextcard, Inc. Sec. Litig.*,
   2006 WL 708663 (N.D. Cal. Mar. 20, 2006) .........................................................13

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) .................................................................................14

*Makah Indian Tribe v. Verity*,
   910 F.2d 555 (9th Cir. 1990) .........................................................................*passim*

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
   927 F. Supp. 1297 (C.D. Cal. 1996) ................................................................13

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) .............................................................................................7

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ...........................................................................17

*Nguyen v. Radient Pharm. Corp.*,
   2011 WL 5041959 (C.D. Cal. Oct. 20, 2011) ..................................................17

*Pampena v. Musk*,
   705 F. Supp. 3d 1018 (N.D. Cal. 2023) ......................................................10, 11

*Sinotrans Container Lines, Co. v. N. China Cargo Serv., Inc.*,
   2008 WL 3048855 (C.D. Cal. Jan. 31, 2008) ...................................................21

*Skiadas v. Acer Therapeutics Inc.*,
   2020 WL 3268495 (S.D.N.Y. June 16, 2020) ..................................................17

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
   551 U.S. 308 (2007)................................................................................9, 14, 15

*Temple v. Synthes Corp.*,
   498 U.S. 5 (1990)..........................................................................................20, 22

*United States v. Bowen*,
   172 F.3d 682 (9th Cir. 1999) ...........................................................................20

*Va. Sur. Co. v. Northrop Grunman Corp.*,
   144 F.3d 1243 (9th Cir. 1998) .........................................................................18

*Wang v. Zymergen Inc.*,
   744 F. Supp. 3d 995 (N.D. Cal. 2024)............................................................8, 9

*Wietschner v. Monterey Pasta Co.*,
   294 F. Supp. 2d 1102 (N.D. Cal. 2003)............................................................22

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ..............................................................9, 10, 12

**Statutes**

15 U.S.C. §78j(b) ........................................................................................................7

15 U.S.C. §78t(a) ........................................................................................................8

15 U.S.C. §78u-4(b)(1) ...............................................................................................8

Exchange Act §10(b) ..........................................................................................7, 9, 19

Private Securities Litigation Reform Act of 1995 ....................................................7

iii

Securities Act of 1933 and the Securities Exchange Act of 1934 (the
    "Exchange Act" or the "1934 Act") ...........................................................1, 7, 8, 9

**Other Authorities**

Fed. R. Civ. P. 19(a)(1)(A) & (B).........................................................................19, 20

Fed. R. Civ. P. 12(b) ..........................................................................................*passim*

Fed. R. Civ. P. 19 ...............................................................................................*passim*

Plaintiff Bluefin Capital Management, LLC ("Bluefin" or "Plaintiff"), respectfully submits this memorandum of law in opposition to Defendant Dimitri Elkin ("Elkin")'s Motion to Dismiss the Second Amended Complaint (ECF No. 136 the "Motion" or the "Elkin Brief," or "Elkin Br.").

## INTRODUCTION

Defendant Dimitri Elkin ("Elkin") was the Chief Executive Officer ("CEO") and a director of Twelve Seas Investment Co. ("Twelve Seas"), the Special Purpose Acquisition Company, or "SPAC," entity that merged with Defendant Brooge Energy Limited ("Brooge") in 2019. Elkin does not deny the massive fraud at the heart of this case, which involves the falsification of Brooge's revenues enabled by sham contracts and the creation of fake invoices. Nor does he challenge the falsity of the financial statements and other facts that his company, Twelve Seas, disseminated to the market via a proxy statement in November 2019 (the "Proxy"). That Proxy presented revenues for Brooge that were inflated by more than 80% and contained an entirely deceptive description of Brooge's business designed to give the impression of a "de-risked" investment with guaranteed revenues, when the opposite was true. As Plaintiff's Second Amended Complaint (ECF No. 114, the "Complaint") alleges, the Proxy misled investors and inflated the value of Brooge's shares, ultimately causing Plaintiff and the proposed class significant losses. None of this is challenged or even addressed by Elkin.

Rather, Elkin makes just one substantive challenge—to scienter. Because Elkin is being sued pursuant §20(a) of the Securities Exchange Act of 1934 for "control person liability," the only issue here is whether *Twelve Seas* acted with scienter in releasing the Proxy. Elkin does not deny his status as a "control person" or any other elements of Plaintiff's claims beyond scienter.

In that regard, the Complaint contains detailed and highly plausible allegations of Twelve Seas' knowing and reckless conduct in disseminating the false

1

Proxy. At the time of the SPAC merger, the founders of Twelve Seas had to conclude an acquisition in order to avoid losing over $42 million in SPAC share value and having to pay millions in costs. The Complaint alleges in detail how Twelve Seas obtained extensive due diligence rights and did in fact perform such diligence prior to the merger. Elkin argues that the court should infer that the fraudulent operations were hidden from Twelve Seas during the process. However, Brooge's entire operations at the time of the Proxy and the vast bulk of its revenues were supported by a fraudulent agreement (which was not even being performed) and fake transactions that would have been apparent with any reasonable diligence. The agreement and revenues were of such core importance that it is not plausible to suggest Twelve Seas would not have seen what was actually happening.

