Perrie M. Weiner, State Bar No. 134146
perrie.weiner@bakermckenzie.com
Benjamin W. Turner, State Bar No. 256092
ben.turner@bakermckenzie.com
**BAKER & McKENZIE LLP**
10250 Constellation Blvd., Suite 1850
Los Angeles, California 90067
Telephone: 310.201.4728
Facsimile: 310.201.4721

Attorneys for Defendant
BROOGE ENERGY LIMITED, SALEH
YAMMOUT, MASOOD ALI SYED, AND
PAUL DITCHBURN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| ERIC WHITE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BROOGE ENERGY LIMITED F/K/A BROOGE HOLDINGS LIMITED F/K/A TWELVE SEAS INVESTMENT COMPANY, NICOLAAS L. PAARDENKOOPER, SALEH YAMMOUT, SYED MASOOD ALI, LINA SAHEB, DIMITRI ELKIN, NEIL RICHARDSON, STEPHEN N. CANNON, PAUL DITCHBURN, ERNST & YOUNG, and PRICEWATERHOUSECOOPERS LIMITED PARTNERSHIP, DUBAI BRANCH,<br><br>Defendants. | **Case No. 2:24-cv-00959-AH-DFM**<br><br>**REPLY IN SUPPORT OF DEFENDANT BROOGE ENERGY LIMITED, SALEH YAMMOUT, MASOOD ALI SYED, AND PAUL DITCHBURN'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Date:    February 4, 2026<br>Time:    1:30 p.m.<br>Ctrm:    9C, 9th Floor<br>Judge:    Hon. Anne Hwang<br><br>First Street Courthouse<br>350 W. 1st Street<br>Los Angeles, California 90012 |

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page No.**

A.    The SAC Does Not Plead Warrant Prices.......................................................2

B.    Bluefin Fails To Plead Losses On Warrants It Sold Or Retained................................................................................................6

C.    Bluefin Fails To Plead The Fraud-On-Market Theory ..............................7

D.    Bluefin Lacks Standing To Assert Claims Based On Pre-De-SPAC Statements And Purchases ...................................................8

E.    The Court Lacks Jurisdiction Over Common Stock Claims Because Bluefin Profited From Common Stock Trading.........................9

F.    The SAC Fails To Plead Loss Causation ....................................................11

G.    The Court Lacks Jurisdiction Over Bluefin's Common Stock Claims Due To The Fair Fund ......................................................................13

H.    Bluefin Fails To Plead Scienter Or Falsity ...............................................15

CERTIFICATE OF COMPLIANCE ....................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adobe Sys., Inc. Sec. Litig.*,
 139 F.R.D. 150 (N.D. Cal. 1991) ..................................................................4

*Audet v. Fraser*,
 332 F.R.D. 53 (D. Conn. 2019) ...............................................................10, 11

*In re Bos. Sci. Corp. ERISA Litig.*,
 254 F.R.D. 24 (D. Mass. 2008) .................................................................9

*Broudo v. Dura Pharms., Inc.*,
 339 F.3d 933 (9th Cir. 2003) .................................................................1, 3

*Brown v. Medtronic, Inc.*,
 628 F.3d 451 (8th Cir. 2010) ..................................................................9

*Carrieri v. Jobs.com Inc.*,
 393 F.3d 508 (5th Cir. 2004) ..................................................................4

*In re Dura Pharms., Inc. Sec. Litig.*,
 452 F. Supp. 2d 1005 (S.D. Cal. 2006) .........................................................3

*Dura Pharms., Inc. v. Broudo*,
 544 U.S. 336 (2005)..........................................................................*passim*

*In re Fastly, Inc. Sec. Litig.*,
 2025 WL 2721693 (N.D. Cal. Sept. 24, 2025)...................................................11

*Griggs v. Pace Am. Grp., Inc.*,
 170 F.3d 877 (9th Cir. 1999) ..................................................................9

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
 456 U.S. 694 (1982).........................................................................15

*Lewis v. Casey*,
 518 U.S. 343 (1996).........................................................................14

*Lucid Motors Sec. Litig.*,
 110 F.4th 1181 (9th Cir. 2024).............................................................8, 9

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
54 F.4th 82 (2d Cir. 2022) .................................................................................8

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
2013 WL 396117 (D.N.J. Jan. 30, 2013).............................................................4

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ...........................................................................16

*Mirzaie v. U.S. Dep't of State*,
2025 WL 901697 (C.D. Cal. Mar. 21, 2025) .......................................................9

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) ...........................................................................11

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ...............................................................................4

*Petrie v. Elec. Game Card, Inc.*,
308 F.R.D. 336 (C.D. Cal. 2015)..........................................................................7

*Rosemere Neighborhood Ass'n v. U.S. Env't Prot. Agency*,
581 F.3d 1169 (9th Cir. 2009) ...........................................................................15

*In re Salomon Analyst Level 3 Litig.*,
350 F. Supp. 2d 477 (S.D.N.Y. 2004) ...............................................................10

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010) .............................................................................11

*ScripsAmerica, Inc. v. Ironridge Global LLC*,
119 F. Supp. 3d 1213 (C.D. Cal. 2015)................................................................8

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)............................................................................................13

*In re SunPower Corp. Sec. Litig.*,
769 F. Supp. 3d 1042 (N.D. Cal. 2025)..............................................................15

*Taylor v. KeyCorp*,
680 F.3d 609 (6th Cir. 2012) ...............................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)............................................................................................17

