# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
ANVIL TRUST, STEPHEN CANNON,
BRYANT EDWARDS and NEIL
RICHARDSON,

                       Plaintiffs,                      24-cv-9731 (PKC)

          -against-                     <u>OPINION AND ORDER</u>

ERNST & YOUNG, ERNST & YOUNG
MIDDLE EAST, ERNST & YOUNG MIDDLE
EAST (ABU DHABI BRANCH) and ANTHONY
O'SULLIVAN,

                       Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

Plaintiffs acquired shares in non-party Brooge Petroleum and Gas Investment Company FZE ("Brooge") in a transaction made through a Special Purpose Acquisition Company ("SPAC"). Their Amended Complaint (the "Complaint" or "Compl't") asserts that Brooge's share price was artificially inflated due to material misstatements and omissions made by Brooge's independent auditors, defendant Ernst & Young. Plaintiffs bring two claims under section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. 15 U.S.C. §78j(b); 17 C.F.R. § 240.10b-5. They separately bring a claim of common law fraud.

Defendants are Ernst & Young, Ernst & Young Middle East, Ernst & Young Middle East (Abu Dhabi Branch) and Anthony O'Sullivan (collectively, "Ernst & Young"). The Complaint asserts that Ernst & Young either knew, or recklessly failed to know, that Brooge had a years-long practice of recording sham payments from an affiliated entity as if they were outside revenues from legitimate clients. Brooge allegedly engaged in this practice in order to make the

company more attractive to outside investors like plaintiffs. Plaintiffs assert that, among other things, they relied upon audit opinions by Ernst & Young, which concluded that Brooge's financial statements were accurate in all material respects.

Ernst & Young moves to dismiss the Complaint pursuant to Rules 12(b)(6) and 9(b), Fed. R. Civ. P. As will be discussed, nearly all of plaintiffs' claims are time-barred under the Exchange's Act's statute of repose because they are premised on allegedly culpable acts or omissions that occurred more than five years before the initial complaint was filed. 28 U.S.C. § 1658(b)(2); SRM Global Master Fund Ltd. Partnership v. Bear Stearns Companies L.L.C., 829 F.3d 173, 176-77 (2d Cir. 2016). The Rule 10b-5(b) claim of plaintiff Bryan Edwards includes certain statements that are not time-barred by the statute of repose, but his claim directed to those statements will be dismissed because the Complaint does not allege with particularity why those statements were fraudulent or include facts sufficient to allege scienter with the particularity required by Rule 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). The Court will decline to exercise supplemental jurisdiction over the common law fraud claim asserted in Count Three.

Accordingly, Ernst & Young's motion to dismiss will be granted, and the Complaint will be dismissed.

BACKGROUND.

A.  Overview of the Transaction.

A SPAC is a publicly-traded shell company that raises money through an initial public offering and exists for the purpose of acquiring a private company and taking it public without the traditional IPO process. (Compl't ¶ 20.) Plaintiffs Neil Richardson, Bryant Eddwards and Stephen Cannon formed an investment company and a limited liability company

("LLC") sponsor, respectively named SPAC Twelve Seas Investment Co. ("Twelve Seas") and Twelve Seas Sponsor I LLC. (Compl't ¶ 23.) Plaintiff Anvil Trust purchased its shares directly from Twelve Seas. (Compl't ¶ 24.)

Non-party Brooge was incorporated in the United Arab Emirates for the purpose of providing oil storage, heating and blending services. (Compl't ¶ 31.) In 2018 and 2021, it completed projects in the United Arab Emirates for the construction of large oil-storage tanks, and claimed that it had entered into agreements with two Singapore firms, which the Court will abbreviate as "Coral" and "Gunvor," for exclusive leases of the full capacity of those storage tanks. (Compl't ¶¶ 32-34.)

Brooge considered holding an IPO on the London Stock Exchange but instead entered into negotiations with Twelve Seas about a potential SPAC transaction. (Compl't ¶ 25.) Twelve Seas and Brooge entered into a merger agreement for an anticipated SPAC merger, with the resulting company listed on NASDAQ under the symbol "BROG." (Compl't ¶¶ 26-27.)

The transaction closed on December 19, 2019, and resulted in Twelve Seas shareholders receiving publicly-listed shares of the new combined company. (Compl't ¶ 29.) Plaintiffs Anvil Trust, Stephen Cannon and Neil Richardson acquired all of their Brooge shares through the December 19, 2019 SPAC transaction. (Compl't ¶¶ 7-8, 10.) Plaintiff Bryant Edwards also acquired Brooge shares through the SPAC transaction, as well as through later purchases of NASDAQ-traded Brooge securities. (Compl't ¶ 9.)

B. Brooge's Allegedly Fraudulent Conduct.

The Complaint asserts that Brooge's arrangements with Coral and Gunvor were shams, and that Brooge never received a payment from either firm. (Compl't ¶ 35.) To create the false appearance of revenue and to deceive lenders and investors, Brooge allegedly engaged

- 3 -

in "a classic 'round-tripping' scheme" in which two affiliated entities exchanged the same assets back and forth instead of conducting legitimate transactions. (Compl't ¶ 36.)

To carry out this scheme, Brooge created an affiliated entity that the Court will abbreviate as "BIA," which acted as an intermediary between Brooge and its purported customers. (Compl't ¶ 37.) BIA made payments to Brooge, ostensibly as a conduit for payments by legitimate customers, and Brooge secretly returned those funds back to BIA through handwritten paper checks. (Compl't ¶ 38.) Brooge fraudulently recorded payments from BIA as customer revenue. (Compl't ¶ 38.)

