Amanda F. Lawrence (admitted *pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06413
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
alawrence@scott-scott.com

*Attorney for Lead Plaintiff*
*Bluefin Capital Management, LLC*

[Additional Counsel on Signature Page.]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ERIC WHITE, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>          v.<br><br>BROOGE ENERGY LIMITED F/K/A BROOGE HOLDINGS LIMITED F/K/A TWELVE SEAS INVESTMENT COMPANY, NICOLAAS L. PAARDENKOOPER, SALEH YAMMOUT, SYED MASOOD ALI, LINA SAHEB, DIMITRI ELKIN, NEIL RICHARDSON, STEPHEN N. CANNON, PAUL DITCHBURN, ERNST & YOUNG, and PRICEWATERHOUSECOOPERS LIMITED PARTNERSHIP, DUBAI BRANCH,<br><br>                              Defendants. | Case No.: 2:24-cv-00959-AH(DFMx)<br><br>**CLASS ACTION**<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

# **TABLE OF CONTENTS**

NATURE OF THE ACTION ...................................................................................1

JURISDICTION AND VENUE...............................................................................3

PARTIES .................................................................................................................4

I.       THE EXECUTIVE DEFENDANTS ............................................................5

II.      THE AUDITOR DEFENDANT ..................................................................7

OTHER RELEVANT ENTITIES AND INDIVIDUALS .....................................7

I.       ENTITIES ..................................................................................................7

II.      INDIVIDUALS .........................................................................................8

SUBSTANTIVE ALLEGATIONS ........................................................................9

BACKGROUND .....................................................................................................9

I.       BACKGROUND OF SPACS ....................................................................9

II.      TWELVE   SEAS   AND   THE   BUSINESS   COMBINATION AGREEMENT ........................................................................................12

III.     BACKGROUND OF BROOGE ...............................................................13

         A.      The Proxy and Customer Contracts .......................................... 14

         B.      Brooge's Reported Revenue and Audit Opinions Between 2018 and 2020 ...................................................................................15

THE UNDISCLOSED FACTS .............................................................................17

I.       BROOGE'S 2018-2020 REVENUE WAS GROSSLY OVERSTATED DUE TO THE ACCOUNTING FRAUD ..........................................................18

II.      THE FAKE INVOICING SCHEME ENABLED THE ACCOUNTING FRAUD.....................................................................................................21

III.     BIA'S RELATED-PARTY STATUS ENABLED THE ACCOUNTING FRAUD.....................................................................................................24

MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ........................................................................25

I.       THE BROOGE DEFENDANTS' REVENUE MISSTATEMENTS ..........26

         A.      Brooge's Overstated Revenue Numbers.............................................26

         B.      Other Misstatements Related to Brooge's Overstated Revenues .......28

i

C.    Misstatements Related to BIA and Revenue .....................................29

D.    False and Misleading Risk Disclosure About Revenue......................31

II.    THE    BROOGE    DEFENDANTS'    CONFLICT-OF-INTEREST
MISSTATEMENTS ..............................................................................32

III.    THE    BROOGE    DEFENDANTS'    INTERNAL    CONTROLS
MISSTATEMENTS ..............................................................................33

IV.    PWC'S   AUDIT   OPINION   WAS   MATERIALLY   FALSE   AND
MISLEADING .......................................................................................36

THE TRUTH BEGINS TO EMERGE......................................................................36

ADDITIONAL SCIENTER ALLEGATIONS ..........................................................40

I.    ADDITIONAL SCIENTER ALLEGATIONS FOR THE SPAC ..............41

II.    ADDITIONAL   SCIENTER   ALLEGATIONS   FOR   THE   EXECUTIVE
DEFENDANTS......................................................................................43

A.    Defendants Paardenkooper and Saheb....................................43

B.    Defendant Yammout................................................................48

C.    Defendant Masood ..................................................................51

III.    CORPORATE SCIENTER ...................................................................52

PWC KNOWINGLY AND/OR RECKLESSLY VIOLATED THE
EXCHANGE ACT BY FAILING TO COMPLY WITH AUDITING
STANDARDS IN ISSUING A CLEAN AUDIT REPORT THAT
CONTAINED MATERIALLY FALSE AND MISLEADING
STATEMENTS TO THE INVESTING PUBLIC ...................................................53

I.    PWC WAS BOUND TO COMPLY WITH APPLICABLE ACCOUNTING
STANDARDS ........................................................................................53

II.    PWC ISSUED ITS AUDIT OPINION THAT CONTAINED FALSE AND
MISLEADING STATEMENTS ................................................................56

III.    PWC KNEW AND/OR WAS RECKLESS IN IGNORING NUMEROUS
RED FLAGS IN ISSUING ITS CLEAN AUDIT OPINION.....................59

A.    The Company's Reliance on and Dealings with the Phase I
Customer and BIA ..................................................................61

B.    Clear Inconsistencies Between Reported Usage/Industry Prices
and Contract Terms.................................................................68

C.    Material Weaknesses in Internal Controls...........................71

D.    Prior Restatements .................................................................73

ii

IV.    THESE RED FLAGS SUPPORT A STRONG INFERENCE THAT PWC INTENTIONALLY AND/OR RECKLESSLY VIOLATED THE ACCOUNTING STANDARDS IT WAS BOUND TO FOLLOW ............75

PLAINTIFF'S CLASS ACTION ALLEGATIONS ................................................76

APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE .......................................78

NO SAFE HARBOR ..................................................................................80

COUNTS ...............................................................................................81

PRAYER FOR RELIEF ..............................................................................89

DEMAND FOR TRIAL BY JURY .................................................................90

Lead Plaintiff Bluefin Capital Management, LLC ("Bluefin" or "Plaintiff"), individually and on behalf of all others similarly situated, by its undersigned attorneys, for its complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys. That investigation included, among other things: a review of Defendants' public documents; documents, including emails to and from Defendants and third parties, relating to events and allegations herein; conference calls and announcements made by Defendants; Defendants' filings with the U.S. Securities and Exchange Commission ("SEC"); press releases and news articles regarding Defendant Brooge Energy Limited f/k/a Brooge Holdings Limited f/k/a Twelve Seas Investment Company ("Brooge" or the "Company"); and analysts' reports and advisories about the Company and the industry within which it operates. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class (the "Class") consisting of all persons and entities other than the named Defendants that purchased or otherwise acquired publicly traded securities of Brooge between November 25, 2019, and December 27, 2023, inclusive (the "Class Period"). *See* ECF No. 32. This action seeks to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company, certain of its current and former officers, its auditors, and certain affiliated parties as described below.

2. While this action involves multiple parties with varying acronyms spanning several countries, at its heart, it is a quite simple case of blatant fraud, as the SEC has now highlighted.

1

3.     In brief, Brooge, a company in the oil and gas industry, fabricated its revenue for 2018, 2019, and 2020 by at times over 80%. In order to do this, Defendants undertook a fake invoicing scheme whereby they used differing sets of invoices to cover up the fact that the customer that was supposed to make up the vast majority of the Company's revenue was actually paying nothing at all. Instead, small customers were paying far lower amounts. The shortfall was covered up by both the fake invoices and transfers by and to a related company. In short, it was outright fraud.

4.     The Class Period began when a special purpose acquisition company, or "SPAC," chose to merge with Brooge, and in the process issued a November 2019 proxy statement replete with misstatements. The individuals affiliated with the SPAC were motivated to consummate the merger and thus undertake the misstatements in the proxy statement.

5.     Throughout the Class Period, Defendants continued making misrepresentations concerning not only the inflated dollar amounts of revenue, but the sources of that revenue, including the fact that one of the supposed "customers" was a related party, Al Brooge International Advisory LLC ("BIA"), that was reimbursed (by Brooge) for all of the sham payments it made to the Company. Defendants also covered up a complete lack of internal controls, and even certain "risk" disclosures were misleading. Indeed, from the very onset, Defendants failed in any and all of their duties to shareholders as its existence was a sham.

6.     Meanwhile, even when the fraud was well underway and one auditor, Ernst & Young ("E&Y"), had both identified massive issues and then resigned, PwC shockingly issued a clean audit opinion during the Class Period and utterly ignored the blatant red flags present at the Company. PwC was fully aware, for example, that Brooge was receiving all of its revenue from BIA, an acknowledged related party, at a time when Brooge was claiming—in its public financial statements and

2

filings, no less—that its sole customer was an entirely different, independent oil company. Despite having this knowledge, PwC gave Brooge a clean audit opinion for FY2020. Its audit opinion thus contained material misstatements, and PwC violated numerous PCAOB standards as well as the securities laws.

7. While the SEC investigated the Company, Defendants continued to mislead investors (and even the SEC) by failing to reveal the fraud and its depths. When the truth finally did come out, it did so in drips and drabs, until ultimately an SEC cease and desist order (the "C&D Order") was issued in December 2023.

8. With that announcement and the C&D Order, the public first learned about the fraud charges brought by the SEC against Defendants based on the inflated revenues and false invoices created to support them. Unfortunately for investors, by this point the stock price for the Company had dropped a staggering 74%, while the fair value of Brooge's warrants was nearly wiped out.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

11. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements and subsequent damages took place within this Judicial District, and Dimitri Elkin, a defendant in this case when the Action was filed, resides in this Judicial District.

12. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

3

including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

### **PARTIES**[1]

13.    Lead Plaintiff **Bluefin Capital Management, LLC**, as set forth in its previously filed certification, acquired Brooge's publicly traded securities, including common stock and warrants, at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures and/or materialization of the undisclosed risks.  *See* ECF No. 19-3.

14.    Defendant **Brooge Energy Limited** is incorporated in the Cayman Islands, and its principal executive offices are located at Opus Tower A, 1002, Business Bay, Dubai, United Arab Emirates.  Brooge was originally incorporated as Brooge Holdings Limited under the laws of the Cayman Islands as an exempted company[2] in April 2019 in order to effectuate the Business Combination Agreement.[3]  The Company's common stock traded in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "BROG" prior to its voluntary delisting in June 2025.  The Company's warrants were registered on the NASDAQ under the ticker symbol "BROGW."

15.    On December 19, 2019, Brooge acquired all of the issued and outstanding ordinary shares of Brooge Petroleum and Gas Investment Company FZE ("BPGIC FZE"),[4] a company formed under the laws of the Fujairah Free Zone,

---

[1]    For ease of reference, the Parties and Other Relevant Entities, along with their classifications and the claims against them, are set forth in Appendix A hereto.

[2]    "A Cayman Islands exempted company is a common choice for U.S. practitioners creating a foreign entity.  An exempted company's operation is conducted mainly outside the Cayman Islands.  A 20–year exemption from taxation in the Cayman Islands is typically applied for."  *Blum v. C.I.R.*, 103 T.C.M. (CCH) 1099, 2012 WL 129801, at *3 n.3 (T.C. Jan. 17, 2012).

[3]    As defined in more detail below, "Business Combination" refers to the merger of the Twelve Seas SPAC with BPGIC FZE, *i.e.*, the process by which Brooge became a publicly traded company.  The "Business Combination Agreement" refers to the agreement to proceed with the Business Combination.

[4]    Prior to this change in ownership, the company was called Brooge Petroleum and Gas Investment Company FZC ("BPGIC FZC").

4

United Arab Emirates, which conducts its business out of an oil storage facility in Fujairah, United Arab Emirates.  BPGIC FZE is Brooge's operating subsidiary and the sole means by which Brooge operates.

16.   As of the end of fiscal year ("FY") 2019, there were 109,587,754 ordinary shares of Brooge stock and 21,229,000 Brooge warrants outstanding.[5]  The warrants entitled their holders to purchase one ordinary share at an exercise price of $11.50.[6]

17.   As used herein, "**Brooge**" and the "**Company**" refer to BPGIC FZE before the Business Combination, and Brooge after the Business Combination, unless otherwise specified.

## I.    The Executive Defendants

18.   Defendant **Nicolaas L. Paardenkooper** ("Paardenkooper") joined the Company in May 2017.  From the time of the Business Combination, which took place in December 2019, until December 8, 2022, Defendant Paardenkooper was Brooge's CEO and a member of its Board.  When Defendant Paardenkooper resigned as Brooge's CEO and from its Board in December 2022, he joined BPGIC Holdings—Brooge's majority shareholder—on a full-time basis.  Defendant Paardenkooper was an architect and primary beneficiary of the scheme alleged herein and made multiple false statements during the Class Period.

19.   Defendant **Lina Saheb** ("Saheb") joined the Company in 2013.  At the time of the Business Combination, Defendant Saheb was the Chief Strategy Officer for BPGIC FZE.  Following the Business Combination, Defendant Saheb retained her position with BPGIC FZE while also becoming Brooge's Chief Strategy Officer.  She became a member of Brooge's Board in December 2020.  In October 2021,

---

[5]   Based on the data available to Plaintiff, it appears that only 100 warrants were ever exercised.

[6]   According to pricing data available to Plaintiff, Brooge's common stock closed at a price above $11.50 per share on only thirty-three (33) days during the entirety of the Class Period—all in early 2020, soon after the Business Combination was completed.

5

Defendant Saheb was promoted to Deputy CEO. After Defendant Paardenkooper's resignation in December 2022, Defendant Saheb became Interim CEO. She resigned as Interim CEO and as a member of Brooge's Board in August 2023 but remained with Brooge as a consultant for at least four months following her resignation. Defendant Saheb was an architect and primary beneficiary of the scheme alleged herein and made multiple false statements during the Class Period.

20. Defendant **Saleh Mohamed Yammout** ("Yammout") joined the Company in October 2018 and was CFO at the time of the Business Combination, remaining as CFO until April 27, 2020. After Defendant Saheb resigned as Interim CEO in August 2023, Defendant Yammout became a member of the Office of the Chief Executive Officer. Defendant Yammout was also a Brooge director between December 2019 and December 2023 and from September 2024 through the present. Defendant Yammout was an architect and primary beneficiary of the scheme alleged herein and made multiple false statements during the Class Period.

21. Defendant **Syed Masood Ali** ("Masood") became Brooge's CFO on April 27, 2020, taking over the position from Defendant Yammout. In April 2022, Brooge decided not to renew Defendant Masood's CFO contract, and a former finance manager of Brooge took over as interim CFO. Defendant Masood was an architect and primary beneficiary of the scheme alleged herein and made multiple false statements during the Class Period.

22. Defendants Paardenkooper, Saheb, Yammout, and Masood are sometimes referred to herein as the "**Executive Defendants**."

23. The Executive Defendants possessed the power and authority to control the contents of Brooge's SEC filings, press releases, and other market communications. The Executive Defendants were provided with copies of Brooge's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or

6

to cause them to be corrected. Because of their positions with Brooge and their access to material information available to them but not to the public, the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the representations being made were then materially false and misleading. The Executive Defendants are liable for the false statements and omissions pleaded herein.

24. Collectively, the Executive Defendants and Brooge are sometimes referred to herein as the "**Brooge Defendants**."

## II.    The Auditor Defendant

25. During the relevant time period, Brooge had two principal "independent" accountants: E&Y and PwC; E&Y through October 2020, and PwC from then until December 2022.

26. E&Y audited Brooge's FY2018 and FY2019 financials, among others. E&Y was replaced by PwC as Brooge's auditor in October 2020.

27. Defendant **PricewaterhouseCoopers Limited Partnership, Dubai Branch** ("PwC") is an accounting firm with its headquarters in Dubai, United Arab Emirates, and it is a member of the PricewaterhouseCoopers network. PwC audited Brooge's FY2020 financials. PwC resigned as Brooge's auditor in December 2022.

28. PwC is sometimes referred to herein as the "**Auditor Defendant**."

## OTHER RELEVANT ENTITIES AND INDIVIDUALS

## I.    Entities

29. **Twelve Seas Investment Co.** ("Twelve Seas") was incorporated in the Cayman Islands (as an exempted company) as a Special Purpose Acquisition Company ("SPAC"), also known as a "blank check company," in November 2017. Twelve Seas completed an Initial Public Offering ("IPO") in June 2018. In December 2019, as described below, Twelve Seas merged with and into another company as part of the Business Combination Agreement, after which it became a

7

wholly owned subsidiary of the Company and changed its name to BPGIC International.

30.    **Twelve Seas Sponsors I LLC** ("Sponsor") is a Delaware limited liability company and the sponsor of the Twelve Seas SPAC.  In that capacity, the Sponsor initiated the SPAC process and invested risk capital in the SPAC.  At the time of the Business Combination, Dimitri Elkin was the sole managing member of the Sponsor.  Neil Richardson and Stephen N. Cannon were also members of the Sponsor at that time.

31.    **BPGIC Holdings Limited** ("BPGIC Holdings") is incorporated in the Cayman Islands and became the parent of BPGIC FZE in or around October 2019 in preparation for the Business Combination.  At the time of the Business Combination in December 2019, BPGIC Holdings received 98,718,035 ordinary shares of Brooge and cash in the amount of $13,225,827.22 in exchange for the transfer of its interest in BPGIC FZE to Brooge.  Immediately following the Business Combination, BPGIC Holdings held 78.2% of Brooge's voting equity and was its controlling shareholder.

32.    **Al Brooge International Advisory LLC** ("BIA") is a related party or affiliate of BPGIC FZE incorporated under the laws of the United Arab Emirates. Hind Mohammed Muktar Ahmed, one of Brooge's shareholders through entities she owns, was an owner of BIA until at least February 2020.

