Perrie M. Weiner, State Bar No. 134146
perrie.weiner@bakermckenzie.com
Benjamin W. Turner, State Bar No. 256092
ben.turner@bakermckenzie.com
**BAKER & McKENZIE LLP**
10250 Constellation Blvd., Suite 1850
Los Angeles, California  90067
Telephone:  310.201.4728
Facsimile:   310.201.4721

Attorneys for Defendant
BROOGE ENERGY LIMITED

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ERIC WHITE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BROOGE ENERGY LIMITED F/K/A BROOGE HOLDINGS LIMITED F/K/A TWELVE SEAS INVESTMENT COMPANY, NICOLAAS L. PAARDENKOOPER, SALEH YAMMOUT, SYED MASOOD ALI, LINA SAHEB, DIMITRI ELKIN, NEIL RICHARDSON, STEPHEN N. CANNON, PAUL DITCHBURN, ERNST & YOUNG, and PRICEWATERHOUSECOOPERS LIMITED PARTNERSHIP, DUBAI BRANCH,<br><br>Defendants. | Case No. 2:24-cv-00959-AH-DFM<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT MASOOD ALI SYED'S MOTION TO DISMISS**<br><br>Date:      July 29, 2026<br>Time:      1:30 p.m.<br>Ctrm:      9C, 9th Floor<br>Judge:    Hon. Anne Hwang<br><br>First Street Courthouse<br>350 W. 1st Street<br>Los Angeles, California 90012 |

# TABLE OF CONTENTS

Page

II.    INTRODUCTION ......................................................................................2

III.   FACTUAL AND PROCEDURAL BACKGROUND ..................................4

    A.    Brooge's Formation, the SPAC Transaction, and Masood's Tenure .............................................................................................4

    B.    The SEC Investigation, Brooge's Retention Of An Outside Law Firm And The SEC's Order ..................................................................5

    C.    Plaintiff's Attempt to Replead Scienter in the Third Amended Complaint ................................................................................................7

IV.    LEGAL STANDARD ..............................................................................8

V.     DISCUSSION ..........................................................................................8

A.     The TAC's New Allegations Do Not Cure The Scienter Defects .................8

B.     The TAC Fails To Plead Plausible Motive .....................................................14

C.     The TAC's Core Operations Theory Fails ......................................................16

D.     A Holistic Review Does Not Support Scienter ...............................................20

E.     The TAC Fails To Identify An Actionable Misstatement...............................21

VI.    The TAC Fails To Plead Loss Causation As To Masood ...........................23

VII.   The TAC Fails To Adequately Plead A Section 20(a) Claim.......................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amgen Inc. Sec. Litig.*,
    544 F. Supp. 2d 1009 (C.D. Cal. 2008)................................................................26

*Aramic LLC v. Reverence Therapeutics, Inc.*,
    2024 WL 1354503 (N.D. Cal. Apr. 2, 2024)........................................................21

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...............................................................................................8

*Bhangal v. Hawaiian Elec. Indus., Inc.*,
    2024 WL 4505465 (N.D. Cal. Oct. 15, 2024).......................................................20

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020)..................................................................................23

*Brady v. Delta Energy & Commc'ns Inc.*,
    598 F. Supp. 3d 865 (C.D. Cal. 2022)......................................................................9

*Browning v. Amyris, Inc.*,
    2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ......................................................19

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) .................................................................................25

*Dolly v. GitLab Inc.*,
    2025 WL 2372965 (N.D. Cal. Aug. 14, 2025).......................................................19

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023)..................................................................................26

*Espy v. J2 Global, Inc.*,
    99 F.4th 527 (9th Cir. 2024)...................................................................................17

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023)....................................................................................8

*Glazer Cap. Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) ..........................................................................10, 12, 13, 19

*Grossman v. Sin*,
   2025 WL 1330087 (C.D. Cal. Mar. 31, 2025) ....................................................13

*Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*,
   2017 WL 114401 (C.D. Cal. Jan. 9, 2017)..........................................................16

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000) .......................................................................25, 26

*Janus Cap. Grp., Inc. v. First Deriv. Traders*,
   564 U.S. 135 (2011) ........................................................................................21

*Lapiner v. Camtek, Ltd.*,
   2011 WL 445849 (N.D. Cal. Feb. 2, 2011)..........................................................21

*LifeLine Legacy Holdings, LLC v. OZY Media, Inc.*,
   2022 WL 2119122 (N.D. Cal. June 13, 2022) ...............................................14, 16

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ...........................................................................23

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) .............................................................................15

*In re NVIDIA Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ...........................................................................19

*In re Ocera Therapeutics, Inc. Sec. Litig.*,
   2018 WL 7019481 (N.D. Cal. Oct. 16, 2018), *aff'd*, 806 F. App'x
   603 (9th Cir. 2020) .........................................................................................11

*Paciga v. Invuity Inc.*,
   2019 WL 3779694 (N.D. Cal. Aug. 12, 2019)....................................................16

*Petersen v. Stem, Inc.*,
   2024 WL 4602710 (N.D. Cal. Aug. 30, 2024)....................................................19

*In re PG&E Corp. Sec. Litig.*,
   2025 WL 2781745 (N.D. Cal. Sept. 30, 2025)..............................................21, 22

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SYED'S MOTION TO DISMISS

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ..........................................................................17, 18

*Prodanova v. H.C. Wainwright & CO., LLC*,
  993 F.3d 1097 (9th Cir. 2021) ..........................................................................14, 20

*Sakkal v. Anaplan Inc.*,
  557 F. Supp. 3d 988 (N.D. Cal. 2021)...................................................................19

*Sneed v. AcelRx Pharms., Inc.*,
  2024 WL 2059121 (N.D. Cal. May 7, 2024), *aff'd sub nom. Sneed v.
  Talphera, Inc.*, 147 F.4th 1123 (9th Cir. 2025) ....................................................20

*Sneed v. Talphera, Inc.*,
  147 F.4th 1123 (9th Cir. 2025)........................................................................9, 18

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ..........................................................................8, 9, 10, 20

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod.
  Liab. Litig.*,
  2017 WL 66281 (N.D. Cal. Jan. 4, 2017), *reconsideration denied*,
  258 F. Supp. 3d 1037 (N.D. Cal. 2017)...............................................................25

*Wanca v. Super Micro Computer, Inc.*,
  2018 WL 3145649 (N.D. Cal. June 27, 2018) .....................................................22

*Webb v. Solarcity Corp.*,
  884 F.3d 844 (9th Cir. 2018) ...............................................................................15

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ...............................................................................20

**Statutes**

15 U.S.C. § 78u–4(b)(1), (4)...............................................................................14

15 U.S.C. § 78u-4(b)(2)(A) .................................................................................14

15 U.S.C. § 78u-4(b)(4).......................................................................................23

15 U.S.C. § 7241(a) .............................................................................................22

An Outside Law ......................................................................................................5

PSLRA ............................................................................................................... 9, 15

**Other Authorities**

Rule 10b-5 ................................................................................................................ 9

Rule 12(b) .............................................................................................................. 23

Rule 12(b)(6) ........................................................................................................... 8

TAC's "Executive Defendants" ............................................................................. 10

## I.    INTRODUCTION

The Court dismissed the SAC's claims against Masood for failure to plead scienter. The TAC does not cure that defect and adds no particularized facts that survive several independent grounds for dismissal.