Elkin's only other argument is that certain other executives from Twelve Seas are "necessary parties" who must be joined under Rule 19. His support for this misses the mark by a wide margin. He argues that he "needs" the absent parties in this case so that he will not be the only party who faces liability, and so that the absent parties will not be prejudiced by the outcome in this case. Neither point has any legal merit. A plaintiff is not required to join jointly liable parties in a single lawsuit, regardless of whether claims against them overlap. If the law holds Elkin responsible, he cannot avoid liability and obtain dismissal simply by claiming someone else might also be liable. Any judgment to that effect in this case would not prejudice the other parties because, among other reasons, it is not binding on them. Elkin's arguments to the contrary are unsupported and should be dismissed.

## BRIEF STATEMENT OF RELEVANT FACTS

Twelve Seas Investment Co. ("Twelve Seas") was formed in November 2017 as a Special Purpose Acquisition Company ("SPAC"), or a "blank check" company.

2

¶33.[1]  Like all SPACs, it was formed with a single purpose: to go public and then acquire, or otherwise combine with, a private company and thereby take that private company public.  ¶¶37-38.  Defendant Elkin was Twelve Seas' CEO and a director at its inception,[2] making him one of only a handful of key individuals at the helm throughout the SPAC process.  *See* ¶¶26, 39.

SPACs are one of the least transparent and most problematic ways for a company to go public.  Though "the SPAC target IPO is akin to a traditional IPO," in the words of former SEC Chairman Gary Gensler, investors are not guaranteed IPO-level transparency, causing "some SPAC merger announcements [to be] made without full disclosures."  ¶43.  SPAC shareholders are almost totally reliant on SPAC management to provide accurate information about any contemplated transaction. ¶40.  At the same time, SPAC management is highly incentivized to get shareholders to approve a qualifying transaction in the relevant timeframe.[3]  SPAC founders and management invest the initial capital to recruit an investment bank, prepare and file the IPO documentation, and pre-market the investment offering— massive investments of time and money they can only monetize *if* the SPAC completes a qualifying transaction.  ¶¶39, 41.  If the SPAC fails, it is automatically dissolved and the money held in trust is returned to investors.  ¶41.  No salaries, finder's fees, or other cash compensation are paid out, and the "founders' shares" (typically 20% of a SPAC's stock) owned by SPAC founders and management become worthless.  *Id.*  Because SPAC management has such a strong incentive to

---

[1]    ¶ or ¶¶ refers to paragraphs in the Second Amended Complaint (ECF No. 114) (the "Complaint").

[2]    Though Elkin remained the CEO until Twelve Seas' ultimate merger, he was only a director until May 2018, shortly before Twelve Seas' IPO.  ¶¶26, 45.

[3]    As explained in the SAC, the SPAC's shareholders have to vote to approve the merger or acquisition by which the target private company becomes public.  ¶40.

3

push through a transaction at any cost, SPACs have been called "the most egregious example in the industry of executive misalignment with investors." ¶43.

All of these pitfalls were present with the Twelve Seas SPAC. Elkin, along with the other "SPAC D&Os"—former Defendants Neil Richardson and Stephen N. Cannon—invested enormous amounts of time and resources into taking Twelve Seas public. *See, e.g.*, ¶39. As is typically the case with SPACs, Twelve Seas' founders and management held roughly 5.6 million of the SPAC's outstanding shares (more than 20%) in a "sponsor" company, for which Elkin was the sole managing member. ¶26. If Twelve Seas failed to execute a qualifying transaction, the SPAC D&Os' efforts would be wasted and the founders' shares, which were worth approximately $42.3 *million* as of September 2019, would be worthless. ¶¶139-40. Worse, Elkin and the SPAC D&Os would face liability for costs owed to Twelve Seas, and forfeiture of reimbursement for expenses incurred while "investigating possible business targets and business combinations." ¶141. Elkin and the SPAC D&Os thus had every incentive to get a qualifying transaction over the finish line—even one that would not benefit rank-and-file shareholders.

This was the backdrop when the SPAC D&Os began their search for a target company in June 2018, after Twelve Seas completed its IPO. ¶33. In less than a year, they had decided on Brooge.[4] ¶46. As part of the selection process and due diligence, the SPAC D&Os and Twelve Seas' management:

- Attended multiple meetings with members of Brooge's senior management in Abu Dhabi and Dubai;

---

[4] Prior to the merger with Twelve Seas, Brooge operated as a private company: Brooge Petroleum and Gas Investment Company FZE ("BPGIC FZE"). ¶17. For ease of reference, "Brooge," as a defined term, refers to the private company, BPGIC FZE, before the Business Combination, and the publicly-traded company (Defendant Brooge Energy Limited) after the Business Combination. *Id.*

- Received and reviewed due diligence materials, including materials from Brooge's attempted (and unsuccessful) London Stock Exchange initial public offering;

- Had conversations with RBC Capital Markets, LLC, which prepared certain financial information for Brooge;

- Conducted multiple days of on-site due diligence at Brooge's Dubai office;

- Conducted diligence on Brooge's business model in the context of the oil and gas storage industry sector; and

- Attended a facilities tour provided by Brooge's senior management.

*See* ¶142; *see also* ¶143.