Case No. 2:24-cv-00959-AH-DFM
DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

*Thant v. Rain Oncology Inc.*,
    2025 WL 588994 (N.D. Cal. Feb. 24, 2025).........................................................11

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
    581 U.S. 433 (2017)..............................................................................................10

*Volk v. D.A. Davidson & Co.*,
    816 F.2d 1406 (9th Cir. 1987)..............................................................................10

*Wochos v. Tesla, Inc.*
    985 F.3d 1180 (9th Cir. 2021)..........................................................................5, 12

**Statutes**

15 U.S.C.A. § 7246.....................................................................................................13

15 U.S.C.A.§ 78u-4......................................................................................................10

Exchange Act Section 28..............................................................................................2

Sarbanes-Oxley Act Section 308.................................................................................13

**Other Authorities**

148 Cong. Rec. H5462-02............................................................................................13

https://www.broogeenergyfairfund.com/File-a-Claim ...............................................13

https://www.globenewswire.com/news-
    release/2025/11/25/3194644/0/en/Brooge-Energy-Limited-
    Announces-Closing-of-Transaction-and-Declaration-of-Dividend.html.............7

https://www.sec.gov/files/litigation/admin/2025/34-102298-dp.pdf ......................13

Fed. R. Civ. P. 12.........................................................................................................9

iv

When Bluefin filed the FAC, it defined the class as persons and entities who purchased "Brooge common stock." ECF 46 at 5. The SAC expanded that definition to "publicly traded securities of Brooge" (ECF 114 at ¶ 251) – a change that was no accident. Defendants' motion to dismiss the FAC showed that Bluefin generated more than $281,000 in profit trading common stock and, even assuming any loss, would be made whole through the $5.2 million fair fund established for common stockholders. Faced with these deficiencies, Bluefin amended to sweep in warrants – a security it alleges it purchased but for which it pleads no prices, no trading data, and no losses.

Bluefin's contention that it need not plead warrant prices is foreclosed by *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), which reversed the Ninth Circuit for this kind of reasoning. The Ninth Circuit held that it sufficed to plead that "the stock's price at the time of purchase was overstated" and "sufficient identification of the cause for this overvaluation." *Broudo v. Dura Pharms., Inc.*, 339 F.3d 933, 939 (9th Cir. 2003), *rev'd*, 544 U.S. 336. The Supreme Court disagreed, holding that plaintiffs "need to prove proximate causation and economic loss" because the "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura*, 544 U.S. at 342-43.

Bluefin understands this requirement when it comes to common stock–it alleges corrective disclosures and specific prices before and after each one. But for warrants, Bluefin pleads nothing beyond an alleged cumulative 98.75% decline of "fair value" over the entire class period (¶ 8), untethered to any corrective disclosures. Bluefin does not plead a single warrant price, much less the before and after prices necessary for loss causation. Bluefin's fallback that stock prices serve as a proxy for warrant prices is both unpled and wrong. The SAC alleges no facts to suggest that Brooge warrant prices were correlated with stock prices, directionally or otherwise. Deep out-of-the money warrants like Brooge's derive their value primarily from time value, which decays as expiration

approaches regardless of stock movements. The trading data Defendants submitted bears this out–warrants were deeply illiquid, often had zero trading for consecutive days, and sometimes increased in price while the stock fell. Bluefin is a sophisticated hedge fund that trades derivatives professionally and had eight months to amend after Defendants identified these deficiencies. The only reasonable inference from the SAC's silence is that the data does not show what Bluefin needs it to show.

This pleading deficiency alone requires dismissal, but it is not the only reason. Bluefin fails to plead facts establishing that the market for thinly traded Brooge warrants was efficient, a predicate for the fraud on the market presumption it invokes. Bluefin lacks standing to sue Brooge based on pre-merger purchases of Twelve Seas or Twelve Seas' representations. Because Bluefin made money on common stock, it lacks Article III standing to pursue claims on that security and also lacks statutory standing because Section 28(a) of the Exchange Act limits recovery to "actual damages." The common stock claims are independently mooted by the Fair Fund, which will or already has compensated any common stock losses and the SAC is noticeably silent as to whether Bluefin submitted a claim to the Fair Fund administrator. Bluefin's loss causation theories suffer from other problems too, including "corrective" disclosures that revealed nothing, stock and warrant prices trading up or immediately rebounding, and on at least one occasion, warrants not trading at all. Bluefin fails to plead scienter or falsity with respect to Ditchburn, Yammout, and Masood, none of whom appear in the SEC Order that forms the backbone of the SAC. Ditchburn arrived in December 2022, nearly two years after the 2018-2020 period when the alleged revenue recognition issues occurred. As for Masood and Yammout, the SAC identifies no document showing they knew what Bluefin claims they knew or attempted to further any purported misconduct.

## A.    The SAC Does Not Plead Warrant Prices

Bluefin does not dispute the SAC fails to plead warrant prices or whether warrant prices declined in response to a corrective disclosure but argues that "a plaintiff [need not] allege that the price of the warrants declined in response to a corrective disclosure."