According to the Complaint, however, neither Coral nor Gunvor actually stored any oil with Brooge or made any payment to Brooge. (Compl't ¶¶ 35, 45.) In December 2017, Brooge supposedly entered into an agreement with Coral, a Singapore-based oil-trading firm, to lease Brooge's storage capacity for a fixed monthly storage fee and additional fees for ancillary services. (Compl't ¶ 33.) In June 2018, Brooge purportedly entered into a similar agreement with Gunvor, a Singapore-based commodities-trading firm. (Compl't ¶ 34.) No such agreements actually existed, however, and instead, Brooge provided more limited services to other oil and gas firms at significantly lower rates. (Compl't ¶ 46.)

According to the Complaint, Brooge orchestrated these sham arrangements to create an illusion of significant revenue in anticipation of holding an IPO on the London Stock Exchange. (Compl't ¶¶ 35-36.) But then, when it elected to go the SPAC route, it touted its falsely inflated revenues to investors in United States roadshows, thus supporting a higher share price. (Compl't ¶ 42.)

- 4 -

    C.  Ernst & Young's Work as Brooge's Independent Auditor.

    1.  Brooge's Retention of Ernst & Young.

In preparation for the contemplated IPO, Brooge retained Ernst & Young in 2018 to audit its financial statements for 2015, 2016, 2017 and the first half of 2018. (Compl't ¶ 53.) Ernst & Young completed that audit in early 2019. (Compl't ¶ 55.) The Complaint asserts that this audit materially misstated Brooge's financial condition, and that Ernst & Young either knew or recklessly failed to know that Brooge did not receive revenue from Coral during this period. (Compl't ¶ 56.)

In anticipation of the SPAC transaction, Brooge again retained Ernst & Young to audit its financial statements for 2017, 2018 and part of 2019. (Compl't ¶ 57.) Its audit reports were disclosed to plaintiffs, who relied on the reports. (Compl't ¶ 58.) Ernst & Young allegedly understood that the SPAC transaction could not be consummated without an audit that met the standards of the Public Company Accounting Oversight Board ("PCAOB"). (Compl't ¶ 59.)

    2.  Ernst & Young's Allegedly Actionable Misstatements
and Omissions Preceding the SPAC Transaction.

The Complaint asserts that Ernst & Young either knew of, or recklessly failed to know, material deficiencies and indicia of fraud when conducting its Brooge audits. They include a failure to verify 191 invoices that Brooge prepared for Coral between 2017 and 2019, ignoring that a payment owed by Coral had instead been made by BIA, and ignoring that between $23 million and $31 million circulated between BIA and Brooge despite the absence of a contractual relationship between the two companies. (Compl't ¶¶ 63-79.) Plaintiffs assert that on June 14, 2019, Ernst & Young also approved an investor presentation to be used in connection with SPAC road shows, which falsely inflated Brooge revenues and misrepresented the existence of agreements to utilize its full oil-storage capacities. (Compl't ¶ 94.)

- 5 -

The Complaint pinpoints alleged material misstatements and omissions made by Ernst & Young in September and October, 2019.

On September 27, 2019, Ernst & Young issued an "unqualified" audit opinion covering Brooge's financial statements for 2017 and 2018.  (Compl't ¶ 116.)  Ernst & Young transmitted the opinion to Brooge with the intention that it would be sent to plaintiffs.  (Compl't ¶ 117.)  Plaintiffs assert that the audit opinion falsely stated that the Ernst & Young audit complied with PCAOB standards, that Ernst & Young "believe[d]" its audits provided a reasonable basis for its opinions and that Brooge's financial statements "present fairly, in all material respects, the financial position of the Company as of 31 December 2018 and 2017 . . . ." (Compl't ¶ 118.)  Also on September 27, 2019, Brooge filed its financial statements with the SEC, stating that in 2018 the company had $35,849,298 in revenue, a figure that Ernst & Young allegedly knew to be materially false.  (Compl't ¶¶ 121-22.)

On October 8 and 25, 2019, Ernst & Young allegedly approved two investor presentations by Brooge that were to be filed with the SEC.  (Compl't ¶ 124.)  Plaintiffs assert that the presentation materially inflated Brooge's revenues and misrepresented that it had contracts providing for the use of 100% of its storage capacity.  (Compl't ¶ 124.)

Plaintiffs assert that on December 19, 2019, Twelve Seas approved the SPAC transaction with Brooge, in reliance on Ernst & Young's statements about the company's financial condition.  (Compl't ¶ 125.)

3.  Ernst & Young's Allegedly Actionable Misstatements
    and Omissions Following the SPAC Transaction.

The Complaint asserts that on June 30, 2020, Ernst & Young made additional material misstatements and omissions concerning Brooge's financial statements.  (Compl't ¶¶

126-37.)  Among the plaintiffs, only Bryant Edwards asserts that he purchased Brooge shares after these statements were made. (Compl't ¶ 9)

On June 30, 2020, Ernst & Young completed an audit opinion covering Brooge's fiscal year for 2019.  (Compl't ¶ 128.)  It "essentially repeated" the prior year's audit opinion.  (Compl't ¶ 129.)  The Complaint asserts that this audit opinion falsely stated that the audit complied with PCAOB standards, that Ernst & Young "believe[d]" its audits provided a reasonable basis for its opinions and that Brooge's financial statements "present fairly, in all material respects, the financial position of the Company as of 31 December 2019 . . . ."  (Compl't ¶ 130.)

As will be discussed below, Ernst & Young issued this audit opinion after internal discussions about a "fraud risk" presented in Brooge's accounts and shortly before it began to consider resigning as Brooge's auditors.  (Compl't ¶¶ 126, 128.)

### 4.   The "Scheme Liability" Claim Against Ernst & Young.

In addition to asserting that Ernst & Young made material misstatements and omissions that inflated Brooge's share price, plaintiffs also bring a claim of so-called "scheme liability" under Rule 10b-5(a) and (c).

The scheme liability claim turns on Ernst & Young's role in what plaintiffs describe as a "fraudulent novation agreement" involving Coral, Gunvor and BIA.  (Compl't ¶¶ 80-105.)  In anticipation of the SPAC transaction, Brooge allegedly needed to conceal that it had overstated its revenues and that it never received any actual payments from Coral or Gunvor.  (Compl't ¶ 105.)