**II.    Individuals**

33.    **Dimitri Elkin** ("Elkin") served as Twelve Seas' CEO from inception and up to the time of the Business Combination.  He was a director of Twelve Seas from its inception until May 2018.  When the Business Combination occurred, Elkin resigned as CEO.  Elkin was the sole managing member for Twelve Seas' Sponsor and held 5,604,000, or 20.9%, of Twelve Seas' outstanding shares based on his status as the managing member of Twelve Seas' Sponsor before the Business Combination.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:24-cv-00959-AH(DFMx)

34.     Elkin, along with **Neil Richardson** ("Richardson," who was Twelve Seas' Chairman since December 2017 and up to the time of the Business Combination, at which point he resigned) and **Stephen N. Cannon** ("Cannon," who was Twelve Seas' CFO since December 2017 and up to the time of the Business Combination, at which point he resigned) are sometimes referred to herein collectively as the "**SPAC D&Os**."

<u>**SUBSTANTIVE ALLEGATIONS**</u>

<u>**BACKGROUND**</u>

**I.     Background of SPACs**

35.     A "blank check" company is a company that has no specific established business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company, entity, or person.

36.     One type of blank check company is a special purpose acquisition company.  A SPAC is a publicly traded company created specifically to pool funds through an initial public offering ("IPO") for the purpose of completing an acquisition or other business combination with an existing company.  Generally, SPACs are founded by public companies or private asset managers.

37.     In order to create a SPAC, founders must invest the initial capital to recruit an investment bank, prepare and file IPO documentation, and pre-market the investment offering to interested investors.  An appointed management team (typically the SPAC's founders) then has a specified time period, typically between 18 and 24 months, in which to identify an appropriate target to complete the merger or acquisition.  Although the only purpose of a SPAC is to acquire a target company, SPACs generally have corporate governance structures like other operating companies.

38.     Typically, common shareholders of a SPAC are granted voting rights to approve or reject the business combination proposed by the management team.

9

Thus, when the management team identifies a target, a merger proxy statement must be distributed to all SPAC shareholders, which includes the target company's complete audited financials and the terms of the proposed business combination. To this end, shareholders in SPACs depend on management to honestly provide accurate information about any contemplated transactions. In anticipation of the shareholder vote, each SPAC shareholder has three options; they can: (i) approve the transaction by voting in favor of it; (ii) elect to sell their shares in the open market; or (iii) vote against the transaction and redeem their shares for a pro-rata share of the trust account.

39.    If a merger or acquisition is successfully made within the allocated time frame, shareholders and management of the SPAC can profit through their ownership of the common stock and any related securities. However, if an acquisition is not completed within the time period specified when the SPAC is organized, then the SPAC is automatically dissolved and the money held in trust is returned back to investors. No salaries, finder's fees, or other cash compensation are paid to the founders and/or management team if they fail to consummate a successful business combination. Accordingly, the founders and management team of a SPAC, who typically own approximately 20% of the company through founders' shares and invest significant resources in the formation of the company and identifying acquisition targets, are highly incentivized to get a qualifying transaction approved within the operating deadline.

40.    Indeed, leaders in the finance industry have opined that SPAC management teams have an incentive to spend the money they have raised no matter what so they can collect fees and pay themselves in salary and stock options at the company they purchase. For example, Ben Dell, managing partner of investment firm Kimmeridge Energy, stated that "SPACs are the most egregious example in the

10

industry of *executive misalignment with investors*."[7,8]  In addition to the reward of paying themselves a handsome salary, SPAC management teams are incentivized to not waste the significant time and financial resources they expended upfront on legal and financial advisors to set up the investment vehicle.

41.    SEC Chairman Gary Gensler expressed concern over the disclosure, marketing practices, and liability issues surrounding SPACs and said he has asked his staff to prepare associated recommendations.  In a speech given on or about December 9, 2021, Gensler said he wants to address the differences in protections for investors between traditional IPOs and the two-step process for SPACs.  Included in his speech were the following[9]:

> "What's more, retail investors may not be getting adequate information about how their shares can be diluted throughout the various stages of a SPAC," Gensler said.
>
> Gensler also said some ***SPAC merger announcements are made without full disclosures*** or proxy statements and with slide decks and celebrity endorsements.
>
> "SPAC sponsors may be priming the market without providing robust disclosures to the public to back up their claims. Investors may be making decisions ***based on incomplete information*** or just plain old hype," he said.
>
> ***"Functionally, the SPAC target IPO is akin to a traditional IPO. Thus, investors deserve the protections they receive from traditional IPOs, with respect to information asymmetries, fraud and conflicts and when it comes to disclosure, marketing practices and gatekeepers***," Gensler said.

42.    As set forth herein, Twelve Seas exemplified the problem with SPACs. Under pressure to find a target company or lose more than $40 million, the SPAC D&Os landed on Brooge—a private company operating outside the United States

---

[7]    Christopher M. Matthews, *Investors Handed an Oilman a 'Blank Check' Company. Here's How It Turned Out.*, THE WALL STREET JOURNAL (Apr. 15, 2019), https://www.wsj.com/articles/investors-handed-an-oilman-a-blank-check-company-heres-how-it-turned-out-11555328147

[8]    Unless otherwise indicated, emphasis is added and citations are omitted.

[9]    McCord Pagan, *SEC's Chair Expresses Concern Over SPAC Deals*, LAW360 (Dec. 9, 2021), https://www.law360.com/articles/1447310/sec-s-chair-expresses-concern-over-spac-deals.

11

"in an industry sector…outside of Twelve Seas' management's area of expertise."[10] The SPAC D&Os consummated the Business Combination Agreement that was not in the best interests of public investors.

## II.     Twelve Seas and the Business Combination Agreement

43.     On June 22, 2018, Twelve Seas closed its IPO of 18 million Units[11] for gross proceeds of $180 million.  On June 28, 2018, Twelve Seas consummated the sale of an additional 2.7 million Units, which were subject to an over-allotment option granted to the underwriters of its IPO, for gross proceeds of $27 million.  In total, Twelve Seas raised $207 million in gross proceeds from the IPO.

44.     Following the IPO, Twelve Seas began searching for a target company to acquire before finally deciding to sign the Business Combination Agreement with Brooge on April 15, 2019.  The parties to the Business Combination Agreement were Twelve Seas, Brooge Merger Sub Limited ("Merger Sub"), Brooge, BPGIC FZE, and BPGIC FZE's shareholder (the "Seller").  Pursuant to the Business Combination Agreement, (1) the Merger Sub was to merge with Twelve Seas, with Twelve Seas surviving the merger and each of the former security holders of Twelve Seas receiving securities of Brooge (the "Merger"); and (2) the outstanding ordinary shares of BPGIC FZE were to be exchanged by the Seller for Ordinary Shares of Brooge (the "Share Exchange" and together with the Merger and the other transactions contemplated by the Business Combination Agreement, the "Business Combination").

45.     Following the approval of the Business Combination as discussed below, the SPAC D&Os ceased to have any role in Twelve Seas, which became a

---

[10]     Definitive Proxy Statement filed by Twelve Seas/Brooge on November 25, 2019 (the "Proxy").

[11]     Each Unit consisted of one ordinary share, one Warrant to acquire one ordinary share at a price of $11.50, and one Right entitling the holder thereof to receive one-tenth (1/10) of one ordinary share.

12

wholly owned subsidiary of Brooge pursuant to the Business Combination Agreement.

## III.    Background of Brooge

46.    BPGIC FZE (f/k/a Brooge Petroleum and Gas Investment Company FZC), Brooge's operating subsidiary, was incorporated in the Fujairah Free Zone, UAE, in 2013 to provide oil storage, heating, and blending services.  It was also licensed to engage in trading and storing all varieties of oil products and gas and exploring and extracting crude oil and gas in both onshore and offshore fields.

47.    In 2013, BPGIC FZE entered into two 60-year land leases for a parcel of land to build and operate the BPGIC Terminal in the Port of Fujairah.  In the following years, BPGIC FZE proceeded to plan and construct the first phase of its terminal project, which consisted of 14 oil storage tanks with an aggregate geometric oil storage capacity of approximately 0.399 million $m^3$ ("Phase I").  Phase I was completed and became fully operational in 2018.  The second phase, which consisted of eight oil tanks with an aggregate geometric oil storage capacity of approximately 0.601 million $m^3$ ("Phase II"), commenced operations in September 2021.

48.    Phase I's operations were focused primarily on the storage, heating, and blending of fuel oil and clean petroleum products.  Phase II was focused primarily on the storage and blending of crude oil and clean petroleum products.

49.    Brooge generated revenue from the leasing of its oil tanks.  In addition to a monthly service fee (from which Brooge generated the majority of its revenue), Brooge charged its customers variable fees based on their usage of additional ancillary services, like blending and heating fees.

50.    As of December 31, 2019, Brooge employed 16 employees and 47 contractors.  By 2021, that number had grown to 24 employees and 64 contractors.  Those numbers remained relatively static in 2022 and 2023.

13

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:24-cv-00959-AH(DFMx)

## A.    The Proxy and Customer Contracts

51.    In the Definitive Proxy Statement filed by Twelve Seas/Brooge on November 25, 2019 (the "Proxy") in connection with the Business Combination Agreement, Brooge laid out an ambitious plan for expansion in the coming years. By that point, Brooge's Phase I oil storage tanks were fully operational, and it had plans to expand with Phase II, which would have fewer tanks but boast a larger total storage capacity than Phase I.  Importantly, Brooge purported to have secured critical deals to "de-risk" the start-up of its operations for both Phase I and Phase II.[12]

52.    With respect to Phase I, the Proxy stated that Brooge had entered into an agreement, effective December 2017, with a single customer (the "Phase I Customer,"[13] later revealed to be Coral Energy Pte Ltd) to lease all 14 oil storage tanks in Phase I.  The Phase I Customer, which the Proxy stated was "an international energy trading company," would pay Brooge both a monthly fixed storage fee to lease all of Phase I's storage capacity (irrespective of whether the Phase I Customer utilized any storage capacity) and monthly variable ancillary service fees based on its use of the ancillary services offered by Brooge.

53.    As a result of this "take-or-pay" agreement, the Phase I Customer purportedly accounted for 100 percent of Brooge's revenue for the year ended December 31, 2018.

54.    With respect to Phase II, the Proxy stated that Brooge had entered into a similar agreement in June 2018 with another customer (the "Phase II Customer,"

---

[12]    As discussed further below, while the Brooge Defendants claimed that their initial operations were "de-risked" due to the Phase I take-or-pay contract, which provided for the guaranteed lease of their entire Phase I storage first to the Phase I Customer and then to BIA, the contract was a sham; when the truth became known, that risk materialized and caused substantial losses to investors.

[13]    The Phase I Customer is the same as the "Customer A" mentioned in the December 22, 2023 Order Instituting Cease-And-Desist Proceedings, Pursuant to Section 8a of the Securities Act of 1933 and Section 21c of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-And-Desist Order, filed in the Matter of Brooge Energy Limited, Nicolaas Lammert Paardenkooper, and Lina Saheb (Admin Proceeding No. 3-21816) (the "C&D Order").

14

later revealed to be Gunvor Singapore Pte Ltd), purportedly "an international commodities trading company." Similar to the agreement with the Phase I Customer, under this agreement, the Phase II Customer would agree to lease all eight of the Phase II tanks for a monthly fixed fee and pay additional variable fees for ancillary services.

55. As set forth in the Proxy, in August and September 2019, respectively, Brooge restructured its relationship with the two customers and entered into two new agreements with a single customer: Al Brooge International Advisory LLC ("BIA"). These new agreements were made "on identical price terms and otherwise on substantially the same terms" as the existing agreements with the Phase I and II Customers. BIA, under the new agreements, "assumed [Brooge]'s rights and obligations" under the old agreements and subleased the oil tanks to the Phase I and II Customers under novated agreements with those Customers. BIA had an "independent" obligation to pay Brooge the monthly fixed storage fees regardless of whether the Customers paid BIA. The new Phase I and Phase II agreements were for initial periods of four and five years, respectively, with renewal periods of five years.

**B.     Brooge's Reported Revenue and Audit Opinions Between 2018 and 2020**

56. In the Proxy, Brooge stated that the Phase I and II Customer Agreements (and the subsequent agreements with BIA) were intended to "de-risk" the early stages of the BPGIC Terminal's operations by providing a "[s]table and predictable revenue stream for storage services." That prediction appeared to be borne out in the revenue numbers Brooge reported in the Proxy for FY2018 ($35,839,268) and the first half ("1H") of FY2019 ($22,042,687).

57. The FY2017, FY2018, and 1H FY2019 financials reported in the Proxy were audited by E&Y. E&Y also audited Brooge's financials for FY2019, which

15

were reported, *inter alia*, in a Form 20-F that Brooge filed on June 30, 2020. The Form 20-F reported revenue for FY2019 of $44,085,374.

58.    On October 8, 2020, Brooge announced that the Company's Audit Committee was appointing PwC as Brooge's independent registered public accounting firm, effective immediately.

59.    PwC took over as Brooge's auditor for FY2020 and provided a clean audit opinion for that year in Brooge's FY2020 Form 20-F, which was filed on April 5, 2021, though PwC did not express an opinion on Brooge's internal controls over financial reporting.

60.    PwC was to remain Brooge's auditor for FY2021. By August 2022, however, the Form 20-F for FY2021 had yet to be filed, and on August 17, 2022, Brooge filed a Form 6-K announcing that its prior financials for FY2018, FY2019, and FY2020 could no longer be relied upon. The Form 6-K stated:

> On August 12, 2022, the Audit Committee of the Board of Directors of Brooge Energy (the "Audit Committee"), in consultation with the Company's management ("Management"), concluded that Brooge Energy's previously issued audited consolidated financial statements as of and for the periods ending December 31, 2020, 2019, and 2018, and the previously issued unaudited financial statements for interim periods therein and the six months ended June 30, 2021…should no longer be relied upon.
>
> Similarly, any press releases, earnings releases, and investor communications describing the Company's financial performance for the above-referenced periods should no longer be relied upon.
>
> The non-reliance decision is a result of the on-going examination undertaken by the Audit Committee, with the assistance of a respected global law firm and an expert accounting consultancy firm, in response to the previously noted examination being conducted by the SEC into the Company's financial statements. The Audit Committee's non-reliance decision focuses primarily on revenue recognition and other financial reporting and disclosure issues. The Audit Committee is working towards a remediation plan to amend and restate its financial statements for the affected periods as soon as practicable and to remediate material weaknesses in its internal controls over financial reporting and the effectiveness of disclosure controls and procedures.
>
> The Audit Committee has discussed the matters described above with Management and PricewaterhouseCoopers (Dubai Branch), Brooge Energy's current independent registered public accounting firm. The

16

Audit Committee has also discussed the matters described above with Ernst & Young, Brooge Energy's former independent registered public accounting firm.

61.     As such, the non-reliance was framed as being predicated "primarily on revenue recognition and other financial reporting and disclosure issues" that could be addressed by a proposed "remediation plan" targeting its internal control weaknesses—not the wholesale fraud that would later be revealed.

62.     Then, on January 5, 2023, Brooge filed a Form 6-K announcing that PwC had resigned as its auditor.  On January 20, 2023, Brooge filed another Form 6-K with a letter from PwC attached which explained the reasons for PwC's resignation, which included serious concerns regarding current (Defendant Saheb) and former (Defendant Paardenkooper) senior management.  *See* ¶127.

63.     On April 26, 2023, Brooge filed a Form 20-F for FY2022 with a new auditor, Affiniax AAS, which included revenue restatements for FY2018, FY2019, and FY2020.

## THE UNDISCLOSED FACTS

64.     During the Class Period, the Brooge Defendants were engaging in a pervasive and damaging fraudulent scheme in order to make it appear to the investing public that the Company's revenue was far higher than it actually was.

65.     In short, the Brooge Defendants claimed that the revenue numbers were based on a take-or-pay contract under which 100% of the Company's facilities were guaranteed to be leased to a given customer at specific rates, and under which the customer agreed to pay set rates for certain ancillary services.  In reality, though, the Company received nothing from the supposed "100%" customer and was actually only being compensated for storage and ancillary services used by other customers, and at far lower rates than those specified in the take-or-pay contract.

66.     The Brooge Defendants were able to conceal the vastly overstated revenue figures from investors by creating multiple sets of invoices and by making

17

up any differences through yet more fake invoices and transfers from and to a related party, BIA. At the same time, the Company suffered from a massive lack of internal controls. None of this was disclosed to investors.

67. While the fake invoicing scheme was initially revealed to the market via the SEC's issuance of a Cease & Desist Order (*see infra*, ¶130), Plaintiff's independent investigation has now confirmed the scheme proceeded as outlined in the C&D Order. As discussed further below, there can be no doubt that the Brooge Defendants operated the scheme as stated and that management was fully aware of and involved in the fraud.

## I. Brooge's 2018-2020 Revenue Was Grossly Overstated Due to the Accounting Fraud

68. Unbeknownst to investors, Brooge's revenue for the years ending 2018, 2019, and 2020 was grossly overstated due to a pervasive and egregious accounting fraud. At the same time, over this time period, the Company was effectively a sham, running without controls or appropriate oversight.

69. Brooge's revenue numbers were based on the alleged lease of 100% of its Phase I facilities during these years at a monthly rate of $5.00 per cubic meter for storage and a rate of $1.70 for ancillary services. However, the revenue Brooge *actually* generated was at rates and volumes substantially less than the rates and volumes that served as the basis for Brooge's reported revenue.