Masood joined Brooge as CFO on a two-year contract on April 27, 2020 – years after the alleged revenue recognition issues commenced. (Tuszynski Dec. Ex. L; TAC ¶¶ 1-8) Unlike the Twelve Seas SPAC executives who made tens of millions of dollars off the business combination, Masood received a relatively modest monthly salary and no equity compensation. (Tuszynski Dec. Ex. L). The SEC's cease-and-desist order, which forms the backbone of Bluefin's allegations, does not mention him. (Tuszynski Dec. Ex. S). His alleged misstatements, beyond unidentified statements he supposedly made on earnings calls, are limited. (TAC App. B). They consist solely of SOX certifications, a July 2022 statement regarding 2019 revenues recorded and audited before he joined, and two SEC filings he signed. (¶¶ 162-166). The TAC does not allege Masood had access to correspondence or transaction-level documentation that would have revealed the supposed wrongdoing, nor does the TAC allege that anyone ever told him about it. (*See generally* TAC). The only particularized concealment allegation against Masood is the PwC email, which the Court considered and rejected, concluding the more cogent inference was that Masood was addressing a control lapse, not concealing wrongdoing. (¶¶201-206).

Beyond the PwC email, Plaintiff is left with Masood's statements and sign-offs on audited financial results for periods that largely preceded his tenure – figures that turned out to be wrong, and Brooge told the market so. (Tuszynski Dec. Ex. Q). On August 17, 2022, Brooge disclosed to investors that its prior financials for 2018 through 2020, and all press releases, earnings releases and investor communications describing the company's financial performance, could no longer be relied upon. *Id.* The market did not respond with a price decline, and the SEC's December 22, 2023

order, while disclosing alleged wrongdoing by others, revealed nothing new about Masood, who was not charged, fined or even named in the order. (*See generally* Tuszynski Dec. Ex. S ("SEC Order")).

The TAC's allegations regarding the underlying purported misconduct actually widens the distance from Masood. The TAC's core theory rests on a transaction-level invoicing architecture borrowed liberally from the SEC's order: dual sets of invoices issued to the Phase I Customer and BIA, rate and volume adjustments on individual storage contracts and reimbursement checks cycled between Brooge and BIA, an alleged related party. (TAC ¶¶ 64-92). Those are granular, operational arrangements allegedly orchestrated by individuals who were supposedly directing day-to-day commercial relationships with specific counterparties. A CFO would have engaged with revenue at the aggregate level – not by poring over individual invoices and checks.

Indeed, the TAC never alleges Masood received, reviewed or generated any of the alleged hundreds of transaction-level documents at the center of the purported wrongdoing, participated in negotiations with BIA or the Phase I Customer, or had any role in the operational mechanics Bluefin describes. (¶¶ 162-166). Nonetheless, the TAC asks the Court to infer that a salaried officer on a short-term contract, with no equity stake and no performance-based compensation, knowingly perpetuated a multi-year scheme from which he derived no financial benefit – while exposing himself to millions of dollars in personal liability, potential regulatory liability, career destruction and reputational ruin.

The TAC fails to plead scienter, fails to plead loss causation as to Masood, fails to plead scheme liability and fails to plead that Masood exercised actual power or control over an alleged primary violator for purposes of Section 20(a). The claims against Masood should be dismissed with prejudice.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SYED'S MOTION TO DISMISS

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Brooge's Formation, the SPAC Transaction, and Masood's Tenure

Brooge Petroleum and Gas Investment Company FZE (BPGIC) was founded in 2013. (*See* Declaration of Tomas N. Tuszynski in support of Defendants' Motion ("Tuszynski Dec.") Ex. G). Twelve Seas Investment Company, a special purpose acquisition company, completed its initial public offering on June 22, 2018, raising $207 million on terms that required it to consummate a business combination within eighteen months or liquidate the trust account. (Tuszynski Dec. Ex. G). Twelve Seas' sponsor was a Delaware limited liability company called Twelve Seas Sponsors I LLC. (*Id.*) Dimitri Elkin, a former defendant in this litigation dismissed by the Court on March 26, was Twelve Seas's CEO and the managing member of the sponsor LLC. (*Id.*) Twelve Seas' Chairman Neil Richardson and Twelve Seas CFO Stephen N. Cannon – former defendants in this litigation who were dismissed by Bluefin – were also members of the sponsor LLC. (*Id.*) In December 2017, the sponsor LLC acquired the founder shares – eventually 5,175,000 shares of Twelve Seas – for an aggregate purchase of $25,000 or roughly half a cent per share.  (Tuszynski Dec. Ex. B). On June 22, 2018, simultaneously with the closing of Twelve Seas's $207 million IPO, the sponsor LLC purchased 529,000 private placement units from Twelve Seas at $10 per unit, paying an additional $5.29 million. (Tuszynski Dec. Exs. B, C).

On April 15, 2019, Twelve Seas, Brooge Holdings Limited, BPGIC, and related parties entered into a business combination agreement pursuant to which BPGIC would become a publicly traded company through a de-SPAC. (Tuszynski Dec. Ex. D). In December 2019, Twelve Seas completed the business combination with Brooge. (Tuszynski Dec. Ex. E). At closing, Brooge disclosed that Twelves Seas' sponsor and certain Twelve Seas officers and directors held 4,721,900 Brooge ordinary shares and 529,000 private warrants. (Tuszynski Dec. Ex. E). Brooge valued the ordinary shares issued in the transaction at $10.49 per share and the

warrants at $0.80 per warrant. (Tuszynski Dec. Ex. E). Using those values, the Twelve Seas officers and directors held Brooge securities worth approximately $40 million. (TAC ¶138).