Even as the SPAC D&Os and Twelve Seas were conducting that due diligence, Brooge was engaged in a massive accounting fraud to prop up its revenue figures for Fiscal Year ("FY") 2018 and the first half ("1H") of FY 2019. Both were pivotal time periods for purposes of the SPAC merger, which was put up for shareholder approval in December 2019. ¶15. The November 2019 Proxy Statement published by Twelve Seas (the "Proxy") reported that Brooge had nearly $36 million in revenue for FY 2018 and $22 million in revenue for 1H FY2019. The Proxy explained that Brooge was able to achieve these numbers by entering into take-or-pay agreements with a single customer[5] to "de-risk" its initial operations. ¶¶54-55, 107. Under this "de-risked" approach, the customer was supposed to pay Brooge (i) a monthly fixed storage fee to lease all of the storage available under the first phase of Brooge's operations, regardless of whether the customer actually used the storage, and (ii) monthly variable ancillary service fees for certain other services Brooge

---

[5] Initially, this was the "Phase I Customer." ¶107. Later, however, the contract was novated to replace the Phase I Customer with a related party, Al Brooge International Advisory LLC ("BIA"), on the same terms. ¶57.

5

could provide to the customer. ¶107. Though this one customer accounted for 100% of Brooge's revenue for FY 2018 and FY 2019, the Proxy reassured investors that the take-or-pay contract was a "[s]table and predictable revenue stream for storage services" that would be "more than sufficient to cover all of [Brooge]'s costs . . . including operating costs, wages, depreciation and interest costs." ¶109.

The real situation was far different. Brooge's counterparties to the take-or-pay contract—first the Phase I Customer and then related party BIA—never stored any oil with Brooge or used any of its services and never paid Brooge any money under the contract.[6] ¶¶108, 112. Brooge's actual customers, which were different companies, paid for storage at rates and volumes far less than those described in the Proxy. ¶¶71, 72-78. To make it appear as if the Phase I Customer and BIA were complying with the terms of the take-or-pay agreements, however, Brooge created hundreds of fake invoices to both entities and engaged in round-trip transactions with BIA to make the numbers work. ¶¶80-94. Brooge's actual revenue for FY2018 and FY2019 was just $6.4 million and $15.9 million—or *82.18%* and *63.97%* less than reported, respectively. ¶79.

This was an obvious, pervasive fraud that should never have been brought to Twelve Seas' shareholders for approval.[7] Yet Elkin and the SPAC D&Os did just that, even after conducting due diligence that would have exposed the fraud and even as they acknowledged that Brooge was operating "in an industry sector…outside of Twelve Seas' management's area of expertise." ¶¶44, 142; *see also* ¶¶137-38. Their

---

[6]    Though BIA made some payments to Brooge, it was reimbursed by Brooge for these payments as described in the FAC. ¶112. Brooge never received any net funds from BIA. *Id.*

[7]    *See, e.g.*, ¶144 ("[T]he SPAC D&Os—a group of sophisticated investors with dozens of years of relevant experience—apparently failed to uncover the fabrication of *82.18%* of Brooge's revenue for FY2018 and *63.97%* for FY2019, or the fact that the customer purporting to provide 100% of Brooge's revenue had, in reality, provided 0%.").

6

motivation was plain. If they convinced shareholders to approve a qualifying transaction, they would recover their expenses, avoid liability, and be able to monetize their founders' shares. ¶¶139-141, 145.

Ultimately, Twelve Seas' shareholders were convinced; they voted to approve the merger between Twelve Seas and Brooge that was consummated in December 2019. ¶15. Twelve Seas and Brooge merged via a merger subsidiary, with Twelve Seas surviving the merger as a public company (Brooge) and both the Twelve Seas shareholders and Brooge shareholders receiving shares of the "new" Brooge in exchange for the shares they previously held. ¶46. Shareholders would come to regret that decision. Between November 25, 2019, and December 27, 2023, when the fraud that began with the Proxy was revealed, Brooge's stock price declined from $10.28 per share to $2.75 per share, a drop of *74.58%*. ¶134. This lawsuit followed.

## LEGAL STANDARD

Congress enacted the Securities Act of 1933 and the Securities Exchange Act of 1934 (the "Exchange Act" or the "1934 Act") in response to widespread abuses in the securities industry. To advance the objective of "honest markets," *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988), §10(b) of the Exchange Act forbids the use of "any manipulative or deceptive device or contrivance" "in connection with the purchase or sale of any security." 15 U.S.C. §78j(b). A private plaintiff seeking relief for a §10(b) violation must show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") further requires that the complaint in a securities-fraud action alleging a material misstatement or omission "specify each statement alleged to have been misleading,

7

[and] the reason or reasons why the statement is misleading," and provide a particularized basis for any allegations made on information and belief. 15 U.S.C. §78u-4(b)(1). Where applicable, the complaint also must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" – *i.e.*, scienter. *Id.* §78u-4(b)(2).

## ARGUMENT

In arguing that Plaintiff has failed to state a claim under Rule 12(b)(6), Elkin does not contest falsity, reliance, economic loss, or loss causation—the vast majority of the elements for a securities fraud claim. Nor does he contest his control over Twelve Seas. Instead, Elkin only contests scienter with respect to Twelve Seas. For the reasons discussed below, Plaintiff has alleged Twelve Seas' scienter and the claim against Elkin should be sustained.