ECF 144 at 21. This argument is foreclosed by *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), which reversed the Ninth Circuit's holding that "loss causation does not require pleading a stock price drop following a corrective disclosure" and "merely requires pleading that the price at the time of purchase was overstated and sufficient identification of the cause." *Broudo v. Dura Pharms., Inc.*, 339 F.3d 933, 938 (9th Cir. 2003), *rev'd*, 544 U.S. 336. Upon reversal the Ninth Circuit directed the district court to give plaintiffs "an opportunity to amend their complaint … in a manner that complies with the Supreme Court's requirements for loss causation." *In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1016 (S.D. Cal. 2006). The plaintiffs did so, alleging the corrective disclosures dates "and the resulting stock drop on those dates." *Id*. at 1021-22. Bluefin does not seek leave to amend to plead such detail for warrants.

Instead, Bluefin argues the SAC's allegation that "the fair value of Brooge's warrants had dropped 98.75%" suffices. ECF 144 at 21. This is a *Dura* error in its purest form. The SAC does not allege when this 98.75% decline occurred, what corrective disclosure(s) caused it, or how the warrant price moved in response to any alleged revelation. An unexplained cumulative decline over the entire class period does not satisfy *Dura*. And to the extent the 98.75% figure starts with a November 25, 2019 price as Bluefin does with common stock,[1] the calculation is wrong. November 25 was before the de-SPAC closed; what traded on November 25, 2019 were Twelve Seas warrants – a different security issued by a different entity with different pricing dynamics.

Bluefin argues that it need not plead warrant price declines because warrant value is "directly related" to the price of Brooge's stock. ECF 144 at 21. This is another variation of "the price at the time of purchase was overstated" argument rejected by

---

[1] Paragraph 134 of the SAC confirms Bluefin's flawed methodology: for common stock Bluefin alleges a 74.58% decline from the class period start ($10.28 on November 25, 2019) to class period end ($2.75 on December 27, 2023). *See also* ¶ 8 (alleging stock dropped 74% and warrants dropped 98.75%). Accordingly, the 98.75% figure purports to measure a four-year cumulative alleged decline–untethered to any corrective disclosure. In addition, a decline from $10.28 to $2.75 is 73.25%, not 74.58%; Bluefin appears to have inadvertently transposed the digits and calculated using $10.82. There is no reason to believe the 98.75% figure, besides being irrelevant, is correct even if it did not improperly use the price of Twelve Seas warrants.

*Dura*, substitutes theoretical argument for factual allegation, and would improperly allow Bluefin to plead "actual damages" for one security by proxy using price movements in a different security. Following *Dura*, plaintiffs must plead facts tying the "revelation" to a price decline rather than conclusory assertions of loss across a four-year period. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) ("a plaintiff must allege that the 'share price fell significantly **after** the truth became known.'") (emphasis added) (quoting *Dura Pharms*., 544 U.S. at 344–45).

*Dura* warned that the "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or issuer-specific facts, conditions, or other events," creating a "tangle of factors affecting price" that the plaintiff must unravel to plead causation. 544 U.S. at 343. This requirement is paramount where, as here, the security is an expiring derivative instrument subject to unique pricing pressures unrelated to the issuer's conduct, like time decay. If plaintiffs could rely on another security's decline and invoke theoretical pricing relationships, it would nullify *Dura* for any derivative security.[2]

Unlike common stock, warrant value is comprised in significant part of time value–a premium that decays to zero as the expiration date approaches without the stock price exceeding the strike price. By refusing to plead specific warrant prices before and after alleged corrective disclosures–and not pleading corrective disclosures associated with declines in warrant prices–Bluefin fails to provide the essential facts necessary to disentangle the alleged representations from the "tangle of factors." Instead, Bluefin presumes that alleged misconduct caused an unspecified loss, rather than the

---

[2] None of Bluefin's cases are to the contrary. *Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 513 n.4 (5th Cir. 2004) explains what a warrant is. *In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 155 (N.D. Cal. 1991) states that the "value of options is directly related to the value of common stock," not that warrants move in lockstep with stock. The statement in *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2013 WL 396117, at *6 (D.N.J. Jan. 30, 2013) that option prices are "directly responsive" is a theoretical observation–not an empirical claim that warrants will always move in direct correlation with stock prices, particularly where. as here, the warrants are deeply out of the money. Bluefin's remaining cases deal with whether options trading is entitled to a fraud-on-the-market presumption. *See* ECF 144 at 11-12 n.8.

mathematical inevitability of an out-of-of the money asset approaching expiration. This presumption is forbidden by *Dura*, which requires a plaintiff to provide "some indication" the loss was caused by revelation of alleged misrepresentations. *Id.* at 348.

It is telling that Bluefin asks the Court to accept the abstract proposition that warrants definitively track stock in place of pleading the most basic of facts to test it – the warrants' trading prices before and after the corrective disclosure. Bluefin is a sophisticated hedge fund and could have easily alleged readily available pricing data just as it did for common stock. Bluefin amended its pleading in part to expand the class to "securities" rather than "common stock" but then, despite having months to spare, declined to plead warrant prices. Bluefin's selective silence reinforces the data in Defendants' papers, which shows warrants went up in price, did not see a sustained drop in price, or did not trade following the alleged corrective disclosures for common stock.

Bluefin attempts to recast this data, arguing that on December 8, 2022, warrants dropped from $0.26 to $0.1761. This ignores that the 6-K was filed "after hours." ECF 114 at ¶ 128. When the market could react the next day, warrants rose 24.93%. Bluefin dismisses this as a "brief bounce" and points to a decline "by the end of the following month" (ECF 144 at 23) but loss causation requires an immediate market reaction, not a decline six weeks later that could reflect a number of factors unrelated to the disclosure. *See Wochos v. Tesla, Inc.* 985 F.3d 1180, 1198 (9th Cir. 2021) (no loss causation where stock "immediately rebounded"). As this same data also reflects, even where there was an alleged stock price decline, the warrant price does not necessarily decline at all, disproving the theoretical relationship Bluefin suggests.