Beginning in April 2019, a non-party Brooge executive named Lina Saheb began to tell plaintiffs that there was "concern" about publicly disclosing the identity of Coral.

(Compl't ¶ 81.)  In a phone call of April 29, 2019, Saheb told plaintiff Cannon that Brooge needed to conceal from the public the identities of Coral and Gunvor in order to protect Brooge's pricing data from competitors, explaining that they should not be named in SEC filings. (Compl't ¶ 82.)  At the time, plaintiffs were also awaiting Ernst & Young's audit opinion in advance of the proposed SPAC merger.  (Compl't ¶ 83.)

In a phone call of May 23, 2019, Saheb told plaintiff Cannon that Brooge was considering the idea of restructuring its contracts with Coral and Gunvor to insert BIA as an intermediary in order to shield the identities of Coral and Gunvor from public disclosure (the "Novation"), and that she had discussed the possibility with Ernst & Young.  (Compl't ¶ 86.)  On that same call, defendant O'Sullivan of Ernst & Young told plaintiff Cannon that Ernst & Young had completed the audit of Brooge's 2018 financial statements, but that the audit was delayed due to "confidential treatment requests" to protect the identities of Coral and Gunvor.  (Compl't ¶ 86.)

In a later meeting that same day, plaintiff Cannon told Saheb that he was worried that the proposed Novation would further delay the Brooge audit.  (Compl't ¶ 87.)  Saheb then called defendant O'Sullivan over a speaker phone, and he told Cannon that Ernst & Young "would assist Brooge to ensure that the novation structure is done correctly and accomplishes the desired outcome, without delay."  (Compl't ¶ 87.)

In a call of June 3, 2019, defendant O'Sullivan told plaintiff Cannon that Ernst & Young's audit was also being delayed by an "auditor independence" analysis.  (Compl't ¶ 90.) Plaintiffs assert that defendants falsely blamed that auditor-independence review for the delay in disclosing audit results, when, in reality, the delay was due to Ernst & Young's work to conceal that Brooge had no verifiable income from Coral and Gunvor.  (Compl't ¶¶ 99-100.)

On or about August 1, 2019, Brooge and BIA entered into "a fraudulent 'deed of novation'" that seemingly replaced Brooge's purported contracts with Coral and Gunvor with the contractual obligations of BIA. (Compl't ¶ 104.) The Complaint asserts that the Novation was fraudulent because it allowed Ernst & Young to "explain away" BIA revenue and conceal that Brooge never received payment from Gunvor or Coral, thus allowing Brooge to overstate its revenue to plaintiffs. (Compl't ¶ 105.)

D. Subsequent Developments.

In October 2020, Ernst & Young resigned as Brooge's auditors, citing "material weaknesses in the Company's internal control over financial reporting." (Compl't ¶ 133.) However, in April 2021, Ernst & Young, at the request of Brooge, signed a letter reaffirming Brooge's financial statements for 2018 and 2019. (Compl't ¶¶ 135-37.)

PwC took over as Brooge's auditor and issued a clean audit opinion for fiscal year 2020. (Compl't ¶ 134.) Then, in August 2022, Brooge stated in an SEC filing that its previously audited financial statements for 2020, 2019, 2018 and the first six months of 2021 "should no longer be relied upon." (Compl't ¶ 138.) Brooge's CEO resigned in December 2022. (Compl't ¶ 139.) PwC resigned as Brooge's auditor in January 2023, stating that it had learned of "illegal acts" that "will have a material effect on the financial statements of the Company . . . ." (Compl't ¶ 140.)

In April 2023, Brooge's new auditor, Affiniax AAS, made downward revisions to Brooge's historical revenue. (Compl't ¶ 141.) Brooge's revenue for 2018 was restated to $6,387,348 from the original $35,839,268; for 2019, to $15,885,219, from the original $44,085,374; and for 2020, to $27,191,176, from the original $41,831,537. (Compl't ¶ 141.)

On December 22, 2023, Brooge announced that it had reached a settlement with the SEC related to "fraudulent accounting" and would pay a $5 million civil penalty.  (Compl't ¶ 142.)  In the next two trading days, Brooge's share price dropped a total of 17.66%, from $3.34 per share to $2.75 per share.  (Compl't ¶ 144.)

RULE 12(b)(6) STANDARD.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth.  Iqbal, 556 U.S. at 678. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679.  "Dismissal under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'"  Michael Grecco Productions, Inc. v. RADesign, Inc., 112 F.4th 144, 150 (2d Cir. 2024) (quoting Sewell v. Bernardin, 795 F.3d 337, 339 (2d Cir. 2015)).  In reviewing a Rule 12(b)(6) motion, the Court assumes all factual allegations in the complaint to be true and draws all reasonable inferences in favor of the non-moving party.  Peretti v. Authentic Brands Group LLC, 33 F.4th 131, 137 (2d Cir. 2022).

The issue of whether a claim is time-barred by a statute of repose is properly adjudicated on a Rule 12(b)(6) motion.  See, e.g., Moreira v. Societe Generale, S.A., 125 F.4th 371, 388 (2d Cir. 2025); see also Thea v. Kleinhandler, 807 F.3d 492, 501 (2d Cir. 2015) ("a

statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint.") (quotation marks omitted).

In addition, "[a] complaint alleging securities fraud must also satisfy heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the [PSLRA]." Set Capital LLC v. Credit Suisse Grp. AG, 996 F.3d 64, 75 (2d Cir. 2021). The Court will discuss the heightened pleading requirements of Rule 9(b) and the PSLRA in greater detail in its analysis of plaintiff Edwards's claim directed to the June 2020 audit opinion.

DISCUSSION.