70. Brooge's public filings stated that from December 12, 2017 until August 2019, it had a take-or-pay contract with a single customer—the Phase I Customer (referred to as the "Phase I End User" in Brooge's filings)—pursuant to which the Phase I Customer allegedly agreed to lease 100% of Brooge's Phase I storage tanks at a monthly rate of $5.00 per cubic meter for storage and a rate of $1.70 for ancillary services. The Phase I Customer had to pay for the storage

18

regardless of whether or not it (or a sublessee) actually used the storage.  However, the Phase I Customer never stored *any* oil and never paid *anything* to Brooge.[14]

71.    Instead, Brooge leased storage to other end users, who were apparently invoiced and paid in the ordinary course at lower rates and for less than the full volume.  Defendants Paardenkooper and Saheb were not only fully aware of this scheme but actively participated in it.  For example, in a March 18, 2018 email from Paardenkooper to members of Brooge's finance team, on which Saheb was copied, Paardenkooper wrote:

> Kindly prepare the storage fee invoice for Sahara on priority basis so we can send [*sic*] it out by today itself.  The new capacity and price are as per below and will be supported by the renewed 3 months contract that has been send to Sahara today for signature collection.
>
> **A separate invoice to be prepared for Coral [*i.e.*, the Phase I Customer] for auditing purpose to my information**.
>
> New capacity [for Sahara] is 104072 M3 at a price of **3 USD per month** making a total of 312216 USD.

72.    The email confirms that Defendants Paardenkooper and Saheb, and others at the Company, were preparing one invoice for storage fees to an apparent actual customer ("Sahara"[15]) for a small amount of the Phase I storage capacity for just three months, while at the same time preparing another "separate" invoice just "for auditing purposes" to "Coral," the purported Phase I Customer that Defendants

---

[14]    C&D Order ¶15.

[15]    Though Sahara would later purportedly partner with Brooge to develop a modular refinery (a joint project which never materialized, and which was ultimately discontinued in early 2020), that agreement was not made until March 2019 and was not expected to become operational until at least 2020 regardless.  In 2018, therefore, there would have been no reason for an oil company like Sahara to have been making payments to Brooge other than for oil storage, which aligns with the invoice's description as being for "[t]ank rental charges" (*see* ¶73, *infra*)—even though, at the time, Brooge's only paying oil storage customer was supposed to have been the Phase I Customer, Coral Energy Pte Ltd.

19

had repeatedly represented was the sole customer paying all of the fees for the entirety of the Phase I storage on a "take or pay" basis under a five-year contract.[16]

73.    The rate that the *actual* customer—Sahara Energy Resource Limited[17]—was invoiced for ($3.00 USD per cubic meter per month) was $2.00 less per cubic meter per month than Brooge represented in multiple public filings that its Phase I Customer was paying.  Following this email, two invoices were prepared: one to Sahara on the terms above (with the invoice description stating the invoice was for "[t]ank rental charges"), and one for the purported Phase I Customer for the same total amount—$312,216 USD—but at a rate of $5.00 per cubic meter per month to match the terms of Brooge's purported agreement with the Phase I Customer.  To make the numbers work, the second invoice was for a smaller storage capacity: 62,443.20 cubic meters instead of the 104,072 cubic meters that Sahara actually leased.

74.    This incident exactly mirrors the conduct subsequently outlined in the C&D Order, which described an incident in December 2018 in which "one customer rented a tank with a storage capacity of 41,563 cubic meters at a rate of $2.30, for a total of $95,594.90," but for which two sets of invoices were prepared: "[a]n invoice in that amount [which] was issued to and paid by that customer," *and* "[a] second set of invoices [which were] addressed to [the Phase I Customer]" and which "reflected the same total amounts as the real invoices but at the contractual storage rate of $5.00 per cubic meter."[18]  Although "the total amount of $95,594.90 in the invoice to the customer referenced above matched the total amount in the duplicate invoice to [the Phase I Customer], . . . the storage rate was adjusted upward to $5.00

---

[16]    For example, in the Proxy, Brooge stated that the Phase I Customer had "paid [Brooge] (i) *a monthly fixed storage fee to lease all of Phase I's storage capacity* (irrespective of whether the Phase I [Customer] used any storage capacity)."  Similar misstatements are set forth in Appendix B hereto.

[17]    Sahara was not the Phase I Customer, and at that point, Phase I was the only storage facility Brooge had constructed and leased.

[18]    C&D Order ¶16.

per cubic meter" and "the storage quantity was adjusted downward on the [Phase I Customer] invoice to 19,118.98 cubic meters" for the Phase I Customer invoice in order "[t]o make the math consistent."[19]

75. In August 2019, Brooge "restructured" its contract with the Phase I Customer to effectively replace the Phase I Customer with BIA. The terms and rates otherwise remained the same. Like the Phase I Customer, however, BIA *never stored any oil with Brooge*.[20]

76. Brooge's customers also used almost no ancillary services, and when they did, it was at rates lower than those specified in the take-or-pay contracts.[21]

77. The revenue Brooge reported to investors, however, was premised on the fiction of the take-or-pay contracts with the Phase I Customer and BIA, and *not* the revenue that Brooge was actually generating from customers' more limited usage of its service. As a result, between 2018 and 2020, Brooge's revenue was overstated as follows:

| Year Ended | Revenue as Reported | Revenue as Restated | % Change |
|------------|---------------------|---------------------|----------|
| **2018** | $35,839,268 | $6,387,348 | -82.18% |
| **2019** | $44,085,374 | $15,885,219 | -63.97% |
| **2020** | $41,831,537 | $27,191,176 | -35.00% |

## II.    The Fake Invoicing Scheme Enabled the Accounting Fraud

78. Therefore, Brooge never generated any revenue from its alleged take-or-pay contracts with either the Phase I Customer or BIA. It was those contracts, though, which served as the basis for Brooge's reported revenue. To effectuate the fraud, the Brooge Defendants engaged in an unreported fake invoicing scheme. The fake invoicing scheme worked in two primary ways.

---

[19]    C&D Order ¶16.
[20]    C&D Order ¶19.
[21]    C&D Order ¶14.

21

79. ***First***, the Brooge Defendants would take real revenue and create fake invoices to the Phase I Customer or BIA for that amount, but with the rates and volumes adjusted to match the terms of the take-or-pay contract.

80. For example, the customers in ¶71 and ¶74 above rented storage in March and December 2018 at rates of $3.00 and $2.30 per cubic meter of storage, respectively. This was far less than the $5.00 per cubic meter of storage that Brooge said it was receiving from the Phase I Customer and BIA under the terms of the alleged take-or-pay contract. In both instances, invoices to the Phase I Customer were created for that amount, but with the storage volume adjusted downward so the rate per cubic meter matched the rate in the take-or-pay contracts ($5.00 per cubic meter). Between December 2017 and July 2019, more than ***one hundred*** invoices to the Phase I Customer were created in this manner.[22]

81. This practice of fabricating invoices to the Phase I Customer in amounts that matched payments from Brooge's actual customers continued when BIA replaced the Phase I Customer in August 2019: the total amounts invoiced matched real customers' spending, but the storage volume was adjusted to match the rate in the take-or-pay contracts. Additionally, some of the invoices re-characterized ancillary services as "storage fees." Between August 2019 and December 2020, more than ***two hundred*** invoices to BIA were created in this manner.[23]

82. These "adjusted" invoices, however, fell short of the revenue promised by the take-or-pay contracts. To make up the difference, Defendants engaged in a further form of fake invoicing.

83. ***Second***, large, month-end invoices to the Phase I Customer and BIA were created to fill any gaps between the contractual revenue Brooge was reporting and the revenue it was actually generating.

---

[22] C&D Order ¶16.
[23] C&D Order ¶20.

22

84.     Between January 2018 and July 2019, Brooge created monthly invoices to the Phase I Customer to cover any such "shortfalls."  The majority of these invoices were in amounts ranging from $2.5 million to $3.4 million.[24]  Though these invoices were made out to the Phase I Customer, it was BIA that sent funds to make up the difference—critically, *even before* BIA purportedly took over the Phase I Customer contract.

85.     For example, in June 2018, a lower-level employee at Brooge sent an email to Brooge's finance manager, copying Defendants Paardenkooper and Saheb, explaining that Brooge "need[ed] to receive USD 5.8 million from Coral," the Phase I Customer, before June 30, 2018 "in order to have a clean Audit Report for 30th June, as well as the working capital for IPO."  Brooge's finance manager responded to that email, still copying Defendants Paardenkooper and Saheb, and stated that "we have already received USD 3.4 Million in June 2018 till now and expect another USD 1.67 Million by tomorrow or day after tomorrow as per latest updates."

86.     Plaintiff's counsel has uncovered evidence that further confirms these payments were actually made by BIA—not the Phase I Customer.  Bank statements that Plaintiff's counsel has reviewed contain two deposits from BIA into Brooge's account on or prior to the date of the final email in the thread: one from June 20, 2018 (in the amount of United Arab Emirates Dirham ("AED") 6,034,637.47) and one from June 24, 2018 (in the amount of AED 6,131,700.62).  Together, at prevailing exchange rates, these check deposits came to approximately the USD 3.4 million that Brooge's finance manager claimed they had received up to June 24, 2018.  Plaintiff's counsel has also reviewed two other checks from June 2018 made out to Brooge from BIA: one for AED 3,200,500 (June 24, 2018), and one for AED 3,958,099.22 (June 26, 2018).  The latter two checks, when combined and assessed at the prevailing exchange rates, amount to roughly the USD 1.67 million that

---

[24]     C&D Order ¶17.

23

Brooge's finance manager claimed was coming.  All three checks, however, were from BIA and not the Phase I Customer, which was supposed to be the sole source of Brooge's revenue at the time.

87.    This incident is, once again, entirely consistent with the practices outlined in the C&D Order, which described Brooge as using funds transferred from BIA to bridge the gap between its actual, legitimate revenue and the revenue it was supposed to be generating based on its purported take-or-pay contract with the Phase I Customer.[25]

88.    The same practice continued once BIA replaced the Phase I Customer in the take-or-pay contract.  Between August 2019 and December 2020, Brooge created monthly invoices to BIA to cover the shortfalls, the majority of which were in amounts ranging from $1.5 million to $2.5 million.[26]

**III.    BIA's Related-Party Status Enabled the Accounting Fraud**

89.    Investors were assured in the Proxy that there was a single conflict of interest between Brooge and the counterparty to its take-or-pay contract, BIA: Hind Mohammed Muktar Ahmed ("Muktar"), who was a partial owner of BIA and held an 8.0% ownership stake in Brooge immediately after the Business Combination. The Proxy further assured investors that after a "planned sale" of Muktar's shares in BIA, BIA would no longer be a related party.

90.    Though investors were assured BIA would no longer be a related party after Muktar sold her shares, just the opposite was true.  BIA not only remained a related or affiliated party, but it was a critical component of the fake invoicing scheme and accounting fraud outlined above.  In fact, BIA had no meaningful business operations aside from participating in the accounting fraud and fake

---

[25]    C&D Order ¶17.
[26]    C&D Order ¶21.

24

invoicing scheme as described herein, and representatives of Brooge even opened bank accounts for BIA.[27]

91.    BIA assisted Brooge with payment of the fake invoices sent to both the Phase I Customer and BIA itself.

92.    With respect to the Phase I Customer, BIA wrote checks to Brooge that were recorded in the Company's general ledger as payments by the Phase I Customer.  BIA was then reimbursed for these payments when Brooge wrote checks for corresponding amounts back to BIA.  Brooge and BIA engaged in a similar practice once the invoices were to BIA itself, with BIA writing checks to Brooge and Brooge then writing checks back to BIA to reimburse it.[28]    Importantly, Plaintiff's counsel has uncovered at least 45 checks totaling more than AED 87 *million* that were made out from BPGIC FZC to BIA.  All of these checks date back to 2018 and early 2019, before BIA took the place of the alleged Phase I Customer in the take-or-pay agreement (and when there was no reason for Brooge to be writing checks to BIA, a related party).  The existence of the payments to BIA, prior to any client relationship, confirms the statements made in the C&D Order.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD[29]

93.    Rather than disclose even some of the issues, schemes, and lack of controls at the Company, the Brooge Defendants embarked on a spree of outright misstatements and omissions to the market.  Those misstatements included not only the fictitious revenue figures, but several statements explaining the source of that revenue and the role BIA played in the reported revenue.

94.    Furthermore, while stating that the Company had certain controls and procedures, the Brooge Defendants utterly omitted that the Company was in fact

---

[27]    C&D Order ¶18.
[28]    C&D Order ¶¶17, 21.
[29]    For ease of reference, the misstatements and accompanying details, including date, source, and speaker, are set forth in Appendix B hereto.

25

suffering from a complete and total lack of internal controls. The Executive Defendants never met—nor even attempted to meet—their obligations to shareholders as the Company was effectively a sham from the outset. Meanwhile, in the face of all these red flags, PwC issued its FY2020 audit statement replete with misrepresentations as outlined herein.

## I.  The Brooge Defendants' Revenue Misstatements

95.    Brooge's revenues were grossly overstated from 2018 through 2020 in two material ways. *First*, Brooge's reported fixed-fee storage revenues were based on the alleged leasing of 100% of its Phase I storage capacity at a rate of $5.00 per cubic meter, when in reality less than 100% of its Phase I storage capacity was being leased—and at lower rates. *Second*, to the extent customers were using the ancillary services offered by Brooge, it was also at lower frequencies and rates than those reflected in Brooge's reported revenue.

96.    As a result, Brooge's revenue from 2018–2020 was vastly overstated. To support the overstated revenue numbers, Defendants also made multiple misstatements regarding the sources and reliability of the revenue Brooge was generating.

### A.    Brooge's Overstated Revenue Numbers

97.    First, Brooge misstated its actual revenue numbers for FY2018-2020 as described below.

98.    Brooge misstated its revenue for 2018, which it reported as $35,839,268, but which was actually $6,387,348, or *82% less than reported*. This misstatement was reported numerous times during the Class Period, including in the Proxy, the FY2019 Form 20-F, the amended FY2019 Form 20-F filed on November 27, 2020, the July 1, 2020 Form 6-K, a Summer 2020 Investor Presentation filed as an exhibit to a Form 6-K on July 20, 2020, the August 17, 2020 Form F-1 Registration Statement, the August 24, 2020 Prospectus (424B3), the February 4,

2021 Post-Effective Amendment No. 1 to the Form F-1 Registration Statement, the FY2020 Form 20-F, and the amended FY2020 Form 20-F filed on April 6, 2021. Furthermore, Defendants Paardenkooper and Masood repeated the overstated 2018 revenue figures on the July 7, 2020 earnings call. *See* Appendix B.

99.    Brooge also misstated its revenue for 2019, which it reported as $44,085,374, but was actually $15,885,219, or **64% less than reported**.   This misstatement was reported numerous times during the Class Period, including in the FY2019 Form 20-F, the amended FY2019 Form 20-F filed on November 27, 2020, the July 1, 2020 Form 6-K, a Summer 2020 Investor Presentation filed as an exhibit to a Form 6-K on July 20, 2020, the August 17, 2020 Form F-1 Registration Statement, the August 24, 2020 Prospectus (424B3), the February 4, 2021 Post-Effective Amendment No. 1 to the Form F-1 Registration Statement, the FY2020 Form 20-F, and the amended FY2020 Form 20-F filed on April 6, 2021.  *See* Appendix B.

100.   Overstated revenue figures were also reported for the first half of 2019 in the Proxy and the November 30, 2020 Form 6-K.[30]   Furthermore, Defendants Paardenkooper and Masood repeated the overstated 2019 revenue figures on the July 7, 2020 earnings call and the overstated revenue figures for the first half of 2019 on the November 30, 2020 earnings call.

101.   Finally, Brooge also misstated its revenue for 2020, which it reported as $41,831,537, but was actually $27,191,176, or **35% less than reported**.  This misstatement was reported numerous times during the Class Period, including in the FY2020 Form 20-F and the amended FY2020 Form 20-F filed on April 6, 2021. Overstated revenue figures were also reported for the first half of 2020 in the

---

[30]    Though the exact amount by which the first six months of revenue for 2019 were misstated is not available publicly, it is nonetheless clear that the revenue was overstated.  Brooge reported generating $22,042,687 in revenue for the first six months of 2019 in the Proxy, but later restated its revenue for all of 2019 to just $15,885,219 (less than the reported six months' revenue).

27

November 30, 2020 Form 6-K and the September 13, 2021 Form 6-K.[31] Furthermore, Defendants Paardenkooper and Masood repeated the overstated revenue figures for the first half of 2020 on both the November 30, 2020 earnings call and the September 15, 2021 earnings call. *See* Appendix B.

## B.   Other Misstatements Related to Brooge's Overstated Revenues

102.   Defendants also made misstatements related to the sources and reliability of the alleged revenue it was generating in order to provide false support for it.

103.   Specifically, between 2018 and 2020, Defendants reported that Brooge was receiving 100% of its revenue from the Phase I Customer (up to August 2019) and BIA (from August 2019 until late April 2020), and that any shortfalls in the leasing of its Phase I storage tanks were covered by the take-or-pay contract between Brooge and the Phase I Customer/BIA, pursuant to which the Phase I Customer/BIA had purportedly agreed to lease 100% of the Phase I storage tanks regardless of whether or not it was using or able to sublease the storage.

104.   In reality, the alleged Phase I Customer never paid Brooge ***any*** money for either storage or ancillary services, and to the extent BIA paid money to Brooge for Brooge's "services," BIA was reimbursed through a series of transactions. Instead, Brooge generated what revenue it did from a variety of other customers leasing portions of its storage facilities and using ancillary services at lower rates than were specified in the Phase I Customer/BIA contract.

105.  As a result, the following statements were materially false and misleading, and/or constituted material omissions:

---

[31]   Again, though the exact amount by which the first six months of revenue for 2020 were misstated is not available publicly, it is nonetheless clear that the revenue was overstated.  Brooge reported generating $22,893,875 in revenue for the first six months of 2020, but later restated its revenue for all of 2020 to just $27,191,176.

28

- In the Proxy, Brooge claimed that it had entered into the initial agreement with the Phase I Customer "[i]n an effort to de-risk the start-up of operations of Phase I."