Twelve Seas' shareholders approved the Business Combination on December 19, 2019, and on December 20, 2019, Brooge announced that the transaction had been closed and that Brooge would begin trading on Nasdaq on December 23, 2019. (Tuszynski Dec. Exs. I, J). Four months later, on April 27, 2020, Brooge filed a Form 6-K stating that Masood had been appointed to act as Interim CFO. (Tuszynski Dec. Ex. L). As set forth in Masood's offer letter filed with the SEC, Masood's compensation was limited to a monthly salary of 75,000 Dirhams, consisting of a base salary of 37,500 Dirhams and 37,500 to "be distributed by the Employee for all other allowances as per the Employee's personal preference" and a yearly bonus of 180,000 Dirhams. *Id*. The offer letter did not award Masood equity. *Id*. Masood's salary amounted to roughly $245,000 USD per year, or less than one-half a percent of the $50 million value of Brooge securities obtained by Twelve Seas officers and directors. (Tuszynski Dec. Ex. I; TAC ¶ 138). According to the TAC, Masood's tenure ended in April 2022 when Brooge did not renew his CFO contract. (¶ 21).

### B.    The SEC Investigation, Brooge's Retention Of An Outside Law Firm And The SEC's Order

On May 31, 2022, Brooge filed a Form 6-K saying: "The Company has not been able to file the 2021 Form 20-F due to an ongoing non-public examination being conducted by the SEC regarding the financial statements of the Company. The Company is cooperating with the SEC fully." (Tuszynski Dec. Ex. Q).

On August 17, 2022 Brooge filed a Form 6-K, titled "Non-Reliance on Previously Issued Financial Statements," stating the Audit Committee, on August 12, 2022, concluded that Brooge's previously issued audited financial statements for 2018, 2019 and 2020, and certain interim statements including June 30, 2021, should no longer be relied upon. (Tuszynski Dec. Ex. R). The Form 6-K states that the non-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SYED'S MOTION TO DISMISS

reliance decision resulted from an "on-going examination undertaken by the Audit Committee, with the assistance of a respected global law firm and an expert accounting consultancy firm, in response to the previously noted examination being conducted by the SEC into the Company's financial statements." *Id.*

On December 22, 2023, the SEC issued a cease and desist order in connection with Brooge, Paardenkooper and Saheb (Respondents) who "submitted Offers of Settlement (the 'Offers') which the Commission has determined to accept." (Tuszynski Dec. Ex. S. ("SEC Order") at §II). The order states that the SEC proceedings "arise out of" accounting issues, the "crux" of which "was the creation of two sets of invoices." (SEC Order, ¶¶ 1, 3). The order asserts:

> The first set consisted of actual invoices to customers who stored oil at Brooge's facilities in Fujairah. Customers paid these invoices in the ordinary course. A second set of invoices which reflected significantly higher rates and volumes were ostensibly sent to customers who never used Brooge's facilities. These invoices were "paid" through a complicated series of unsupported transactions involving an affiliated or related party. (SEC Order, ¶ 3).

The order names only two former officers – Paardenkooper and Saheb – who the order defines as "Senior Management." *Id.* The order asserts they "knew, or were reckless in not knowing" of the alleged wrongdoing. *Id.* The order does not reference Masood, include Masood in the definition of "Senior Management," assert wrongdoing by Masood or assert Masood's knowledge of alleged wrongdoing. (SEC Order ¶ 3; *see generally* SEC Order).

The TAC references the order approximately 38 times. (*See* ¶¶ 7-8, 67, 74, 87, 92, 130, 146-47, 155 & nn.13-14, 18-28, 34, 37, 39-42, 53-56, 58, 60). Bluefin's opposition to the motion to dismiss the SAC likewise relies on the content of the SEC order. (*See, e.g.,* ECF 144 at 5-6, 21, 22, 24, 26, 28-29, 31-32 & nn. 14, 18-19). Indeed, Bluefin's opposition relies on the order as a basis for its allegations in a dedicated argument spanning pages 28-29 and footnotes 19-20, asserting that the SEC Order may be used to "formulate and frame" allegations regarding scienter because Plaintiff supposedly "confirmed all the key points made in the SEC Order."

(ECF 144 at 28-29 & nn.19-20). Those alleged "key points" cannot refer to Masood because he is not mentioned in the SEC's order.

### C.    Plaintiff's Attempt to Replead Scienter in the Third Amended Complaint

In ruling on the motions to dismiss the SAC, the Court agreed that, with respect to the alleged March 2021 email sent by Masood, "the more 'cogent inference'" was that Masood "recognized the transfer as a control lapse and then proceeded to work with Paardenkooper and PwC to address it." (ECF 164 at 28). The TAC repleads the March 2021 email with additional, argumentative characterizations of that email. (¶¶ 199-203). The TAC alleges that Masood "recognized the risks posed by PwC's discovery of the transfer from Brooge to its then-largest customer, BIA, of more than AED 6 million, and it was Defendant Masood who flagged it as a problem for Defendant Paardenkooper. Defendant Masood clearly understood the nature of the fraud and how the reimbursements to BIA worked to effectuate it." (¶ 163).  The TAC again pleads the conclusory allegation that "Masood was an architect and primary beneficiary of the scheme alleged herein and made multiple false statements during the Class Period" (¶ 21) while simultaneously alleging the same "scheme" was in place long before Masood joined the company. (¶¶ 68-71).

The TAC adds a new allegation as to Masood's overlap with leasebacks – that Masood was "the CFO for the second half of FY2020, when Brooge entered into leasebacks that highlighted the unusual nature of its relationship with BIA" but adds no new factual allegations and instead cross-references paragraph 196, which contains allegations regarding supposed "red flag[s]" for the auditors. (¶ 162).

The TAC alleges "Masood's knowledge is further confirmed by statements he made related to Brooge's operations, which evince his intimate involvement in and familiarity with Brooge's revenue and the contracts supporting it. For example, Defendant Masood commented that Brooge's "record revenue for 2019 was

generated by fixed storage fees together with ancillary fees for services that include blending, heating, inter-tank transfers and throughput transfers" in a Form 6-K filed on July 1, 2020. Defendant Masood also discussed Brooge's contracts and revenues on earnings calls, as set forth in ¶¶98, 100-101, *supra*." (¶ 164). The TAC alleges that "the actions outlined above make it clear that the fake invoicing scheme was initiated and effectuated by the Executive Defendants, amply supporting a strong inference of scienter on this front." (¶ 165). The TAC further invokes the core operations doctrine. (¶ 166).