## I.    Elkin Does Not Contest His Control over Twelve Seas

Plaintiff has alleged that Elkin is liable as a "control person" of Twelve Seas. Control persons of primary violators of the securities laws can be liable for those violations under §20(a) of the Securities Exchange Act of 1934. 15 U.S.C. §78t(a). "In order to prove a prima facie case under §20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . . ; and (2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

Here, Elkin does not contest his control over Twelve Seas.[8] Even if he did, however, Plaintiff has adequately alleged that because of Elkin's position "of control

---

[8]    Nor could he, at this stage. "As the Ninth Circuit has noted, control 'is an intensely factual question,'" and its assessment requires "'scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions.'" *Wang v. Zymergen Inc.*, 744 F. Supp. 3d 995, 1011 (N.D. Cal. 2024) (quoting *Howard*, 228 F.3d at 1065). "It is enough to allege at the pleading stage that the defendant *possessed* actual power, even if the plaintiff cannot show that the defendant *used* that power to cause the underlying violation." *Wang*, 744 F. Supp. 3d at 1011 (emphasis in original).

8

and authority as a senior officer, Elkin was able to, and did, control the contents of the various reports, press releases and public filings which Twelve Seas disseminated in the marketplace" and was therefore a "controlling person" of Twelve Seas within the meaning of Section 20(a) of the Exchange Act.  ¶¶283-84. Accordingly, Plaintiff has sufficiently alleged Elkin's control over Twelve Seas prior to the Business Combination.

## II.    The SAC Alleges a Primary Violation by Twelve Seas

As he conceded control, so does Elkin implicitly admit that Plaintiff has properly alleged nearly all other elements of its §10(b) claim against Twelve Seas.[9] Elkin only argues that Plaintiff fails to make factual allegations against anyone in Twelve Seas' management or on its board that are sufficient to support the necessary strong inference of scienter at the time of the Proxy that would be necessary to show a primary violation by Twelve Seas prior to the Business Combination. Accordingly, Elkin is only challenging Twelve Seas' scienter.  A holistic analysis of Plaintiff's allegations, however, confirms that Twelve Seas' scienter is adequately pled.

To allege scienter, a plaintiff must allege facts that support a "strong inference" of a defendant's intentional or reckless misconduct.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).  But this inference "need not be irrefutable, i.e., of the 'smoking gun' genre," *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 324 (2007).  Instead, the test is: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter *at least as strong* as any opposing inference."  *Id.* at 326.

---

[9]    Plaintiff has adequately alleged (1) that Twelve Seas made material misrepresentations in the Proxy Statement (*see* ¶¶ 95-112), (3) a connection with the purchase or sale of a security (*see* ¶¶ 127-136, 257-262), (4) transaction and loss causation (*Id*.), and (5) economic loss (*Id*).

OPPOSITION TO DEFENDANT ELKIN'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-FLA-DFM

Ultimately, a court must consider all of the allegations "holistically" when assessing scienter. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701 (9th Cir. 2021).

### A. Plaintiff Has Alleged Twelve Seas' Scienter

Here, Plaintiff has more than adequately alleged that Twelve Seas acted with knowledge of the fraud or "deliberate recklessness," which the Ninth Circuit defines as "an *extreme* departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Alphabet*, 1 F.4th at 701 (emphasis in original). In the context of a merger, courts have found deliberate recklessness is adequately alleged where there are "general allegations about a defendant's involvement in a transaction" and those "allegations are 'buttressed with detailed and specific allegations about management's exposure to factual information within the company'" where, like here, "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Pampena v. Musk*, 705 F. Supp. 3d 1018, 1048-49 (N.D. Cal. 2023) (quoting *Zucco Partners*, 552 F.3d at 1000).

*Pampena*, which found the standard met, is instructive here. In that case, as here, misstatements made during the context of a merger were at issue. The *Pampena* plaintiffs alleged that the defendant's "personal[] negotiat[ion]" of the merger created the requisite strong inference of scienter, because the defendant "was heavily involved in the Merger Agreement process" (including by communicating directly with the merger target's executives; *compare, e.g.*, ¶142), and "tout[ed] his 'intimate knowledge' of the deal." *Id.* at 1049. Even though the defendant in *Pampena* had "undisputably waived" his "broad due diligence rights" in connection with the merger, *id.* at 1042—in contrast to the instant case, where extensive due diligence was conducted, *see* ¶142—the court found scienter adequately alleged,

concluding that "it was at least deliberately reckless to not investigate" the matter at issue, given what the defendant allegedly knew. *Pampena*, 705 F. Supp. 3d at 1049.

Here, Plaintiff has alleged far more than in Pampena. The misstatements at issue were at the heart of the Proxy that Twelve Seas put out to induce investment, involving Brooge's revenue for the pivotal 18 months pre-merger (FY 2018 and 1H 2019, ¶¶100-102) and including representations that Brooge had "de-risked" its initial operations by virtue of a contract that guaranteed sufficient revenue to cover all of Brooge's expenses (¶¶107-109). And unlike in *Pampena*, where the defendant waived due diligence, here the SPAC D&Os and Twelve Seas engaged in a thorough due diligence process, which involved multiple meetings between Twelve Seas and Brooge, the receipt and review of due diligence materials, discussions with preparers of Brooge's financial information, multiple days of on-site due diligence, diligence on Brooge's business model and the oil and gas storage industry sector, and even a facilities tour. *See* §SoF, *supra*. If Twelve Seas' due diligence somehow failed to uncover the fraud, then it was plainly insufficient—and especially given the last-minute novation of the take-or-pay contracts to replace the Phase I and II Customers with an acknowledged related party, BIA, ¶¶57, 91, "it was at least deliberately reckless to not investigate" further. *See Pampena*, 705 F. Supp. 3d at 1049. These allegations (which do not rely on the misconduct of either the Executive Defendants or the post-merger Brooge) put the lie to Elkin's contention that the SAC contains "only 'motive and opportunity' allegations" with respect to Twelve Seas, and support a strong inference of scienter whether or not motive is considered.[10]