For January 20, 2023 Bluefin observes that warrants traded at $0.16 on January 18 and fell to $0.1440 on the "next date shown"–which was January 30, ***ten days later***. ECF 144 at 12 n.8. Bluefin glosses over the zero trades made during that ten-day period, meaning the disclosure produced no trading activity. For December 22, 2023, Bluefin points to a 28.57% drop on December 22 and a 60% drop on December 26. Bluefin speculates that even though the 6-K was filed "after hours," the administrative order

Case No. 2:24-cv-00959-AH-DFM
DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

"may have been known" to unspecified "traders during trading hours because the SAC alleges the order was "issued the same day." ECF 144 at 12 n.8. Bluefin cannot rely on these prices because it does not plead them but in any event, the argument is wrong. For one, the SAC does not allege it was issued during trading hours or otherwise known to traders during trading hours. Further, warrants rebounded to $0.0148 by December 29, fully 48% above the pre-disclosure price of $0.01 and the price Bluefin claims the warrants were worth in its Capital Loss Analysis. Bluefin contends Defendants are "cherry-picking" (ECF 144 at 12), but it is Bluefin that does so, ignoring the immediate rebound and pointing to distance dates in January 2024, outside the class period.

If Bluefin's claimed economic loss can arise solely from warrant transactions (as it now effectively concedes), it must plead facts showing warrant price declined when the alleged truth was revealed–not simply that the common stock declined. Even on Bluefin's own telling, the warrants were economically distinct from common stock in ways that make Bluefin's "proxy pleading" inappropriate. Bluefin alleges the warrants were exercisable at $11.50 per share, that Brooge's common stock closed above $11.50 on only 33 days during the entire class period, all in early 2020, and that only 100 warrants were ever exercised before expiring. ¶ 16 & n.6. These allegations highlight that Brooge warrants were a deep out of the money derivative, materially affected by time to expiration, volatility, liquidity and other market inputs–a "tangle of factors" that can swamp or invert any unpled "stock down - warrant down" speculative inference.

**B.    Bluefin Fails To Plead Losses On Warrants It Sold Or Retained**

Warrants that Bluefin sold before any corrective disclosures are not actionable. For the warrants Bluefin retained, Bluefin argues that holders need not sell to claim damages. True in some circumstances, but for the 918,029 warrants Bluefin retained, instead of pleading specific corrective disclosures and price drops, Bluefin attributes the entire alleged price decline on the Company's alleged wrongdoing.

The extraordinary inflation required to sustain Bluefin's theory demonstrates its implausibility. To justify Bluefin's claimed warrant loss of $592,236.53 solely based

on alleged wrongdoing inflating warrant prices, Bluefin would have to plead that the alleged wrongdoing artificially inflated the warrant price by $0.65 (dividing $592,236.53 by 918,029 warrants), meaning the alleged fraud artificially inflated the warrants by 6400%. The SAC pleads no similar collapse in Brooge's stock price, no facts to suggest that Brooge declared bankruptcy, and no other facts to suggest this level of inflation would otherwise be plausible. Nor could it. Not only did Bluefin yield a $281,379 gain selling Brooge's common stock for a profit over the same period, Brooge was successfully acquired for nearly $900 million, with shareholders receiving approximately $7.76 per share–nearly three times the end of class period stock price.[3]

### C. Bluefin Fails To Plead The Fraud-On-Market Theory

Bluefin argues the SAC contains "well-pled and detailed allegations of … market efficiency" (ECF 144 at 25), but those allegations plead just three "facts:" Brooge securities were "actively traded" on NASDAQ, Brooge filed SEC reports and Brooge issued press releases. ECF 114 at ¶ 259. The last two allegations establish only that Brooge was a reporting company that disseminated information to the public – the bare minimum for any issuer. The first allegation is incorrect. The data reflects the market for Brooge warrants frequently had zero volume for days at a time and Bluefin's trading records reflect that it posted hundreds of reciprocal small-lot buy and sell orders on a single day, presumably in an effort to artificially create or probe liquidity, precisely because the warrants were not "actively traded."

In evaluating the fraud-on-the-market presumption, courts examine factors such as "whether the stock trades at a high weekly volume;" whether the security has "numerous market makers and arbitrageurs;" and "whether there are 'empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.'" *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 349 (C.D. Cal. 2015). Defendants have proffered judicially

---

[3] *See* https://www.globenewswire.com/news-release/2025/11/25/3194644/0/en/Brooge-Energy-Limited-Announces-Closing-of-Transaction-and-Declaration-of-Dividend.html

noticeable trading data showing that the warrant market was characterized by extended multi-day gaps with zero trading activity, sporadic volume often measured in mere hundreds of shares and warrant prices increasing after alleged corrective disclosures or not trading at all. Accordingly, Bluefin's conclusory allegation that Brooge warrants traded in an efficient market fails. *ScripsAmerica, Inc. v. Ironridge Global LLC*, 119 F. Supp. 3d 1213 (C.D. Cal. 2015) ("inadequate allegations of efficiency is an appropriate basis upon which to dismiss a complaint").