I.      Plaintiffs' Claims Arising from Brooge Shares Acquired on December 19, 2019 Are Barred by the Statute of Repose.

A. The Alleged Material Misstatements Made Prior to the SPAC Transaction Are Time-Barred Under the Statute of Repose.

Count Two, which is brought under Rule 10b-5(b), asserts that plaintiffs acquired Brooge shares at artificially inflated prices caused by Ernst & Young's material misstatements about Brooge's financial condition. (Compl't ¶¶ 153-59.) Because the Rule 10b-5(b) claims of Anvil Trust, Cannon and Richardson are premised on culpable acts or omissions that occurred prior to December 17, 2019, they are time-barred by the statute of repose that governs section 10(b). Plaintiff Edwards's Rule 10b-5(b) claim directed toward these statements will also be dismissed.

A section 10(b) claim is subject to a five-year statute of repose. 28 U.S.C. § 1658(b)(2); SRM, 829 F.3d at 176-77. "'[S]tatutes of repose are enacted to give more explicit and certain protection to defendants,' and thus run from 'the date of the last culpable act or omission of the defendant.'" Williams v. Binance, 96 F.4th 129, 142 (2d Cir. 2024) (quoting California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc., 582 U.S. 497, 505 (2017)); see also

- 11 -

CTS Corp. v. Waldburger, 573 U.S. 1, 8 (2014) ("A statute of repose . . . puts an outer limit on the right to bring a civil action.  That limit is measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant.").

"Unlike a statute of limitations, a statute of repose is not a limitation of a plaintiff's remedy, but rather defines the right involved in terms of the time allowed to bring suit."  P. Stolz Family Partnership L.P. v. Daum, 355 F.3d 92, 102 (2d Cir. 2004).  "[A] statute of repose begins to run without interruption once the necessary triggering event has occurred, even if equitable considerations would warrant tolling or even if the plaintiff has not yet, or could not yet have, discovered that she has a cause of action."  Id. at 102-03.  "[A] repose period can run to completion even before injury has occurred to a potential plaintiff, extinguishing a cause of action before it even accrues."  Id. at 103.  In short, section 1658(b)(2) "creates a substantive right in defendants to be free from liability after five years . . . ."  SRM, 829 F.3d at 177 (emphasis in original).

Plaintiffs filed the initial complaint in this action on December 17, 2024.  (ECF 1.)  Thus, for their section 10(b) claims to be timely, they must be based upon a "culpable act or omission" that took place no later than December 17, 2019.  Williams, 96 F.4th at 142; SRM, 829 F.3d at 176-77 (dismissing section 10(b) and Rule 10b-5 claim where plaintiff "fail[ed] to allege that the defendants made any misrepresentations within five years of filing [the] complaint . . . .").

Plaintiffs assert that they relied upon audit reports completed in "early 2019" covering Brooge's financial statements of 2015 through mid-2018.  (Compl't ¶¶ 55-58.)  They also relied upon the audit opinion of September 27, 2019 covering Brooge's financial statements

of 2017 and 2018, and the two investor presentations that Ernst & Young approved on October 8 and 25, 2019.  (Compl't ¶¶ 116, 124.)

Plaintiffs acquired their Brooge shares through the SPAC Merger of December 19, 2019.  (Compl't ¶¶ 5, 7-10.)  They allegedly did so in reliance on statements that were made before December 17, 2019.  Because all culpable acts or omissions relied upon by plaintiffs occurred more than five years before the Complaint was filed, the Court concludes that their claims are time-barred.  28 U.S.C. § 1658(b)(2); Williams, 96 F.4th at 142.

In an attempt to salvage their claims, plaintiffs urge that rather than looking to the date of the defendants' last culpable act or omission, the statute of repose ran from the December 19, 2019 date that they acquired shares in the SPAC.  They cite Arnold v. KPMG, LLP, 334 Fed. App'x 349, 351 (2d Cir. 2009) (summary order), which stated that the "statute of repose in federal securities law claims 'starts to run on the date the parties have committed themselves to complete the purchase or sale transaction.'"  Id. (quoting Grondahl v. Merritt & Harris, Inc., 964 F.2d 1290, 1294 (2d Cir. 1992)).

But Arnold pre-dates the Second Circuit's decision in Williams, 96 F.4th at 142, and the Supreme Court's decision in CTS, 573 U.S. at 8, which instruct that the statute of repose runs from the date of the last culpable statement or omission.  Both the Second Circuit and courts in this District have more recently determined a claim's timeliness based on the date of defendant's alleged misstatement or omission.  See, e.g., SRM, 829 F.3d at 177 (affirming dismissal of section 10(b) claim where the complaint did not identify "any misrepresentations within five years" of filing); In re Veon Sec. Litig., 2024 WL 4362728, at *5 (S.D.N.Y. Sept. 30, 2024) ("Significantly, the clock begins running from the date of each alleged misstatement, and is not subject to equitable tolling.") (Carter, J.) (internal citation, quotation marks and emphasis

- 13 -

omitted); <u>Fogel v. Wal-Mart de Mexico SAB de CV</u>, 2017 WL 751155, at *8 n. 11 (S.D.N.Y. Feb. 27, 2017) ("[I]n the years since <u>Arnold</u>, the Second Circuit has made plain its belief that it is the date of the misrepresentation, not the transaction, that matters for purposes of the Sarbanes-Oxley statute of repose.") (Failla, J.).[1]

The Court respectfully disagrees with decisions that have continued to rely on <u>Arnold</u> and measure the statute of repose from the date of the purchase or sale of a security. <u>See</u>, <u>e.g.</u>, <u>Felice v. Westpark Capital, Inc.</u>, 2024 WL 4349482, at *5 (S.D.N.Y. Sept. 30, 2024); <u>Langhamer v. Johnson</u>, 2023 WL 6691017, at *10 (S.D.N.Y. Oct. 12, 2023); <u>Seagrape Invs. LLC v. Tuzman</u>, 2020 WL 5751232, at *14 (S.D.N.Y. Sept. 25, 2020). None of those decisions cited <u>Williams</u> or <u>CTS</u>, and it is not always apparent whether the parties raised the issue of what event triggers the running of the statute of repose. Moreover, "statutes of repose are enacted to give more explicit and certain protection to defendants" and "'effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time.'" <u>California Pub. Employees' Ret. Sys.</u>, 582 U.S. at 505 (quoting <u>CTS</u>, 573 U.S. at 9); <u>SRM</u>, 829 F.3d at 177 (section 1658(b)(2) "creates a <u>substantive</u> right in defendants to be free from liability after five years . . . .") (emphasis in original). Measuring the statute of repose from the date of a defendant's last culpable act or omission is consistent with that purpose because it anchors the analysis in the defendant's conduct, as opposed to the plaintiff's action in buying or selling a security.