- Under this "de-risk[ed]" approach, the Phase I Customer was supposed to "pay [Brooge] (i) a monthly fixed storage fee to lease all of Phase I's storage capacity (irrespective of whether the Phase I [Customer] utilized any storage capacity) and (ii) monthly variable ancillary service fees based on the Phase I [Customer]'s usage of the following ancillary services: throughput, blending, heating and inter-tank transfers."

- As a result, the Phase I Customer purportedly "***accounted for 100 percent of [Brooge]'s revenue for the year ended December 31, 2018***."[32]

106. These statements were materially false and misleading and/or constituted material omissions because (i) the agreement did not "de-risk" Brooge's start-up phase (as the Phase I Customer never paid a cent to Brooge), (ii) the Phase I Customer never complied with the purported terms of its contract with Brooge, (iii) the Phase I Customer provided ***0%*** of Brooge's FY2018 revenue—not ***100%*** as Brooge claimed—and (iv) Brooge's representations about the legitimacy of the Phase I Customer transactions were false.

**C.    Misstatements Related to BIA and Revenue**

107. In the Proxy, Brooge repeatedly touted its "[s]table and predictable revenue stream for storage services" as a result of its 100% take-or-pay contract with BIA. Brooge stated that it "generates stable and predictable cash flows for its storage

_____

[32]    The same or nearly identical statements appeared in the August 17, 2020 Form F-1 Registration Statement, the August 24, 2020 Prospectus Supplement (424B3), the February 4, 2021 Post-Effective Amendment No. 1 to the Form F-1 Registration Statement, the FY2019 Form 20-F filed on June 30, 2020, the amended FY2019 Form 20-F filed on November 27, 2020, the FY2020 Form 20-F filed on April 5, 2021, and the amended FY2020 Form 20-F filed on April 6, 2021, and were materially false and misleading and/or constituted material omissions for the same reasons as stated above. *See* Appendix B.

29

services by providing fee-based, take-or-pay storage services to [BIA], under a long-term agreement" that was "for an initial period of four years with a renewal period of five years."  The agreement with BIA was particularly important, per the Proxy, because "[t]he level of the fixed storage fee for Phase I is more than sufficient to cover all of [Brooge]'s costs (other than the variable costs associated with ancillary services), including operating costs, wages, depreciation and interest costs."

108.   The same or nearly identical statements appeared in the August 17, 2020 Form F-1 Registration Statement, the August 24, 2020 Prospectus Supplement (424B3), the February 4, 2021 Post-Effective Amendment No. 1 to the Form F-1 Registration Statement, the FY2019 Form 20-F filed on June 30, 2020, the amended FY2019 Form 20-F filed on November 27, 2020, the FY2020 Form 20-F filed on April 5, 202, and the amended FY2020 Form 20-F filed on April 6, 2021.  *See* Appendix B.

109. Additionally, on the July 7, 2020 earnings call, Defendant Paardenkooper stated that "[o]ur business model is designed to ensure revenue visibility and financial stability with 100% of Phase I and Phase II capacity, fully contract in a multiyear take-or-pay contracts."  Defendant Paardenkooper added that "[t]his generates steady stretched fee revenue for Brooge with additional upside potential from incremental and [indiscernible] revenues."

110.   These statements were all materially false and misleading, and/or constituted material omissions, because (i) Brooge never received any real revenue from BIA (to the extent BIA made any payments to Brooge under the take-or-pay contract, it was reimbursed by Brooge), (ii) because Brooge was generating revenue from a number of customers not subject to a take-or-pay contract, its revenue was not "stable and predictable" or subject to a "long-term agreement" as Brooge claimed, and (iii) because no net payments were made under the take-or-pay contract with BIA, that contract never "cover[ed] all of [Brooge]'s costs."

30

**D.      False and Misleading Risk Disclosure About Revenue**

111.   Defendants also issued related misstatements in the form of risk warnings, which were materially false and misleading and/or constituted material omissions because the warned-of risk had already come to pass.

112.   In the Proxy, Brooge warned that it was "currently reliant on [BIA] for all of its revenues and any material non-payment or non-performance by [BIA] would have a material adverse effect on [Brooge]'s business, financial condition and results of operations."  This risk disclosure was materially false and misleading, and/or constituted a material omission, because BIA never made actual payments to Brooge under the contract, and to the extent it did make payments, Brooge reimbursed BIA for those payments, and as a result, BIA never actually performed under the contract's terms.

113.   Similarly, the August 17, 2020 Form F-1 Registration Statement warned that Brooge "is currently reliant on BIA for the majority of its revenues and any material non-payment or non-performance by BIA would have a material adverse effect on [Brooge]'s business, financial condition and results of operations." The same or a nearly identical statement appeared in the August 24, 2020 Prospectus Supplement (424B3), the February 4, 2021 Post-Effective Amendment No. 1 to the Form F-1 Registration Statement, the FY2019 Form 20-F filed on June 30, 2020, the amended FY2019 Form 20-F filed on November 27, 2020, the FY2020 Form 20-F filed on April 5, 2021, and the amended FY2020 Form 20-F filed on April 6, 2021,[33] *see* Appendix B, and was materially false and misleading and/or constituted a material omission for the same reasons as stated above.

---

[33]     The FY2020 Form 20-F and amended FY2020 Form 20-F had slightly different language to reflect the fact that during FY2020, as demand for oil storage picked up, BIA "leased back" a portion of the storage under the take-or-pay contract to Brooge, which Brooge then leased to new, legitimate customers.  The language in these Forms stated that Brooge was "currently reliant on BIA *and the Company's storage customers* for the majority of its revenues and any material non-payment or non-performance by BIA would have a material adverse effect on the Company's business, financial condition and results of operations."

31

## II.   The Brooge Defendants' Conflict-of-Interest Misstatements

114.   In the Proxy, Brooge stated the following regarding a purported conflict of interest:

> *The Phase I & II Customer, Al Brooge International Advisory LLC is partially owned by Mrs. Hind Muktar. Mrs. Hind Muktar will also be a limited partner of H Capital International LP and the sole shareholder of Gyan Investments Limited, the general partner of H Capital International LP.* The Phase I Customer Agreement provides for Al Brooge International Advisory LLC to lease all 14 Phase I storage tanks for a fixed fee per cubic meter per month payable in advance on a monthly basis. The Phase I Customer Agreement also provides that Al Brooge International Advisory LLC shall pay BPGIC a fixed fee per cubic meter per month for product throughput with a supplementary fee per metric ton of throughput in excess of agreed volume, a fixed blending fee per cubic meter per month, a fixed inter tank transfer fee per cubic meter per month, and a fixed heating fee of per cubic meter per month. Further, BPGIC is entitled to pass through any tariffs, additional charges or fees imposed by the Port of Fujairah. BPGIC is entitled to review and seek to amend the fees every two years. This adjustment can result only in the fees remaining constant or increasing. BPGIC believes that the terms of this agreement are no less favorable to BPGIC than would result from a similar transaction with an unaffiliated third party. Al Brooge International Advisory LLC is only allowed to sublease the Phase I storage tanks with BPGIC's prior approval. *H Capital International LP is a minority stakeholder in BPGIC and following a planned sale of Mrs. Muktar's shares in Al Brooge International Advisory LLC, Al Brooge International Advisory LLC will no longer be a related party*.

115.   This statement was materially false and misleading, and/or constituted a material omission, because it understated the significance of the conflict of interest and BIA's status as a related party.  Contrary to the statement—which indicated any conflicts would be resolved with the sale of Muktar's interest—BIA continued to be a related party and assisted Defendants in effectuating the fake invoicing scheme by purporting to act as Brooge's independent counterparty in the Phase I take-or-pay contract.  BIA, which continued to be "an affiliated or related party" for the duration of the fake invoicing scheme, was reimbursed for "payments" made to Brooge and never actually made net payments to Brooge under the contract's terms.[34]

---

[34]   C&D Order ¶¶17–18, 21.

## III.    The Brooge Defendants' Internal Controls Misstatements

116.   Defendants also made misstatements about the existence and adequacy of the Company's internal controls, which were materially false and misleading and/or constituted material omissions for the reasons set forth below.

117.   *First*, in the FY2019 Form 20-F filed by Brooge on June 30, 2020, Defendants Paardenkooper (then CEO) and Masood (then CFO) certified that the information contained in the Form 20-F "fairly presents, in all material respects, the financial condition and results of operations of the Company" to their knowledge.

118.   *Second*, in the FY2019 Form 20-F filed by Brooge on June 30, 2020, Defendants Paardenkooper (then CEO) and Masood (then CFO) certified that they had reviewed the Form 20-F and that:

- The Form 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

- "[T]he financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report."

- Defendants Paardenkooper and Masood were "responsible for establishing and maintaining disclosure controls and procedures…and internal control over financial reporting" for Brooge and had, *inter alia*:

  (a)   "designed internal control over financial reporting, or caused such control to be designed "under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external

33

purposes in accordance with generally accepted accounting principles," and

    (b)    disclosed "any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting."

- Defendants Paardenkooper and Masood had "disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors" the following:

    (a)    "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information," and

    (b)    "*[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting*."

119.  The same or nearly identical certifications were made by Defendants Paardenkooper (then CEO) and Masood (then CFO) in the amended FY2019 Form 20-F filed on November 27, 2020, the FY2020 Form 20-F filed on April 5, 2021, and the amended FY2020 Form 20-F filed on April 6, 2021.  *See* Appendix B.

120.  All such certifications were materially false and misleading, and/or constituted material omissions, because (i) the Form 20-F substantially overstated Brooge's revenue for 2018 and 2019, (ii) Brooge's disclosure controls and internal controls over financial reporting basically did not and had never existed and had

34

certainly failed to identify and/or report the fake invoicing scheme and revenue overstatements, and (iii) the revenue overstatements and the fake invoicing scheme that supported them, along with the other misstatements identified herein, were not disclosed in the Form 20-F.

121.    Additionally, the same or nearly identical certifications as set forth above in ¶¶117-118 were made by Defendant Saheb (then Interim CEO) in the FY2022 Form 20-F filed on April 26, 2023, and the amended FY2022 Form 20-Fs filed on May 1 and 2, 2023.  Though the FY2022 Form 20-F and amended FY2022 Form 20-Fs restated the Company's revenue for FY2018, FY2019, and FY2020, they were nonetheless still false and misleading because (i) the prior year restatements were attributed to the failure to classify BIA as a related party, as opposed to the falsification of revenues via the fake invoicing scheme, (ii) Brooge's disclosure controls and internal controls over financial reporting basically did not and had never existed and had still failed to identify and/or report the fake invoicing scheme, and (iii) the fake invoicing scheme was not disclosed in the Form 20-F.

122.    Finally, in the April 26, 2023 Form 20-F for FY2022 and the amended FY2022 Form 20-F filed on May 1, 2023, the restatement of Brooge's revenue for FY2018, FY2019, and FY2020 was attributed to a determination that "the funds received from a related party Al Brooge International Advisory LLC (BIA) do not qualify to be recognized as revenue," which Brooge was "rectify[ing]" by taking "funds received from BIA" ($74,253,965) during those years, "revers[ing] [it] from revenue and re-classif[ying] [it] as Advance from customer under Liabilities for the financial years from 2018 to 2020."  These statements were materially false and misleading and/or constituted material omissions because the overstatement in Brooge's revenue was not attributable to an inadvertent failure to classify BIA as a related party, but to Brooge's outright falsification of its revenues as part of the fake invoicing scheme described above.

## IV.    PwC's Audit Opinion Was Materially False and Misleading

123.    As discussed in detail below, during the Class Period PwC issued an unqualified or "clean" audit report that incorrectly certified Brooge's financial statements as being free of material misstatements.  It stated that Brooge's statement of financial position and the results of operations for the relevant years presented "fairly" the financial position of Brooge.  The audit report also stated that PwC "conducted its audit in accordance with the standards of the Public Company Accounting Oversight Board."  PwC's unqualified audit report during the Class Period was materially false and misleading because, as set forth above, Brooge's financial statements did not present fairly, in all material respects, the Company's results of operations or its financial condition.  Furthermore, PwC in no way conducted its audit in accordance with PCAOB standards.

124.    Under §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, an auditor may be primarily liable for securities fraud when it provides an audit report containing an unqualified or "clean" audit opinion certifying financial statements that were false or misleading at the time the audit report was issued.  An auditor may also become primarily liable for securities fraud if it subsequently learns, or is reckless in not learning, that its previously issued audit reports erroneously certified financial statements that, in fact, were materially false and misleading if the auditor fails to take reasonable steps to correct or withdraw the previously issued audit reports.

## **THE TRUTH BEGINS TO EMERGE**

125.    Unfortunately for investors, the truth behind the numerous fraudulent practices being undertaken at the Company only began to trickle out in late 2022.  Furthermore, at that time, the risks of mismanagement and a lack of internal controls began to materialize.

36

126.    The truth regarding Defendants' misrepresentations and omissions leaked into the market gradually through a series of partial disclosures, beginning on December 8, 2022, when Defendant Paardenkooper abruptly resigned as Brooge's CEO.  The news was announced via a Form 6-K filed after hours on that day and was a materialization of the undisclosed risks associated with Brooge's fake invoicing scheme, which caused the stock to drop from a closing price of $5.74 per share on December 8, 2022, to $5.32 per share the following day; a drop of 7.32%.

127.    The truth only continued to trickle out and the decline continued when, on January 20, 2023, Brooge filed a Form 6-K after hours that included a letter from its former auditor, PwC.  In PwC's letter, it specifically disagreed with statements previously issued by Brooge that "[t]hrough the date of PwC's resignation on December 29, 2022, there were 'disagreements' on matters of accounting principles and practices."  PwC clarified:

> PwC states…that, during the Company's two most recent fiscal years and the subsequent interim period preceding PwC's resignation, there were disagreements between the Company and PwC on matters of accounting principles or practices and auditing scope or procedure,…[specifically]:
>
> (1)    *PwC informed the Company that the Firm would not accept representations from the Company's interim Chief Executive Officer* [*i.e.*, Defendant Saheb]*, unless the interim CEO's conduct had been the subject of a review by counsel*, who had assisted with the Audit Committee Examination (the "Audit Committee's counsel"); [and]
>
> …
>
> (6)    PwC informed the Company that: (i) *in light of the findings of the Audit Committee Examination, the Firm would not accept representations from the Company's then-Chief Executive Officer*, and (ii) *it would be necessary that the Company confirm to PwC that the former Chief Executive Officer* [*i.e.*, Defendant Paardenkooper]*, who following his resignation had concurrently joined the Company's majority shareholder, would not assume any role in the Company's corporate structure*, including in the Company's parent entity, for such time as PwC is the Company's auditor, and that PwC would require the Company's assurances to that effect.

37

In each of the six instances enumerated above, as of the date of PwC's resignation, the Company had failed to take the step(s) that PwC advised the Company were necessary in order for PwC to conduct the audit of the Company. The Disagreements formed the basis for PwC's conclusion that the Company had not taken timely and appropriate remedial actions.

…***PwC did conclude and communicate to the Company PwC's conclusion that the Company had not taken timely and appropriate remedial actions***. However, pursuant to Section 10A of the Securities Exchange Act of 1934, ***PwC also communicated to the Company that those remedial actions were with respect to likely illegal acts that had come to the attention of PwC and which were the subject of the Audit Committee Examination. In PwC's view, those likely illegal acts will have a material effect on the financial statements of the Company as identified in the Audit Committee Examination***.

PwC notes that the Firm discussed each of the Disagreements with the Audit Committee in advance of its resignation.

128. PwC further identified as "reportable events pursuant to Item 16F(a)(1)(v) of Form 20-F" material weaknesses in Brooge's internal controls over financial reporting, specifically based on "a lack of sufficient skilled personnel with requisite… reporting knowledge and experience" and "a lack of sufficient entity level and financial reporting policies and procedures."

129. This was a corrective disclosure and/or a materialization of the undisclosed risks associated with Brooge's fake invoicing scheme and its lack of management oversight, which caused the stock to drop from a closing price of $6.19 per share on January 20, 2023, to $5.80 per share the next trading day; a drop of 6.32%.

130. Finally, on December 22, 2023, Brooge issued a Form 6-K after hours announcing its settlement with the SEC. The C&D Order was issued the same day. Brooge stated in its Form 6-K:

December 22, 2023 – As an update to our prior disclosures, without admitting or denying any violation or wrongdoing, Brooge Energy Limited (the "Company") has reached a settlement with the U.S. Securities and Exchange Commission ("SEC") related to alleged fraudulent accounting and offering conduct by the Company and two former officers. Pursuant to the SEC administrative order, which was entered today, and which centers on financial statements that have since been restated by the Company, the Company will pay a civil money

38

penalty in the amount of $5,000,000. The Company also agreed to cease and desist from committing or causing any violations and any future violations of certain provisions under the Securities Act of 1933 and the Securities Exchange Act of 1934. Two former officers of the Company resolved related SEC charges without admitting or denying the SEC's findings.

131.   The stock closed at $3.34 per share on December 22, 2023, dropping 17.66% over the next two trading days, closing at $2.75 per share on December 27, 2023.  Meanwhile, the price of Brooge's warrants dropped from a price of $0.01 per warrant at close on December 22, 2023 to $0.004 per warrant at close on December 26, 2023, a drop of 60%.[35]   This drop was both a corrective disclosure and a materialization of the risks of the fake invoicing scheme and the utter lack of any Company management.

132.   Between the time of the first corrective disclosure on December 8, 2022, and the final corrective disclosure in December 2023, Brooge's stock price declined from $5.74 per share to $2.75 per share; a drop of *52.1%*.

133.   At the beginning of the Class Period, the Brooge Defendants claimed that their initial operations were "de-risked" due to the Phase I take-or-pay contract, which provided for the guaranteed lease of their entire Phase I storage first to the Phase I Customer and then to BIA.  The contract, however, was a sham; when the truth became known, that risk materialized and ultimately caused substantial losses to investors: between November 25, 2019 and December 27, 2023, Brooge's stock price declined from $10.28 per share to $2.75 per share; a drop of *74.58%*.