## III. LEGAL STANDARD

To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court must "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

## IV. DISCUSSION

### A.    The TAC's New Allegations Do Not Cure The Scienter Defects

Courts conduct a two-part inquiry when considering the sufficiency of scienter allegations. First, the court "determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). If not, then the court "conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Id*. (citation omitted). In evaluating scienter, courts must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323-24. "Showing scienter necessarily becomes harder when the allegedly

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SYED'S MOTION TO DISMISS

misleading statements are not flagrantly false because in those cases an innocent alternative explanation becomes more likely." *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1134 (9th Cir. 2025).

The TAC again relies on the March 2021 email and contains a new section, paragraphs 162 through 166, that allege Masood became CFO in 2020, that 2020 revenue was overstated, that BIA leasebacks occurred around the time he became CFO, that he recognized the significance of the March 2021 PwC transfer issue, that he made revenue-related comments and that the alleged scheme was "initiated and effectuated by the Executive Defendants." (TAC ¶ 162-166). None of these additional allegations supply the missing facts to infer scienter – that Masood knew the alleged revenue numbers were false, knew of the alleged fake invoices, knew of the allegedly improper BIA reimbursement, or knew that Paardenkooper's explanation to PwC was allegedly false.

### 1. Masood's Status As CFO

The TAC alleges that Masood was Brooge's CFO in 2020, the year Brooge later restated revenues by 35%. (¶ 162). The TAC appears to ask the Court to infer contemporaneous knowledge of wrongdoing solely from that overlap, characterizing Masood elsewhere as an "architect and primary beneficiary" of the conduct alleged (¶ 21) and concluding that the conduct was "initiated and effectuated by the Executive Defendants." (¶ 165). This is insufficient. *Tellabs*, 551 U.S. at 323-24.

First, the framing is implausible because Masood became CFO on April 27, 2020 – more than two years after the alleged misconduct began. (¶ 68). Accordingly, he could not have been an "architect." (¶ 21). Nor could he be a "primary beneficiary" as he was a salaried employee with no equity compensation. (*Id.*; Tuszynski Dec. Ex. L).

Second, "with the enactment of the PSLRA, courts around the country and in this district have emphatically rejected the use of group pleading for Rule 10b-5 claims." *Brady v. Delta Energy & Commc'ns Inc.*, 598 F. Supp. 3d 865, 871 (C.D.

Cal. 2022). The "Executive Defendants" group pleading treats every officer, including officers named in the SEC order and officers absent from the order, as a single actor and asks the Court to infer scienter from corporate level alleged conduct. (TAC ¶ 165).

Third, the SEC order is inconsistent with the TAC's "Executive Defendants" definition, as the order defines "Senior Management" to mean Paardenkooper and Saheb only. (SEC Order ¶ 3). The SEC had broader investigative tools than any private plaintiff and reached a narrower conclusion than Plaintiff does. *Id.* Plaintiff previously argued it had conducted an "independent investigation" that "confirmed all the key points made in the SEC Order" and "there is no reason that Plaintiff cannot use them [the SEC's findings] to formulate and frame allegations in the Complaint regarding scienter." (ECF 144 at 28-29). If, as Plaintiff contends, the SEC order is reliable enough to support Plaintiff's allegations, it is reliable enough to draw inferences from its omissions – and it omits Masood entirely. *Tellabs*, 551 U.S. at 323-24; (*See generally* SEC Order). And even where a company accepts the SEC's factual findings – which did not happen here – that acceptance does not establish that a particular officer had actual knowledge of the violations. *See Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 748-49 (9th Cir. 2008) ("even if [the defendant company] accepted the SEC's and DOJ's statements of fact, there is nothing in either settlement agreement that would support the conclusion that Magistri [an officer] had actual knowledge of the violations").

Fourth, this theory reduces to a core operations inference, which as discussed below, the TAC fails to adequately plead.

### 2.    Leasebacks

The TAC alleges that Masood was CFO when Brooge entered into leasebacks "that highlighted the unusual nature of its relationship with BIA." (TAC ¶ 162). The leaseback theory fails for four reasons.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SYED'S MOTION TO DISMISS

First, Plaintiff places most of its leaseback allegations within the TAC's auditor scienter section. (*Compare* TAC ¶¶ 162-165; ¶¶190-209). Paragraphs 190-209 of the TAC walk through "red flags" Plaintiff alleges PwC ignored and the leaseback discussion at paragraph 196 is one of those "red flags." (¶ 196). These allegations rely on PwC's professional skepticism duty under PCAOB standards, not what Masood supposedly did or knew. The TAC's scienter section on Masood at paragraphs 162-165 simply reference paragraphs 196 rather than allege independent facts specific to him. (¶ 162). The TAC does not allege Masood negotiated the leasebacks, approved them, reviewed BIA's economics, knew that BIA was allegedly being reimbursed or had information to connect the leasebacks to the alleged dual invoice and circular payment allegations. (¶ 162-166). This does not satisfy the PSLRA's requirement "to plead particular facts giving rise to a strong inference that each Defendant acted with the required state of mind[.]" *In re Ocera Therapeutics, Inc. Sec. Litig.*, 2018 WL 7019481, at *10 (N.D. Cal. Oct. 16, 2018), *aff'd*, 806 F. App'x 603 (9th Cir. 2020).

Second, while the TAC offers conclusory allegations that the leasebacks "highlighted the unusual nature" of BIA's alleged relationship with Brooge and that "there was no reason for BIA to agree to these terms, which only advantaged Brooge and not BIA," the TAC does not plead factual allegations to support those conclusions. (¶ 162). Paragraph 196 alleges the leaseback terms "were in Brooge's favor," that one leaseback was at a "60% premium to Brooge's previous contracts" and there was supposedly "no reason" for BIA to "lose out on lucrative subleasing arrangements." (¶ 196). But according to paragraph 114, Brooge publicly disclosed that BIA "is only allowed to sublease the Phase I storage tanks with BPGIC's prior approval" – meaning that BIA was not free to enter "lucrative subleasing arrangements" without Brooge's approval. (¶ 114). Further, the TAC does not plead the actual leaseback economics such as what Brooge might have paid BIA for the leaseback, whether BIA received other consideration, whether BIA shared in the

11                Case No. 2:24-cv-00959-AH-DFM

economics, what "previous contracts" means, or whether BIA actually could have contracted with the sublessee. Nor does the TAC allege that leasebacks failed to generate real revenue from real customers paying real market rates.  Notably, for all of Plaintiff's reliance on the SEC order, the order makes no mention of the leasebacks.