Moreover, Plaintiff's allegations regarding Twelve Seas' access to and review of Brooge's documents and operations during due diligence supports a finding of

---

[10]    As discussed in the section immediately following the instant section, however, motive and opportunity can—and here, do—support a strong inference of scienter. *See* §Arg. II. B.

scienter as it suggests that Twelve Seas actually knew their statements in the Proxy were false. *See Zucco Partners*, 552 F.3d at 1000 ("[F]alsity may itself be indicative of scienter where it is combined with allegations regarding a management's role in the company that are particular and suggest that the defendant had actual access to the disputed information, and where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter"); *In re Mullen Auto Sec. Litig.,* 2023 WL 8125447, at \*9 (C.D. Cal. Sept. 28, 2023) (finding that the plaintiffs adequately alleged scienter because the defendants would have known about a "core feature" of their business and that "it would be absurd to suggest" that they "simply restated false claims about" it); *In re Genius Brands Int'l, Inc. Sec. Litig.*, 763 F. Supp. 3d 1027, 1047 (C.D. Cal. 2025) (finding scienter by imputing knowledge of an issue to a defendant in light of "how important" it was to the business in part, because of the large portion of revenues it represented). Here, Brooge's entire operations at the time of the Proxy were supported by a fraudulent contract purportedly generating 100% of its revenues, and which was not even being performed. This take-or-pay contract was the single most important component of Brooge's business, making it implausible that Twelve Seas did not look into and have knowledge of the actual workings of the business before entering into the Business Combination agreement.

The cases that Elkin cites in support of his arguments to the contrary are inapposite. *E. Ohman J v. NVIDIA Corp.*, 81 F.4th 918 (9th Cir. 2023), cited in the Motion at 15, dealt with an *individual's* scienter, and the misstatements at issue related to a far narrower issue—namely, the degree to which Nvidia's revenue was dependent on cryptocurrency miners' use of a particular product. *Id.* at 940-41. Those misstatements did not involve "fact[s] of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Id.* Here, in contrast, employees at all levels of Twelve Seas thoroughly investigated

12

Brooge prior to the Business Combination (*see, e.g.*, ¶142-43), and the misstatements went to the core of Brooge's business operations: the gross overstatement of revenue via the take-or-pay contracts that purported to support *100%* of Brooge's revenue, and which were later found to be wholesale shams.  This was more than just a situation in which Twelve Seas "had access to contradictory information."  *E. Ohman J*, 81 F.4th at 940-41 (quoted in Elkin Br. at 16).

Nor is Elkin correct that Auditor Defendant Ernst & Young (Bahrain) ("E&Y")'s "clean" opinion with respect to the financial statements of Brooge renders it impossible for Plaintiff to plead a strong inference of Twelve Seas' scienter.  *See* Elkin Br. at 18.  "Clean" audit opinions do not immunize defendants from wrongdoing.  *See, e.g.*, *In re Nextcard, Inc. Sec. Litig.*, 2006 WL 708663, at *5 (N.D. Cal. Mar. 20, 2006) (concluding that allegations gave rise to a strong inference of scienter despite a "clean" audit opinion, and noting specifically that "[t]he Court is not persuaded by Defendants' argument that the certification of the company's financials by its outside auditor, Ernst & Young, LLP ('E & Y'), negates or weakens the inference of scienter"); *cf. Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1314 n.13 (C.D. Cal. 1996) (finding auditor's approval of accounting method did "not shield [the company] from liability for deception such methods may have caused" and determining that "[t]he fact[] that the allegedly overstated revenues constituted such a significant portion of [the company]'s total revenues . . . tend[ed] to support the conclusion that the defendants acted with scienter").  Even if the audit opinions in the Proxy were to cut against Twelve Seas' scienter (they do not), the question is whether, when viewed holistically, the allegations support Twelve Seas' deliberate recklessness—and here, they do.

### B.      Plaintiff's Motive Allegations Support a Strong Inference of Scienter

When considered alongside the motive allegations, the inference of scienter becomes even stronger. While "allegations of a motive to mislead, standing alone, cannot satisfy the heightened scienter standard," a court is "not precluded from considering allegations of motive in combination with other allegations of Defendants' intent to mislead or deliberate recklessness." *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 949 (9th Cir. 2005). Indeed, "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325.

Here, the SPAC D&Os and Elkin had the potential for substantial personal financial gain if the merger with Brooge went through, and they faced substantial losses if it failed to pass. Elkin (Twelve Seas' CEO and one of its founders) and the other SPAC D&Os had invested substantial time and resources into Twelve Seas, including by providing the initial capital, preparing, and conducting the IPO, and marketing the investment. §SoF, *supra*. If the SPAC failed to merge with or acquire a private company within the requisite time period, Elkin and the SPAC D&Os would face liability for costs and lose out on reimbursement of expenses. *Id.* Moreover, Elkin and the SPAC D&Os would lose out on the founders' shares, which were worth a whopping *$42.3 million* in September 2019. *Id.*

All of this combined makes for a strong motive for Twelve Seas' executives to push through *any* merger—even one that disadvantaged Twelve Seas' own shareholders—and amplifies the allegations of Twelve Seas' scienter outlined above. Courts have found that motive allegations supported scienter in similar scenarios. In *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 621 (S.D.N.Y. 2008), for example, the court found that motive allegations contributed to scienter where the defendants were motivated not just by management fees (similar

14

to the reimbursements to which Elkin and the other SPAC founders were entitled once the Business Combination was approved), "but also [by] their additional *personal* financial investment in [an] under-capitalized…fund that needed to obtain a certain level of capital commitment in order to create a diverse investment portfolio" (emphasis in original) (similar to Elkin and the SPAC founders' ownership of the founders' shares). Twelve Seas' and the SPAC D&Os' motives to push through shareholders' approval of the Business Combination likewise weigh in favor of scienter here.