### D.     Bluefin Lacks Standing To Assert Claims Based On Pre-De-SPAC Statements And Purchases

Bluefin's statutory standing argument conflates (1) whether Bluefin ever purchased Brooge securities with (2) whether Bluefin can pursue 10b-5 claims against Defendants for purchases made before the de-SPAC, when the only publicly traded securities were those of Twelve Seas. Under *In re CCIV / Lucid Motors Sec. Litig.*, 110 F.4th 1181 (9th Cir. 2024), Bluefin lacks statutory standing to sue Brooge for the latter.

Whatever standing Bluefin may have to assert claims based on its post-merger purchase of Brooge securities, those subsequent transactions cannot retroactively confer standing for losses allegedly incurred on pre-merger Twelve Seas purchases. "[P]urchasers of a security of an acquiring company do not have standing under Section 10(b) to sue the target company for alleged misstatements the target company made about itself prior to the merger between the two companies." *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 88 (2d Cir. 2022). Bluefin's class definition stretches the class period back to November 25, 2019 while defining the class as purchasers of Brooge securities. Yet there were no Brooge securities to purchase on November 25.[4] This is the kind of bootstrapping that *CCIV* and *Menora* forbid.[5]

Bluefin argues that because it purchased Twelve Seas securities after the de-SPAC had been announced, it had a "contractual right" to ownership of Brooge. ECF

---

[4] The SAC's references to alleged inflation in "securities of Twelve Seas" (¶ 285) while defining the class as Brooge purchasers underscores why there should be clarity at the pleading stage as to which security and which transactions are being pursued.
[5] If Bluefin's theory were correct, any SPAC plaintiff could bypass *CCIV* by buying a single share of the target company after the merger to unlock liability for their entire pre-merger portfolio.

144 at 10 n.5. *CCIV* rejected this argument. Plaintiffs purchased SPAC shares during active merger negotiations – after it was "widely speculated that CCIV would acquire Lucid, based on extensive reporting in the financial press." 110 F.4th at 1184. The Ninth Circuit nonetheless held that the plaintiffs lacked standing because they "did not purchase or sell Lucid stock, as Lucid was a privately held company during the relevant period." *Id.* at 1186.[6]

### E.    The Court Lacks Jurisdiction Over Common Stock Claims Because Bluefin Profited From Common Stock Trading

Because Bluefin profited on common stock by over a quarter million dollars, the sole plaintiff before this court lacks standing to pursue common stock damages. *See Taylor v. KeyCorp*, 680 F.3d 609, 613 (6th Cir. 2012) (plaintiff lacked Article III standing where "trading history reveals that [plaintiff] sold over 80% of her KeyCorp holdings at a time she claims the stock was artificially inflated" and thus "sold the majority of her KeyCorp holdings for more money than it was worth"); *Brown v. Medtronic, Inc.*, 628 F.3d 451, 455-57 (8th Cir. 2010) (plaintiff "has suffered no cognizable injury if the participant sold shares at an inflated price and, therefore, was a net beneficiary of the inflated share price," and plaintiff further failed to establish "redressability" given that "the breach actually conferred a financial benefit"); *In re Bos. Sci. Corp. ERISA Litig.*, 254 F.R.D. 24, 32 (D. Mass. 2008) (where plaintiffs sold shares at prices that were allegedly inflated due to misrepresentations, "they could only have benefited from an overvaluation of [the company's] stock" and thus "failed to demonstrate individual injury in fact and therefore lack Article III standing").

Bluefin argues it was a "not a net gainer" in light of unpled, purported warrant losses set forth in support of its motion for lead plaintiff. ECF 144 at 17-18. Because the SAC does not plead that warrant losses exceed common stock gains, "this theory is not properly before the Court on a Rule 12(b)(6) motion to dismiss." *Mirzaie v. U.S. Dep't of State*, 2025 WL 901697, at *12 (C.D. Cal. Mar. 21, 2025). The "net loser"

---

[6] Bluefin invokes *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877 (9th Cir. 1999) but the plaintiff was a shareholder of the target and had surrendered his old stock and locked into receiving shares subject to an external performance metric. *See id.* at 878. As the SAC acknowledges (¶ 40), when an investor purchases SPAC stock, it acquires a bundle of rights that includes the right to tender shares back to the SPAC.

argument also fails because it is "standing in gross" by another name – a theory rejected by the Supreme Court. *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433 (2017) reiterated the "simple rule" that a plaintiff "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id*. at 439 (citation omitted). The Court clarified that in cases involving multiple parties, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Id*. This requirement "includes cases in which both the plaintiff and the intervenor seek separate money judgments in their own names." *Id.* at 440. Courts have applied this "simple rule" in securities class actions. *See In re Salomon Analyst Level 3 Litig*., 350 F. Supp. 2d 477, 496 (S.D.N.Y. 2004) ("the selection of lead plaintiffs does not remove the basic requirement that at least one ***named*** plaintiff must have standing to pursue each claim alleged" and dismissing claims of bondholders, as distinct from shareholders, because named plaintiffs lacked standing to assert claims on behalf of bondholders).

Warrant damages and common stock damages are "separate money judgments"– calculated independently under the PSLRA, paid to different claimants, and redressing distinct injuries for distinct instruments – each requiring a plaintiff with standing to pursue it. The injury to a warrant holder who owns a leveraged, time-limited derivatives with no ownership rights is no less distinct from a stockholder's injury than a bondholder's is. This security-by-security framework is consistent with the PSLRA's bounce-back provision, which caps losses by comparing the purchase price of the "subject security" to the 90-day post-disclosure mean for "that security" – not "the securities," "plaintiff's investment" or "portfolio." *See* 15 U.S.C. § 78u-4(e)(1).