Accepting the truth of the Complaint's allegations, the Rule 10b-5(b) claims of Anvil Trust, Stephen Cannon and Neil Richardson are premised on the alleged culpable acts or

---

[1]As the late Judge Sweet observed, "<u>Arnold</u> is an unpublished summary order, and therefore does not constitute binding precedent." <u>Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. & Inv. Bank</u>, 924 F. Supp. 2d 528, 537 (S.D.N.Y. 2013) (citing Local Rules of the Second Circuit § 32.1.1).

omission of Ernst & Young that took place prior to December 17, 2019, and are therefore time-barred.  28 U.S.C. § 1658(b)(2).  To the extent that plaintiff Bryant Edwards's Rule 10b-5(b) claim is also directed to these statements, that portion of his claim is also dismissed.

        B.  Plaintiffs' Scheme Liability Claim Is Also
           Time-Barred by the Statute of Repose.

The claim of so-called "scheme liability" asserted in Count One is also based on culpable acts or omissions that are alleged to have taken place prior to December 17, 2019.  Accordingly, that claim also will be dismissed as time-barred under the statute of repose.[2]

Rule 10b-5(a) and 10b-5(c) make it unlawful for any person "[t]o employ any device, scheme, or artifice to defraud" or engage in any act, practice or course of business that operates as a fraud or deceit.  17 C.F.R. § 240.10b-5(a) and (c).  "To state a scheme liability claim, a plaintiff must show: (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."  Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 105 (2d Cir. 2021) (quotation marks omitted).  "Because scheme claims sound in fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)."  Id.  "To maintain a 10b-5(a) or (c) claim, a plaintiff must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue."  Id. (quotation marks omitted).  The plaintiff must "articulate with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it."  Id.

---

[2] For the purposes of this analysis, the Court assumes without deciding that the Complaint has alleged the existence of a scheme with the required particularity, and that these allegations do not merely repackage material misstatements and omissions as a scheme.  See, e.g., S.E.C. v. Rio Tinto plc, 41 F.4th 47, 49 (2d Cir. 2022) ("[M]isstatements and omissions can form part of a scheme liability claim, but an actionable scheme liability claim also requires something beyond misstatements and omissions, such as dissemination.") (emphasis in original).

As already discussed, the scheme liability claim asserted in Count One turns entirely on events and conversations that occurred between April and August 2019, including phone calls and meetings involving plaintiff Cannon, defendant O'Sullivan and non-party Brooge executive Saheb, as well as the alleged fraudulent novation of August 2019.  (Compl't ¶¶ 81-83, 86-87, 90, 99-100, 104-05.)  The Complaint does not identify a culpable act or omission within five years of the Complaint's filing.

Plaintiffs' opposition memo argues that defendants' "'scheme' was defrauding investors into purchasing securities at a grossly inflated price," and that this scheme completed with the close of the SPAC merger on December 19, 2019.  (Opp. Mem. at 5.)  That argument suffers from the same defect as plaintiffs' Rule 10b-5(b) claim because it relies upon the date that plaintiffs purchased their securities, as opposed to the date of defendants' culpable acts or omissions.  See Fogel, 2017 WL 751155, at *17 (dismissing scheme liability claim as untimely because "[c]learly, any claim arising from this scheme would be barred by the Sarbanes-Oxley statute of repose.").  Moreover, plaintiffs' broad description of the scheme's ongoing and open-ended quality is similar to describing it as a continuing violation, even though plaintiffs refrain from using that phrase.  The continuing violations doctrine is a form of equitable tolling that does not apply to a statute of repose.  Kuwait Investments Office v. AIG, Inc., 128 F. Supp. 3d 792, 808 (S.D.N.Y. 2015) ("[T]he expansion of 'violation' to include a series of misstatements and omissions would almost certainly require the operation of equitable considerations – the kind foreclosed by the reasoning in IndyMac with respect to statutes of repose.  The continuing violations doctrine has been recognized by courts as an equitable tolling doctrine.") (Swain, J.) (citing Police & Fire Ret. Syst. of Detroit v. IndyMac MBS, Inc., 721 F.3d 95 (2d Cir.2013)).

Because the claim of scheme liability does not identify a culpable act or omission that occurred later than December 17, 2019, it is time-barred under the Exchange Act's statute of repose, 28 U.S.C. § 1658(b)(2). Count One will therefore be dismissed.

II.     The Rule 10b-5(b) Claim of Bryant Edwards Directed to the June 2020 Audit Opinion Will Be Dismissed for Failure to Plead Fraud with Particularity.

        A.  The Presumption of Reliance Applies to the NASDAQ-Traded Brooge Shares Purchased by Edwards.

Unlike the other plaintiffs, plaintiff Bryant Edwards purchased Brooge securities after the SPAC merger of December 19, 2019. (Compl't ¶¶ 9, 24.) The Complaint asserts that on June 30, 2020, Ernst & Young issued its audit opinion about Brooge's financial statements for 2019. (Compl't ¶¶ 128, 130.) The audit opinion was publicly filed as an attachment to Brooge's Form 20-F filing for fiscal year 2019. (Compl't ¶ 128.) Edwards thereafter bought NASDAQ-traded Brooge shares on July 31, 2020, August 31, 2020 and October 31, 2020. (Compl't ¶ 9.) The June 30, 2020 audit opinion was issued within five years of the Complaint's filing and Edwards's claim based on its content is not time-barred by the statute of repose.