134.   Meanwhile, it appears that only 100 of Brooge's warrants were ever exercised before December 22, 2024, when the warrants expired and were delisted.

135.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages which they have not recovered.

---

[35]   The stock price rebounded very slightly (though still not above the pre-disclosure price) to close at $0.0051 per warrant on December 27, 2023.

39

## **ADDITIONAL SCIENTER ALLEGATIONS**

136. At all relevant times, the Executive Defendants acted with scienter in making the materially false and misleading statements and omissions alleged herein. The Executive Defendants had actual knowledge that the statements and omissions made by them were false and misleading, or acted with reckless disregard for the truth or falsity of those statements and omissions. The Executive Defendants' intent to deceive, or reckless disregard for the truth, is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of scienter. Furthermore, each of the Executive Defendants had the motive and opportunity to commit the fraud. In addition to the numerous allegations throughout this complaint, herein incorporated by reference, demonstrating the Executive Defendants' scienter, for the reasons further detailed below, the Executive Defendants acted with scienter in that they: (i) knew that the public documents and statements issued or disseminated in the name of the Company were materially false, misleading, and incomplete when made; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

137. The Executive Defendants, by virtue of their control over, and/or receipt and/or modification of Brooge's materially false, misleading, and incomplete statements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Brooge, participated in the fraudulent scheme alleged herein. By virtue of their senior management and decisionmaker positions, the Executive Defendants' knowledge is also imputed to Brooge.

40

## I.   Additional Scienter Allegations for the SPAC[36]

138.   The SPAC D&Os had a clear financial motive to knowingly or recklessly allow the fake invoicing scheme and the corresponding misrepresentations and omissions in the Proxy in order to push through the Business Combination.  At the time the Business Combination was proposed, Twelve Seas' Sponsor held approximately $42.3 million worth of "Founder Shares" as of September 2019, per the Proxy—but the Founder Shares, which would become exchangeable for Brooge shares following the Business Combination, would only have value if the Business Combination was consummated.

139.   The SPAC D&Os, as members of the Sponsor, were entitled to the Sponsor's profits and would be direct beneficiaries of the Business Combination, but only *if* the Business Combination closed.  Failure to close would have resulted in the SPAC's dissolution, with all funds returned to investors.  Completing a qualifying transaction was thus crucial for the SPAC D&Os to realize any profits.

140.   In fact, if the Business Combination failed to close, the SPAC D&Os could also incur significant costs and liability in connection with their role in the transaction.  Specifically, per the Proxy, if Twelve Seas failed to complete a qualifying transaction within the timeframe, the SPAC D&Os faced the potential loss of well over $40 million; liability for costs owed to Twelve Seas; and forfeiture of reimbursement for expenses incurred while "investigating possible business targets and business combinations."  This created a perverse conflict of interest, incentivizing not only the completion of an acquisition but also a rash approach to the due diligence that the SPAC D&Os did in advance of the Business Combination.

141.   Furthermore, through that due diligence, the SPAC D&Os had unique access to Brooge's confidential financial information, contracts, and financial statements and projections, among other things.  The Proxy made it clear that:

---

[36]   Plaintiff has not named Twelve Seas, which became part of Brooge as a result of the Business Combination.

41

- On December 11, 2018, Cannon, on behalf of the SPAC D&Os, met with members of Brooge's senior management in Abu Dhabi. At that meeting, Cannon received initial due diligence materials from Brooge, including financial statements, as well as the prospectus and investor presentation from Brooge's attempted London Stock Exchange initial public offering. On the same day, Cannon had a call with representatives of RBC Capital Markets, LLC ("RBC") "to discuss the meeting with [Brooge] in Abu Dhabi and certain financial information prepared by RBC with respect to [Brooge]."

- On December 19, 2018, Cannon met with senior management of Brooge at its Dubai office to review and discuss valuation materials and conducted due diligence for two days there.

- On January 9, 2019, Cannon had a call with representatives of RBC to discuss the Brooge business model in the context of the oil and gas storage industry sector, as well as U.S. investor interest in Brooge.

- On April 8, 2019, representatives of Twelve Seas met with Brooge's senior management to take a facilities tour of Brooge.

142. The SPAC D&Os thus had extensive access to Brooge's records and business information prior to the Business Combination, including records related to Brooge's revenue and its contract with the Phase I Customer—which was, at the time, purportedly responsible for 100% of Brooge's revenue. Though the Phase I Customer was supposed to be supplying all of Brooge's revenue, the Phase I Customer never paid *any* money to Brooge.[37] Moreover, Brooge's actual revenue was substantially less than what it was reporting and at rates inconsistent with the terms of the Phase I Customer agreement. *See* ¶¶71–77, *supra*. Even the most rudimentary due diligence would have uncovered these gross inconsistencies.

[37] C&D Order ¶15.

42

143. Indeed, the SPAC D&Os—a group of sophisticated investors with dozens of years of relevant experience—apparently failed to uncover the fabrication of *82.18%* of Brooge's revenue for FY2018 and *63.97%* for FY2019, or the fact that the customer purporting to provide 100% of Brooge's revenue had, in reality, provided 0%.

144. This failure, which occurred despite several site visits, unique access to Brooge's books and records, and extensive discussions with Brooge's management, was reckless at best. More likely, the SPAC D&Os—motivated by their large financial stake in the Business Combination's completion—had actual knowledge of the alleged fraud.

## II.    Additional Scienter Allegations for the Executive Defendants

145. The Executive Defendants were well aware of the gross overstatement of the Company's revenues for FY2018–2020, as detailed further herein.

### A.    Defendants Paardenkooper and Saheb

146. With respect to Defendants Paardenkooper and Saheb, the C&D Order expressly found they either knew, or were reckless in not knowing, of the accounting fraud particularly. On top of this, their knowledge of the fake invoicing scheme underlying the entire fraud was corroborated and confirmed by other documents, including emails, Plaintiff's counsel has received.

147. *First*, Defendants Paardenkooper and Saheb's perpetuation of the fake invoicing scheme, as described throughout, confirms they knew about the overstated revenues. The statements in the C&D Order, which were corroborated by emails sent by Defendant Paardenkooper himself, on which Defendant Saheb was copied (*see* ¶71, *supra*), make it abundantly clear that Brooge's senior management was orchestrating the scheme. There can be no doubt that Defendants Paardenkooper and Saheb acted with scienter with respect to the scheme—a scheme which was crafted to conceal the overstatement of Brooge's revenue for FY2018-2020.

43

148.    *Second*, even if this ironclad evidence were not considered, there is a wealth of support for Defendants Paardenkooper and Saheb's scienter.  The sheer size of the overstatement (82.18% for FY2018, 63.97% for FY2019, and 35.00% for FY2020), as well as the critical importance of the Phase I Customer (which was supposedly "de-risking" Brooge's early operations by paying to lease the entirety of Brooge's Phase I storage) and its purported provision of 100% of Brooge's revenue until the novation, further supports a strong inference of scienter.  Standing alone, it defeats any argument that Defendants Paardenkooper and Saheb could have somehow "missed" the fact that the Company was fabricating the bulk of its revenue for those years.  Furthermore, as alleged throughout, Defendants touted the purported Phase I Agreement and Customer as being of core strategic importance to the Company—even though both were effectively a fiction, since the Phase I Customer did not make a single payment to Brooge and Brooge never generated revenue on the terms set forth in the take-or-pay agreement.  Instead of being of core strategic importance to the Company, this customer and contract were of core strategic importance to the *fraud*.  This, too, supports a strong inference of scienter.

149.    *Third*, and in a similar vein, the clear mismatch between the terms of the contracts that were purportedly providing up to 100% of the Company's revenue during FY2018-2020,  and the actual sources from and terms on which the Company was generating that revenue, belies any claims of ignorance from Defendants Paardenkooper and Saheb and supports a strong inference of scienter.  Brooge was supposed to be generating 100% of its revenue from either the Phase I Customer agreement (through July 2019) or the agreement with BIA (from August 2019 on).  Yet the Phase I Customer never made any payments to Brooge, and BIA was reimbursed for any payments it did make.  The money that the Company was making came from a variety of customers who leased space at substantially lower rates than the rates listed in the take-or-pay contract.  This clear mismatch would have been

44

obvious to anyone with a working knowledge of the Company, and particularly Defendants Paardenkooper and Saheb.

150. *Fourth*, Defendants Paardenkooper and Saheb had the necessary knowledge of and familiarity with both the oil industry and the Company itself to easily identify the inconsistencies noted above. Defendant Paardenkooper, for example, joined Brooge in May 2017 and had over 30 years of experience in the oil and gas mid and downstream sector at the time of the Business Combination. Defendant Saheb joined Brooge even earlier, in 2013, and had worked with Brooge's initial shareholders on many different ventures before that. They were thus intimately familiar with how the UAE oil and gas industry functioned, as well as how the Company operated.

151. *Finally*, Defendants Paardenkooper and Saheb's knowledge of the overstated revenue is evinced by their intimate involvement in and familiarity with Brooge's revenue and the contracts supporting it. Brooge was a small company, with only 16 employees at the end of 2019. Defendant Paardenkooper repeatedly confirmed that he was closely involved in these areas, including, *inter alia*:

- In a July 1, 2020 Form 6-K, where Defendant Paardenkooper stated that Brooge's "impressive 23% revenue growth for 2019 was driven by our multi-year agreement with an offtake customer for our Phase I terminals, which operated at full capacity throughout the whole year."

- In a Form 6-K filed on December 1, 2020, where Defendant Paardenkooper likewise stated that Brooge had "continued to generate strong and consistent revenue throughout the first half of 2020 from our Phase I facility, which is operating at full capacity," going on to add that "[a]ncillary services contributed 47% of total revenue in H1 2020 (46% in H1 2019), with the balance coming from fixed, storage revenue."

45

- In that same Form 6-K from early December 2020, where Defendant Paardenkooper discussed the terms of leaseback contracts, pursuant to which BIA leased storage back to Brooge so that Brooge could then lease it to real, legitimate customers in the latter half of 2020, when the demand for oil storage was increasing.[38]

- In another Form 6-K filed on December 17, 2020, where Defendant Paardenkooper noted that Brooge had signed two additional leaseback contracts. The Executive Defendants were clearly apprised of, and involved with, Brooge's critical contracts.

- In a September 9, 2021 Press Release, where Defendant Paardenkooper, speaking on behalf of himself and the management team, highlighted the "months of careful planning, construction, contract negotiations, and testing" involved in operationalizing Brooge's Phase II facility.

- Defendant Paardenkooper also discussed Brooge's contracts and revenues on earnings calls, as set forth in ¶¶98, 100,-101, 109, *supra*.

152. As to the fake invoicing scheme itself, in addition to the allegations set forth *supra*, there is further support for Defendants Paardenkooper and Saheb's scienter. In particular:

- Defendant Paardenkooper "signed management representation letters," which Plaintiff's counsel has reviewed, "misrepresenting that the company had 'made available to [the outside auditors] all significant contracts, communications (either written or oral), and other related information pertaining to arrangements with customers.'"[39]

---

[38] As further discussed in ¶196, the strange nature of the leasebacks meant that these contracts, too, were indicative of the fraud.

[39] C&D Order ¶25.

46

- Defendant Paardenkooper had signed "confirmation letters attesting falsely to account receivable balances from [the Phase I Customer] and BIA."[40]

- Defendant Paardenkooper signed falsified, backdated invoices created in 2022 to explain why BIA made payments for invoices to the Phase I Customer.[41]

- At least three sets of false documents—false, backdated invoices to BIA (signed by Defendant Paardenkooper), a false, backdated Commercial Storage Agreement between BPGIC and BIA, and a false, backdated loan agreement created to explain other false general ledger entries— were created "[a]t the direction of Senior Management [*i.e.*, Defendants Paardenkooper and Saheb]" and provided to the SEC during the course of its investigation.[42]

153. There is further support for Defendant Saheb's scienter, too. Defendant Saheb presided over Brooge after Defendant Paardenkooper left as the Interim CEO, and was in charge when Brooge was forced to restate its revenue for FY2018–2020 in a Form 20-F.

154. Rather than disclosing the invoicing scheme in the Form 20-F, Defendant Saheb knowingly made additional misstatements in order to further conceal the truth from investors. The Form 20-F for Brooge's FY2022 (filed on April 26, 2023) falsely attributed the prior year's restatements to the failure to classify BIA as a related party, as opposed to the falsification of revenues via the fake invoicing scheme. Defendant Saheb knew that the overstatement in Brooge's revenue was not attributable to an inadvertent failure to classify BIA as a related party, but rather to Brooge's falsification of its revenues as part of the fake invoicing

---

[40] C&D Order ¶25.
[41] C&D Order ¶27.
[42] C&D Order ¶27.

47

scheme described above. This attempt at a cover up further supports a strong inference of scienter.

155. The suspicious timing of Defendants Paardenkooper and Saheb's departures also supports a strong inference of scienter: On December 8, 2022, just months after the SEC investigation was disclosed, Defendant Paardenkooper abruptly resigned as Brooge's CEO. And following Defendant Paardenkooper's resignation, Defendant Saheb assumed the role of Interim CEO, but she also resigned in August 2023, stepping down just four months before the C&D Order was issued.

156. The departure of these two high-ranking executives during the Class Period, and particularly during the SEC investigation, underscores Defendants Paardenkooper and Saheb's involvement in and knowledge of the fraud. It also highlights that the fraudulent scheme was pervasive, well-known, and orchestrated at the highest levels of the organization.

**B.    Defendant Yammout**

157. Defendant Yammout became the CFO of Brooge in October 2018 and remained its CFO through the Business Combination and up until April 27, 2020, after which he continued to serve as a director on Brooge's board. Defendant Yammout was acting CFO of this small, close-knit company—one with only 16 employees at the end of 2019—during the fraud's most pivotal years, when Brooge's revenue was massively overstated (by 82.18% for FY2018, 63.97% for FY2019, and 35.00% for FY2020). He was the CFO when the Phase I Customer, which was supposedly Brooge's sole customer and responsible for 100% of the Company's revenue, was in fact providing *zero* percent of its revenue. He was the CFO when Brooge novated the Phase I contract to replace the Phase I Customer with related party BIA, to further enable the fraud.

158. In a similar vein, the clear mismatch between the terms of the contracts that were purportedly providing up to 100% of the Company's revenue during

48

FY2018-2020, and the actual sources from and terms on which the Company was generating that revenue, belies any claims of ignorance from Brooge's CFO. Importantly, Defendant Yammout was more than a CFO in name only. At an April 9, 2020 Audit Committee meeting attended by Defendant Yammout, the auditors (then E&Y) raised the Company's ability to continue as a going concern as a serious issue, noting that Brooge was in "continual non-compliance" with its Phase I term loan agreement even though the Company had the funds to make the payments in its bank account. It was Defendant Yammout who responded to E&Y, stating that Brooge had "elected not to pay these contractual repayment amounts" due to "multiple factors," such as "cash disbursements towards other major expenses incurred with respect to the previous UK and US IPO expenses, IR [likely 'investor relations' or 'investor roadshow'] expenses," and the "Phase 2 construction & Phase 3 preliminary studies."

159. The April 2020 board minutes make clear that Defendant Yammout was involved with the Company's finances and aware of (and governing) how Brooge was spending its money. It would have been obvious to anyone with access to Brooge's accounts—which Defendant Yammout clearly had, based on the April 2020 board minutes—that Brooge was not operating in compliance with the terms of its contracts. For example, as discussed above in ¶¶69-77, even though Brooge was supposed to be receiving 100% of its revenue from either the Phase I Customer or BIA during Defendant Yammout's tenure as CFO, it was actually receiving less than the full amount from other oil and gas companies that were leasing the oil storage space from Brooge directly.

160. In particular, when the contract with the Phase I Customer was in place, Brooge was supposed to receive just under $24 million USD per year from the Phase

I Customer.[43]  Instead, Brooge received nothing from the Phase I Customer at any point while the contract was in effect.  At the same time, Brooge's operating subsidiary (of which Defendant Yammout was also the CFO) transferred more than $87 million AED across 45 checks from 2018 and early 2019 to related party BIA—*before* BIA took the place of the Phase I Customer in the take-or-pay contract.  $87 million AED equates to roughly $24 million USD at prevailing exchange rates.  While Defendant Yammout was CFO, then, not only was Brooge not receiving any of the $24 million USD it was supposed to be receiving from its sole contractual customer, but it was also sending roughly the same amount (i.e., its total annual revenue) to a related party, BIA, which was not a party to any contract with Brooge at the time.  Once BIA did become Brooge's contractual counterparty, replacing the Phase I Customer, it still never made any net payments to Brooge: any payment it *did* make was reimbursed by Brooge.

161.  Finally, Defendant Yammout, along with Defendants Paardenkooper and Saheb, had motive and opportunity to commit securities fraud at the time of the Business Combination.  The Proxy acknowledged there was a material uncertainty as to Brooge's ability to continue as a going concern.  It went on to state that, as part of negotiations with a lender, the Company had agreed to "pre-settle," from the proceeds of the Business Combination, the equivalent of more than $27 million of principal owed on loans Brooge had taken out to build its Phase I tanks.[44]  Brooge thus ***needed*** the Business Combination to close, lest the lender call an event of default and bankrupt the Company.  This provided a strong motive for Brooge's

---

[43]    The Phase I facilities had 0.399 million cubic meters of storage (¶47), and under the terms of the contract, the Phase I Customer was supposed to pay Brooge $5 per cubic meter per month for the full amount of the Phase I storage (¶69). This equates to just under $2 million USD per month.