Third, even crediting the premise that the leasebacks might support some inference about BIA's relationship with Brooge, that does not cure the scienter defect.  Plaintiff's theory of liability turns on alleged revenue recognition issues arising from supposed dual invoices, circular BIA payments and reimbursement of BIA payments.  (¶ 3-8). The leaseback, by contrast, at most suggests that BIA may not have been acting at arm's length when it returned capacity to Brooge. The TAC pleads no facts showing that the leasebacks put Masood on notice of the alleged revenue recognition issues. Nor does the TAC or Appendix B to the TAC identify any disclosure by Masood rendered false by the leasebacks. (*See generally* TAC App. B).

Fourth, the Court already considered the leaseback allegation as part of Plaintiff's auditor scienter theory and rejected the theory. The Court described the leasebacks at length, and still dismissed the Section 10(b) claim as to the auditors. (ECF 164 at 34-36). It should conclude the leaseback theory also fails as to Masood. The TAC pleads no facts to suggest Masood was in any better position than the auditors to determine the leasebacks were a supposed "red flag," particularly given the allegedly concealed nature of the revenue recognition issues. *See Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 746-47 (9th Cir. 2008) ("the surreptitious nature of the transactions creates an equally strong inference that the payments would have deliberately been kept secret – even within the company").

### 3.   Masood's Public Statements

The TAC alleges that Masood's scienter "is further confirmed by statements he made related to Brooge's operations, which evince his intimate involvement in

and familiarity with Brooge's revenue and the contracts supporting it." (TAC ¶ 164). The TAC cites two purported examples: (1) a statement attributed to Masood in a July 1, 2020 Form 6-K that Brooge's "record revenue for 2019 was generated by fixed storage fees together with ancillary fees for services that include blending, heating, inter-tank transfers and throughput transfers;" and (2) Masood allegedly "discussed Brooge's contracts and revenues on earnings calls." *Id*. Neither example establishes scienter.

For one, the two examples largely predate Masood's tenure. (Tuszynski Dec. Ex. L). The Form 6-K describes Brooge's revenues for the fiscal year 2019, a period that ended more than four months before Masood joined the company on April 27, 2020. For another, the 6-K was filed just three months after Masood had joined and the TAC pleads no facts to suggest Masood should have known the audited financials referenced in that filing were wrong. (Tuszynski Dec. Ex. M). For another, reciting audited financial results in a public filing is part of a CFO's ordinary job duties; it is not evidence that the CFO knew those results were wrong. *See Glazer*, 549 F.3d at 747-48 (holding that SOX certifications are "not sufficient, without more, to raise a strong inference of scienter on the part of" the signing officer); *Grossman v. Sin*, 2025 WL 1330087, at *36 (C.D. Cal. Mar. 31, 2025) ("the mere signing of the filing does not give rise to a strong inference of scienter absent allegations the defendant knew of alleged misstatements contained within the SEC filing").

As for the earnings calls, the July 7, 2020 and November 30, 2020 calls discussed the same 2019 revenue figures. While the TAC alleges the September 15, 2021 call discussed revenue for the first half of 2020, neither the TAC nor Appendix B allege any specific statement made by Masood on that call or any other. (TAC ¶ 101; App. B). Instead the TAC baldly groups Masood and Paardenkooper together and alleges they "repeated" alleged "overstated" revenue without describing what Masood specifically said. (¶¶ 100-101). This does not satisfy the PSLRA's

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SYED'S MOTION TO DISMISS

requirement to specify each misleading statement, the speaker, and why that speaker's statement was false. *See* 15 U.S.C. § 78u–4(b)(1), (4).

> 4.   *March Email*

Paragraph 163 of the TAC attempts to restate an inference this Court already rejected regarding the March email.  The TAC alleges "it was Defendant Masood who recognized the risks posed by PwC's discovery of the transfer from Brooge to its then-largest customer, BIA, of more than AED 6 million, and it was Defendant Masood who flagged it as a problem for Defendant Paardenkooper. Defendant Masood clearly understood the nature of the fraud and how the reimbursements to BIA worked to effectuate it." The Court agreed that "the more 'cogent inference' is that Masood recognized the transfer as a control lapse and then proceeded to work with Paardenkooper and PwC to address it." The TAC does not plead additional factual allegations regarding this episode, identifies no new documents and offers no new factual context to suggest the Court's conclusion should be revisited. Paragraph 163 merely adds characterizations – that Masood "recognized the risks" and "clearly understood" the purported wrongdoing, but these characterizations of alleged facts the Court already held were uncompelling do not satisfy the PSLRA's requirement of pleading "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

## B.   The TAC Fails To Plead Plausible Motive

"In the Ninth Circuit, allegation of a plausible motive generally is required to plead scienter." *LifeLine Legacy Holdings, LLC v. OZY Media, Inc.*, 2022 WL 2119122, at *4 (N.D. Cal. June 13, 2022). As a result, the "lack of a plausible motive" "makes it much less likely that a plaintiff can show a strong inference of scienter." *Prodanova v. H.C. Wainwright & CO., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021). The TAC does not plead a plausible motive for Masood to knowingly participate in the purported revenue recognition issues. The TAC does not plead that Masood – who received no equity compensation – sold Brooge stock while the price

14

was purportedly inflated, which "detract[s] from a scienter finding." *Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018). Nor does the TAC plead any other way in which Masood benefited from the alleged misstatements.

In *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020), plaintiff alleged "defendants knew the FDA would not approve [a medical device], or at least that it would not do so on the timeline defendants were telling the market." *Id.* at 415. The Ninth Circuit questioned: "why would defendants promise the market that the FDA would approve [the device] if defendants knew the FDA would eventually figure out that [it] could not be approved due to 'intractable' and 'unresolvable' ... problems?" *Id.* The court noted: "If defendants had sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium, the theory might have more legs." *Id.* Without such allegations, "we are asked to accept the theory that defendants were promising FDA approval for a medical device application they knew was 'unapprovable,' misleading the market all the way up to the point that defendants were 'unable to avoid the inevitable.'" *Id.*

So too, here. Masood earned a relatively modest salary as a CFO, was employed on a two-year contract, received no equity compensation and had no financial stake in whether Brooge's reported revenue was $27 million or $42 million. (Tuszynski Dec. Ex. L). Alleged wrongdoing at a public company of the nature and scale Plaintiff alleges does not remain undetected indefinitely. Plaintiff nonetheless wants the Court to accept the premise that Masood engaged in long-running misconduct regarding Brooge's revenues that risked professional ruin, a referral to the DOJ and millions of dollars in liability, even though he did not benefit from that alleged misconduct and the SEC would eventually figure out the "truth." Where a theory of fraud "does not resonate in common experience," the "PSLRA neither allows nor requires [courts] to check [their] disbelief at the door." *Nguyen*, 962 F.3d at 415.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SYED'S MOTION TO DISMISS