### C.    The Inference of Twelve Seas' Scienter Is at Least As Compelling As Any Alternative Inference

Ultimately, all Plaintiff must allege is that, "[w]hen the allegations are accepted as true and taken collectively . . . the inference of scienter at least as strong as any opposing inference." *Tellabs*, 551 U.S. at 326. Plaintiff submits that it has met its burden. The SAC alleges that Twelve Seas and its executives conducted *extensive* due diligence[11] on Brooge prior to the Business Combination, including via site visits and a thorough review of Brooge's financial information, and that Twelve Seas' founders were at risk of losing out on tens of millions of dollars' worth of founders' shares if Twelve Seas' shareholders failed to approve the Business Combination with Brooge. Against that backdrop, the inference that Twelve Seas and its executives were deliberately reckless as to the existence of a long-running and systemic accounting fraud at Brooge—one that involved (i) the overstatement of Brooge's revenues by more than *80%* at points, and (ii) too-good-to-be-true take-or-pay contracts with customers that were novated, at the eleventh hour, to replace the original customers with a related party—but chose to push the Business

---

[11]    Elkin points to the fact that Twelve Seas used financial advisory firms and lawyers to advise on their investment and structure the transaction, but that does not negate the allegations that Twelve Seas conducted the due diligence itself, and nothing demonstrates otherwise.

Combination regardless because of the personal financial benefit to Elkin and the other SPAC founders, is "at least as strong" as any inference Elkin puts forward.

Elkin's suggested competing inference, which is that the relevant information was not made available to Twelve Seas and its executives, is not more plausible and actually suggests reckless conduct. Only the most inadequate and reckless diligence would have failed to uncover the fact that Brooge's revenues were all coming from parties other than the supposed single customer, and in different amounts and rates than the fixed-price deal.  *See* ¶¶71, 72-78, 108, 112.  In support of his position, Elkin cites *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 746 (9th Cir. 2008) which declined to infer that a defendant had knowledge of "surreptitious" payments. In *Glazer*, however, the transactions at issue were a "discrete set of illegal payments" made by foreign sales agents operating overseas, overseen by a manager who had his own incentives (commissions) to keep the payments concealed from others at the company.  In this case, unlike the "surreptitious" payments made by overseas personnel in *Glazer*, the fraud encompassed the very core of the business—the company's purported contract to lease all of its storage facilities to a single customer, from which it generated 100% its revenues—and was well-known within Brooge itself.[12]  The inference that Twelve Seas and its executives either uncovered the fraud and knowingly looked the other way to profit handsomely while avoiding substantial losses, or were deliberately reckless, is far more plausible than Elkin's suggestion that the extensive diligence revealed nothing was wrong.

Elkin also argues that Plaintiff's suggested inference "makes no sense" because "[s]taking the success of an entire venture on temporarily concealing the massive, unsustainable fraudulent scheme is a strategy doomed to failure."  Elkin

---

[12]   The scope of the fraud at Brooge, and Brooge employees' knowledge thereof, is discussed in more detail in the Statement of Facts in the Opposition to the Brooge Defendants' Motion to Dismiss.

16

Br. at 15.  Elkin relies on *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) in which the court found that it would not make sense for a pharmaceutical company to seek a brief stock gain by lying about the prospects for a pharmaceutical it knew would fail.  However, the court tempered this finding by noting that there are indeed circumstances where *it would* make sense for a company to engage that type of fraud, "[i]f defendants had sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium," in which case "the theory might have more legs."  *Id.*  Here, Twelve Seas stood to profit greatly in the short term.  Its founders had not been able to identify another deal and needed to do so in order to avoid losing the $42.3 million in value of their shares and having to pay, out of their own pockets, investigation expenses for looking at what Elkin claims was over 100 other targets.  ¶¶139-141. They were also effectively "selling" the company in a manner the court in *Nguyen* suggested would give rise to an inference of scienter.  *Nguyen*, 962 F.3d 405, 415 ("If defendants had sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium, the theory might have more legs").[13]  Twelve Seas' founders were seeking to take Brooge public and would have profited from Brooge's fake scheme that ultimately inflated the value of the soon-to-be-public shares (which they owned) for years.  It was the perfect opportunity for them to run away with huge profits while laying the blame at the feet of a foreign entity and leaving investors

---

[13]    *See also Nguyen v. Radient Pharm. Corp.*, 2011 WL 5041959, at *2, 8-9 (C.D. Cal. Oct. 20, 2011) (holding that there was scienter where defendant pharmaceutical company falsely claimed it was conducting a clinical trial with Mayo Clinic and it admitted its ability to continue operating was dependent upon raising additional capital); *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) ("an executive at a company that will go belly up if it fails to fundraise has different incentives from a generic corporate insider. One salient difference is that the former executive has a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure."); *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 299 (D. Mass. 2006) (finding strong motive evidence where plaintiffs alleged that company "needed an immediate cash infusion to keep the business alive").