Bluefin argues under *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1412 (9th Cir. 1987) that the "cognizable injury occurs at the time an investor enters…. [into] a transaction …" ECF 144 at 17. But *Volk* addressed when a claim accrues for statute of limitations purposes. It did not hold that a plaintiff need not plead actual loss. While *Audet v. Fraser*, 332 F.R.D. 53 (D. Conn. 2019) reasons that a plaintiff who "broke even or profited" from their investment still has Article III standing, respectfully, it erroneously relies on authorities discussing the accrual rule for statutes of limitations.

Case No. 2:24-cv-00959-AH-DFM
DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

*See id.* at 63-64. Setting that aside, this is also contrary to *Dura*'s holding that "at the moment the transaction takes place, the plaintiff has suffered no loss." 544 U.S. at 342.

### F.       The SAC Fails To Plead Loss Causation

Bluefin argues it can establish loss causation based on the materialization of the risk theory, which "recognizes that 'a misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor.'" *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 176–77 (2d Cir.2005)). [7] To the extent materialization of risk functionally differs from corrective disclosures[8]–the SAC treats the two interchangeably, alleging that events were a "corrective disclosure and/or a materialization of the undisclosed risks." ¶¶ 13, 131. The SAC's inability to plead more than conclusory labels underscores why the doctrine is inapt here; it exists for cases where a defendant downplays an operational risk. *See, e.g, Thant v. Rain Oncology Inc.*, 2025 WL 588994, at *10 (N.D. Cal. Feb. 24, 2025) (defendant "downplayed the level of risk … skipping straight to Phase 3 increased the risk that Phase 3 would fail in ways that investors could not appreciate" and "[w]hen the Phase 3 trial failed, that risk materialized" and "also caused Rain's stock price to decline"). Bluefin alleges that Brooge misclassified revenues and that the alleged misclassification came to light through the Administrative Order. That is an alleged corrective disclosure, not materialization of risk.[9] Stripped of the "materialization" label, Bluefin is left with three alleged disclosures. Each fails.

[7] The Ninth Circuit has not adopted the materialization-of-the-risk approach to loss causation. *See Nuveen*, 730 F.3d at 1122 n.5.
[8] *Schleicher v. Wendt*, 618 F.3d 679, 683 (7th Cir. 2010) (criticizing materialization of the risk as "not a legal doctrine or anything special as a matter of fact").
[9] Bluefin cites *In re Fastly, Inc. Sec. Litig.*, 2025 WL 2721693 (N.D. Cal. Sept. 24, 2025), but this reinforces the point. In *Fastly*, the concealed condition was declining customer usage. When revenue missed expectations as a result of that decline, the risk of lower revenues "materialized" and the stock dropped because the harm occurred, not because the concealment was revealed. *Id.* at *22.

11

*December 8, 2022 resignation of Pardenkooper*. Bluefin contends that because of later events such as the PwC letter and Administrative Order, the resignation was fraud-related and the market must have understood this connection at the time of Pardenkooper's resignation. ECF 144 at 30. The market cannot react to information it does not have and on December 8, the market learned only that Pardenkooper resigned.

*January 20, 2023 PwC letter*. Bluefin does not dispute the letter "did not reveal or definitively adjudicate any misconduct or expressly outline the fake revenues or invoicing scheme." ECF 144 at 12. The PwC letter revealed only auditor disputes and governance concerns, referencing "likely illegal" conduct without identifying what and making no mention of alleged revenue misclassification issues. ECF 144 at 21, 33. A disclosure that something is purportedly amiss, without revealing what, does not permit the market to reprice the security based on the "concealed" truth being revealed.

*December 22, 2023 Administrative Order*. The stock immediately rebounded to $2.85 on December 28, $3.68 on December 29 and then to $3.96 on January 2 – a price 18.5% higher than the pre-disclosure price. ECF 114 at ¶ 133; Turner Decl. Ex. A. "The quick and sustained price recovery after the modest … drop refutes the inference that the alleged concealment of this particular fact caused any material drop in the stock price." *Wochos*, 985 F.3d at 1198. Bluefin argues the stock's decline to $2.42 on January 5, 2024–a full two weeks after the disclosure–"reinforces" loss causation. ECF 144 at 23. But Bluefin also pleads that Brooge common stock trades in an "efficient market" that "promptly digested information" ¶ 260. An efficient market incorporates new information into the stock price immediately. Here, the market promptly digested the December 22 order and, after an initial volatility spike, drove the price up to $3.68 on December 29 and $3.96 on January 2. Moreover, the stock traded above the initial "loss" price of $2.75 for five consecutive trading days. In *Wochos*, the Ninth Circuit found a recovery "over the next week" sufficient to refute loss causation. Brooge's stock held its value for exactly that timeframe.[10] 985 F.3d at 1198.