Ernst & Young urges that Edwards's claim should be dismissed because the Complaint does not allege that he personally relied upon the June 2020 audit opinion when he later purchased shares. The Complaint does not expressly invoke the fraud-on-the-market presumption or assert that Brooge shares traded in an efficient market.

"Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action." Basic Inc. v. Levinson, 485 U.S. 224, 247 (1988). "[A] plaintiff must make the following showings to demonstrate that the presumption of reliance applies in a given case: (1) that the alleged misrepresentations were publicly known, (2) that they were material, (3)

that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 268 (2014).

The Complaint asserts that after the SPAC merger, Brooge shares traded on NASDAQ and that Edwards purchased NASDAQ-traded Brooge securities. (Compl't ¶¶ 9, 26.) "[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency." In re Shanda Games Ltd. Sec. Litigation, 2019 WL 11027710, at *9 (S.D.N.Y. Sept. 30, 2019) (Carter, J.) (quotation marks omitted); see also Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc., 2006 WL 2161887, at *8 (S.D.N.Y. Aug. 1, 2006) ("If, for example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient.") (Scheindlin, J.).[3]

On this Rule 12(b)(6) motion, where every reasonable inference is drawn in favor of the plaintiff, the Court concludes that because Edwards purchased NASDAQ-traded shares on July 31, 2020, August 31, 2020 and October 31, 2020, those shares traded in an efficient market, and the presumption of reliance applies to those transactions.

B.  The Complaint Does Not Allege With Particularity that the June 2020 Audit Opinion Contained a Fraudulent Misstatement.

Edwards's Rule 10b-5(b) claim directed to the alleged misstatements contained in the June 2020 audit opinion will be dismissed because the Complaint does not allege with particularity why these statements were fraudulent. As will be explained, these statements of opinions did not contain any implied facts or embedded facts, and the Complaint does not

---

[3] By contrast, shares acquired through an IPO or over-the-counter transactions are not presumed to trade in an efficient market. In re Shanda, 2019 WL 11027710, at *9; Handal v. Tenet Fintech Grp. Inc., 2023 WL 6214109, at *18 (E.D.N.Y. Sept. 25, 2023).

include facts alleging that these opinions were not sincerely held. See Omnicare, Inc. v. Laborers Dist. Council Construction Industry Pension Fund, 575 U.S. 175 (2015). Edwards's claim will therefore be dismissed.

Under Rule 10b-5(b), it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "[T]he PSLRA specifically requires a complaint to demonstrate that the defendant made '[m]isleading statements and omissions . . . of a material fact,' 15 U.S.C. § 78u-4(b)(1), and acted with the '[r]equired state of mind' (the 'scienter requirement'), id. § 78u-4(b)(2)." Employee Retirement System of Government of the Virgin Islands v. Blanford, 794 F.3d 297, 305 (2d Cir. 2015).

Rule 9(b) similarly states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." "To satisfy the pleading standard for a misleading statement or omission under Rule 9(b), a complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Emp. Ret. Sys. of Gov't of the Virgin Islands, 794 F.3d at 305 (quoting Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004)). "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).

"Although pleading standards are heightened for securities fraud claims, 'we must be careful not to mistake heightened pleading standards for impossible ones.'" Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co., 19 F.4th 145, 150 (2d Cir. 2021) (quoting In re Synchrony Fin. Sec. Litig., 988 F.3d 157, 161 (2d Cir. 2021)).  As with any other motion to dismiss, "'[i]n considering a motion to dismiss a 10(b) action, [courts] must accept all factual allegations in the complaint as true and must consider the complaint in its entirety.'"  Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010).

A statement of opinion can be actionable under section 10(b) if "the speaker subjectively disbelieved the statement," if "a statement of opinion contained one or more embedded factual statements that can be proven false," or if "a statement of opinion, without providing critical context, implied facts that can be proven false."  Abramson v. Newlink Genetics Corp., 965 F.3d 165, 175 (2d Cir. 2020) (citing Omnicare, 575 U.S. at 185, 188-90).

"Audit reports, labeled 'opinions' and involving considerable subjective judgment, are statements of opinion . . . ."  Querub v. Hong Kong, 649 Fed. App'x 55, 58 (2d Cir. 2016).  "[A]n auditor's statement that the auditor conducted an audit in conformity with [governing standards] cannot properly be characterized as a statement of fact given the general and often inherently subjective nature of the standards that make up significant parts of generally accepted auditing standards."  In re Lehman Bros. Sec. & ERISA Litig., 131 F. Supp. 3d 241, 251 n.44 (S.D.N.Y. 2015) (Kaplan, J.).  The Second Circuit, however, recently concluded that a plaintiff alleged that outsider auditors made an actionable misstatement in asserting that their work complied with PCAOB standards when plaintiffs alleged that partners on the audit did not complete necessary checks, signed audit papers without reviewing them, and did not verify that audit work was performed before issuing the opinion.  New England Carpenters Guaranteed

Annuity & Pension Funds v. DeCarlo, 122 F.4th 28, 52-53 (2d Cir. 2024).  Those allegations were supported by SEC findings.  See id.

The Complaint alleges that three statements in the June 2020 audit opinion contain "false and misleading statements of fact."  (Compl't ¶ 130.)

First, Ernst & Young stated that it "conducted [its] audits in accordance with the standards of the [Public Company Accounting Oversight Board] ('PCAOB')."  (Compl't ¶ 130.)  The complaint asserts that this statement was materially false and misleading because Ernst & Young knew or was reckless in not knowing that it did not audit Brooge's financial statements consistent with PCAOB standards.  (Compl't ¶ 130.)