[44]    Specifically, the Proxy stated in relevant part that Brooge had agreed "to assign to the lender all proceeds from the operation of the tanks and to pre-settle by December 31, 2019 AED 100,000,000 (($27,225,701) translated using the exchange rate as of June 30, 2019) of principal under the Phase I Construction Facilities from the proceeds received from the Business Combination."

management—then Defendants Paardenkooper, Saheb, and Yammout—to overstate Brooge's revenues in order to increase the likelihood that the Business Combination would be effected.

### C.    Defendant Masood

162.    Defendant Masood became Brooge's CFO during FY2020, when Brooge's revenue was overstated by a whopping 35%. Defendant Masood was also the CFO for the second half of FY2020, when Brooge entered into leasebacks that highlighted the unusual nature of its relationship with BIA. It was right around the time that Masood became CFO, in April 2020, that BIA began to lease back to Brooge portions of its Phase I storage under the take-or-pay contract, which Brooge then leased to new customers under new agreements. As discussed further below in ¶196, there was no reason for BIA to agree to these terms, which only advantaged Brooge and not BIA.

163.    Moreover, as discussed below in ¶¶199-205, it was Defendant Masood who recognized the risks posed by PwC's discovery of the transfer *from* Brooge *to* its then-largest customer, BIA, of more than AED 6 million, and it was Defendant Masood who flagged it as a problem for Defendant Paardenkooper. Defendant Masood clearly understood the nature of the fraud and how the reimbursements to BIA worked to effectuate it.

164.    Defendant Masood's knowledge is further confirmed by statements he made related to Brooge's operations, which evince his intimate involvement in and familiarity with Brooge's revenue and the contracts supporting it. For example, Defendant Masood commented that Brooge's "record revenue for 2019 was generated by fixed storage fees together with ancillary fees for services that include blending, heating, inter-tank transfers and throughput transfers" in a Form 6-K filed on July 1, 2020. Defendant Masood also discussed Brooge's contracts and revenues on earnings calls, as set forth in ¶¶98, 100-101, *supra*.

165.   In conclusion, the actions outlined above make it clear that the fake invoicing scheme was initiated and effectuated by the Executive Defendants, amply supporting a strong inference of scienter on this front.

166.   Furthermore, the core operations doctrine supports a strong inference of scienter here.  The take-or-pay contracts, which relied on just a single customer for each Phase, were critical to Brooge's business model and, thus, the Company's commercial prospects and viability.  Indeed, on the July 7, 2020 earnings call, Defendant Paardenkooper reemphasized the importance of the take-or-pay contracts, stating "[o]ur business model is designed to ensure revenue visibility and financial stability with 100% of Phase I and Phase II capacity, fully contract in a multiyear take-or-pay contracts."  As such, there can be no doubt that Defendants knew (and, at least, recklessly disregarded) that the take-or-pay structure was fraudulent because every segment of the Company's operations would be impacted by the reality that the take-or-pay contracts did not exist for all intents and purposes.

## III.   Corporate Scienter

167.   The falsity of the statements identified herein is so egregious that Brooge would have been deliberately reckless had it not known of the accounting fraud.  Accordingly, the Company acted with scienter under the corporate scienter doctrine.

168.   Brooge is liable for the acts of the Executive Defendants and its other employees under the doctrine of respondeat superior and common law principles of agency, because all of the wrongful acts complained of herein were carried out within the scope of their employment.

169.   The scienter of the Executive Defendants and other employees and agents of Brooge is similarly imputed to Brooge under respondeat superior and common law agency principles.

**PWC KNOWINGLY AND/OR RECKLESSLY VIOLATED THE EXCHANGE ACT BY FAILING TO COMPLY WITH AUDITING STANDARDS IN ISSUING A CLEAN AUDIT REPORT THAT CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS <u>TO THE INVESTING PUBLIC</u>**

170.   PwC was required to comply with applicable auditing standards when performing its audits during the Class Period.  As described herein, PwC intentionally and/or recklessly violated those professional standards and thereby provided a clean audit opinion that allowed the Brooge Defendants to perpetrate the fake invoicing scheme, grossly overstate revenues, and operate a business that was largely a sham.  Accordingly, PwC issued an audit opinion that contained false and misleading statements.

**I.    PwC Was Bound to Comply with Applicable Accounting Standards**

171.   Public investors, creditors, and others rely on independent, registered public accounting firms to audit financial statements and assess internal controls when deciding whether to invest in, or to do business with, a public company.  As such, the Supreme Court has described the role of an independent auditor as that of a "public watchdog," established to improve the reliability of financial statements, enhance the credibility of those statements and thereby, support the capital markets. *United States v. Arthur Young & Co.*, 465 U.S. 805, 818 (1984).

172.   To oversee independent auditors, the Sarbanes-Oxley Act ("SOX") established the Public Company Accounting Oversight Board ("PCAOB").  The PCAOB is given the responsibility to establish professional audit standards applicable to audits of certain publicly traded companies, including Brooge (the "PCAOB Standards").  Since 2004, the PCAOB has required that foreign issuer auditors register with the PCAOB.

173.   PCAOB Standards effective for the fiscal years ending December 15, 2017, to December 14, 2020, were grouped into the following five topical categories and referenced with an "AS" prefix:

(a)   General Auditing Standards: Standards on broad auditing principles, concepts, activities and communications;

(b)   Audit Procedures: Standards for planning and performing audit procedures and for obtaining audit evidence;

(c)   Auditor Reporting: Standards for auditors' reports;

(d)   Matters Relating to Filings Under Federal Securities Laws: Standards on certain auditor responsibilities relating to SEC filings for securities offerings and reviews of interim financial information; and

(e)   Other Matters Associated with Audits: Standards for other work performed in conjunction with an audit of an issuer.

174.   PCAOB Standards state that the objective of a financial statement audit is the expression of an opinion on the fairness with which the audited financial statements present, in all material respects, the financial position, results of operations, and the cash flows of the reporting entity, in conformity with generally accepted accounting principles.[45]

175.   To achieve this objective, PwC was responsible for planning and performing its financial statement audits to obtain "reasonable assurance" about whether Brooge's consolidated financial statements were free of material misstatements, including misstatements caused by fraud.[46]   In reaching its conclusions, PwC was required to apply the appropriate professional skepticism and

[45]   AS 1001.01.  The standards (AS) cited herein governed audits of financial statements for fiscal years ending December 15, 2017, through December 14, 2020. The standards effective for audits beginning December 15, 2020, were not materially different for purposes of the allegations in this Amended Complaint.
[46]   AS 1001.02; *see also* AS 2401.

54

"*should not be satisfied with less than persuasive evidence because of a belief that management is honest*."[47]

176.  To identify the risks of material misstatements, the PCAOB Standards, including but not limited to those specifically identified below, require auditors to perform the procedures identified in those standards:

| PCAOB Standard | Requirement(s) |
|---|---|
| AS 2110.07 - 2110.17 | Require an auditor to obtain a sufficient understanding of the company and its environment, including steps to "understand the events, conditions, and company activities that might reasonably be expected to have a significant effect on the risks of material misstatement." |
| AS 2110.18 - 2110.40 | Require an auditor to obtain an understanding of internal controls over financial reporting to (a) identify the types of potential misstatements, (b) assess the factors that affect the risks of material misstatement, and (c) design further audit procedures. |
| AS 2110.46 - 2110.71 | Require an auditor to perform audit procedures designed to identify areas that might represent specific risks relevant to the audit, including the existence of unusual transactions and events, and amounts, ratios and trends that warrant investigation. |
| AS 2301.08 and AS 2301.13 | Require the auditor to design and perform the audit procedures in a manner that is specifically responsive to evident risks of material misstatement for each relevant assertion of each significant account and disclosure, including fraud risk. |
| AS 2410.03 and AS 2410.14 - 2410.18 | Require the auditor to perform procedures to obtain an understanding of the company's relationships and transactions with its related parties that might reasonably be expected to affect the risk of material misstatement of the financial statements, including whether related-party transactions have been properly accounted for and disclosed. |
| AS 1015.01 and AS 1015.07 - 1015.09 and AS 2401.13 | Require an auditor to apply "due professional care," including the appropriate "professional skepticism."  Professional skepticism requires the auditor to maintain a questioning mind and critically assess the audit evidence it obtains. |
| AS 1105.04 and AS 1105.29, AS 2810.08 | Prohibit an auditor from issuing any unqualified opinion when it fails to gather sufficient appropriate audit evidence necessary to support its opinion.  When audit evidence obtained from one source is inconsistent with that from another, or if the auditor has doubts regarding the reliability of audit evidence, auditors |

---

[47]  AS 1015.01, 1015.07–1015.09, 2401.13.

55

| | |
|---|---|
| | are required to perform additional procedures necessary to resolve the matter. |
| AS 2401.66 - 2401.67A, AS 2410.05 and AS 2410.11 - 2410.12 | Require, as applicable, that auditors understand the business rationale for significant unusual transactions including corresponding related-party transactions and evaluate whether the rationale—or lack of rationale—suggest that the transaction may have been entered into to engage in fraudulent financial reporting or conceal the misappropriation of assets. Require additional evaluation and measures for identified related party transactions required to be disclosed or determined to be a significant risk. |

## II. PwC Issued Its Audit Opinion That Contained False and Misleading Statements

177. Because PwC intentionally and/or recklessly failed to perform its audit in compliance with the PCAOB Standards, its clean audit opinion contained false and misleading statements and allowed the Brooge Defendants to perpetrate the fake invoicing scheme, overstate Brooge's revenue, and cause investors to purchase Brooge securities at inflated prices.

178. On October 20, 2020, Brooge filed a Form 6-K announcing that on October 8, 2020, Brooge's Audit Committee had "appointed PricewaterhouseCoopers LLP ('PwC') as the Company's independent registered public accounting firm, effective immediately," and that it had concurrently "approved the resignation of Ernst & Young ('EY') from serving as the Company's independent registered public accounting firm, effective immediately." As the successor auditor, PwC had a duty under professional standards to adhere to policies and procedures that provided the firm with reasonable assurance that risks associated with its audit services were appropriately considered and minimized the likelihood of being associated with a client whose management lacked integrity.

179. PwC's responsibilities included making sufficient inquiries with E&Y to determine whether to accept the Brooge audit engagement, including understanding the reasons for changing auditors and understanding the nature of the Company's relationships with related parties and significant unusual transactions.

56

180.   An April 5, 2021 signed representation letter sent on that date by email from Brooge to PwC's audit team stated that Brooge had provided PwC with "[a]ll minutes of the meetings of stockholders, directors, and audit or other committees of directors," which would have included minutes of the meetings E&Y attended and, in particular, in which it reported the reasons for its departure.

181.   PwC included its 2020 audit opinion on Brooge's FY2020 financials in the FY2020 Form 20-F.   In opining that the consolidated financial statements presented fairly, in all material respects, the financial position of Brooge and its subsidiaries as of December 31, 2020, PwC stated the following:

To Board of Directors and Shareholders of Brooge Energy Limited

**Opinion on the Financial Statements**

We have audited the accompanying consolidated statement of financial position of Brooge Energy Limited and its subsidiaries (the "Company") as of December 31, 2020, and the related consolidated statements of comprehensive income, changes in equity and cash flows for the year then ended, including the related notes (collectively referred to as the "consolidated financial statements"). ***In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020, and the results of its operations and its cash flows for the year then ended in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board***.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

***We conducted our audit of these consolidated financial statements in accordance with the standards of the PCAOB***. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit we are

57

required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. *We believe that our audit provides a reasonable basis for our opinion*.

/s/ PricewaterhouseCoopers LLP
Dubai, United Arab Emirates
April 5, 2021
We have served as the Company's auditor since 2020.

182.   This audit opinion also appeared in the amended FY2020 Form 20-F filed on April 6, 2021.

183.   The following statements from the PwC FY2020 audit opinion were materially false and misleading statements of actual fact:

- PwC's statement that it "conducted [its] audit of these consolidated financial statements in accordance with the standards of the PCAOB" was materially false and misleading because, as PwC knew or was reckless in not knowing, PwC did not conduct its audit of Brooge's financials in accordance with applicable PCAOB Standards for the reasons set forth in ¶¶184-233 below.

- PwC's statement that it "believe[d] that [its] audit provide[d] a reasonable basis for [its] opinion" was materially false and misleading because, as PwC knew or was reckless in not knowing, PwC's audit did not provide a reasonable basis to issue [its] clean audit opinion on Brooge's financials for the reasons set forth in ¶¶184-233 below.

- PwC's statement that "[i]n [its] opinion, the consolidated financial statements present[ed] fairly, in all material respects, the financial

58

position of the Company as of December 31, 2020, and the results of its operations and its cash flows for the year then ended in conformity with International Financial Reporting Standards," was materially false and misleading because, as PwC knew or was reckless in not knowing, Brooge's consolidated financial statements did not fairly represent the financial picture of Brooge as set forth in ¶¶184-233 below.

## III.    PwC Knew and/or Was Reckless in Ignoring Numerous Red Flags in Issuing Its Clean Audit Opinion

184.    Throughout the Class Period, there were a series of significant red flags regarding the fake invoicing scheme and overstated revenue that PwC knew or was reckless in not knowing.  These red flags relate to several different issues including that (a) the Company relied on a related party for 100% of its revenue; (b) clear inconsistencies existed between contractual terms and the actual rates and usage by the Company's customers; (c) material weaknesses in internal controls were identified; (d) the Company had twice previously restated its financials; and (e) there was uncertainty regarding the Company's ability to continue as a going concern.

185. PwC's client acceptance and retention process "involves a determination by the engagement team, industry experts and risk management professionals of whether the risks related to an existing client or a potential client are manageable, and *whether or not we should be associated with the particular company and its management*."  PwC purportedly "decline[s] to propose, accept, or retain work when the risks are considered not to be manageable."[48]

186.    PwC's client acceptance process evaluates "[t]he reputation of the company and its management," "[a]ny incentives or inclinations for management to manipulate reported results," "[*a]ny significant transactions structured to achieve revenue recognition*," "[a]ny transactions with related parties that are not part of the

---

[48]    PwC (Dubai) PCAOB Form 1, Ex. 4.1.1.

59

consolidated group," and "[a]ny indications that the company might be in financial difficulty." PwC's process "is a powerful enabler, but the real backbone of our client acceptance and continuance process is the *significant time invested by our risk management partner(s)*," who are "senior partners with stature and independence who provide key input into the decision to accept or continue a client relationship."[49]

187. PwC could not have undertaken this process or even part of it. In fact, as stated above, PwC was provided with meeting minutes including meetings where E&Y had several times expressed serious concerns related to the red flags discussed below. PwC was thus on notice of these issues before even becoming Brooge's auditor and should have applied the "professional skepticism" required by PCAOB standards.

188. The red flags discussed below, especially when considered in the aggregate, placed PwC on notice of the facts ultimately revealed, which would have been uncovered if appropriate processes were in place. And they are especially glaring considering both that PwC became the auditor once the fraud was well underway and E&Y had resigned and that documents confirm PwC's awareness of the red flags.

189. In addition to the normal motivations auditors have to maintain relationships with their audit clients, PwC had an additional, powerful motivation to continue auditing Brooge even in the face of the significant and prevalent red flags set forth below: one of Brooge's substantial shareholders (15.6% as reported in the Proxy) was His Highness Sheikh Mohammad bin Khalifa bin Zayed Al Nahyan ("Sheikh MBK"), the son of the previous President of the United Arab Emirates, Sheikh Khalifa bin Zayed bin Sultan Al Nahyan. As auditing firms operating in the Middle East and routinely in the U.A.E., exposing the Brooge fraud (and thereby derailing a company in which Sheikh MBK had a meaningful investment) could well

---

[49] PwC (Dubai) PCAOB Form 1, Ex. 4.1.1.

60

have hindered PwC's business in the country; on the other hand, currying favor with Sheikh MBK by continuing to provide clean audit opinions to his company could have enhanced its business prospects. Regardless of the amount of revenue PwC generated from its audits of Brooge, Sheikh MBK's involvement was an important additional motivation for it to continue providing clean audit opinions for Brooge even in the face of the glaring red flags outlined below.

A. The Company's Reliance on and Dealings with the Phase I Customer and BIA

190. Everything about Brooge's dealings with the Phase I Customer and, in particular, BIA constituted major unavoidable red flags.

191. *First*, for all of FY2018-2019 and part of FY2020, Brooge was reliant on a single customer for *100%* of its revenue: the Phase I Customer through July 2019, and from August 2019 to April 2020, BIA. Brooge's reliance on a single customer for the entirety of its revenue was a red flag that merited further scrutiny. At a minimum, heightened due diligence on the customer relationship was required, given the importance of BIA to Brooge's ability to continue as a going concern.

192. *Second*, the scrutiny required increased dramatically when the sole source of Brooge's revenue shifted from the Phase I Customer to BIA (an acknowledged related party until early 2020) due to the "restructuring" of Brooge's contract with the Phase I Customer, which effectively replaced the Phase I Customer with BIA on the exact same terms. Nearly two years had passed between the time the Phase I Customer signed the take-or-pay contract in December 2017 and when the restructuring occurred in or around August 2019. The idea that conditions in the volatile oil markets[50] had remained wholly unchanged during that period and that

---

[50] As the Proxy itself noted in the context of demand for Brooge's ancillary services, "current or expected prices and market demand for refined petroleum products…can be volatile."

61

both the Company and BIA would be content to continue the contract on the previous terms should have provoked extreme skepticism from PwC.

193.   *Third*, *BIA was a related party*.  Though the Proxy filed in November 2019 promised investors that the conflicted individual, Muktar, was going to rid herself of her ownership stake in BIA via a "planned sale," BIA was still a related party in August 2019 when the restructuring occurred, as the Proxy itself admitted. The Proxy also made clear that, subsequent to the Business Combination, Muktar held 8.2% of Brooge's shares through two entities she owned and controlled.  This was a very significant red flag.