### C.    The TAC's Core Operations Theory Fails

#### 1.    *The Core Operations Doctrine Requires More Than Officer Status*

To establish scienter – particularly when attempting to overcome a lack of motive – plaintiffs must plead "compelling and particularized facts showing fraudulent intent or deliberate recklessness." *LifeLine*, 2022 WL 2119122, at *4. Thus, Plaintiff must allege with particularity that Masood knew "specific negative information" that necessarily "contradicted [his] public statements." *Paciga v. Invuity Inc.*, 2019 WL 3779694, at *6 (N.D. Cal. Aug. 12, 2019). The TAC pleads no facts showing Masood received specific information before or during the Class Period "contradicting [his] public statements." *Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*, 2017 WL 114401, at *12 (C.D. Cal. Jan. 9, 2017). Accordingly, the TAC pleads no facts showing that Masood knew or was deliberately reckless in not knowing that Brooge's revenues were allegedly overstated.

Instead, Plaintiff relies on Masood's CFO title – a position present in most companies – and the core operations doctrine, alleging that "[t]he take-or-pay contracts, which relied on just a single customer for each Phase, were critical to Brooge's business model and, thus, the Company's commercial prospects and viability." (TAC ¶ 166). The TAC further alleges that Paardenkooper – not Masood – supposedly "reemphasized" "the importance of the take-or-pay contracts" and posits that "Defendants" – not Masood specifically – "knew (and, at least, recklessly disregarded) that the take-or-pay structure was fraudulent because every segment of the company's operations would be impacted by the reality that the take-or-pay contracts did not exist for all intents and purposes." (*Id.*).

The Ninth Circuit dismisses this doctrine outside of "rare circumstances," absent here, where a plaintiff produces "specific admissions from top executives that they are involved in every detail of the company" or "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was

16    Case No. 2:24-cv-00959-AH-DFM

without knowledge of the matter." *Espy v. J2 Global, Inc.*, 99 F.4th 527, 539 (9th Cir. 2024). Plaintiff's allegations fail under either approach.

### 2. The TAC Fails To Satisfy Either Prong Of The Doctrine

Plaintiff does not allege any "admissions" by Masood demonstrating that he was aware of all "minutia" of the  company's operations – much less that he was aware of all information that might have conflicted with his challenged statements. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). Second, Plaintiff does not provide any allegations suggesting that it would be "absurd" to assume that Masood lacked the requisite knowledge to raise a strong inference of scienter. *Id*. at 1063. The TAC pleads that the alleged structure began in December 2017, that the Phase I customer allegedly never paid, that BIA allegedly replaced that customer in August 2019 and that the alleged BIA reimbursement mechanics were already in place in 2018 and 2019. (¶¶ 3-8, 80). Masood did not become CFO until April 27, 2020, his two-year contract was not renewed and he was not identified in the SEC order. (Tuszynski Dec. Ex. L; *see generally* SEC Order). Further, the TAC alleges Brooge had real customers, real storage activity and real 2020 revenues of $27.19 million. (¶¶ 81, 101). Even on Plaintiff's theory, Brooge had a substantial multi-million dollar legitimate business. The issue was that reported revenue allegedly exceeded actual revenue because of an improper accounting architecture that, according to the TAC, "was crafted to conceal the overstatement." (¶ 147).

Nor does the TAC allege that the revenue recognition issues were facially visible from any document to which Masood had access.  Paragraph 166 invokes the core operations doctrine on the basis that the take or pay contracts were "critical to Brooge's business model" and BIA was an important customer. (¶ 166). A CFO could know that take-or-pay contracts were important without knowing that the contracts were allegedly being used with dual invoices and reimbursement payments.  A CFO could know that a particular customer was "critical" to its

17

business. Indeed, customer concentration and dependence on key contracts are standard features of commercial enterprises. That Brooge was singularly or primarily dependent on one customer is entirely separate from whether the revenue figures from that customer were overstated and Masood knew they were overstated.

### 3. The Nature of the Alleged Scheme Makes It Implausible – Not "Absurd" – That Masood Was Unaware

Far from connecting Masood to the alleged overstatement, the TAC describes alleged misconduct that was, by design, invisible to anyone relying on the company's audited financial reporting or aggregated financial data of the type a CFO would ordinarily review. (¶ 78-88). The TAC – and the SEC order on which the TAC so heavily relies – describe the alleged concealment as involving transaction-level individual invoices, individual payments, audit materials and other documents that went undetected by professional auditors with full record access. *Id.* Under that premise, there is no reason to infer it would have been "absurd" that a CFO – relying on those auditors and the aggregate financial reporting those auditors produced – was unaware of the allegedly concealed underlying issue. Nor does the TAC supply any reason to draw such an inference, as the TAC pleads no facts suggesting that Masood created, directed the creation of, reviewed, approved or was even told about the allegedly concealed information. *See Sneed*, 147 F.4th at 1134 (plaintiffs "fail to plausibly show the core operations doctrine applies here because no fact existed that would have led [individual defendants] to know the...slogan conveyed patently false information.").

In *Intuitive Surgical*, though executives allegedly knew "contents of the software-generated reports because the substance of the reports was discussed in meetings," there were no "allegations linking specific reports and their contents to the executives." 759 F.3d at 1062-63. Here, Plaintiff offers even less. Where *Intuitive Surgical* held allegations insufficient despite references to specific software-generated reports discussed in meetings, the TAC does not identify a single

18    Case No. 2:24-cv-00959-AH-DFM

report, ledger entry, invoice or internal communication that Masood reviewed or received from which the alleged overstatement would have been apparent. Nor does Plaintiff – despite having conducted an "independent investigation" and having apparent access to numerous internal company emails and Audit Committee minutes – allege any facts regarding Masood's responsibilities at the company.

### 4. General Management Oversight And Company Size Are Insufficient

Even "micromanagement" does not suffice to plead core operations. *See Sakkal v. Anaplan Inc.*, 557 F. Supp. 3d 988, 992, 999 (N.D. Cal. 2021). Allegations that a CEO "hovered over the sales department, interfering with, and sometimes overruling, leadership decisions" were no shortcut to pleading that "Defendants had 'actual access' to the relevant information," nor did this level of "involvement ... indicate it would be 'absurd' to suggest that management was unaware of the [facts] alleged." *Id.* at 992, 999. Permitting such allegations to succeed "would eviscerate the core-operations test and turn it into an automatic presumption of [management's] comprehensive knowledge." *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *15 (N.D. Cal. Mar. 24, 2014) (dismissing); *see also Dolly v. GitLab Inc.*, 2025 WL 2372965, at *14 (N.D. Cal. Aug. 14, 2025) ("Access to information, by itself, does not establish that Individual Defendants knew their statements were false or misleading."); *Petersen v. Stem, Inc.*, 2024 WL 4602710, at *11 (N.D. Cal. Aug. 30, 2024) ("The allegations on which plaintiffs rely, however, which reflect defendants' general oversight of company business and projects, do not suffice to show defendants had access to information demonstrating Athena's alleged lack of functionality for FTM projects.").