17

holding the bag.  Given the enormous financial pressure and prospects of large gains instead of tens of millions in losses that were facing Twelve Seas' founders, an inference of culpability is eminently plausible and sufficient to allege scienter.

## III.    Dismissal Under Rule 12(b)(7) Is Inappropriate

Elkin's argument for dismissal under Rule 12(b)(7) and Rule 19 glosses over key portions of the analysis and asks the Court to make an ultimate finding of prejudice to force an inappropriate dismissal of the action.[14]   For the reasons discussed below, none of Elkin's arguments should be credited.

### A.    None of the Absent Defendants Are "Necessary Parties"

Rule 12(b)(7) allows dismissal of an action for failure to join a necessary and indispensable party under Rule 19. Fed. R. Civ. P. 12(b)(7).  The moving party bears the burden of persuasion to support a Rule 12(b)(7) motion. *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990).  "A Rule 12(b)(7) motion for failure to join an indispensable party demands a fact specific and practical inquiry." *Id.*  An analysis under Rule 19 is a two-step inquiry. "First, a court must determine whether an absent party should be joined as a 'necessary party' under subsection (a). Second, if the court concludes that the nonparty is necessary and cannot be joined for practical or jurisdictional reasons, it must then determine under subsection (b) whether in 'equity and good conscience' the action should be dismissed because the nonparty is 'indispensable.'" *Va. Sur. Co. v. Northrop Grunman Corp.*, 144 F.3d 1243, 1247 (9th Cir. 1998).

The Former Twelve Seas Parties are not "necessary" parties and thus fall outside Rule 19's jurisdiction. "A party is necessary [under Rule 19(a)] if: (1) complete relief cannot be granted among existing parties in the party's absence; or

---

[14]    For example, and as discussed further below, nearly all of Elkin's arguments address the analysis under Rule 19(b), which a court only reaches after determining that a necessary party is absent and cannot be joined – neither of which is true in this case. *See, e.g.*, *Makah Indian Tribe*, 910 F.2d at 559.

(2) [where] the absent party 'claims an interest relating to the subject of the action and is so situated that disposing of the action in the [party's] absence may' either 'impair or impede' the absent party's ability to protect its interest, or 'leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of those interests.'" *Garrison v. Ringgold*, 2019 WL 2089509, at *10 (S.D. Cal. May 13, 2019) (quoting Fed. R. Civ. P. 19(a)(1)(A) & (B)).

The absent Twelve Seas executives do not qualify as necessary parties under either prong of Rule 19(a). First, there is no reason—and indeed, Elkin offers none—why "complete relief cannot be granted among existing parties" in the absence of any former Twelve Seas officers or directors. The Supreme Court has clarified that "complete relief" refers to "relief as between the persons already parties, and not as between a party and the absent person whose joinder is sought." *Confederated Tribes of Chehalis Indian Rsrv. v. Lujan*, 928 F.2d 1496 (1991). Elkin cannot explain why the absence of other Twelve Seas related parties prevents complete relief for the current parties to this case. Elkin himself could be ordered to pay the damages resulting from his own fraudulent conduct,[15] whether or not any other parties are served and join the action. Elkin's failure to explain why "complete relief" is unavailable absent joinder is, standing alone, fatal to this line of argument. *See Makah Indian Tribe*, 910 F.2d at 558 (burden is on movant requesting dismissal).

Nor do the absent parties qualify as necessary parties under the second prong, which asks whether any absent party "claims an interest" in the action and, if so, whether proceeding in that party's absence (1) would impair the absent party's ability to protect that interest; or (2) subject an existing party "to a substantial risk

---

[15]  *See DCD Programs v. Leighton*, 90 F.3d 1442, 1446-47 (9th Cir. 1996) ("actual damages" are available for violations of Section 10(b), measured as either "out-of-pocket" or "rescissory" damages, plus "consequential damages that can be proven with reasonable certainty").

19

of incurring double, multiple, or otherwise inconsistent obligations because of" the absent party's claimed interest. Fed. R. Civ. P. 19(a)(1)(B). As an initial matter, Elkin's argument under Rule 19(a)(1)(B) fails because none of the absent parties have ever "claimed an interest." To satisfy this requirement the absent party must actually claim the interest, not just have a potential interest. *United States v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999).

Even if an absent party had claimed an interest, the claimed "interest must be more than a financial stake, . . . and more than speculation about a future event." *Makah Indian Tribe*, 910 F.2d at 558. Elkin has not offered any evidence that any interest is at stake, let alone one covered by the rule. Nor has Elkin adequately explained how a claimed interest of an absent party would be *impaired* by this action. His mere conclusion that the absent parties have an interest in *Twelve Seas* not being held liable is insufficient. As Elkin admits, a ruling in this case would not be binding on absent Twelve Seas executives. *See* Elkin Br. at 20. Therefore, proceeding without them does not impair their ability to later protect their rights if some speculative other (unlikely) lawsuit were filed.[16] Contrary to Elkin's view, a plaintiff is clearly not obligated to join all parties against whom it has similar claims, or even where the parties have joint liability. Indeed, Elkin's argument on this point contradicts the well settled rule that "it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990). "The Advisory Committee Notes to Rule 19(a) explicitly state that 'a tortfeasor with the usual "joint-and-several" liability is merely a permissive party to an action against another with like liability.'" *Id.* Permissive joinder (for which Elkin does not argue) is assessed under Rule 20—not Rule 19.