---

[10] Bluefin misconstrues Defendants' argument as raising an affirmative "truth on the market" defense requiring factual development (ECF 144 at 23), but Defendants' point

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

**G.      The Court Lacks Jurisdiction Over Bluefin's Common Stock Claims Due To The Fair Fund**

The Fair Fund provides an independent basis to dismiss Bluefin's common stock claims for lack of jurisdiction. Created to compensate investors who suffered "net trading losses" on common stock,[11] it provides the relief Bluefin seeks here–or would, if Bluefin had lost money. Bluefin contends that nothing "proves" it received or will receive Fair Fund compensation. ECF 144 at 25. But Bluefin, "as the party invoking federal jurisdiction, bears the burden of establishing the[] elements [of Article III standing]" including that it is has suffered an injury in fact "likely to be redressed by a favorable judicial decision." *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The $5.2 million relief the Fair Fund provides is not collateral to this lawsuit because the relief it provides is compensatory in nature. Congress enacted Section 308 of the Sarbanes-Oxley Act to ensure that civil penalties, previously deposited in the Treasury, would instead "be added to and become part of a disgorgement fund or other fund established for the benefit of the victims of such violation." 15 U.S.C.A. § 7246(a). The statute directs the SEC to "provide restitution to injured investors." *Id.* § 7246(c). Representative Baker explained the provision's purpose–so "the shareholders back home can get their hands on their money"–and emphasized the section was part of Congress' ongoing effort to ensure investors receive "full recompense." 148 Cong. Rec. H5462-02, 148 Cong. Rec. H5462-02, H5463, 2002 WL 1724141. Fair Funds are thus designed to make investors whole–the objective Bluefin purports to pursue here.

Bluefin's contention that Defendants are speculating that "Plaintiff … will receive[] anything" (ECF 144 at 25) is an attempt to keep the Court in the dark about jurisdictional facts that are uniquely within Bluefin's knowledge and, given the July 26, 2025 claims deadline,[12] no longer unknown even to Bluefin. A plaintiff seeking the

---

is that the core facts underlying the alleged revenue misclassification were publicly disclosed months before 2023. Thus the Administrative Order referenced what was already public, which explains why there was no sustained price decline following the settlement.

[11] https://www.sec.gov/files/litigation/admin/2025/34-102298-dp.pdf at Ex. A.

[12] Claimants must "include [their] supporting documentation with the submission" and claims "postmarked after Claims Bar Date of July 26, 2025 may not be accepted." https://www.broogeenergyfairfund.com/File-a-Claim.

13

identical relief the Fair Fund provides, filed after the opportunity to claim that relief has closed, should address why the existing remedy is inadequate. *See St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989) (in response to factual attack on subject matter jurisdiction, plaintiff must present affidavits or other evidence to satisfy its burden). The most plausible inference from Bluefin's silence is that it did not qualify for Fair Fund compensation – because as its own documents show, it generated a $281,379.85 profit on common stock. The Fair Fund requires "net trading losses."

Bluefin argues class damages "far exceed" the Fair Fund. ECF 144 at 25. To establish standing, Bluefin must demonstrate that *it* suffered an injury and that *its* injury is redressable by the Court. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) (plaintiff who represents class must show personal injury, "not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent") (internal quotations omitted). Speculation that $5.2 million might not be enough for everyone does not establish that Bluefin has an unredressed injury. Bluefin further argues the Fair Fund's offset provision, which reduces distributions by compensation received from sources such as a class action settlement, removes any risk of double recovery. ECF 144 at 26. If anything, this provision confirms the Fair Fund exists to make investors whole, and its structure is designed to ensure investors receive full compensation without a windfall. In any event, the offset operates prospectively, reducing distributions by any recovery that "was" received from another source. *Id.*

Bluefin contends that Brooge "agreed to waive" arguments against offsets, pointing to language in which Brooge agreed not to argue entitlement to "offset or reduction of any award of compensatory damages by the amount of any part of their payment of a civil penalty in this action." ECF 144 at 26. But this language attempts to prevent a defendant from, at the damages stage, reducing its damages liability dollar-for-dollar by what it paid into the Fair Fund. Defendants make no such argument. Instead, Defendants contend that, if the Fair Fund fully compensated Bluefin for its "net trading losses" in common stock, Bluefin lacks Article III standing because it has no

injury to redress and the relief it requests is also moot. A plaintiff that already received full compensation for the alleged harm–or that suffered no loss in the first place–can no longer invoke federal jurisdiction and parties cannot confer subject matter jurisdiction by contract or consent. *See Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("no action of the parties can confer subject-matter jurisdiction upon a federal court").[13] Bluefin also argues that it needs discovery to "fully assess its losses." ECF 144 at 27. To the extent Bluefin does not know whether it suffered an uncompensated loss, that is an extraordinary concession. If it does not know whether it suffered a loss, it cannot carry its burden to establish Article III standing. To the extent Bluefin suggests it needs discovery to calculate its alleged damages, jurisdiction does not turn on the quantification of the injury but whether it has suffered injury at all and, if so, whether it is redressable by the Court.

## H.    Bluefin Fails To Plead Scienter Or Falsity

*Ditchburn*. Ditchburn joined in December 2022, nearly two years after the 2018-2020 period when the alleged revenue recognition issues occurred. ECF 114 at ¶¶ 22, 62. Under Ditchburn's tenure, Brooge filed restated financials in April 2023 that explicitly reversed approximately $74 million in revenue from BIA. ¶ 124. Bluefin complains Ditchburn attributed the reversal to "insufficient documentation" rather than "fake invoices" (¶¶124, 155) but for a new CFO reviewing legacy transactions, "insufficient documentation" is a factually accurate and prudent accounting description that was also simply paraphrasing the same statement in the 20-F. ¶¶ 124, 155; ECF 144 at 30. Bluefin cites no law for the proposition that an incoming CFO must contradict the company's SEC filings during earnings calls. *See In re SunPower Corp. Sec. Litig.*, 769 F. Supp. 3d 1042, 1057-58 (N.D. Cal. 2025) (statements that officers were "working diligently" to restate financials not actionable and officers had no duty to disclose disagreements with auditor or ongoing SEC investigation). Nor does Bluefin plead any

---

[13] Bluefin cites *Rosemere Neighborhood Ass'n v. U.S. Env't Prot. Agency*, 581 F.3d 1169 (9th Cir. 2009) to argue that Defendants bear a "heavy burden" to establish mootness but that standard applies to voluntary cessation scenarios.