The Complaint does not include facts that, if credited, allege that Ernst & Young made an actionable misrepresentation by stating that it conducted its audit consistent with PCAOB standards.  The statement does not contain an embedded or implied factual statement and the Complaint does not allege facts showing that the speaker subjectively disbelieved the statement.  Abramson, 965 F.3d at 175; see also In re Lehman Bros., 131 F. Supp. 3d at 251 n.44.  Unlike New England Carpenters, the Complaint does not include allegations about the failure of any Ernst & Young auditor to adequately review the audit.  122 F.4th at 52-53.  The assertion that Ernst & Young knew or recklessly failed to know that its audit failed to comply with PCAOB standards is conclusory.  Edwards's claim directed to this statement will be dismissed.

The second statement from the audit opinion cited by plaintiffs suffers from the same defects.  It asserted that Ernst & Young "believe[d]" that its audits provided "a reasonable basis" for its opinion.  The Complaint asserts that Ernst & Young knew or was reckless in not knowing that its audit did not provide a reasonable basis to issue a "clean" audit opinion of

Brooge's financials.  But this statement was expressly phrased as a belief and does not contain any embedded or implied factual statement, nor does the Complaint allege facts showing that Ernst & Young did not sincerely hold this opinion.  See Abramson, 965 F.3d at 175.  Edwards's claim directed to this statement will be dismissed.

In the third statement, Ernst & Young stated that "[i]n [its] opinion, the financial statements present[ed] fairly, in all material respects, the financial position of [Brooge] at 31 December 2019 and 2018, and the results of its operations and its cash flows for each of the two years in the period ended 31 December 2017, in conformity with International Financial Reporting Standards (IFRS)."  (Compl't ¶ 130.)  The Complaint asserts that Ernst & Young knew or was reckless in not knowing that Brooge's consolidated financial statements did not fairly represent the company's finances.  (Compl't ¶ 130.)

For this statement, the Complaint includes allegations that describe Ernst & Young's roughly contemporaneous concerns about the soundness of Brooge's financial statements and reporting.  At a meeting of April 9, 2020 to discuss finalizing its review of Brooge's financial statements for 2019, Ernst & Young reported that it had "identified a fraud risk related to the completeness of the owners' account."  (Compl't ¶ 126.)  This risk related to Brooge's payments to shareholders, and Ernst & Young observed that Brooge's qualification as a "Going Concern" was at risk because it used funds "to repay shareholder dues."  (Compl't ¶ 126.)  Plaintiffs assert that these payments to "shareholders" were, in fact, predominantly payments related to the fraudulent round-tripping scheme.  (Compl't ¶ 126.)  After the audit opinion was issued, Brooge's auditors met again on July 7, 2020.  (Compl't ¶ 127.)  Defendant O'Sullivan observed that Brooge's CFO and finance staff lacked the expertise to fulfill their financial reporting responsibilities.  (Compl't ¶ 127.)  O'Sullivan also stated that Ernst & Young

was "in internal discussions to assess continuation as statutory auditors of the Company, given the various issues faced during the audit for 2019." (Compl't ¶ 128.)

These concerns by Ernst & Young were not so concrete and specific that they render the opinions in the third statement actionable, however. Ernst & Young identified "a fraud risk" related to shareholder payments and was concerned the company's competence in its financial reporting responsibilities. (Compl't ¶ 126.) But this does not render as fraudulent the auditors' opinion that Brooge's financial statements still "fairly" represented in "all material respects" its operations and cash flows consistent with IFRS standards. (Compl't ¶ 130.) The auditors' misgivings are consistent with an audit that scrutinized the company's finances and internal procedures and found points of concern, not a known defect that rendered its financial statements false or inaccurate. At most, they are consistent with a failure to investigate possible red flags identified during the audit and might plausibly suggest negligence on the part of the auditors by not conducting a more thorough follow-up investigation. But these statements do not allege with particularity that the stated opinions of Ernst & Young in the June 2020 audit opinion were not sincerely held. Those statements of opinion also did not contain any embedded or implied facts.

Accordingly, the Court concludes that the statements contained in the June 2020 audit opinion were statements of opinion, and that the Complaint does not allege with particularity why these statements were fraudulent. Edwards's Rule 10b-5(b) claim directed to these statements will therefore be dismissed.

C.  The Complaint Does Not Allege Scienter as to
Statements Contained in the June 2020 Audit Opinion.

Edwards's claim directed to the statements of the June 2020 audit opinion are separately dismissed because the Complaint does not allege that the statements were made with scienter.

A section 10(b) plaintiff must allege that the defendants "acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." New England Carpenters, 122 F.4th at 48 (quotation marks omitted).  "Scienter may be established by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." Id. (quotation marks omitted).

The Complaint does not assert that Ernst & Young had the motive and opportunity to commit fraud, and instead asserts that it either knew or was reckless in not knowing that its statements in the June 2020 audit opinion were false.  When a plaintiff "does not allege any motive for the Auditor Defendants to defraud and premises his claim entirely on a theory of recklessness, the strength of the circumstantial allegations must be correspondingly greater." In re Advanced Battery Techs., Inc., 781 F.3d 638, 644 (2d Cir. 2015) (quotation marks omitted).

"To plead recklessness through circumstantial evidence, Plaintiffs would have to show, 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 202-03 (2d Cir. 2009) (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)).  "[F]or an independent

- 24 -

auditor, the conduct must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company, as, for example, when a defendant conducts an audit so deficient as to amount to no audit at all, or disregards signs of fraud so obvious that the defendant must have been aware of them." Advanced Battery, 781 F.3d at 644 (quotation marks and internal citation omitted). "Mere allegations of GAAP violations or accounting irregularities, or even a lack of due diligence, will not state a securities fraud claim absent evidence of corresponding fraudulent intent." Id. (quotation marks and internal citation omitted); accord Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., 645 Fed. App'x 72, 74 (2d Cir. 2016) ("mere allegations of negligence or allegations that a better audit would have uncovered the fraud earlier will not suffice.").

"The issue . . . is not the sufficiency of [defendant's] audit, but its intent in conducting the audit." Capital LLC v. Ernst & Young Hua Ming, 636 Fed. App'x 582, 585 (2d Cir. 2016), as amended (Jan. 28, 2016) (summary order). Allegations that the conduct of the audit was "merely highly negligent" does not meet the scienter standard, and scienter cannot be alleged through "hindsight evaluations of a defendant's conduct." Id.

A court must "evaluate the sufficiency of a complaint's allegations of scienter 'holistically,' considering all of the facts alleged, taken collectively, rather than any individual allegation, scrutinized in isolation. Set Capital, 996 F.3d at 78 (emphasis in original; quotation marks omitted). "For an inference of scienter to be strong, as required by the PSLRA, a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. (emphasis in original; quotation marks omitted). "[A] court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be

irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 323-24 (2007) (quotation marks omitted).

The Court concludes that the Complaint does not allege with particularity that Ernst & Young knew or was reckless in not knowing that its statements in the June 2020 audit opinion were false. Its scienter allegations are broad and conclusory. Though the Ernst & Young meetings of April 2020 and July 2020 included concerned observations about the accuracy and professionalism of Brooge's financial reporting standards, those observations are not circumstantial evidence of an extreme departure from the standard of ordinary care, approximating actual intent. Advanced Battery, 781 F.3d at 644; ECA, Local 134, 553 F.3d at 202-03. Rather, they suggest that Ernst & Young identified defects during the audit, considered them, and ultimately concluded that, in its professional opinion, Brooge's financial statements nevertheless complied with governing standards and "fairly" represented the company's financials in all "material respects." (Compl't ¶ 130.) Ernst & Young may have failed to identify fraudulent conduct within the company, but the Complaint does not allege facts consistent with a reckless or knowingly fraudulent "intent in conducting the audit." Capital LLC, 636 Fed. App'x at 585.

Any inference of scienter on the part of Ernst & Young is further weakened by the allegation that its successor as Brooge's independent auditor, PwC, separately "provided a clean audit opinion" for the company's fiscal year 2020, before eventually resigning in 2023 after it learned of "illegal acts." (Compl't ¶¶ 134, 140.) This suggests that Brooge concealed from two separate independent auditors the existence of its round-tripping scheme.

The Court therefore concludes that, in addition to failing to allege with particularity why the June 2020 audit opinion contained fraudulent statements, Edwards's Rule 10b-5(b) claim directed to that audit opinion is dismissed because the Complaint does not allege scienter with the particularity required under the PSLRA and Rule 9(b).

### III. PLAINTIFFS' COMMON LAW FRAUD CLAIM WILL BE DISMISSED FOR LACK OF SUPPLEMENTAL JURISDICTION.

Count Three brings a claim of common law fraud. (Compl't ¶¶ 160-65.) Ernst & Young argues that if plaintiffs' Exchange Act claims are dismissed, their state law claim of common law fraud should also be dismissed because the Court lacks supplemental jurisdiction over the claim. Plaintiffs do not urge that the Court should exercise supplemental jurisdiction over this claim.[4] (See Opp. Mem. at 25.)

The Complaint invokes federal question jurisdiction premised on plaintiffs' Exchange Act claims and supplemental jurisdiction over their state law claim. (Compl't ¶ 18.) Diversity jurisdiction is not invoked, nor are facts alleged that would support diversity jurisdiction. (Compl't ¶¶ 7-16.)

A district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). A district court has discretion as to whether it should exercise supplemental jurisdiction over state law claims when all federal claims have been dismissed. Catzin, 899 F.3d at 85. "It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts

---

[4] Specifically, plaintiffs state in their memorandum that the "argument is moot in light of the Second Circuit's directive that 'if all federal claims are dismissed before trial, the state claims should be dismissed as well.'" (Opp. Mem. at 25, quoting Tracey Tooker & TT Ltd., Inc. v. Whitworth, 212 F. Supp. 3d 429, 435 (S.D.N.Y. 2016)). While plaintiffs have not accurately summarized the law governing a court's exercise of supplemental jurisdiction, see Catzin v. Thank You & Good Luck Corp., 899 F.3d 77, 83 (2d Cir. 2018), plaintiffs were given notice and an opportunity to respond to defendants' argument about the exercise of supplemental jurisdiction, and have not urged that the Court should exercise supplemental jurisdiction. See id. at 83-84.

should generally decline to exercise pendent jurisdiction over remaining state law claims." Klein & Co. Futures, Inc. v. Board of Trade of City of New York, 464 F.3d 255, 262 (2d Cir. 2006). When deciding whether to exercise supplemental jurisdiction over state law claims, "district courts should balance the values of judicial economy, convenience, fairness, and comity – the 'Cohill factors.'" Id. (citing Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 (1988)).

The Court has dismissed plaintiffs' two federal claims arising under the Exchange Act. At this stage in the litigation, judicial economy will not be served by the Court retaining jurisdiction over the remaining state law claim. Discovery has not yet begun in this case. Further, while the parties' citizenship is not alleged, plaintiff Anvil Trust is governed by the laws of Gibraltar, defendant Ernst & Young Middle East is based in Bahrain, defendant Ernst & Young Middle East (Abu Dhabi Branch) is based in the United Arab Emirates and defendant O'Sullivan is based in the United Arab Emirates. (Compl't ¶¶ 7, 11, 12, 16.) Given the locations of these defendants, the interests of convenience and comity weigh against retaining supplemental jurisdiction over plaintiffs' common law claim.

Accordingly, the Court will decline to exercise supplemental jurisdiction over the claim of common law fraud set forth in Count Three.

CONCLUSION.

Defendants' motion to dismiss is GRANTED. (ECF 36.) The Clerk is respectfully directed to terminate the motion, close the case and enter judgment for defendants.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
March 17, 2026

- 28 -