194.   *Fourth*, BIA was not just Brooge's new counterparty in the take-or-pay contract for the lease of the Phase I storage facilities; it was also Brooge's counterparty in the lease of the Phase II storage facilities.  As with the Phase I take-or-pay contract, Brooge's original counterparty for the Phase II take-or-pay contract had been a third party (in this case, the "Phase II Customer") when the contract was signed in 2018.  Then, in September 2019, that contract, too, was "restructured" and the Phase II Customer replaced with BIA.  That BIA once again stepped in and replaced an unaffiliated and unrelated counterparty in one of Brooge's contracts was another major red flag.

195.   BIA's role raised further questions in February of 2020, after Brooge's unaffiliated partner in a planned refinery dropped out and was—once again—replaced by BIA.  Unlike with the Phase I and II Customers, however, the contract at issue was not a take-or-pay storage contract.  Now, BIA was going to work with Brooge "to finalize the technical and design feasibility studies for a refinery with a capacity of 25,000 bpd to be located on [Brooge]'s Phase I and II land and operated by [Brooge]," which would include negotiation of "a sublease agreement and a joint venture agreement to govern the terms on which [Brooge] will sublease land to BIA to locate, BIA will construct, and [Brooge] will operate, the refinery."  That BIA,

62

even if no longer purporting to be a related party,[51] was now taking the place of an unaffiliated and unrelated party in a ***third*** Brooge contract that was completely different in kind from the other two contracts was extremely suspicious and constituted a red flag that PwC could not avoid.

196.  ***Fifth***, beginning in April 2020, BIA began to lease back to Brooge portions of its Phase I storage under the take-or-pay contract, which Brooge then leased to new customers under new agreements.  At the time, there were still three and a half years remaining under Brooge's Phase I contract with BIA.  The new terms were in Brooge's favor.  On December 17, 2020, for example, it announced that it was re-leasing the newly leased-back storage to another oil company at a whopping ***60%*** premium to Brooge's previous contracts.  BIA, however, had the ability to sublease under the terms of its contract, and there was no reason for it to lose out on lucrative subleasing arrangements as the global demand for oil storage rose.  The only reason for BIA to agree to the leasebacks was if it was still a related party, and benefitting alongside Brooge, as turned out to be the case.  The leaseback thus serves as another significant red flag.

197.  Critically, PwC had recognized the unusual nature of BIA's role in Brooge's business from the time of its appointment as Brooge's auditor on October 8, 2020.  An audit partner (Viren Lodhia), a director (Muhammad Omer Shafique), and a manager (Ume Farwa Jafer) at PwC all attended the November 8, 2020 meeting of Brooge's Audit Committee and flagged the issue of BIA from the outset.  The draft meeting minutes stated that Lodhia "noted that as part of the year end audit they will ***reassess the status of BIA, currently disclosed as an unrelated party*** in the books of accounts."

198.  In fact, had PwC bothered to look at the July 7, 2020 Audit Committee meeting notes, it would have seen that at that meeting (convened at E&Y's request),

---

[51]    The FY2022 Form 20-F stated that Muktar purportedly ceased to be a partner in BIA in February 2020.

E&Y partner Anthony O'Sullivan "noted that the Company ha[d] entered into various agreements with…BIA.  Although BIA is not considered a related party based on accounting standards for the financial year end 2019 audit, however ***there were multiple transactions subsequent to the yearend which could be assessed in detail for [the] 2020 audit***."  O'Sullivan thought "for the record" that "the Directors of the Company should analyze these transactions, and should undertake required diligence to obtain comfort on these transactions," reflecting continued discomfort with BIA's ongoing relationship Brooge and the red flags it raised.[52]

199.   ***Sixth***, it is clear that PwC unquestionably at least became aware of the "risky" relationship with BIA.  Specifically, on March 23, 2021, PwC director Shafique sent Masood a draft of PwC's audit committee report for FY 2020.  The presentation noted under "Significant changes to audit plan" that "[d]isbursements from certain bank accounts have been identified as a significant risk."  In the slide on "Audit risks and results," PwC included a "Risk of misappropriation of assets – Disbursements from the CBD and EIB bank accounts ***do not have a valid business purpose***."  In its summary of procedures performed to address the risk, PwC stated that it "selected transactions with values in excess of $ 350 thousand from the bank statements and ***inspected the underlying supporting documents***, to verify that the transactions were for the purposes of the Company's business."

200.   That review identified a transfer of AED 6,000,500 from BPGIC FZE to BIA on June 1, 2020, which was labeled as an "***intercompany transfer***" by Brooge.  Given BIA's acknowledged status as a previously (but allegedly, no longer) related party to Brooge, this transfer was highly significant.

---

[52]   Indeed, after noting these deficiencies, O'Sullivan further highlighted E&Y's ongoing concerns, disclosing that E&Y was "in internal discussions to assess continuation as statutory auditors of the Company, given the various issues faced during the audit for 2019."  O'Sullivan's commentary in this context confirms that E&Y's discomfort with the BIA relationship was one of the reasons they were considering terminating (and ultimately did terminate) the auditing relationship with Brooge.

64

201.   Indeed, the Executive Defendants recognized the significance of PwC's finding immediately.  Masood sent a frantic email back to Shafique, writing:

> I came to know from [another Brooge employee,] Hassan [Khan,] that several items are . . . under discussion between you and Hassan and *might be removed from the list*, apart form [*sic*] that I also request[ed] Viren [Lodhia, PwC audit partner] [make] certain changes.
>
> Would wait for the revised document, please let me know if any discussions are required with me[.]

202.   Masood was less sanguine in the email he sent to Defendant Paardenkooper less than a week later.  In that email, he wrote (all emphasis and typographical errors in the original):

> **DEAR NICO,**
>
> **PWC HAS IDENTIFIED A TRANSACTION OF AED 6,000,500/- DURING JUNE 2020, WHEREIN THE AMOUNT WAS TRANSFERRED TO BIA AND LATER BROUGHT BACK TO BPGIC ACC (WITH FAB [First Abu Dhabi Bank]). WHERE FINANCE TRIED TO PROVE AS PER EMAIL CORRESPONDENCE THAT THIS WAS DONE ERRONEOUSLY, PWC IS OF THE OPINION THAT THIS AMOUNT OF TRANSACTION BEING TRANSFERRED ERRONEOUSLY THAT TOO, TO YOUR BIGGEST CUSTOMER IS NOT MAKING ANY SENSE AND IS A CLEAR LACK OF CONTROL. WE MANAGED SOMEHOW FOR THEM NOT TO HIGHLIGHT IT AS AN UNRESOLVED ITEM TO AUDIT COMMITTEE, THEY AGREE TO IT PROVIDED AN EMAIL TO BE SENT DIRECTLY TO PWC FROM THE CEO OF THE COMPANY.**
>
> **I AM DRAFTING AN EMAIL BELOW FOR YOU TO SEND DIRECTLY TO PWC AND RESOLVE THE ISSUE, HAPPY TO DISCUSS**

203.   Therefore, there can be no question that PwC was aware of erroneous transfers to Brooge's biggest "customer" that did not make "any sense" and evidence a clear lack of control.  Yet, rather than dig deeper (by, for example, contacting BIA or the former Phase I customer, Coral), PwC instead was convinced by Defendant Masood to look the other way and not mark it as an unresolved issue.  Masood himself appeared surprised that PwC had acquiesced to his alarming request not to flag the issue as unresolved for the Board's Audit Committee.

65

204.  On March 30, 2021, Defendant Paardenkooper sent a lightly revised version of Masood's draft email to PwC's audit partner, Lodhia, which read:

With reference to a financial transaction in June 2020 kindly find the response below:

**Background:**

Just as a background to this transaction, the company had to transfer AED 6,000,500 as an Intercompany Transfer to its account with First Abu Dhabi Bank to meet its Loan commitment of AED 11 Million on or before 30th June 2020. Accordingly, the letter was prepared on 1st June 2020 and submitted for signature of the signatories. As filled on this transfer letter form the transfer was an Inter-Company Transfer in purpose of payment which indicates that the transfer was to be done within the company. However due to the extra busy period in finance dept at that time and due to urgency of timely filing our financials, an error creeped in wherein the transfer letter was wrongly addressed to Al Brooge International Advisory LLC and accordingly the transfer was erroneously made to BIA instead of our account with FAB.

However, this was subsequently rectified in 2 working days through correspondence with BIA wherein they had transferred that amount to our account with FAB through a special clearing cheque for AED 6 Million (They deducted AED 500 towards their bank charges that they were charged on account of that transfer they received from BPGIC FZE). As we understand that while we were working towards establishing controls on processes then this lapse had occurred. The management has already issued strict warnings to the concerned staff in company responsible for this error. However, since this error was noticed and acted upon by the same staff, HR and senior management decided not to release these staffs from their duties on account of such a negligence.

**Remedial Steps Taken:**

As a corrective action, as you would have noticed during the audit, we have changed the entire process which includes change in signatories and shifting majority of payments (entire revenues) via an online platform through HSBC requiring 2 signatories and a prior approval from CFO and a Board Member (AC). Also, all sales proceeds are now being assigned to and received in HSBC accounts. We have also started the process of changing signatories in all other bank accounts while the same is already done with Commercial Bank of Dubai ensuring that no such type of errors re-occur in future.

Trust the above adequately clarifies the abovementioned transaction and the steps to avoid reoccurrence.

205.  The following day, Lodhia replied simply: "Many thanks indeed for this memo. If there [are] any further clarifications necessary we will reach out to

66

you." The final version of the year-end report sent to the Audit Committee treated the "erroneous" transfer as resolved, which it very much was not. PwC thus simply accepted management's word and failed to conduct "any audit at all" even though PCAOB Standards explicitly state that PwC should not have been satisfied based on the belief that management was honest.

206. The issue was briefed for the Audit Committee at least by June 9, 2021, at an Audit Committee meeting which PwC's engagement partner, Lodhia, and its director, Shafique, attended. The draft meeting minutes for that meeting reflect that PwC had identified other problems with the transfer in addition to the above—namely, that it was authorized by Brooge's majority shareholders, who were still signatories for the Company's bank accounts *through 2020*. The minutes stated:

> 3.1.3 Related Party Transactions:
>
> <u>Bank Account Signatory:</u> For the financial year ended 31 Dec 2020 the majority shareholders of the Company were *acting as signatories to all of the Company's bank accounts*, which was subsequently changed in 2021….
>
> Pwc as part of the 31 Dec 2020 audit conducted audit procedures on these bank accounts and it had come to their attention of certain corrections pertaining to a payment, for which satisfactory explanations were provided by the management.

207. In summary, PwC had clearly recognized the fundamental issue (albeit belatedly, since they did not report on it in their half-year report for the period ended June 30, 2020), but ignored the several major and serious red flags it presented. They knew, *at a minimum*, that Brooge's operating subsidiary, which had Brooge's majority shareholders as the signatories on its bank accounts through 2020, had made a large transfer to BIA, Brooge's largest *customer* and a former *related party*, which was earmarked as an "inter-company transfer" and had no "valid business purpose" that PwC could discern. After identifying the issue in a draft report to the Audit Committee sent to Brooge's management, that same management "somehow" convinced PwC to hold off on identifying the transfer as an unresolved issue to the

67

Audit Committee until they could cobble together a flimsy excuse for the transfer that PwC could rubberstamp before it went up to the Audit Committee.

208.    In ignoring these red flags when conducting its audit, PwC intentionally and/or recklessly violated the PCAOB Standards described infra, specifically those standards: (a) requiring an understanding of the transaction at issue (AS 2110.07 - 2110.17); (b) requiring an appropriate audit response to risks of material misstatement, including fraud risk (AS 2301.08 and AS 2301.13); (c) applicable to related-party transactions (AS 2410.03 and AS 2410.14 - 2410.17); (d) requiring due care and professional skepticism (AS 1015.01 and AS 1015.07 - 1015.09 and AS 2401.13); (e) applicable to significant unusual transactions, including related party transactions (AS 2401.66 - 2401.67A, AS 2410.05 and AS 2410.11 - 2401.12); and (f) regarding sufficiency of audit evidence obtained, including the questionable reliability of audit evidence received (AS 1105.04 and AS 1105.29).

**B.    Clear Inconsistencies Between Reported Usage/Industry Prices and Contract Terms**

209.    Additionally, clear inconsistencies between the reported usage of Brooge's facilities and the going rate for oil storage on the one hand, and the terms of Brooge's Phase I take-or-pay contract on the other, served as further serious red flags.  It would have been obvious to anyone with access to Brooge's accounts—which Defendant PwC had—that Brooge was not operating in compliance with the terms of its contracts.

210.    As discussed herein, this was not one single invoice, but the Company created hundreds of fake invoices under PwC's watch.  In fact, a large amount of the Company's revenue was fabricated.  For example, in one instance, Brooge based its revenue calculations on the Phase I Customer's use of a substantial amount of ancillary services, when in reality, the customers who were actually using Brooge's

storage used almost no ancillary services.[53]   At other times, Brooge would re-characterize payments made for ancillary services as storage fees.[54]   The falsified invoices that Brooge created to reconcile the actual usage of its storage facilities with the contract rates (as described above at ¶¶69-77) were inconsistent with on-site usage of Brooge's facilities.   To make the numbers work, Brooge's fake invoices reported usage of its storage below what was actually being used in at least some instances.[55]

211.   Then, the rates that customers were actually paying to store oil with Brooge were well below the storage rate in the Phase I take-or-pay contract.   One customer, for example, was paying Brooge $2.30 per cubic meter for storage when the contract rate was $5.00 per cubic meter—more than *double* what the real customer paid.[56]   In another instance, described above in ¶¶71-73, the customer was paying Brooge at a rate of $3.00 per cubic meter, which was $2.00 per cubic meter below the contract rate.   Had PwC looked closer or called this customer, this would have become readily clear.

212.   The PCAOB standards, in fact, required PwC to look closer and to apply professional skepticism as PwC was aware that Brooge was in deliberate contradiction to the terms of its purported contracts.   Specifically, in multiple instances, PwC received (and even signed off on) ***evidence that the Phase I Customer had never paid Brooge a cent***, and that all its income came from its related party, BIA—even before the contract was novated to replace the Phase I Customer with BIA in August 2019.

213.   One example comes from documents PwC approved in its role as the auditor of BPGIC FZE, Brooge's operating subsidiary and the source of its revenue.

---

[53]   C&D Order ¶¶14-15.
[54]   C&D Order ¶20.
[55]   *See, e.g.*, ¶74, *supra*, & C&D Order ¶16.
[56]   C&D Order ¶16.

69

PwC signed off on BPGIC FZE's financial statements for FY 2020, which included the following language regarding BPGIC FZE's revenue:

> The Group has only one segment at the reporting date. Revenue generation from leasing of storage capacity of tanks and other ancillary services started in December 2017. ***The Group had only one customer, Al Brooge International Advisory LLC ("BIA"), since the inception of the operations in 2017 and as such all revenues had been derived from BIA till April 2020***.

214.    This was in direct contradiction to Brooge's public representations that, prior to August 2019 when the Phase I contract was novated, Brooge's only customer was the Phase I Customer and *not* BIA.  Instead, here, BPGIC FZE was stating just the opposite—that its only customer was BIA, with no mention of the Phase I Customer—***in the financial statements that PwC had audited***.  This was especially problematic since, until early in 2020, BIA was an acknowledged related party.[57]

215.    As another example, on April 1, 2021, a Brooge employee sent the PwC audit team, including Shafique, an Excel spreadsheet intended to address concerns about Brooge's ability to continue as a going concern.  The spreadsheet reflects that from January 2019 through March 2020, Brooge's only storage rental revenue came from BIA—even though, as noted above, its Phase I take-or-pay contract was not novated to replace the Phase I Customer with BIA until August 2019.

216.    In both cases, where PwC should have expected to see payments (or language reflecting payments) to the Phase I Customer, they instead saw ***100%*** of Brooge's storage rental income attributed to a related party: BIA.  The framing of BIA as Brooge's only customer, even before the contract's novation, was a serious red flag that had continued ramifications for Brooge, since BIA remained Brooge's largest customer for FY2020.

---

[57]    Regardless of whether or not PwC had a nominally separate audit team for BPGIC FZE, versus Brooge, the Brooge team was in receipt of the BPGIC FZE financial statements that PwC approved.  The Brooge team sent the signed BPGIC FZE financials to Brooge, copying Shafique and Jafer, on, *inter alia*, April 29, 2021.

217. Additionally, PwC was provided with charts purporting to show which vessels were delivering oil in Fujairah on certain dates—when, in reality, those vessels were scattered throughout the world, including off the coasts of India, Indonesia, Egypt, West Africa, and in the Gulf of Mexico.[58] This is another example of an inconsistency that was a clear red flag.

218. In ignoring these red flags when conducting its audits, PwC intentionally and/or recklessly violated the PCAOB Standards as described above in ¶208.

### C.      Material Weaknesses in Internal Controls

219. PwC was long aware that there were serious issues with the internal controls at Brooge.  Indeed, E&Y noted in the financial statements for 2017 and 2018 that the Company had material weaknesses in its control over financial reporting.  In particular, the material weaknesses identified were: (1) a lack of sufficient skilled personnel with requisite IFRS and SEC reporting knowledge and experience; and (2) a lack of sufficient financial reporting policies and procedures that are commensurate with IFRS and SEC reporting requirements.

220. This lack of internal controls was never fixed.  In fact, the Form 20-F audited by PwC noted the exact same deficiencies, making it clear that the Company never employed the requisite skilled personnel or put in place financial reporting procedures. This should have caused PwC to be even more skeptical of relying upon management.

221. It was also abundantly clear that Brooge and the Executive Defendants did not take their financial reporting seriously and were instead prioritizing going after investors' cash.  PwC knew this from the Audit Committee meeting minutes it was provided.  The minutes for the July 7, 2020 Audit Committee meeting, for example, explain that E&Y could not begin its audit until a month before the

---

[58]      C&D Order ¶24.

deadline, which was "mainly due to the unavailability of [Defendant Paardenkooper] and [Defendant Yammout, then CFO] for the audit kickoff meeting due to investor roadshow commitments." The minutes also noted that when E&Y *did* begin its fieldwork in March, Brooge's "finance team was not ready with the required details" and E&Y "observed that there was insufficient attention given to the financial reporting process." E&Y was not even "formally" appointed until April 20, 2020—just 10 days before the original SEC reporting deadline. The minutes went on to state:

> It is E[&]Y's view that the existing finance team is capable of simple cash accounting tasks but cannot manage the complex accounting framework and does not have the expertise to handle public Company accounting. To this effect E[&]Y noted that there were ***substantial changes in the accounts submitted initially and the final audited financial statements.***
>
> ***Much of the income statement and balance sheet figures were changed during the course of the audit, as and when accounting issues were identified.*** The finance team were not able to identify accounting issues on a timely basis and had to work with external consultants on certain accounting issues.

222. These minutes demonstrate PwC was well aware of serious management issues at the Company. In fact, PwC flagged material weaknesses in Brooge's internal controls over financial reporting. Its report to Brooge's Audit Committee for FY2020 noted as "significant risks" a "[r]isk of management override of controls" and a "[r]isk of fraud in revenue recognition through manual journal entries," and it flagged "[r]elated party balances and transactions" as an "elevated risk." The same report identified multiple control failures. The draft audit plan for FY2021 (presented in September 2021) continued to list the same significant and elevated risks.

223. Despite knowing this, PwC still did not apply professional skepticism and identify or obtain an understanding of transactions and parties as PCAOB standards require.

72

224. In ignoring these red flags when conducting its audit, PwC intentionally and/or recklessly violated the PCAOB Standards as described above in ¶208, (b), (d), and (f).

**D.      Prior Restatements**

225. Even prior to the restatement of its FY2018–2020 financials as described above in ¶63, Brooge had had two earlier restatements, which was yet another red flag.

226. In the Proxy's Notes to the Financial Statements, E&Y stated that "[s]ubsequent to the issuance of the Company's 2017 financial statements, the Company's management identified errors in the financial statements for the year ended 31 December 2017 and determined that the 2017 financial statements should be restated." The errors noted included the use of an incorrect discount rate for the measurement of its land lease liability, the incorrect calculation of accrued interest on one of its loan facilities, the incorrect determination of functional currency (no impact), the incorrect classification of advances to contractors in the statement of cash flows, and—most importantly—the erroneous classification of Brooge's debt as a "non-current liability." With respect to the last point, because "the Company was not in compliance with its debt covenants," its Phase I financing should have been "classified as a current liability." This directly impacted the Company's ability to continue as a going concern, as described further below, as it increased the Company's current liabilities as of December 31, 2017 from $14,906,680 (initial) to $100,910,068 (restated); an increase of more than *676%*.

227. Then, in November 2020, after PwC had replaced E&Y as Brooge's auditor, it was determined that the FY2019 financials "should no longer be relied upon because the Company had concluded that the warrants issued by it should have been accounted for as a derivative liability rather than equity" (FY2020 Form 20-F).

73

To correct this error, equity was reduced by roughly $15.7 million and current liabilities were increased by the same amount.

228. Both of these prior restatements were significant red flags. The "[r]estatement of previously issued financial statements to reflect the correction of a material misstatement" is a noted indicator of a material weakness in internal control over financial reporting[59] and should have prompted PwC to undertake a more thorough investigation.

229. Adding to this is the fact that Brooge had a history of financial shakiness from the onset. In the Proxy, E&Y acknowledged that there was a material uncertainty as to whether or not Brooge could continue as a going concern. *See* ¶¶159, 171, *supra*. By management's calculation, "[a]s of June 30, 2019 and December 31, 2018, the Company's current liabilities exceeded its current assets by *$101,547,022* and *$108,536,113*, respectively." Brooge was in technical default on at least one of its loans, though the lender had not called an event of default as negotiations were ongoing. To attempt to stave off another default, Brooge had even pledged proceeds from the Business Combination to the lender, placing it in a situation where Brooge ***needed*** the Business Combination to close to avoid bankruptcy.

230. This was not rectified quickly. The April 9, 2020 Audit Committee meeting minuets (provided to PwC), in fact, still noted the Company's "continual non compliance" with its loans. According to the minutes, "the auditors noted that they [we]re expecting to receive an appropriately worded 'letter of support' from the shareholders[] in order to potentially issue an unqualified audit opinion with regards to going concern [status], assuming a worst-case scenario of the lender accelerating the loan instalments due to the contractual default."

---

[59]    AS 2201.69.

231. At that same meeting—held just before PwC took over as Brooge's auditor—Brooge's management requested, "as part of the Q1 dividend proposal, that the Board approve and sign off on disclosures stating that the Company [wa]s in full compliance with respect to its payment obligations as and when it f[ell] due," even though the "*actual fact…was that the Company had defaulted on contractual loan repayments* and that the Independent Directors were not aware of such material facts." In short, Brooge's management had *asked Brooge's independent Board members to lie* and report that it was in compliance with its payment obligations when the opposite was true.

232. Both the loan issues leading to going concern fears and management's bargaining with the Board were serious red flags for PwC. This kind of pressure increased the likelihood that Brooge's management would falsify or embellish financials and constituted another red flag.

233. In ignoring these red flags when conducting its audits, PwC intentionally and/or recklessly violated the PCAOB Standards as described above in ¶208, (a)–(b), (d)–(f).

## IV. These Red Flags Support a Strong Inference That PwC Intentionally and/or Recklessly Violated the Accounting Standards It Was Bound to Follow

234. PCAOB Standards require that PwC, during all times complained of herein, perform procedures necessary to identify and respond to risks that Brooge's financial statements could be materially misstated. The Auditor Defendant intentionally and/or recklessly ignored these standards by failing to take into account specific risks as described in more detail above.

235. Despite the heightened risks from each of the red flags, PwC failed to take actions that it should have taken, all of which resulted in the issuance of false and misleading audit opinions and resulting in damages to the Class members. The

75

actions taken should have included gathering sufficient appropriate audit evidence in response to these significant risks of material misstatement, as required by the PCAOB Standards set forth above. Had PwC taken such steps, or even the most basic steps, the audit evidence would have demonstrated the existence of material violations of IFRS in Brooge's financials, as well as the issuance of false and misleading statements by Brooge. As just one example, had PwC contacted the Phase I Customer, it would have learned that the Phase I Customer ***never stored any oil with Brooge and never made any payments to Brooge***.[60]

236.    Moreover, the sheer size of the fraud contributes to a strong inference of PwC's scienter. Brooge's revenues for FY2018–2020 were overstated by massive amounts: ***82.18%*** (2018), ***63.97%*** (2019), and ***35.00%*** (2020). This was not a fraud that was easy to overlook.

237.    The consequence of the failure by PwC to have followed applicable PCAOB Standards, as it was bound to follow, was to exaggerate Brooge's true financial condition by showing false financial success and growth. As a consequence, PwC intentionally or recklessly disregarded that Brooge's consolidated financial statements were false and misleading as discussed in more detail above.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

238.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired publicly traded securities of Brooge during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are the Defendants named herein; and members of their immediate families and their legal representatives, heirs,

---

[60]    C&D Order ¶15.

successors or assigns and any entity in which the named Defendants have or had a controlling interest.

239. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Brooge common stock was actively traded on the NASDAQ, and the Brooge warrants were also registered on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Brooge or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

240. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

241. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

242. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Brooge;

77

(c)    whether the Individual Defendants caused Brooge to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the price of publicly traded securities of Brooge was inflated during the Class Period due to Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

243.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. Finally, there will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND**
***AFFILIATED UTE* PRESUMPTIONS OF RELIANCE**

244.    The market for Brooge's publicly traded securities was open, well developed, and efficient at all relevant times.  As a result of Defendants' materially false or misleading statements and material omissions, the Company's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities, relying on the integrity of the market price of such securities and on publicly available market information relating to Brooge.  Plaintiff and Class members have been damaged thereby.

245.    During the Class Period, the artificial inflation of the value of Brooge's publicly traded securities was caused by the material misrepresentations and

omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiff and other Class members. As alleged herein, during the Class Period, Defendants made, or caused to be made, a series of materially false or misleading statements about the Company's business, revenue, and operations, causing the price of the Company's securities to be artificially inflated at all relevant times. When the truth was disclosed, it drove down the value of the Company's securities, causing Plaintiff and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

246. At all relevant times, the market for Brooge's publicly traded securities was efficient for the following reasons, among others:

(a) Brooge securities met the requirements for listing and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Brooge filed periodic public reports with the SEC and/or the NASDAQ; and

(c) Brooge regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

247. Based on the foregoing, during the Class Period, the market for Brooge's publicly traded securities promptly digested information regarding the Company from all publicly available sources and reflected such information in the price of Brooge stock. Under these circumstances, the market for Brooge's securities was efficient during the Class Period and, therefore, investors' purchases of Brooge's securities at artificially inflated market prices give rise to a Class-wide presumption of reliance under the fraud-on-the-market doctrine.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:24-cv-00959-AH(DFMx)

248.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions, which concealed that:

          (a)    Defendants' revenue was grossly overstated for FY2018, FY2019, and FY2020; and

          (b)    To support the overstated revenue, Defendants engaged in a fake invoicing scheme with a related party, BIA.

249.    Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

250.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein.  To the extent that statements alleged to be false or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had

actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

251. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading and/or the forward-looking statement was authorized or approved by an executive officer of Brooge who knew that the statement was false when made.

## COUNTS

### Count I
### (Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against the Brooge Defendants)

252. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

253. This Count is asserted against the Brooge Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

254. During the Class Period, the Brooge Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate

81

and maintain the market price of the publicly-traded securities of Brooge; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire the publicly-traded securities of Brooge at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Brooge Defendants, and each of them, took the actions set forth herein.

255. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Brooge Defendants participated directly or indirectly in the preparation and/or issuance of SEC filings, press releases and other statements and documents described above that were designed to influence the market for the publicly traded securities of Brooge. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Brooge's finances, business, and prospects.

256. By virtue of their positions at Brooge, the Brooge Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class; or, in the alternative, the Brooge Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Brooge Defendants. Said acts and omissions of the Brooge Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Brooge Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

257. Information showing that the Brooge Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Brooge Defendants' knowledge and control. As the senior managers and/or directors of Brooge, the Brooge Defendants had knowledge of the details of Brooge's internal affairs.

82

258.    The Brooge Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, they were able to and did, directly or indirectly, control the content of the statements of Brooge.  As officers and/or directors of a publicly held company, the Executive Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Brooge's businesses, operations, future financial condition and future prospects.    As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of the publicly traded securities of Brooge was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Brooge's business and financial condition which were concealed by the Brooge Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired publicly-traded securities of Brooge at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Brooge Defendants, and were damaged thereby.

259.    During the Class Period, Brooge securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Brooge Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired publicly traded securities of Brooge at prices artificially inflated by the Brooge Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of the publicly traded securities of Brooge was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Brooge common stock, and

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:24-cv-00959-AH(DFMx)

the corresponding valuation of the warrants, declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

260. By reason of the conduct alleged herein, the Brooge Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

261. As a direct and proximate result of the Brooge Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

262. With respect to Twelve Seas as it operated before the Business Combination, it engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the publicly-traded securities of Twelve Seas; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire the publicly-traded securities of Twelve Seas at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Twelve Seas took the actions set forth herein.

263. Pursuant to the above plan, scheme, conspiracy and course of conduct, Twelve Seas participated directly or indirectly in the preparation and/or issuance of

84

SEC filings, press releases and other statements and documents described above that were designed to influence the market for the publicly traded securities of Twelve Seas. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about BPGIC FZE's finances, business, and prospects.

264. Twelve Seas had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Twelve Seas acted with reckless disregard for the truth in that it failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to them. Said acts and omissions of Twelve Seas were committed willfully or with reckless disregard for the truth. In addition, Twelve Seas knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

265. Twelve Seas had a duty to disseminate timely, accurate, and truthful information with respect to its businesses, operations, future financial condition and future prospects, including with respect to BPGIC FZE as the potential SPAC merger target. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of the publicly traded securities of Twelve Seas was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Twelve Seas' and BPGIC FZE's business and financial condition which were concealed by Twelve Seas, Plaintiff and the other members of the Class purchased or otherwise acquired publicly traded securities of Twelve Seas at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Twelve Seas, and were damaged thereby.

85

266. During the Class Period, Twelve Seas' securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which Twelve Seas made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired publicly traded securities of Twelve Seas at prices artificially inflated by Twelve Seas' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of the publicly traded securities of Twelve Seas was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Twelve Seas common stock, and the corresponding valuation of the warrants, declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

267. By reason of the conduct alleged herein, Twelve Seas knowingly or recklessly, directly or indirectly, has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

268. As a direct and proximate result of Twelve Seas' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**Count II**
**(Violations of Section 20(a) of the Exchange Act**
**Against the Executive Defendants)**

269. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86

270.  During the Class Period, the Executive Defendants participated in the operation and management of Brooge, and conducted and participated, directly and indirectly, in the conduct of Brooge's business affairs.  Because of their senior positions, they knew the adverse non-public information about Brooge's misstatement of revenues and false financial statements.

271.  As officers and/or directors of a publicly owned company, the Executive Defendants had a duty to disseminate accurate and truthful information with respect to Brooge's financial condition and operations, and to correct promptly any public statements issued by Brooge which had become materially false or misleading.

272.  Because of their positions of control and authority as senior officers, the Executive Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Brooge disseminated in the marketplace during the Class Period concerning Brooge's results of operations. Throughout the Class Period, the Executive Defendants exercised their power and authority to cause Brooge to engage in the wrongful acts complained of herein.

273.  The Executive Defendants, therefore, were "controlling persons" of Brooge within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Brooge's publicly traded securities.

274.  Each of the Executive Defendants, therefore, acted as a controlling person of Brooge.  By reason of their senior management positions and/or being directors of Brooge, each of the Executive Defendants had the power to direct the actions of, and exercised the same to cause, Brooge to engage in the unlawful acts and conduct complained of herein.  Each of the Executive Defendants exercised control over the general operations of Brooge and possessed the power to control the

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:24-cv-00959-AH(DFMx)

specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

275.  By reason of the above conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Brooge.

## Count III
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against PwC)

276.  Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

277.  PwC made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading, by use of the means or instrumentalities of interstate commerce in order to maintain artificially inflated prices for Brooge securities in violation of Section 10(b) for the Exchange Act, 15 U.S.C. §78j(b), and Rules 10b-5.

278.  During the Class Period, PwC made false and misleading statements of material fact, which were intended to and did: (a) deceive the investing public, including Plaintiff, as alleged herein; (b) artificially inflate and maintain the market for and market prices of Brooge's securities; and (c) cause Plaintiff to purchase or otherwise acquire Brooge securities at artificially inflated prices.

279.  PwC acted as an independent auditor for Brooge.  It knew and understood that the opinion issued concerning the consolidated financial statements and reports of Brooge would be released to the investing public, and that investors would rely, and had a right to rely, on those reports and opinions.  PwC had access to Brooge employees and continuing access to and knowledge of Brooge's confidential corporate, financial, operating, and business information.  Despite this access and knowledge, PwC knowingly, or with extreme recklessness, perpetrated and/or concealed the accounting manipulations and other schemes undertaken, and

88

certified without qualification and publicly represented that Brooge's financial reports were free from material misstatements, in order to fraudulently boost Brooge's reported assets and earnings.

280. PwC engaged in the fraudulent activity described above knowingly, or in such a reckless manner, as to constitute willful deceit and fraud upon Plaintiff. It knowingly or recklessly caused Brooge's and its own reports and statements to contain misrepresentations and omissions of material fact as alleged herein.

281. As a result of the fraudulent activities of PwC described above, in conjunction with the activities of the other Defendants, the price of Brooge securities was artificially inflated during the Class Period.

282. In ignorance of Brooge's true financial condition, Plaintiff, relying upon the integrity of the market price for Brooge's securities, and/or the statements and reports of Brooge containing false and misleading information, purchased or otherwise acquired Brooge's securities at artificially inflated prices during the Class Period.

283. The prices for Brooge's securities declined materially upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

284. As a direct and proximate result of the wrongful conduct of PwC, Plaintiff suffered damages in connection with its purchases of Brooge's securities for which the Defendants are jointly and severally liable.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

89

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 27, 2026        **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*s/ Amanda F. Lawrence*

Amanda F. Lawrence (admitted *pro hac vice*)
156 South Main Street
P.O. Box 192
Colchester, CT 06413
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
alawrence@scott-scott.com

John T. Jasnoch (CA 281605)
Cornelia J. B. Gordon (CA 320207)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508
jjasnoch@scott-scott.com
cgordon@scott-scott.com

Thomas L. Laughlin, IV (admitted *pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Ave., 24th Fl.
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
tlaughlin@scott-scott.com

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335

90

Facsimile:  (310) 388-0192
brian@schallfirm.com

*Counsel for Lead Plaintiff Bluefin Capital Management, LLC and Co-Lead Counsel*

91

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2026, I caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

Executed on April 27, 2026, at Colchester, Connecticut.

*s/ Amanda F. Lawrence*

Amanda F. Lawrence (*pro hac vice*)

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:24-cv-00959-AH(DFMx)