The TAC alleges that the Company had, by 2021, 24 employees and 64 contractors (¶ 50) but the Ninth Circuit has consistently rejected reliance on a company's size. *See, e.g., Glazer Cap. Mgmt.*, 549 F.3d at 747 (holding that "the mere size and nature of [the] business are not sufficient to create a strong inference of scienter"); *In re NVIDIA Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014) (holding

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SYED'S MOTION TO DISMISS

that core operations theory does not apply simply because "the nature of the problem concerned [the company's] flagship product"); *Sneed v. AcelRx Pharms., Inc.*, 2024 WL 2059121, at *13 (N.D. Cal. May 7, 2024), *aff'd sub nom. Sneed v. Talphera, Inc.*, 147 F.4th 1123 (9th Cir. 2025) ("Plaintiffs' allegations that AcelRx was a small company and that it only had one product are not sufficient to raise a strong inference of scienter.").

### D. A Holistic Review Does Not Support Scienter

Because none of the TAC's allegations of scienter is sufficient to raise a strong inference of scienter, the Court must "consider the complaint in its entirety," to determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322–23. When conducting this holistic review, courts must "'take into account plausible opposing inferences that could weigh against a finding of scienter.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1006 (9th Cir. 2009) (quoting *Tellabs*, 551 U.S. at 323).

Viewed holistically, no "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Again, Plaintiff offers no plausible theory of "why" Masood would knowingly mislead investors by supposedly overstating revenues when he had no financial incentive to do so and numerous reputational, professional and financial reasons to avoid doing so. *See, e.g., Prodanova*, 993 F.3d at 1108 ("[T]he lack of a plausible motive certainly makes it much less likely that a plaintiff can show a strong inference of scienter."); *Bhangal v. Hawaiian Elec. Indus., Inc.*, 2024 WL 4505465, at *16 (N.D. Cal. Oct. 15, 2024) (no scienter where "Plaintiffs do not allege why Individual Defendants concealed information regarding the company's wildfire mitigation efforts and do not allege any Individual Defendant benefited from the alleged fraud by selling stock at an inflated price").

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SYED'S MOTION TO DISMISS

The more compelling inference based on the facts alleged is of a CFO who arrived in April 2020 to a company with audited financials and clean audit opinions, who relied on those audited financials and audit opinion in his certifications and public statements, who worked with Paardenkooper and PwC to escalate a potentially erroneous transfer, who had no motive to engage in wrongdoing as he received no equity compensation, and who was not even mentioned in the SEC order. Also weighing against an inference of scienter is the absence of any allegation that Masood sold Brooge stock, let alone held Brooge stock during the relevant period. *Lapiner v. Camtek, Ltd.*, 2011 WL 445849, at *8 (N.D. Cal. Feb. 2, 2011) ("the absence from the SAC of any allegation that defendant Ronit Dulberg, Camtek's CFO during much of the relevant period, sold any of her Camtek stock" weighed against scienter).

### E.    The TAC Fails To Identify An Actionable Misstatement

A person can only be held liable under Section 10(b) for statements that they make. *Aramic LLC v. Reverence Therapeutics, Inc.*, 2024 WL 1354503, at *12 (N.D. Cal. Apr. 2, 2024) (citing *Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 141 (2011)). "[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc.*, 564 U.S. at 142. In other words, to survive a motion to dismiss, Plaintiff "must plausibly allege that [Masood] was intricately involved or [] substantially participated in deciding what the statements would say and how they would be delivered." *In re PG&E Corp. Sec. Litig.*, 2025 WL 2781745, at *12 (N.D. Cal. Sept. 30, 2025) (citation omitted). Appendix B identifies approximately 76 individual statement instances. Masood is listed as a "speaker" for only 23. Under *Janus*, the Court may not consider the remaining 53 statements in assessing whether Plaintiff states a claim against Masood.

Further, of the 23 instances where Masood is listed as a speaker, five involve earnings calls but neither Appendix B nor the TAC identify a statement Masood

made on those calls. (*See* ¶¶ 98, 100, 101). The TAC's group pleading of "Paardenkooper, Masood" as co-speakers – without identifying which statements Masood personally made – is insufficient to allege that Masood was the "maker" of the revenue figures recited on these calls. *Id.*

Appendix B alleges Masood signed certifications attesting that each Form 20-F "fairly presents, in all material respects, the financial condition and results of operations of the Company" and did "not contain any untrue statement of a material fact" (¶¶ 117, 118). But as in *Wanca v. Super Micro Computer, Inc.*, 2018 WL 3145649 (N.D. Cal. June 27, 2018), "each SOX Certification contains important qualifying language; that is, the declarants only certified the financial reporting to the extent of his or her knowledge on the date of execution." *Wanca*, 2018 WL 3145649 at *6. Each of Masood's SOX certifications contains the qualifying language "based on my knowledge" (*see* Ex. W) – the same formulation prescribed by 15 U.S.C. § 7241(a). Thus, to successfully plead falsity, Plaintiff must also allege facts explaining why the declarants knew the financial reporting was false at the time it was made. As explained above, Plaintiff fails to do so.

Finally, the TAC and Appendix B attribute statements in three documents to Masood: (1) the August 17, 2020 Form F-1 Registration Statement; (2) the February 4, 2021 Post-Effective Amendment No. 1; and (3) the July 1, 2020 Form 6-K.  As to the Form 6-K, the alleged misrepresentation concerns "revenue for 2019" – figures generated, closed and audited before Masood became CFO. (TAC App. B). As to the first two documents, the TAC attributes to Masood allegedly misleading statements regarding 2018 and 2019 revenues, the Phase I customer and revenues from BIA. *Id.* As to the third document, the alleged representation concerns "revenue for 2019." *Id.* All of these statements thus concern revenues and related issues that predated Masood's tenure. As explained above, the TAC alleges no facts to suggest Masood had any reason to believe any of these representations were inaccurate, let alone false.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SYED'S MOTION TO DISMISS

## V.    The TAC Fails To Plead Loss Causation As To Masood

A corrective disclosure must at least "relate back to the misrepresentation and not to some other negative information about the company." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (citation omitted). A corrective disclosure "not tethered to any actionable misstatements" is insufficient. *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 797 n.6 (9th Cir. 2020). Applied to the TAC's allegations against Masood, this standard requires asking whether each of the alleged corrective disclosures relates back to a specific representation Masood allegedly made. *See* 15 U.S.C. § 78u-4(b)(4) (requiring plaintiff to prove the "act or omission of the defendant" caused the loss). Plaintiff identifies three corrective disclosures: (1) the December 8, 2022 Paardenkooper resignation; (2) the January 20, 2023 PwC letter; and (3) the December 22, 2023 SEC order. (¶¶ 126, 127, 130). While the Court's prior motion to dismiss order identified what content in each disclosure rendered it corrective for purposes of Rule 12(b), that content related back to alleged conduct by Paardenkooper and Saheb, not Masood. (ECF 164 at 37-38).

The Court held that the December 8, 2022 disclosure was corrective because the SAC "appears to allege that the stock price dropped because Paardenkooper abruptly resigned and that he resigned because of the SEC investigation after he concealed the fake invoicing scheme from the public." (ECF 164 at 22). The corrective content relates to Paardenkooper's alleged representations about Brooge's revenue and his integrity as CEO. The disclosure did not reveal any new fact about the reliability of Masood's alleged revenue statements. The Court held the PwC letter corrective because it "discloses 'likely illegal acts" that "will have a material effect on the financial statements." *Id.* In the letter, PwC states it "would not accept representations from the Company's interim Chief Executive Officer (the 'interim CEO'), unless the interim CEO's conduct had been the subject of a review by counsel, who had assisted with the Audit Committee Examination." (Tuszynski Dec. Ex. X). The letter further states, "(i) in light of the findings of the Audit Committee

Examination, the Firm would not accept representations from the Company's then-Chief Executive Officer, and (ii) it would be necessary that the Company confirm to PwC that the former Chief Executive Officer, who following his resignation had concurrently joined the Company's majority shareholder, would not assume any role in the Company's corporate structure, including in the Company's parent entity, for such time as PwC is the Company's auditor, and that PwC would require the Company's assurances to that effect." (*Id.*)

Masood, who is not mentioned in the letter, had been gone from the Company for nine months at the time when PwC issued the letter. The Court found the SEC order non-redundant of the August 17, 2022 6-K because it "newly revealed" additional alleged misconduct "that Brooge's former CEO, CSO and Interim CEO knew, or were reckless in not knowing." (*Id.* at 23). But those additional alleged facts did not reveal any new "truth" about Masood's conduct.

None of the three corrective disclosures relate back to anything Masood is alleged to have misrepresented. And before all three corrective disclosures, the August 17, 2022 6-K had already told investors not to rely on the 2018-2020 financial statements and related communications that form the basis for Masood's alleged misrepresentations. (*See* Tuszynski Dec. Ex. R).

The Court's March 26 order held Plaintiff adequately pleaded loss causation "regarding stock purchases" against "the Brooge Defendants" as a group but the Court did not perform a defendant-specific tethering analysis as to the officer defendants individually. (ECF 164 at 23). The Court did apply representation-specific loss causation as to EY, concluding that the three corrective disclosures "do not address EY's audit opinions on the 2018 and 2019 financials" and that "Plaintiff does not present sufficient facts that the truth of EY's supposed fraud became known through these corrective disclosures." (*Id.* at 37). The three corrective disclosures no more address Masood's alleged misrepresentations than they addressed EY's audit opinions, and Plaintiff equally fails to present sufficient facts that the truth of

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SYED'S MOTION TO DISMISS

Masood's supposed fraud became known through those disclosures.

## VI.    The TAC Fails To Adequately Plead A Section 20(a) Claim

Plaintiff does not plead facts showing that Masood "exercised actual power or control over the primary violator" for statements Masood did not make. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017) (quotation omitted). Instead, the TAC pleads conclusory allegations that, by virtue of their positions, the "Executive Defendants" "were able to, and did, control the contents of the various reports, press releases and public filings which Brooge disseminated in the marketplace during the Class Period concerning Brooge's results of operations." (¶ 272). This is insufficient to establish Section 20(a) liability. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 66281, at *19 (N.D. Cal. Jan. 4, 2017), *reconsideration denied*, 258 F. Supp. 3d 1037 (N.D. Cal. 2017) (rejecting control person liability based on position on the Management Board and conclusory allegations that a defendant was "involved in the day-to-day operations of, and exercised power and control over" companies including "their public statements and regulatory action").

The TAC does not allege that Masood controlled the company's financial reporting, let alone that Masood "had the requisite actual authority over the preparation of the financial statements necessary to find [him] a control person." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1067 (9th Cir. 2000) ("Plaintiff simply points to [defendant's] general level of control but provides no specific indication that [defendant] supervised or had any responsibility for the preparation of the financial statements."); (*see* ¶¶ 270-274). Merely noting that executives "reviewed and approved" financial statements, without showing that such executives were "active in the day-to-day affairs" of the company or "exercised any specific control over the preparation and release of the financial statements" "does not rise to a level

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SYED'S MOTION TO DISMISS

of supervision or participation sufficient for a § 20(a) violation." *Howard*, 228 F.3d at 1067 n.13.

True, an officer or director who has "signed financial statements containing materially false or misleading statements qualifies as a control person." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1037 (C.D. Cal. 2008). But Section 20(a) also requires "actual power or control" over the acts constituting the alleged violation. *Howard v. Everex Sys., Inc.*, 228 F.3d at 1067. Masood did not join as CFO until April 27, 2020 and therefore could not have controlled any of the alleged misconduct predating his tenure. Nor does the TAC allege that Masood controlled Paardenkooper or Saheb. As the Ninth Circuit held in *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918 (9th Cir. 2023), being the CFO alone is insufficient to satisfy Section 20(a) where the alleged primary violation is through the company's CEO. *See id.* at 946 (affirming dismissal of Section 20(a) claim against Nvidia's CFO and another senior executive where plaintiffs failed to allege either officer "exercised actual power or control" over Jensen Huang).

Dated:  May 21, 2026

Respectfully submitted,

By: /s/  *Perrie M. Weiner*

Perrie M. Weiner
**BAKER & MCKENZIE LLP**

Attorneys for Defendant
BROOGE ENERGY LIMITED

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SYED'S MOTION TO DISMISS