---

[16]    Elkin has also failed to even proffer a plausible potential later lawsuit against any absent Twelve Seas executives, particularly in light of the statute of repose.

20

Because none of the absent parties are a necessary party, dismissal under Rule 12(b)(7) and Rule 19 is inappropriate.

### B.    Even If the Court Were to Reach the Rule 19(b) Inquiry, Elkin Has Not Met His Burden

Finally, *even if* the SPAC D&Os are deemed absent and necessary parties, Elkin has not shown that the action should be dismissed "in equity and good conscience."  "To make this determination, [the Court] must balance four factors: (1) the prejudice to any party or to the absent party; (2) whether relief can be shaped to lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and (4) whether there exists an alternative forum." *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1161-62 (9th Cir. 2002).  If no alternative forum exists, a court should be "extra cautious" before dismissing the suit.  *Makah Indian Tribe*, 910 F.2d at 560.

Elkin's arguments rest entirely on the first factor: prejudice.  He focuses primarily on his ability to defend the case *if* it proceeds to discovery, acknowledging that the potential defenses he raises are ill-suited for resolution on a motion to dismiss.  Elkin Br. at 22.  He posits that he may need the third parties to "support" his defense, but the absence of a witness is not prejudicial for these purposes.  Elkin "confuses the role of the absent persons as witnesses with their role as parties." *Sinotrans Container Lines, Co. v. N. China Cargo Serv., Inc*., 2008 WL 3048855, at *4 (C.D. Cal. Jan. 31, 2008).  The fact that an absent party may be a necessary witness does not make it a "necessary party" under Rule 19.  *Id.* Even if absent parties were truly "absent," Elkin's defense of his case could be accomplished by subjecting those Defendants to third-party discovery and trial subpoenas, just like Plaintiff must do.

Elkin's second argument, that he might bear responsibility for the full share of liability if other parties are not joined, is also not prejudice to him in this context.

OPPOSITION TO DEFENDANT ELKIN'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-FLA-DFM

If, in fact, it is found in this case that he is personally liable and he fails to assert any valid defense, that is Elkin's legal burden.  As discussed above, a plaintiff is not obligated to sue all jointly liable parties in a single lawsuit; it is not even mandatory for parties who have joint and several liability to be joined under Rule 19.  *Temple*, 498 U.S. at 7 (1990).  Elkin does not get a free pass simply because other parties might also be liable.

As to the third factor, Plaintiff is seeking damages, a remedy that could certainly be awarded without the SPAC D&Os' presence in the litigation. The third factor therefore weighs against dismissal as well.

What weighs most strongly against dismissal, however, is the prejudice to *Plaintiff* if the case were to be dismissed, based on the lack of an alternative forum. Defendants' misconduct spans multiple years and reaches back into 2019.  As both Plaintiff and Elkin acknowledge, there is only one category of misstatements for which Elkin may have liability: those made in the November 2019 Proxy.  While Plaintiff's claims were timely when the lawsuit was filed, the statute of repose has now expired with respect to the Proxy—meaning that if Plaintiff's claims against Elkin are dismissed under Rule 12(b)(7) and Rule 19, *Plaintiff will have no alternative forum to bring its claims*.  The Ninth Circuit has cautioned courts to be "extra cautious" before dismissing a suit in these circumstances. *See Makah Indian Tribe*, 910 F.2d at 560.  The Court should exercise that caution here and decline to dismiss Plaintiff's claims against Elkin, even if it reaches the Rule 19(b) inquiry.

## CONCLUSION

For the foregoing reasons, Elkin's Motion should be denied.[17]

---

[17]    If the Complaint is dismissed, Plaintiff respectfully requests leave to amend. *See Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1118 (N.D. Cal. 2003) (leave to amend should be liberally granted).

Dated: December 17, 2025

Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Amanda F. Lawrence

Amanda F. Lawrence (*pro hac vice*)
Anna Hunanyan (CA 330609)
The Helmsley Building
230 Park Ave., 24th Fl.
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
alawrence@scott-scott.com
ahunanyan@scott-scott.com

Cornelia J. B. Gordon (CA 320207)
John T. Jasnoch (CA 281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
cgordon@scott-scott.com
jjasnoch@scott-scott.com

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile:  310-388-0192
brian@schallfirm.com

*Attorneys for Lead Plaintiff Bluefin Capital Management, LLC, and Co-Lead Counsel*

23

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Lead Plaintiff Bluefin Capital Management, LLC, certifies that this Opposition to Defendant Dimitri Elkin's Motion to Dismiss is 22-pages in length and complies with the 25-page limit of this Court's Standing Order, ¶ F(3), dated March 5, 2025, docketed in this action as ECF No. 48.

DATED: December 17, 2025

/s/ Amanda F. Lawrence
Amanda F. Lawrence (*pro hac vice*)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 17, 2025, I caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

Executed on December 17, 2025, at Colchester, Connecticut.

/s/ Amanda F. Lawrence
Amanda F. Lawrence (pro hac vice)

OPPOSITION TO DEFENDANT ELKIN'S MOTION TO DISMISS
CASE NO. 2:24-cv-00959-FLA-DFM