Case No. 2:24-cv-00959-AH-DFM
DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

facts showing that, even assuming the 20-F was false, Ditchburn **knew it was false** when he paraphrased it. Relatedly, Bluefin pleads no particularized facts showing Ditchburn participated in, knew of, or concealed any of the alleged revenue recognition issues over which it sues. Instead, Bluefin argues that because Ditchburn was CFO of a "small company," he "had access" to information and therefore must have assisted in a "cover[-]up." ECF 144 at 33. This is the core operations inference rejected in *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008). And notably, even after the SEC's investigation concluded, in the Administrative Order Brooge, Paardenkooper and Saheb do state they were aware of any purported revenue recognition issues; accordingly it is unclear why Bluefin believes a newly onboarded CFO would be. As to the PwC letter, if a **public letter** put Ditchburn on notice while working as CFO, that undermines scienter because it means he could not have possibly known from his actual job. And if it did somehow put him on notice, his actions in overseeing the restatement were exactly what an innocent CFO would do. Finally, Bluefin identifies no false statement Ditchburn made, no document he signed that was misleading and no conduct furthering any alleged revenue misclassification.

*Yammout*. The SAC contains no specific facts linking Yammout to the creation of improper invoices or the BIA reimbursement. Far from covering up alleged revenue recognition issues, the SAC alleges that Yammout was candid about the Company's liquidity concerns. In the April 9, 2020 Audit Committee meeting, Yammout allegedly stated that the Company had "elected not to pay" its contractual loan repayments and explained that it was being diverted to other liabilities such as IPO expenses. ¶ 244. These are fully consistent with a CFO managing a cash crunch, not someone engaged in concealing supposed accounting irregularities. The SAC also alleges that Brooge's auditors believed the finance team led by Yammout "[did] not have the expertise to handle public Company accounting," that the 2019 audit was delayed because Yammout was "unavailable[] … due to investor roadshow commitments," and the finance team was "not ready with the required details." ¶ 230. These allegations support

the non-culpable inference that Yammout was overwhelmed by roadshows and other demands, not secretly masterminding a conspiracy to improperly book revenue. Bluefin also identifies no correspondence or document wherein Yammout directs the supposed fabrication of invoices or reimbursement of BIA.

*Masood.* Bluefin sensationalizes a single email chain in which Masood expresses confusion that a transfer is "not making any sense," escalates the matter to the CEO, drafts a response explaining the circumstances, documents the remedial measures taken, and ensures the matter is sent to external auditors. Most significantly, the SAC alleges the issue was then briefed to the Audit Committee at a meeting attended by PwC's engagement partner. This reflects a CFO working through governance channels to address an auditor inquiry. Unable to plead particularized facts, plaintiff falls back on the assertion that the stronger inference is Masood would be aware of the "true facts." But *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) requires a "strong inference" of scienter based on particularized facts, not generalized assumptions about what a CFO would have known. *Id.* 322-24.

*Brooge.* Bluefin argues its "independent investigation" confirmed the Administrative Order by locating an alleged email where Pardenkooper "instructed employees to create fake invoices." ECF 144 at 27. But the alleged email instructs staff to "prepare" a "separate invoice to…Coral for auditing purposes." ¶ 73. Nowhere does it instruct anyone to fabricate data. The allegations of rate and volume manipulation are not in the email but instead in paragraph 75 of the SAC, which Bluefin admits "mirrors the conduct" described in the Administrative Order. ¶¶ 75-76. While the SAC references other alleged internal documents, none support a strong inference of fraudulent intent. The emails (¶¶ 73, 201) describe administrative billing requests and questions over "erroneous" transfers. The minutes (¶¶ 194, 245) reflect debate between auditors and the board regarding diligence issues, material weaknesses and compliance. The bank statements (¶¶ 88, 212) show the company was receiving funds from BIA and Sahara, reflecting at most revenue classification issues, not that the business was a sham.

Dated:  January 14, 2026

Respectfully submitted,

By: */s/ Perrie M. Weiner*
Perrie M. Weiner
**BAKER & MCKENZIE LLP**

Attorneys for Defendants
BROOGE ENERGY LIMITED,
SALEH YAMMOUT, MASOOD ALI
SYED, AND PAUL DITCHBURN

18

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants Brooge Energy Limited, Saleh Yammout, Masood Ali Syed, and Paul Ditchburn certifies that this Reply Brief is 17 pages in length and complies with the 17-page limit of this Court's Order to Exceed Page Limits for Defendants' Reply Memorandum to Motion to Dismiss dated November 3, 2025, docketed in this action as ECF 130.

Dated:  January 14, 2026                          /s/ Benjamin W. Turner
                                                  Benjamin W. Turner

Case No. 2:24-cv-00959-AH-DFM
DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT